------------------------------------------------ x
   :
   :   Civil Action No.: 07-CV-00312-GBD
   :
IN RE CELESTICA INC. SECURITIES   :   (ECF CASE)
LITIGATION   :
   :   Hon. George B. Daniels
   :
   :   **Jury Trial Demanded**
------------------------------------------------ x

## CONSOLIDATED CLASS ACTION COMPLAINT

**LABATON SUCHAROW LLP**
Joel H. Bernstein (JB-0763)
Eric J. Belfi (EB-8895)
Joseph A. Fonti (JF-3201)
Stephen W. Tountas (ST-8395)
Ann E. Gittleman (AG-8367)
140 Broadway
New York, New York 10005
(212) 907-0700

*Counsel for Lead Plaintiffs New Orleans,
Millwright, DALI, Carpenters 27 and the
Lead Counsel for the Class*

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ............................................................................... 1

II.     JURISDICTION AND VENUE ......................................................................... 8

III.    PARTIES ........................................................................................................ 11

     A.    Lead Plaintiffs .................................................................................... 11

     B.    Defendant Celestica .......................................................................... 13

     C.    Defendant Onex ................................................................................ 13

     D.    The Individual Defendants................................................................. 14

     E.    Defendant Schwartz .......................................................................... 17

IV.     CLASS ACTION ALLEGATIONS ................................................................ 18

V.      SUBSTANTIVE ALLEGATIONS ................................................................. 19

     A.    Background ........................................................................................ 23

          1.    Celestica's Business and Operations ...................................... 23

          2.    Onex and Schwartz appoint Delaney as CEO In 2004 and
              Implement an Aggressive Restructuring Plan........................... 25

     B.    The Fraud Begins:  Defendants Announce The "Final" Restructuring ............... 25

     C.    During the Class Period, Defendants Intentionally Misled Investors
        Through Celestica's Materially False And Misleading Financial Results........... 27

          1.    Defendants Intentionally Manipulated Inventory To Falsify
              Celestica's Earnings and Artificially Inflate Its Share Price ................... 27

          2.    Defendants Intentionally Lied to Analysts and Investors
              Concerning The Key Inventory Metric...................................... 39

     D.    Defendants Fraudulently Withheld From Investors That,  Throughout The
        Class Period, The Restructuring Was A Complete Failure Due to
        Pervasive And Persistent Known Problems........................................ 40

          1.    The GAAP and Disclosure Requirements for Restructuring................... 41

          2.    Defendants Fraudulently Concealed That the Restructuring Was
              Failing ...................................................................................... 43

E. Throughout The Class Period, Defendants Knew That Customers Were Leaving Celestica In Droves Due To The Failure Of The Restructuring Constant Manufacturing Problems ...................................................................... 47

F. Defendants' Motive and Opportunity to Commit Fraud ....................................... 49

G. Additional Evidence of Scienter ........................................................................... 51

 1. Additional Evidence of Defendants' Scienter, Generally ......................... 51

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS .................................... 59

VII. LOSS CAUSATION/ECONOMIC LOSS .................................................................... 110

VIII. FRAUD-ON-THE-MARKET PRESUMPTION ............................................................ 115

IX. NO SAFE HARBOR PROTECTION ........................................................................... 116

X. CAUSES OF ACTION ................................................................................................. 117

XI. PRAYER FOR RELIEF ............................................................................................... 123

Lead Plaintiffs New Orleans Employees' Retirement System, Millwright Regional Council of Ontario Pension Trust Fund, Drywall Acoustic Lathing and Insulation Local 675 Pension Fund, and Carpenters' Local 27 Benefit Trust Funds (collectively, "Lead Plaintiffs") bring this securities fraud class action pursuant to the Securities Exchange Act of 1934 against defendants Celestica Inc. ("Celestica" or the "Company"), its former Chief Executive Officer Stephen W. Delaney ("Delaney"), its former Chief Financial Officer Anthony P. Puppi ("Puppi"), and Onex Corporation ("Onex") and its Chairman and Chief Executive Officer Gerald W. Schwartz ("Schwartz") (collectively, "Defendants"), on behalf of themselves and all persons and entities who purchased or otherwise acquired Celestica common stock during the period January 27, 2005 through and including January 30, 2007 (the "Class" and "Class Period").

Lead Plaintiffs' allegations are based on Lead Counsel's investigation, which included, among other things, reviews of public filings with the U.S. Securities and Exchange Commission by Celestica and Onex; press releases; publicly available trading information; articles in the general and financial press; and information provided by numerous high-level former Celestica employees based in the United States, Canada, and Mexico, each of whom have specific, personal knowledge of the facts alleged herein.

I.       **NATURE OF THE ACTION**

1.       Throughout the Class Period, Defendants disseminated materially false and misleading statements concerning Celestica's earnings, profitability, and financial outlook, thereby inflating Celestica's share price by over *50 percent*.  Defendants achieved these fraudulent results through various machinations, including:  (i) manipulation of the Company's inventory, *its single largest asset*, resulting in overstated earnings; (ii) understating operating expenses through the manipulation of Celestica's books; (iii) overstating revenues by booking

phony sales; and (iv) understating the true cost of an announced restructuring by as much as *68 percent* of what Defendants previously told investors. All told, if Defendants had taken the charges they knew were required to properly reflect Celestica's financial condition, earnings during the Class Period would have been reduced by at least $116 million, or $0.51 per share.

2.     The backdrop of Defendants' scheme was a major corporate restructuring. On the first day of the Class Period, January 27, 2005, defendant Delaney, the Company's self-proclaimed restructuring czar, announced a $225 to $275 million restructuring plan that was to yield significant increases in operating margins by the fiscal year-ended December 31, 2006, and place Celestica in a competitive position with respect to its peers. To achieve these results, Defendants promised significant cost-saving and efficiency from moving Celestica's business and operations from high-cost geographies in the U.S. to facilities in Mexico.

3.     Investors met this announcement with enthusiasm, within days driving Celestica's share price up six percent. Analysts were also quick to report their observation that Defendants apparently had come to grips with their past failures, and Celestica's future had just brightened significantly. For instance, an analyst with Deutsche Bank observed that Celestica's "admission of past excesses," as evidenced by Defendants' recognition that the restructuring was needed, should put Celestica in a "much better position[] to deliver profitability in the future." Similarly, an analyst with National Financial Bank reported on January 27, 2005 that "[w]hile restructuring might be viewed as a negative," in Celestica's case "we see it as a positive." Little did investors know that Celestica's "restructuring" was actually part of a fraudulent scheme, designed to artificially inflate Celestica's share price.

### **The Business**

4.     Celestica's core business is in the highly competitive, low-margin electronic manufacturing systems ("EMS") industry, fabricating communications and electronic

components.  Celestica's core-client base is comprised of a handful of American household-brands, such as Motorola, Lucent, Cisco, Dell and Avaya.  Indeed, only ten of Celestica's customers account for nearly two-thirds of its revenues.

5.  Accordingly, the need to maintain and improve this handful of key-client relations and their satisfaction is, and has always been, critically important to Celestica's success.  Any client dissatisfaction—let alone defection—would result in a significant decline in revenues and earnings, and directly impact the Company's share price.  Throughout the years, in a purported attempt to satisfy customer demands and resolve their dissatisfactions, Celestica had repeatedly undertaken several restructurings.  As detailed below, however, all of these prior attempts—like the restructuring now at issue—failed.

**The Decision Makers**

6.  On the surface, at Celestica's helm during this critical time were defendant Delaney, Chief Executive Officer, and defendant Puppi, Chief Financial Officer.  Above all others, however, defendant Onex and its powerful and ubiquitous CEO and Chairman defendant Schwartz directed and controlled Celestica's every decision.  By Defendants' own admissions, defendant Schwartz "***effectively controls [Celestica's] affairs***" through his ownership of the majority of the voting rights of the shares of Onex.  In turn, Onex "***exercises a controlling influence*** over [Celestica's] business and affairs and has the power to determine ***all matters*** submitted to a vote of [Celestica's] shareholder."

7.  For Onex, Celestica is the flagship investment whose performance has been the benchmark of Onex's, and even more so Schwartz's, image and reputation as a manager—especially in view of Schwartz's controlling influence on Celestica's board.  As was widely reported, however, in the years leading into the Class Period, the lion's share of the significant annual losses Onex suffered resulted from lower revenues at Celestica.

8. Once the fraud commenced, Onex's fortunes quickly turned with its investment in Celestica driving its own earnings performance. Just as the fraud ramped up, defendant recorded a gain of **more than $750 million** (CAD) resulting from its stake in Celestica. Specifically, in February and June 2005, Onex settled two long-standing hedging strategies involving exchangeable debentures and forward sale agreements, respectively, resulting in this gain. Fueled by this massive infusion of cash, Onex reported favorable earnings for a change. As the fraud progressed, quarter after quarter, Celestica's artificially inflated earnings served to inflate Onex's, and thus Schwartz's, bottom line. Similarly, defendants Delaney and Puppi, whose compensation during the Class Period was composed of more than 60 percent in equity, also profited from their scheme.

### The Fraud

9. Defendants fraudulently inflated Celestica's share price using various means— all for the purpose of misleading investors. Defendants' scheme included the following fraudulent acts:

- <u>Overstatement of Obsolete Inventory</u>: Inventory was Celestica's single largest asset, the level of which investors watched carefully. Defendants knew at all times relevant that Celestica maintained extraordinarily high levels of obsolete inventory, which if written down would dramatically reduce earnings during the Class Period and signal to investors that the Company was incompetent in managing its supply chain and customer contracts. To avoid reporting the truth and taking the required charges, Defendants knowingly transferred this obsolete inventory from facility to facility, while keeping the inflated values on Celestica's books. ¶¶ 69-108.

- <u>Falsifying Celestica's Books to Further Manipulate Inventory Levels</u>: A key metric for measuring Celestica's performance and potential is the inventory turn-over ratio. As detailed below, this metric reflects the amount of inventory Celestica put to use during a reporting period, meaning that Defendants wanted to report a favorable rate so to give the appearance that the Company was meeting expectations. Accordingly, to avoid adding to Celestica's already overstated inventory levels, Defendants engaged in a scheme through which they:

(i) booked false entries to manipulate the level of inventory reflected on Celestica's books;

(ii) delayed recording new inventory until after the quarter-end by leaving trucks full of materials in the parking lot;

(iii) prematurely booked revenue by shipping products to customers near quarter-end that these customer *did not order*, knowing full-well that the product would be return it; and

(iv) shipped inventory off-site to temporarily move it off Celestica's books, sending the inventory to empty warehouses and even employees garages.

(¶¶ 93-104)

- <u>Lied to Investors Concerning the Failing Restructuring</u>: At all relevant times, Defendants knew that their restructuring plan was failing. The plan to quickly shut down U.S.-based facilities and transfer their operations to Monterrey only inflamed the inventory and productions issues. Through conference calls, written reports, and site visits, Defendants were repeatedly informed that the transition was creating insurmountable obstacles that required more extensive planning and a much higher cost. Rather than address the issue, Defendants plowed forward, telling investors and analysts that all was going according to plan. Ultimately, Defendants admitted that the restructuring failed because it was executed "without the appropriate planning" in the face of long-term problems that were well known to them. Ultimately, Celestica was forced to announce that it had to incur charges as much as 68 percent larger than what Defendants told investors. Indeed, the restructuring that was to end in 15 months continues today (¶¶ 109-132).

- <u>Failed to Disclose Key-Customer Defections</u>: As a result of the failed restructuring and the resulting inefficiencies and production delays that came with it, many key customers, including Lucent, Cisco, Motorola, and AMD, terminated their dealings with Celestica. Again, Defendants refused to disclose these material defections to investors, fearing that they would see through the false statements concerning inflated earnings and successful restructuring (¶¶ 133-145).

**<u>The Truth is Revealed</u>**

10. Despite their best efforts—and worst intentions—Defendants' scheme began to unravel. But before it did, after the market's close on October 26, 2006, in his final investor conference call as CEO, Delaney provided inflated earnings guidance for the fourth quarter 2006 of $0.15 to $0.23 adjusted net earnings per share. While for the first time Defendants admitted during this call that the restructuring was executed "without appropriate planning,"

- 5 -

Delaney assured investors that nonetheless "restructuring benefits [were] largely going to hit" operating earnings in the current quarter. When asked point blank about inventory levels, Delaney lied to investors saying Defendants' "expect[ed] it to go down over the next few quarters," despite knowing that Celestica was drowning in obsolete inventory valued near $30 million. Even though Defendants disclosed only a fraction of the true state of affairs at Celestica, the share price dropped over 13 percent the very next day.

11.     As investors would learn in just four weeks, however, the balance of Defendants' statements were all lies. Rather than inventory coming down, as Delaney had promised, on November 27, 2007, Celestica announced his sudden resignation. In disclosing his sudden departure, Celestica said Delaney left to pursue "other business interest"—he did so with a severance payment of roughly three times his base salary and bonus in his pocket.

12.     Just two weeks later, on December 12, 2006, Celestica's new CEO reported a dramatically different financial picture than Delaney's fraudulent statements had depicted just a few weeks earlier. Indeed, Celestica would not come close to the inflated targets Delaney had relayed to the market. Rather than Delaney's estimated earnings for the fourth quarter 2006 of $0.15 to $0.23 adjusted net earnings per share, the Company disclosed that it expected to report dismal adjusted net earnings per share of $0.00 to $0.06. This reduction was due to lower demand from top customers and an inventory write-down necessary at the Monterrey facility. Investors reacted harshly, sending the stock price down over 12 percent from the prior day's close on five times the average volume on the New York Stock Exchange ("NYSE") during the Class Period.

13.     Realizing that they had been deceived, analysts began to see the true state of affairs at Celestica. For example, on December 13, 2006, analysts at Cowen & Company

downgraded to neutral, and reported that "*[a]lthough Defendants continued to deny the truth* … restructuring problems, and the likelihood that we will not get true visibility on a turnaround until mid 2007, we are lowering our rating on the shares to Neutral" (emphasis added). On the same day, National Bank Financial reported "[j]ust when we thought we were nearing the end of many years of restructuring, the recent events suggest to us more may be needed."

14. Finally, on January 31, 2007, the end of the Class Period, Celestica announced the full impact of Defendants' fraud, along with the departure of Puppi. The results were horrible. Celestica announced a $150.6 million loss for 2006, three times the loss incurred for 2005. Even more telling of the magnitude of the fraud was Celestica's announcement that it expected up to an additional $80 million in restructuring charges. Similarly, Celestica announced a $30 million net charge for obsolete inventory in Monterrey, which resulted in an admission that earnings had been inflated by as much as $0.11 per share during the Class Period.

15. At bottom, the truth disclosed that day revealed Defendants had previously failed to take at least $116 million in required charges during the Class Period in order to artificially inflate earnings as well as to deceive investors, and Celestica's customers, into believing in its value and potential. Deceived no longer, investors fled Celestica's stock, sending the share price down to $5.96, nearly *50 percent* lower than its October 26 close on volume of over 13.3 million shares, nearly 12 times the average daily volume on the NYSE during the Class Period.

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and § 1391(d) (stating that "an alien may be sued in any district"). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. In addition, Celestica common stock trades over the NYSE, which is headquartered in this District.

19. Pursuant to the "effects test" of extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over the claims of (a) all investors who purchased or otherwise acquired Celestica common stock on markets located in the United States, including the NYSE, and (b) investors based in the United States who purchased or otherwise acquired Celestica common stock regardless of where those securities traded.

20. This Court may also properly exercise subject matter jurisdiction over the claims of foreign class members who acquired Celestica common stock on foreign markets, including the Toronto Stock Exchange and other foreign Exchanges, under the "conduct test," articulated by the Second Circuit (and other courts), which provides that a federal court has subject matter jurisdiction over the claims of foreign purchasers who acquired their securities abroad if: (a) Defendants' activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere; and (b) these activities or culpable failures to act within the United States "directly caused" the claimed losses. The acts alleged herein show that

substantial activity in furtherance of Defendants' fraud occurred within the United States and damaged Class members worldwide.

21.     As alleged herein, Defendants engaged in extensive fraud-related conduct in the United States, which misrepresented Celestica's financial and operating condition by, *inter alia*:

> (a)     misrepresenting inventory values and levels of obsolete inventory at U.S. facilities, such as: Fort Collins, Colorado; Mount Pleasant, Iowa; Carrollton, Texas; Arden Hills, Minnesota; Salem, New Hampshire; and Little Rock, Arkansas;
>
> (b)     overstating revenues at the U.S. facilities by generating phony quarter-end sales;
>
> (c)     booking false entries at the U.S. facilities in order to inflate earnings and understate expenses;
>
> (d)     misrepresenting the weak internal controls surrounding inventory at U.S. facilities that were transferred in accordance with the restructuring;
>
> (e)     falsifying costs, duration and success of restructuring of U.S.-based operations;
>
> (f)     failing to disclose its U.S. customers' dissatisfaction as a result of manufacturing delays and inventory shortages from the transfer of U.S. facilities to lower-cost areas;
>
> (g)     conducting earnings conference calls with Wall Street research analysts located in the U.S. where the Company and the Individual Defendants made false and misleading statements; and
>
> (h)     filing false and misleading financial statements with the SEC.

Defendants' actions were part of a single fraudulent scheme. The domestic conduct was not merely "preparatory" or perfunctory acts, but led directly to the loss by both foreign and domestic investors.

22.     As set forth in detail below, the fundamental fraud at issue centers on Defendants' artificial inflation of Celestica's stock price by overstating earnings, understating expenses, and falsifying the failing state of the restructuring of U.S.-based operations.

23.     Celestica concealed its inventory problems at its U.S. facilities prior to the transfer, as well as its lower-cost facilities in Mexico.  Celestica's failure to timely write-down excess and obsolete inventory at its U.S. facilities created a colossal domino effect at its Monterrey, Mexico facility.  When Celestica finally wrote-down excess and obsolete inventory at the end of the Class Period, in the amount of $30 million, shareholders that invested in Celestica on the NYSE were severely injured.  The conduct which took place in the United States directly caused the damages suffered by the Class.

24.     Moreover, throughout the Class Period, Celestica's shares predominantly traded on the NYSE in the form of common stock.  There was a single worldwide and informationally efficient market for Celestica's stock and information concerning the Company was accessible globally at the same time to investors worldwide through electronic financial news reporting media.  Celestica's stock was priced based on trades reported from various exchanges in the United States and Canada.  The market was defrauded by Defendants' conduct, causing extensive effects on domestic purchasers of Celestica stock, as well as on those who purchased Celestica stock on foreign exchanges.

25.     In addition, Defendants' false and misleading statements disseminated to the investing public as alleged herein, were issued in the United States and were contained in the Company's annual financial statements filed with the SEC, quarterly press releases, and conference calls aired in the United States.  Moreover, the Company's annual financial statements filed on Form 20-F with the SEC were prepared in accordance with United States federal securities laws and United States Generally Accepted Accounting Principles ("GAAP").  The Company's independent auditor, KPMG LLP, is also based in the United States.

26. Throughout the Class Period, Celestica's SEC filings were broadly disseminated within the United States through the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone and electronic communications, and the facilities of national securities exchanges.

27. During 2005, Celestica generated approximately one-third of its revenue from its U.S. facility operations. During 2005, Celestica's largest customers, Cisco Systems and IBM, both headquartered in the United States, represented in excess of 10 percent of total revenue and in aggregate represented 27 percent of total revenue.

28. Moreover, a significant portion of Celestica's common stock is held by individuals and institutional investors in the United States. During the Class Period, nearly 50 percent of the institutional shareholders were based in the United States and nearly 60 percent of the overall volume of Celestica common stock traded over the NYSE during the Class Period. As a result, the effect from Defendants' fraud is greater on the United States market than the effect on foreign markets.

29. The facts alleged herein demonstrate that Celestica's conduct in the United States was not "merely preparatory" to Defendants' scheme to defraud, but rather directly caused the losses suffered by Celestica's investors.

## III. PARTIES

### A. Lead Plaintiffs

30. Lead Plaintiff New Orleans Employees' Retirement System ("New Orleans") is an institutional investor that is also a Defined Benefit Pension Plan established under the laws of the State of Louisiana on July 1, 1947. New Orleans manages approximately $405 million in total assets. New Orleans is supported by joint contributions from the City of New Orleans, its employee members and income from investments. As set forth in its certification previously

filed with the Court, a copy of which is attached hereto as Exhibit A, New Orleans purchased shares of Celestica common stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

31.    Lead Plaintiff Millwright Regional Council of Ontario Pension Trust Fund ("Millwright") is an institutional investor that is also a Defined Benefit Plan established September 2, 1969 and manages approximately $341 million in total assets.  As set forth in its certification previously filed with the Court, a copy of which is attached hereto as Exhibit B, Millwright purchased shares of Celestica common stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

32.    Lead Plaintiff Drywall Acoustic Lathing and Insulation Local 675 Pension Fund ("DALI") is an institutional investor established for the benefit of its current and retired members and beneficiaries and manages approximately $256 million in total assets.  As set forth in its certification previously filed with the Court, a copy of which is attached hereto as Exhibit C, DALI purchased shares of Celestica common stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

33.    Lead Plaintiff Carpenters' Local 27 Benefit Trust Funds ("Carpenters 27") is an institutional investor that is a jointly trusted labor-management training centre, established in 1986 and located in Woodbridge, Ontario.  It was established to serve the human resources development needs of both the Carpenter 27 membership and its employers.  It also manages approximately $341 million in total assets.  As set forth in its certification previously filed with the Court, a copy of which is attached hereto as Exhibit D, Carpenters 27 purchased shares of

Celestica common stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

**B.    Defendant Celestica**

34.    Defendant Celestica is organized under the laws of Ontario, Canada and is headquartered at 12 Concorde Place 5th Floor, Toronto, Ontario, Canada M3C 3R8.  The Company purports to be a global leader in electronics manufacturing services.  The Company provides integrated services and solutions to major original equipment manufacturers worldwide from over 40 facilities located in the Americas, Europe, and Asia.  Celestica's common stock trades on the NYSE and the Toronto Stock Exchange ("TSX"), with nearly 60 percent of the total volume trading in the U.S. on the NYSE.

**C.    Defendant Onex**

35.    Defendant Onex is organized under the laws of Canada and is headquartered at 161 Bay Street, Toronto, Canada M5J 2S1.  In 1996, Onex acquired the Company from IBM in a transaction valued at $700 million.  Onex's portion of the investment was only $199 million for a 43 percent equity interest and voting control.  As reported in its 2007 proxy, Onex currently owns 29.6 million multiple voting shares of defendant Celestica, excluding shares held for Onex management investment rights; this represents a 13 percent ownership interest and a 79 percent voting interest.  To date, Onex has achieved approximately $1 billion in proceeds on its initial $199 million investment in Celestica and continues to hold 29.6 million Celestica shares.

36.    As noted in Celestica's public filings with the SEC, including its Form 20-F for the year-ended December 31, 2006 (the "2006 20-F"), "***Onex exercises a controlling influence over [Celestica's] business and affairs and has the power to determine all matters submitted to a vote of [Celestica's] shareholders*** where [Celestica's] shares vote together as a single class.

Onex has the power to elect [Celestica's] directors and to approve significant corporate transactions such as certain amendments to [Celestica's] articles of incorporation, the sale of all or substantially all of [Celestica's] assets and plans of arrangement in certain circumstances. Onex's voting power could have the effect of deterring or preventing a change in control of [Celestica] that might otherwise be beneficial to [Celestica's] other shareholders."

37.     Throughout the Class Period, two of Onex's most senior officers—including its founder—served on Celestica's Board of Directors (the "Board").  Specifically, from 1998 through present, defendant Schwartz, Onex's founder, CEO and Chairman, has served as one of the Company's directors.  Additionally, from 1996 through present, Dr. Anthony L. Melman, a Managing Director of Onex from 1984 through 2006, has served as a director on the Board. Notably, with respect to Schwartz, the 2006 20-F states that "Schwartz . . . owns shares with a majority of the voting rights of the shares of Onex.  Mr. Schwartz, therefore, effectively controls [Celestica's] affairs."

38.     In addition, pursuant to a Management Services Agreement (as amended on July 1, 2003) (the "Management Agreement"), Onex is required to "provide to Celestica on a continuing basis, through personnel of Onex or, at Onex's discretion, the personnel of subsidiaries of Onex, management, administrative, strategic planning, financial and support services relating to Celestica and its subsidiaries of such nature as Celestica may reasonably require …"  As consideration for such services, Celestica paid Onex management-related fees of $1.6 million in 2005 and $1.0 million in 2006.

### D.     The Individual Defendants

39.     Defendant Stephen W. Delaney served as Celestica's Chief Executive Officer ("CEO") from April 22, 2004 until his "resignation" on December 12, 2006.  As the Company's CEO, Delaney was responsible for charting Celestica's course and overall business strategy,

particularly with respect to the restructuring. From 2001 through April 2004, Delaney served as the Company's President, Americas Operations, where he was responsible for Celestica's operations in the region. Throughout the Class Period, Delaney was personally involved in virtually all aspects of Celestica's business and operations, and was frequently quoted in the Company's press releases and participated in the Company's conference calls with analysts. Moreover, throughout the Class Period, Delaney spoke at various conferences discussing issues in the EMS industry, specifically with respect to Celestica.

40. As the Company's CEO, Delaney participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC filings throughout the Class Period. In addition, Delaney certified Celestica's false and misleading 2005 Form 20-F pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX").

41. Defendant Anthony P. Puppi ("Puppi") served as Celestica's Chief Financial Officer ("CFO") since Celestica's formation as a public company in 1994 through his "resignation" on January 30, 2007. As the Company's CFO, Puppi was responsible for overseeing the corporation's accounting, financial, investor relations and compliance functions in order to enhance and protect Celestica's shareholder value. Puppi was appointed Executive Vice President in October 1999, and served as General Manager, of Global Services from January 2001 until April 2004, overseeing Celestica's after-market services, design, power systems and plastics business. From 1980 to 1992, defendant Puppi held numerous senior financial management positions with IBM Canada.

42. As the Company's CFO, Puppi participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC

filings throughout the Class Period.  In addition, Puppi certified Celestica's false and misleading 2005 Form 20-F pursuant to Sections 302 and 906 of SOX.

43.      Defendants Delaney and Puppi are together referred to herein as the "Individual Defendants."  Because of their senior executive positions at the Company, each of the Individual Defendants were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, internal controls and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, the fact that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

44.      As officers and controlling persons of a publicly-held company whose shares are registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the federal securities laws, Delaney and Puppi had a duty to disseminate promptly, accurate and truthful information with respect to Celestica, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Celestica's publicly-traded common stock would be based upon truthful and accurate information.  Delaney and Puppi each violated these specific requirements and obligations during the Class Period.

45.      The Individual Defendants, because of their positions of control and authority as senior officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Both of the Individual Defendants were provided with copies of the

documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, both Delaney and Puppi are responsible for the accuracy of the false and misleading statements detailed herein and are therefore primarily liable for the misrepresentations and omissions contained therein.

46.     In addition, both of the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Celestica common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Celestica's business, finances, financial statements and the intrinsic value of Celestica common stock; and (ii) caused plaintiff and other members of the Class to purchase Celestica securities at artificially inflated prices.

**E.      Defendant Schwartz**

47.     Defendant Gerald W. Schwartz is a Director of Celestica. Schwartz served on Celestica's Board of Directors from 1998 through the present and is also a majority shareholder of Celestica with voting control. Schwartz is also defendant Onex's founder, CEO and Chairman. The Company's 2006 20-F states that "Schwartz . . . owns shares with a majority of the voting rights of the shares of Onex. *Mr. Schwartz, therefore, effectively controls [Celestica's] affairs*." Upon information and belief, and based upon Plaintiffs' investigation, Schwartz regularly attended the Company's executive committee meetings during the Class Period and, therefore, was personally involved in virtually all aspects of Celestica's business and operations beyond his personal involvement as one of the Company's directors.

48.     Schwartz is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Celestica common stock by disseminating

materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Celestica's business, finances, financial statements and the intrinsic value of Celestica common stock; and (ii) caused Lead Plaintiffs and other members of the Class to purchase Celestica stock at artificially inflated prices.

## IV.    CLASS ACTION ALLEGATIONS

49.    Lead Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired Celestica common stock from January 27, 2005 through January 30, 2007, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company during all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

50.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, there were in excess of 220 million shares of Celestica common stock outstanding that were actively traded on the NYSE and the TSX. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Celestica or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Celestica;

(c)     the extent to which the price of Celestica common stock was artificially inflated during the Class Period; and

(d)     the extent to which the members of the Class have sustained damages and the appropriate measure of such damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this case as a class action.

## V.     SUBSTANTIVE ALLEGATIONS

55.     Lead Plaintiffs' allegations are based on the investigation conducted by Lead Counsel, which included, among other things, reviews of public filings with the SEC by Celestica and Onex, press releases, transcripts of the Company's conference calls with Wall Street analysts, publicly available trading information, and articles in the general and financial press.

56.     Lead Plaintiffs' allegations are also based upon information provided by former employees of Celestica with knowledge of the facts alleged herein, including, but not limited to, the following confidential witnesses:

- Confidential Witness No. 1 ("CW1") is a former employee of Celestica who worked as the Business Development Director for Corporate from 1997 through August 2005. CW1 was specifically responsible for maintaining and expanding Celestica's business relationship with Lucent, and developed Celestica's global account plan for Avaya. CW1 was in a position to know, and does know, about problems arising in Monterrey with respect to his/her customer accounts, and, as part of his/her responsibilities, visited the facility numerous times throughout the course of his/her employment. In addition, CW1 personally addressed the inventory control issues that impacted the Company's Avaya account, and participated on certain monthly operational review conference calls with senior management, including defendants Delaney and Puppi and their chief lieutenants, as detailed herein.

- Confidential Witness No. 2 ("CW2") is a former employee of Celestica who worked as the Director of Operations for Celestica's Austin, Texas facility ("Austin") from 2000 through March 2005. Celestica acquired Austin, a manufacturing facility, from Excel Electronics in 2000. As Austin's Director of Operations, CW2 reported to the facility's General Manager, who reported to Michael Homer ("Homer"), President of the Americas, who reported to Delaney. CW2 was in a position to know, and does know, about inventory and control issues affecting the Company, and participated on certain monthly operational review conference calls with senior management, including defendants Delaney and Puppi and their chief lieutenants, as detailed herein.

- Confidential Witness No. 3 ("CW3") is a former employee of Celestica who worked as the General Manager of Monterrey between 2003 and September 2005, and remained at Celestica until August 2006. CW3 reported directly to Delaney during Delaney's tenure as President of the Americas, and thereafter reported to Homer. CW3 was in a position to know, and does know, about issues arising in Monterrey while serving as General Manager, including issues relating to the facility's inventory management, customer relationships and internal controls, as detailed herein. CW3 also participated on certain monthly operational review conference calls with senior management, including defendants Delaney and Puppi and their chief lieutenants.

- Confidential Witness No. 4 ("CW4") is a former employee of Celestica who worked as the Supply Chain Director at Monterrey until January 2006, and reported to the General Manager of Monterrey and the Supply Chain Manager in Corporate. Twice a year, CW4 attended a meeting in Toronto consisting of the senior managers responsible for managing the Company's supply chain, including Homer. As the Supply Chain Manager, CW4 was in a position to

know, and does know, about issues relating to Monterrey's inventory management, customer relationships and internal controls, as detailed herein.

- Confidential Witness No. 5 ("CW5") is a former employee of Celestica who worked as the Program Manager at the Company's Fort Collins, Colorado facility ("Fort Collins") from 1998 through March 2005. Fort Collins's business was transferred to Monterrey in the months leading up to March 2005, when the facility closed. CW5 was responsible for managing the customer accounts at Fort Collins, including Lucent and Avaya, and was personally involved in the transfer of certain operations from Fort Collins to Monterrey. Thus, CW5 was in a position to know, and does know, about inventory issues concerning certain of the facility's customer accounts, as well as issues arising during the transfer of certain operations from Fort Collins to Monterrey, as detailed herein.

- Confidential Witness No. 6 ("CW6") is a former employee of Celestica who was a Senior Buyer/Planner at the Company's facility in Carrollton, Texas ("Carrollton") from August 2005 through January 2007. Carrollton is one of the Company's After Market Services ("AMS") facilities, which provides "after market" services such as repair, refurbishing and retesting. Certain of Carrollton's business units were transferred to Reynosa in 2005. CW6 was responsible for procuring component inventory for Carrollton to fulfill contracts for customers including Teradyne, Xerox, Sun Microsystems, Motorola and Research-in-Motion. CW6 was in a position to know, and does know, about Carrollton's inventory management issues because s/he was specifically hired to address Carrollton's excess inventory issues, as detailed herein. CW6 was also in a position to know about customer dissatisfaction issues, as s/he also addressed Carrollton's ongoing credit problems with various vendors, as detailed herein.

- Confidential Witness No. 7 ("CW7") is a former employee of Celestica who was the Supply Chain Manager at Carrollton from July 2003 through August 2005. CW7 reported to the facility's General Manager, who reported to Homer. CW7 was personally responsible for managing Carrollton's purchases, supply chain and served as the SAP project lead. Thus, CW7 was in a position to know, and does know, specific information about issues relating to the facility's supply chain, including the facility's inventory management, customer relationships and internal controls, as detailed herein.

- Confidential Witness No. 8 ("CW8") is a former employee of Celestica who was a Senior Buyer at the Salem, New Hampshire facility ("Salem") from June 2003 through May 2005. Salem serviced various business units, including Cisco, Teradyne, Lucent and AMD. Salem's business was ultimately transferred to Monterrey on or about March 2005. CW8 was personally responsible for purchasing component inventory and supporting numerous customers, including Cisco, Teradyne and Acme Packet. Thus, CW8 was in a position to know, and does know, about inventory management

issues relating to certain of the facility's customer accounts, as well as the sufficiency of the facility's internal controls with respect to those accounts, as detailed herein.

- Confidential Witness No. 9 ("CW9") is a former employee of Celestica who was a Senior Operations Manager at Salem from 2002 through March 2005, and subsequently worked as a Global Accounts Manager through January 2006. CW6 was personally responsible for the day-to-day manufacturing and operational functions at Salem, and reported directly to Salem's General Manager (Donald Hersey), who reported to Homer. CW9 was in a position to know, and does know, about manufacturing and operational issues affecting Salem, including inventory management issues, customer dissatisfaction and the sufficiency of the facility's internal controls, as detailed herein.

- Confidential Witness No. 10 ("CW10") is a former employee of Celestica who was the Global Logistics Contract Manager in Corporate from March 2000 through March 2006. CW10 was personally responsible for managing all of the Company's after market services' global transportation needs, such as transferring component inventory from various vendors to different Celestica facilities, including the facility in Little Rock, Arkansas. Thus, CW10 was in a position to know, and does know, about issues arising from the transfer of business from various AMS facilities to Mexico, including inventory management and internal control issues. CW10 also had knowledge about issues relating to Monterrey's inventory practices and internal controls as s/he worked on-site at Monterrey at various times during his/her employment, as detailed herein.

- Confidential Witness No. 11 ("CW11") is a former employee of Celestica who was the Supply Chain Manager in the Reynosa, Mexico facility ("Reynosa") from July 2005 through September 2006. Reynosa was the Company's AMS site in Mexico, and refurbished and repaired inventory relating to various customer accounts, including Motorola. CW11 was responsible for managing Reynosa's supply chain, and reported directly to the facility's General Manager (Fernando Tellez and Ali Fami), who reported to Homer. CW11 was in a position to know, and does know, about issues affecting the facility's supply chain, including inventory management issues, customer dissatisfaction and the facility's internal controls, as detailed herein.

- Confidential Witness No. 12 ("CW12") is a former employee of Celestica who was the Informational Technology Project Manager at the Little Rock, Arkansas facility ("Little Rock") from 2001 through 2006, who was transferred to Reynosa in 2006 until February 2007. Celestica acquired Little Rock in 2000 from Avaya for its manufacturing, repair and supply chain operations, and transferred its business to Mexico in 2005. CW12 reported directly to Little Rock's General Manager, who reported to Homer. CW12 was in a position to know, and does know, about informational technology issues affecting Little Rock and Reynosa, including inventory management

issues and the sufficiency of those facilities' internal controls, as detailed herein.

- Confidential Witness No. 13 ("CW13") is a former employee of Celestica who was the Business Unit Director at Monterrey from 1999 through December 2005. CW13 reported directly to the General Manager in Monterrey, who reported to Homer. As a Business Unit Director, CW13 was in a position to know, and does know, about issues affecting the facility's customer units, including issues arising from the restructuring, inventory management issues and the facility's internal controls, as detailed herein.

- Confidential Witness No.14 ("CW14") is a former employee of Celestica who was the Senior Manager of Business Controls in Monterrey from April 2005 through April 2006. As the Senior Manager of Business Controls, CW14 was responsible for implementing Sarbanes-Oxley initiatives at the Monterrey facility. Thus, CW14 was in a position to know, and does know, about the sufficiency of Monterrey's internal controls, as well as issues impacting internal controls, such as the facility's inventory management practices, as detailed herein.

A.    **Background**

1.    **Celestica's Business and Operations**

57.    Celestica provides a range of manufacturing services to original equipment manufacturers across several industries, and operates a global manufacturing network with operations in the Americas, Asia and Europe. For more than 75 years, Celestica operated as an important manufacturing unit of IBM and, in 1993, began outsourcing services to non-IBM customers. In 1994, IBM incorporated the Company as a wholly-owned subsidiary.

58.    In October 1996, Onex and Celestica's then management acquired Celestica from IBM in a transaction valued at $700 million. Onex's portion of the investment was only $199 million for a 43 percent equity interest and voting control. Onex currently owns 29.6 million multiple voting shares of Celestica, or approximately 79 percent of the voting interest, and "exercises a controlling influence over [Celestica's] business and affairs…."

59.     Under the direction and control of Onex, Celestica grew at an explosive pace, marked by a series of acquisitions designed to pay back the Company's debt while bolstering its business and operations in the U.S. and Europe.  These acquisitions included:

- In June 1997, the Company acquired from Hewlett Packard Company's ("HP") printed circuit assembly operations, located in Fort Collins, Colorado, for approximately $47 million.  The Company utilized Fort Collins to serve HP, and later expanded its manufacturing facilities in the Fort Collins area to support Celestica's continuing growth in the United States.

- In September 1997, the Company acquired HP's system assembly operation, located in Exeter, New Hampshire.  In connection with the acquisition, the Company issued a press release stating that "[t]his acquisition will enhance the Celestica Group's service offerings in North America by significantly expanding its system build capabilities and its presence in the eastern United States."

- In March 1998, Celestica acquired the development arm of HP's embedded systems operation, located in Chelmsford, Massachusetts.  According to Celestica, these operations focused on "development and qualification of a range of systems from board level products to fully-integrated system level workstations for the industrial computer market."

- In April 1998, Celestica purchased Lucent Technologies' ("Lucent") manufacturing facility in Monterrey, Mexico.  In a press release dated January 30, 1998, Celestica reported that acquiring this facility "allows Celestica to quickly establish operations in Mexico without having to construct a new facility and build a skilled workforce."

- In September 1998, the Company acquired Accu-Tronics, Inc., a full service electronics manufacturing offering.  Accu-Tronics's operations were located in Raleigh, North Carolina, thus adding yet another facility in the United States.

60.     In the years that followed, between 2000-2003, Celestica continued to grow at a rapid pace by broadening its reach in the U.S., Asia and Europe.

61.     The Company was initially focused on growing its business in North America carried out through Celestica's acquisition of numerous facilities in the U.S.  Notwithstanding these concerted efforts, Celestica was simply unable to achieve a meaningful level of profitability from these new facilities, and underwent several restructuring plans between 2001-2003 to try to turn things around.

### 2. Onex and Schwartz appoint Delaney as CEO In 2004 and Implement an Aggressive Restructuring Plan

62. On January 29, 2004, on the heels of the Company's failed restructuring efforts between 2001-2003, the Company announced that long-time Eugene Polistuk was "retiring" as Chairman and CEO effective immediately, and would be replaced by Delaney as CEO.

63. Under Delaney's guidance and leadership, Celestica underwent yet another restructuring, which was purportedly focused on increasing the Company's profitability in low-cost geographic areas. As a result, Delaney advised investors during an earnings conference call on April 22, 2004 that to achieve these results the Company needed to record $175 to $200 million in additional restructuring charges. Further, Delaney disclosed that, over the next twelve months, the Company would drastically reduce its workforce by more than 5,000 employees, mostly in higher cost geographies.

64. During that same conference call, Delaney stated unequivocally that he was the person behind the Company's new restructuring plan, and was personally overseeing its implementation. Specifically, an analyst with Ingalls & Synder asked Delaney whether there was one person organizing the restructuring, and questioned whether there was someone specifically responsible for establishing the plan and migrating it to the workforce. Dissatisfied with Delaney's evasive answers, the analyst asked Delaney point blank whether "there [is] a czar so to speak, somebody who is providing the leadership for all of this, some one person?" In response, Delaney admitted "[y]es, it is me."

### B. The Fraud Begins: Defendants Announce The "Final" Restructuring

65. On January 27, 2005, the start of the Class Period, Celestica was still in dire need of a major restructuring to restore its competitive and financial health. This is exactly what

Defendants promised, announcing a $225 to $275 million restructuring for 2005 and 2006 that was to increase profitability, reduce costs, and ensure customer satisfaction.

66.     That day, Delaney disclosed during an earnings conference call that "after evaluating the needs of our customers and assessing the best roadmap to get back to sustainable and acceptable levels of profitability, we have made the decision to **_significantly reduce the amount of excess capacity in our system_** through a new restructuring program that will bring our **_utilization rates higher and accelerate margin expansion_**."

67.     Investors reacted with enthusiasm—driving Celestica's share price up by nearly **_six percent_** in the days following the announcement.  That same day, analysts reported that Defendants had apparently come to grips with their past failures, and Celestica's future had just brightened significantly.  Specifically, Deutsche Bank's analyst observed that Celestica's "admission of past excesses," as evidenced by their recognition that another restructuring was necessary, should put Celestica in a "much better position to deliver profitability in the future." Similarly, an analyst with National Financial Bank reported on January 27, 2005 that he was "encouraged that CLS is prepared to make the hard decisions to drive its utilization level to reasonable levels."  This analyst continued, "[w]hile restructuring might be viewed as a negative," in Celestica's case "**_we see it as a positive_**."  (Emphasis added.)

68.     Despite their enthusiasm, however, analysts remained objective and set a benchmark against which to judge Celestica.  Specifically, they were cautious about Celestica's ability to restructure sufficiently to compete against other more efficient and profitable EMS manufacturers.  For example, analysts at Citigroup Smith Barney noted in a research report dated January 28, 2005 that "while we are optimistic that this latest restructuring will yield additional cost savings and operating benefits, we would note that Celestica **_remains a year behind_**

*competitors* such as Flextronics, Jabil, and Solectron in terms of restructuring activities."
Defendants were well aware that Celestica would continue to be measured against its
competitors and that the restructuring needed to be viewed as putting the Company on par with
these firms.  Indeed, Delaney and Puppi's compensation hinged on Celestica's status relative to
its competitors, as well as the Company's share price.

## C.    During the Class Period, Defendants Intentionally Misled Investors Through Celestica's Materially False And Misleading Financial Results

69.    Defendants' fraudulent scheme to inflate Celestica's stock price hinged on
reporting inflated financial results, which rendered an appearance that Celestica was more
profitable and the restructuring more successful than in reality, especially when compared to its
peers.  As detailed below, Defendants achieved their goal by falsifying the value of inventory—
***Celestica's single largest asset***, falsifying and manipulating expenses, and falsifying Celestica's
books.

### 1.    Defendants Intentionally Manipulated Inventory To Falsify Celestica's Earnings and Artificially Inflate Its Share Price

#### (a)    Inventory Was The Key Metric To Assess Celestica's Restructuring Efforts and Performance

70.    For Celestica, inventory levels are, and have always been, a key metric of current
and future performance.  Generally, in the EMS business, production runs for particular
products are short.  Importantly, the vast majority of product components are unique not only to
certain customers, but also to specific products.  Once a production run is complete, it is
generally the case that excess parts are not usable in other products and are therefore rendered
obsolete.  Accordingly, manufacturers like Celestica must adjust quickly to adapt to changes in
demand without letting their own inventories of raw materials and finished products get large.

71.     Throughout the Class Period, analysts and investors examined Celestica's inventory levels to determine the Company's performance and to measure the success of the restructuring.  Investors' key metric was Celestica's inventory turnover ratio.  The ratio—the measure of inventory as a multiple of the cost of goods sold (*i.e.*, costs of goods sold divided by inventory)—reflects whether inventory is being properly managed at a facility and illustrates how many times a company's inventory is sold and replaced over a period of time.  A low ratio implies poor sales and, therefore, excess inventory.  A high ratio, driven by lower inventory figures, implies strong sales.

72.     Analysts routinely relied on the Defendants' representations regarding inventory levels, and were generally encouraged by what the numbers indicated.  For instance:

- On July 22, 2005, Citigroup reported; "***Inventory management was also positive***, with inventory down slightly q/q by approximately $3.7 million (-0.3%) versus sales, which increased by 4.7% quarter-over-quarter, and inventory turn[over] increased to 7.7x from 7.5x.  Given negative sentiment surrounding inventory build throughout the supply chain, ***we view Celestica's tight control of its inventory positively***."  (Emphasis added.)

- Similarly, on July 28, 2006 after the second quarter 2006 results were released, analysts at Kintishneff Research commented that there was evidence of "***improved inventory management*** (with inventory turns increasing to 7.0x in Q2 from 6.6x for Q1)."  Also, on the same day, analysts at RBC Capital Markets noted that inventory improvements drove inventory turns to 7.0x (vs. 6.6x LQ), ***reflecting better inventory management and product mix***.  Moreover, on July 31, 2006, analysts at Blackmont Capital reported that "good visibility and strong demand for the upcoming [third] quarter and from the backlog due to component shortages."  (Emphasis added.)

- Likewise, on October 26, 2006, after the third quarter 2006 results were released, analysts at RBC Capital Markets noted that "[i]nventory [turnover] increased by 5% to $1.3B driving turns to 7.1x (vs. 7.0x LQ), ***reflecting better management and product mix***."  (Emphasis added.)

- On January 26, 2006, the Company announced its fourth quarter 2005 results.  On that same day, analysts from Bear Stearns reported "[w]orking capital and cash flow performance in the fourth quarter showed signs of improvement in comparison to the prior quarter.  Celestica's ***inventory declined $37 million reversing the trend from last quarter*** when the company built unnecessary

component inventory. ***As a result of inventory reductions*** during the December quarter, this resulted in inventory turns increasing sequentially to 7.3x from 6.9x. Moreover, on the same day, analysts at CIBC reported that "***[t]he better inventory turns were likely the result of the higher demand at the end of the quarter***." (Emphasis added.)

73.     As detailed below, these glowing observations about Celestica's inventory levels and turnover ratio were not the result of higher demand, better managements, or productivity. Instead, they were the result of Defendants' fraudulent scheme.

### (b)     Well-Settled, Simple GAAP Rules And Celestica's Stated Policy Required Defendants To Properly Account For Celestica's Inventory

### General GAAP Requirements

74.     At all relevant times, Defendants represented that Celestica's financial statements were prepared and issued in conformity with GAAP, which are recognized by the accounting profession and the Securities and Exchange Commission as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.  However, in order to artificially inflate the price of Celestica's stock, Defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate its balance sheet and to falsely report financial results in the interim quarters and fiscal year during the Class Period.

75.     Celestica's materially false and misleading financial statements resulted from Defendants' deliberate decisions designed to conceal the truth regarding Celestica's actual operating results.  Specifically, as discussed below, Defendants caused the Company to violate GAAP by, among other things:

- intentionally misrepresenting the value of Celestica's inventory, thereby inflating the Company's earnings;

- falsifying Celestica's books and financial statements to reflect fraudulent sales of product that Defendants knew would be returned after quarter-end;

- failing to record charges to income related to Celestica's excess and obsolete inventory resulting in artificially inflated earnings and operating margins, and artificially lower expenses;

- delaying the recording or inventory in order to falsify Celestica's true inventory levels;

- failing to properly plan for its 2005 restructuring by creating insufficient reserves that were unable to cover the cost of the restructuring, while inflating Celestica's earnings; and

- failing to design and implement internal control policies and procedures designed to ensure that Celestica's publicly filed reports were in compliance with GAAP, SEC regulation and its own disclosed policies.

76.     As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provides accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

77.     Furthermore, as set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform with GAAP. As noted by the AICPA professional standards:

financial statements are management's responsibility.…
[M]anagement is responsible for adopting sound accounting
policies and for establishing and maintaining internal control that
will, among other things, record, process, summarize, and report
transactions (as well as events and conditions) consistent with
management's assertions embodied in the financial statements.
The entity's transactions and the related assets, liabilities and
equity are within the direct knowledge and control of
management.… Thus, the fair presentation of financial statements
in conformity with Generally Accepted Accounting Principles is an
implicit and integral part of management's responsibility.

**Accounting for Obsolete Inventory**

78.     Under well-settled, long-standing GAAP, a company must account for inventory

to reflect its true value.  Under GAAP, inventory is deemed obsolete if the market value of the

inventory is substantially below cost.  Factors that contribute to declines in market value of

inventory are:  the unfavorable general economic conditions, the reduced demand for goods, and

the declining proprietary product demand.  In this regard, Accounting Research Bulletin

("ARB") No. 43, adopted in June 1953, provides, in pertinent part:

A departure from the cost basis of pricing the inventory is required
when the utility of the goods is no longer as great as its cost.
Where there is evidence that the utility of goods, in their disposal
in the ordinary course of business, will be less than cost, whether
due to physical deterioration, obsolescence, changes in price
levels, or other causes, **the difference should be recognized as a
loss of the current period**.  This is generally accomplished by
stating such goods at a lower level commonly designated as
*market*.  ARB 43, Chapter 4, State. 5.

(Italics in original, bold and underscore added).

79.     Moreover, GAAP requires that a loss contingency associated with obsolete

inventory "shall be accrued by a charge to income," thereby reducing earnings by an equal

amount in the current period.  Such a charge shall be taken if:  (i) [i]nformation available prior

to issuance of the financial statements indicated that it is probable that an asset had been

impaired or a liability had been incurred at the date of the financial statements; and (ii) the

amount of the loss can be reasonably estimated. Statement of Financial Accounting Standards ("SFAS") No. 5 Accounting for Contingencies, ¶ 8, (March 1975). SFAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible (*i.e.*, anything greater than a slight chance) that a loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss or state that such an estimate cannot be made.

80. Similarly, Celestica's 2005 20-F disclosed the following policy for valuing inventory:

> In determining the net realizable value [of inventory], [the Company] consider factors such as shrinkage, the aging and future demand of the inventory, contractual arrangements with customers, and our ability to redistribute inventory to other programs or return inventory to suppliers.

### Accounting For New Inventory

81. A company's inventories should include owned items (i) that are held for sale in the ordinary course of business, (ii) that are in process of production for sale (such as work in process), or (iii) will be consumed in the production of goods or services that will be held for sale. ARB No. 43, Ch. 4, ¶ 2. Typically, inventories shall include items that are ***in transit*** to the company with free on board ("FOB") shipping point terms.

82. In all events, a company must record inventory at the precise moment that the rights and risks of inventory are transferred from the vendor to the purchaser. SEC Staff Accounting Bulletin No. 101, which was in effect at all relevant times, states that the point at which delivery has occurred depends upon whether the terms of the sale are "FOB destination," where title to the product passes upon arrival at the customer's loading dock or "FOB shipping point" (when the inventory leaves the vendor), where title to the product passes at the time the shipment leaves the vendor's loading dock. These terms are important because they evidence

the point at which title to the product, and thus risks and rewards of ownership, has legally

passed to the buyer.

(c)     **Defendants' Fraudulent Scheme to**<br>**Falsely Report Obsolete Inventory**

83. As detailed herein, Defendants knew at all times relevant that Celestica suffered

from excessive amounts of obsolete inventory. However, Company management believed that

had Celestica taken a charge against earnings due to inventory that was obsolete, investors

would equate the charge as an admission that the supply chain was mismanaged, customers

were not following through on orders because of dissatisfaction, and, ultimately, the

restructuring was failing. This in turn would lead, in management's minds, to a decline in the

Company's stock price. Indeed, this is exactly what investors interpreted at the end of the Class

Period when Celestica took a $30 million charge for inventory to correct Defendants' fraud,

causing Celestica's share price to be slashed in half.

84. In view of the importance of inventory levels to Celestica's business, it comes as

no surprise that, at all relevant times, "all the way to the top senior management had visibility of

what was happening" with regard to increasing obsolete inventory levels, according to CW1.

Specifically, CW1, CW2, and CW3 confirm that defendants Puppi and Delaney, along with

Celestica's other senior management, knew of the inventory conditions at all of Celestica's

manufacturing facilities, including Monterrey. Each month, these three confidential witnesses

participated in a "monthly operational review" conference call with Celestica's senior

management, including Homer (who reported to Delaney), wherein defendants, senior

management, and plant managers discussed all of the operational metrics for their facilities.

85. In particular, CW2 recalls that these detailed discussions often concerned levels of

obsolete inventory, problems affecting sales, profit and loss margins, customer satisfaction, and

- 33 -

on-time deliveries.  Indeed, CW3, who participated in these monthly calls in order to relay the inventory crisis at Monterrey, prepared spreadsheets for senior management—including Delaney and Puppi—detailing the extent of excess and obsolete inventory in Monterrey.

86.     Despite knowing the details and depth of the obsolete inventory levels, Defendants refused to address the issue or apply the required accounting treatment.  At the Carrollton, Texas facility, for instance, millions of dollars in obsolete inventory was maintained in containers and lockers.  The level of inventory was so much, no one knew precisely what was on-site, according to CW6 and CW7.

87.     Indeed, CW6 stated that, at the time s/he was hired, Carrollton's inventory levels were "completely out of whack" and further confirmed that Carrollton "absolutely had an excess and obsolete" inventory issue.  For example, CW6 recalled that Carrollton was stuck with millions of dollars worth of Lucent-related component inventory that was so old that it could not be used for any currently ongoing customer contracts.

88.     Similarly, there was inventory kept at Salem that was so out-dated that it related to customers who had long-ago dismissed Celestica.  For example, at the time that CW8 left Celestica in May 2005, obsolete inventory for one customer (AMD) was still sitting around Salem, and was still stated on Celestica's books, even though AMD had pulled its business from Celestica in December 2003.  Indeed, according to CW9, there was a growing "bone pile" of defective inventory in Salem, which grew by as much as $1.4 million per quarter.

89.     In addition to the monthly reports and teleconferences, Defendants exerted hands-on control over these facilities.  CW8 confirmed that ***Corporate controlled every facet of the facility***, including pricing, resulting in a "chaotic" inventory situation in which there was always a lot of excess inventory that was not being used.

90.     CW9 also stated that she/he interacted directly with Homer regarding various problems in Salem, such as "execution, support, and pricing." However, CW9 stated that neither Homer nor the Corporate Office effectively resolved these problems, noting that the "proof [was] in the pudding" with the plant ultimately closing and its customers pulling their business.

91.     Additionally, Defendants refused demands to record adequate reserves for obsolete inventory, in view of the ongoing crisis and the inevitable reality that it would get worse. For instance, CW14 informed Celestica's Corporate Office that the reconciliations of inventory was insufficient. Specifically, CW14 informed Defendants that because Celestica had two competing MRP systems in place at Monterrey, the vast levels of known obsolete inventory, if anything, were understated. Accordingly, CW14 told the Corporate Office that the reserves for excess and obsolete inventory must be increased to address the known risk, as required under GAAP. Faced with the prospect of lowering earnings and revealing an inventory crisis, however, the request to increase the reserves for excess and obsolete inventory "went unanswered," according to CW14. Ultimately, CW14 left Celestica in protest over Defendants' failure to address the ongoing crisis.

92.     Defendants themselves confirmed these allegations at the close of the Class Period, taking a charge of $30 million for obsolete inventory and reducing earnings by an equal amount, or $0.11 per share. Indeed, as Celestica's new CEO admitted, this "charge was simply unacceptable."

### (d)     Defendants Knew That Levels of Inventory Were Intentionally Manipulated To Fraudulently Increase Earnings

93.     Defendants' refusal to take a charge against earnings for the obsolete inventory gave rise to a dilemma. Celestica could not keep adding to its already overstated inventory levels and still report a favorable inventory turnover ratio. But it still needed new, useable parts,

which in the ordinary course would increase Celestica's already inflated inventory levels. As discussed above, if new inventory was properly accounted for under GAAP when the rights of ownership transferred to Celestica, the turnover ratio would be negatively impacted. In order to resolve this dilemma, as detailed below, Defendants intentionally manipulated Celestica's recording of new inventory, recorded phony sales, and held inventory off-site, all to further falsify the Company's results and to meet earnings targets.

### **Manipulation of Recorded Inventory**

94. Throughout the Class Period, Defendants knew and were repeatedly reminded that Celestica's MRP system was (i) inadequate to monitor and plan inventory levels because it was not uniformly used throughout the Company or even within one facility, and (ii) subject to and was indeed manipulated to fraudulently distort Celestica's inventory levels. Despite their knowledge, Defendants failed to correct the fraudulent manipulation of inventory levels reported on the system.

95. At Fort Collins, for instance, senior managers had override privileges on the BPCS system (the internal inventory system which tracked inventory transactions and amounts). These people included the Director of Supply Chain, Director of Program Management, Director of Operations, the Director of Business Affairs, IT Director, and Controller (Peter Shin). Each of these individuals reported to General Manager and Vice President Dave Halter, who also had override privileges, as well as to Celestica's corporate management, including defendants Puppi and Delaney.

96. These override privileges were used to book falsified entries in order to reduce the critical inventory levels and to meet Celestica's earnings estimates handed down by Defendants, according to CW5. In fact, at the direction of director-level managers, "order entry

clerks" falsified inventory levels by going into the BPCS system and manipulating the numbers, according to CW5.

### Improper Recording of Inventory

97.     Indeed, Celestica's inventory was routinely manipulated at both ends of its life cycle.  On one end, as detailed by numerous confidential witnesses, raw materials that were purchased were held off-site or at the facilities' parking lot and were thus not included on Celestica's books before quarter-end.  For instance, according to CW5, senior managers routinely directed employees to hold shipments outside the facility until the first day of the next quarter.  Celestica also routinely removed obsolete inventory from its books by shipping it off site, also according to this witness.

98.     Similarly, near quarter-end, Celestica's senior management directed the Monterrey facility to delay recording new inventory on Celestica's books in order to understate expenses as well as not add to the already growing inventory levels.  As CW10 confirms, at or around quarter-end, Monterrey's parking lot became filled with "tens" of trucks and trailers full of component inventory from Celestica's vendors.  Employees could only unload the inventory and record it on Celestica's books *after* the quarter closed.

### Premature Booking of Revenue

99.     On the other end of the inventory life-cycle, Defendants ***prematurely booked revenue*** by shipping to customers who ***did not order*** products, with ***full knowledge*** that the customers would reject the shipment and return it the following quarter.  Senior management, who reported directly to Homer and Delaney, directed employees to execute these transactions in an apparent attempt to meet Celestica's earnings targets and to smooth revenue, according to CW5.

100.     This fraudulent scheme was deployed for the sole purpose of inflating

Celestica's financial results.  Rather than adhere to GAAP, and properly account for inventory

on Celestica's books in accord with contract terms, these confidential witnesses confirm that

senior management instructed employees to manipulate Celestica's inventory.  As confirmed

above, such practices were rampant at Celestica's U.S. and Mexican facilities in order to

manipulate inventory levels and turnover ratio, inflate sales, and falsify expenses.

**Inventory Fraudulently Shipped Off-Site**

101.     Furthermore, Defendants directed that inventory be packed onto trailers and

taken off-site, often shipping it to empty warehouses or even employees' garages, so that it did

not show up as obsolete inventory on Celestica's books, according to CW5.  This conduct also

had the effect of delaying expenses resulting from payments to vendors and reducing parts

inventories, thereby fraudulently inflating Celestica's earnings.

102.     As a result of these machinations, not all of Celestica's inventory was accurately

reflected in its MRP system, SAP.  Indeed, CW7 stated that Celestica maintained a significant

amount of inventory on the Carrollton premises that was never entered into SAP.  For example,

CW7 recalled that even though Carrollton maintained certain component inventory on-site, they

often could not locate the necessary inventory because it did not appear on the system.  As a

result, CW7 recalled that Carrollton routinely spent money reordering—or duplicating—the

same component inventory that was already on-site.

103.     During the Class Period, Celestica's management knew about the excess

inventory problem at Carrollton.  In fact, CW7 personally brought these issues to the attention

of senior members of management, such as the Vice President of After Market Services (Bert

Pendergast) or the General Manager (Richard Bambury), both of whom were under the direct

reporting line of Delaney and Homer, respectively.  In response to raising such concerns with

management, however, CW7 was told that Corporate refused to write-off this excess inventory, and take the required charges against earnings.

*    *    *

104. These various means to manipulate Celestica's reported inventory levels had only one end—to fraudulently inflate Celestica's earnings to investors' detriment, and to increase Delaney and Puppi's compensation and, ultimately, Onex's bottom line.

### 2. Defendants Intentionally Lied to Analysts and Investors Concerning The Key Inventory Metric

105. Fully in tune with the importance of inventory levels and turnover, throughout the Class Period, analysts asked pointed questions regarding whether Celestica was accumulating excess or obsolete inventory. These questions were met with outright lies.

106. For instance, on October 20, 2005, in an earnings conference call, Delaney responded to a question from an analyst at Ingalls & Snyder, stating: "this inventory buildup [in the third quarter of 2005] . . . occurred because the demand fell out in front of us. It didn't become obsolete . . . [and] it's expected to be used in the reasonably near future." This statement, however, failed to disclose that Monterrey's excess and obsolete inventory was customer-specific and held no value. Accordingly, under GAAP and Celestica's stated accounting policies, Defendants were to take the required charges.

107. Notably, at times during the Class Period, Defendants did report inventory levels and turnover ratios that were disappointing. For instance, on October 20, 2005, when the Company announced third quarter 2005 results, analysts at CIBC reported that "[b]alance sheet performance could have been better; (inventory turns declined by 0.8x to 6.9x)." Absent Defendants' scheme, however, this disappointing news would have been far more devastating.

108.    Moreover, had defendants disclosed the truth at this juncture, investors would have learned of the true financial ailments at Celestica and that the restructuring was failing more than a year earlier that they did.  Ultimately, on January 30, 2007, following the ouster of Delaney and Puppi, the Company came clean about the inventory's true value, announcing an "increased inventory provision," and taking a charge of $30 million, as well as admitting that the restructuring failed.

**D.      Defendants Fraudulently Withheld From Investors That, Throughout The Class Period, The Restructuring Was A Complete Failure Due To Pervasive And Persistent Known Problems**

109.    As described above, Defendants' restructuring plan was critical to Celestica's future, its ability to retain customers, and to generate earnings.  Investors and analysts viewed the 2005 restructuring as the Company's competitive edge back into the EMS marketplace.  Notwithstanding their knowledge of the improprieties set forth above, Defendants refused to take appropriate measures to resolve the crisis or to disclose the true state of affairs to investors.  Instead, as a former senior-level employee put it, Defendants "force fit" the restructuring efforts into the Monterrey facility.

110.    All the while, however, Defendants continued representing to investors that the restructuring was proceeding as planned, while knowing it was not.  The running joke at Celestica during the transition of the U.S. facilities was "if you sent anything to Monterrey, it's going to die," according to another senior-level former employee.  Although concerns were often expressed internally, Defendants promulgated a culture within Celestica that when "***the CEO sets a strategy there is no debate***;" the strategy is followed through whether its good or bad, according to CW4.

## 1.     The GAAP and Disclosure Requirements for Restructuring

111.     When a company decides to undertake a restructuring, GAAP requires management to commit to a plan.  An exit plan, in accordance with SFAS No. 146, <u>Accounting for Costs Associated with Exit or Disposal Activities</u>, June 2002, must specifically identify ***all significant actions*** to be taken to complete the exit plan, activities that will not be continued, including the method of disposition and location of those activities, and the expected date of completion.  Celestica's management, including defendants Delaney, the restructuring czar, and Puppi were intimately involved in creating and executing this plan, as did Onex and Schwartz, based on their admitted control and participation in Celestica's affairs.

112.     Defendants purported to do exactly that.  For example, in Celestica's 2004 annual report, issued in March 2005, Defendants spoke about the Company's 2005 restructuring:

> To further improve capacity utilization and accelerate margin improvements, the Company announced in January 2005 additional plans to restructure its operations and expects to incur restructuring charges in the range of $225 million to $275 million during the next 15 months.  The restructuring will include some plant closures and a 10-15% reduction in the company's global workforce (approximately 5,500 employees).  The restructuring plans will target primarily its higher-cost geographies where end-market demand has not recovered to the levels management requires to achieve sustainable profitability.

(Emphasis added).

113.     GAAP requires that reserves are adjusted ***as soon as management is aware*** that the costs accrued are insufficient.  In this regard, accounting estimates, including estimates for restructurings, may change as new events occur, as more experience is acquired, or as additional information is obtained.  A change in an accounting estimate should be accounted for in (a) the period of change if the change affects that period only, or (b) the period of change and future periods if the change affects both.  SFAS No. 154, <u>Accounting Changes and Error Corrections, a</u>

replacement of APB Opinion No. 20 and FASB Statement No. 3 ¶ 19 (May 2005). If the effect on income is material, disclosure is recommended for changes in estimates made each period in the ordinary course of accounting. Id. ¶ 22.

114.    In reality, however, Defendants significantly underestimated the Company's 2005-2006 restructuring costs. As detailed below, Defendants were aware of the inventory problems that plagued the Company's U.S. and Mexican facilities at the beginning and during the restructuring; however, they chose not to disclose these problems to the investing public. As a result, Defendants improperly understated the restructuring costs, and specifically the recorded reserves, in order to disguise the extent of Celestica's problems and inflated earnings.

115.    Nonetheless, defendants continued to mislead the market, conceal the true severity of the inventory problems at Monterrey and conceal the insufficiency of its restructuring reserves. On the October 26, 2006 conference call, Defendants increased the accrual for their restructuring reserves to $300 million and extended the time for completion of the restructuring until the forth quarter of 2006, yet did not come clean and reveal to the market the additional $60 to $80 million of restructuring costs needed to complete the restructuring.

116.    At the end of the Class Period, when the truth emerged, Defendants were forced to admit that the restructuring failed due to a lack of "appropriate planning" and that far-higher costs would be incurred to address issues that existed all along, and, in fact, were made worse. Thereafter, restructuring reserves were increased by $80 million. Of this increase, $40 million was booked in the fourth quarter of 2006. As a result, the restructuring charges booked in 2005-2006 totaled $338.2 million, plus an additional $20-$40 million more, exceeding what Defendants' had told investors by as much as *68 percent*.

117.     Moreover, rather than conclude in the 12 months expected under GAAP or the 15 months that Defendants initially estimated, Celestica's 2005 restructuring continues today. This fact reflects Defendants' failure to properly plan for a restructuring in conformity with SFAS No. 146, to commit to the plan, to make necessary and appropriate adjustments to increase the plan's allocations, or to appropriately disclose the truth to the market.

### 2.     Defendants Fraudulently Concealed That the Restructuring Was Failing

#### (a)     The Restructuring Plan Was No Plan At All

118.     In reality there was no restructuring plan at all, as Defendants conceded.  Rather than rectify problems known to Defendants prior to the restructuring and formulate and implement a sufficient business plan to transfer operations to Mexico, Celestica simply chose to "storm over the fence" and essentially "shut everything down" at once, according to CW2.

119.     Few, if anyone, knew the problems with the restructuring better than defendant Delaney, the Company's self proclaimed restructuring czar.  Even prior to the Class Period, as Celestica's President of the Americas, Delaney was well acquainted with the internal control and inventory problems at Monterrey, as well as the inventory problems at U.S. facilities whose operations were being sent there.  Nonetheless, Delaney personally initiated the transfer of certain business units from the U.S. to "force fit" them into Monterrey.

120.     In addition to participating in monthly operation report conference calls, reviewing and discussing written reports and spreadsheets detailing inventory problems, and taking part in one-on-one conversations as detailed above, Celestica's most senior executives were on the ground in Monterrey.  As a result of the constant crisis at Monterrey, it quickly became a place where Celestica's senior executives, including Delaney, spent much time.  For instance, at defendant Delaney's direction, Homer was "continuously" in Monterrey to

specifically address certain customer relations problems on behalf of Corporate, according to CW2. In addition, according to CW12, defendants Delaney and Puppi visited Monterrey three or four times during late 2005 to review the problems there.

121. In reality, the restructuring called for complicated changes that required appropriate timing and planning, according to CW2. Rather than stagger or plan an effective implementation of these changes, Delaney wanted everything done at once, recalls CW2. This witness further confirms that the General Manager in Austin (James Armstrong) regularly informed Homer that the transfer was disrupting operations, exacerbating inventory problems, and undermining customer relationships, and Homer relayed these issues directly to Delaney, but received "no assistance."

122. Similarly, the transfers of the U.S. operations and inventory to Monterrey resulted in interrupted production and disturbed customer relations. For example, CW5 stated that when Fort Collins transferred Avaya's component inventory to Monterrey it was a "disaster." Not only did this "horribly botched" transfer add to the inventory management problems in Monterrey, but it prevented Monterrey from accurately forecasting its operational results, according to CW5. Furthermore, CW5 confirmed that senior managers knew about these problems, including Fort Collins's General Manager (David Halter), who reported directly to Homer.

123. More specifically, when the Company ultimately transferred Fort Collins to Monterrey, the buildup of excess and obsolete inventory only got worse. Generally, when inventory was relocated to Monterrey, the existing demand from the transferring facility (*e.g.*, Fort Collins) was to be loaded into Monterrey's MRP system, and the necessary materials were to be ordered. Yet, in transferring Fort Collins' inventory to Monterrey, CW5 became aware that

Fort Collins and Monterrey were ***duplicating their inventory*** with respect to Lucent, a misstep that went unchecked, and only made matters worse. Defendants were aware of these weaknesses and duplication of costs and expenses, but continued the transition to Monterrey at full speed.

124.     Moreover, twice a year, Celestica held a supply chain meeting in Toronto to discuss the Company's inventory management strategies, particularly with respect to Monterrey. During these meetings, CW4 expressed his/her1 concerns to members of Corporate, including Homer and the Supply Chain Manager in Corporate (Steve Radewych), regarding Monterrey's inability to contend with the Company's explosive plans for the facility and the rapid increase in inventory over a very short period of time. Furthermore, as did CW3, CW4 expressed his/her concerns that Defendants' scheme was causing already excess obsolete inventory to multiply, while stifling the facilities' ability to obtain necessary parts in time to meet production demands. As Defendants ignored the other complaints, so did they ignore these witnesses.

**(b)      Defendants Knew The Restructuring Failed,
But Continued to Lie to Investors**

125.     At times during the Class Period, investors were skeptical of the success Defendants were achieving in their purported restructuring. To offset the tough questions, Defendants simply lied.

126.     Throughout the Class Period, Defendants told analyst that they were "executing well, generating good customer satisfaction from our efforts while making dramatic improvements in our costs." In reality, however, in monthly operational report conference calls, in which Puppi and Delaney personally participated, and in written reports Defendants received, they were informed of the inventory crisis, the manipulation of reported earnings and expenses, and the fact that customers were defecting, as detailed below.

127.     Instead of relaying the truth that the restructuring was going terribly and would last far longer than the promised 15 months, by the spring of 2006, Defendants were telling investors that the end of the restructuring was near.  Defendant Puppi reported to analysts during a March 14, 2006 conference call that this "is our last kick at the cat, actually, and we have, probably, the most meaningful restructuring underway…. [O]ur belief is that **this is the last round**.  We will have, at the end of this, one of the most competitive footprints in the industry."

128.     During this same call, when asked about reports of Avaya's dissatisfaction, Puppi responded "I'd say that **has not been an issue**."  "We feel very good about the customers that we have.… So as we work through those issues, we feel that those—that relationship [Avaya] will continue in the same size and magnitude and degree of robustness that its had for five years."  The truth, however, as detailed below is that, at this time, major customers such as Avaya, Lucent, Motorola, and Cisco felt the pinch of Celestica's mismanagement, and began pulling their contracts from Celestica's plants—a major blow to future projections.

129.     By July 27, 2006, defendant Delaney reported to investors, in "terms of restructuring, we're entering an important final phase of our major program that we launched a year and a half ago…. We believe we're undertaking the most aggressive restructuring program in our industry.  And while this ambitious plan came with execution risks, we're confident we'll achieve" our year-end 2006 deadline.

130.     Defendants' repeated denials simply continued their deceit.  Only a month before he was forced to resign as a result of his misdeeds, defendant Delaney told investors during an October 26, 2006 conference call "Mexico is getting better every day."  He emphasized that he

wanted to "make sure that our customers don't suffer from any of this." Delaney continued that he "expect[ed inventory] [to] go down over the next few quarters."

131.     Unfortunately, even at this late date, investors continued to believe Defendants. For instance, in a report dated October 27, 2006, analysts at Cowen & Company recommended that "Celestica is at the tail end of its restructuring efforts and is close to fixing operational problems which should greatly aid margins and cash flow in 2007, Outperform."  Similarly, analysts at Genuity reported that "Rome wasn't built in a day, and work remains to do at Celestica.  However, the probability of incremental margin improvements over the coming quarters is high, in our opinion.  We reiterate our BUY recommendation."

132.     Little did investors know that the restructuring would last until late 2007, and cost as much as 68 percent more than promised.  Ultimately, as Defendants admitted, the restructuring failed because Defendants executed it "without the appropriate planning"—despite their personal knowledge of the pervasive, long-standing problems; intentional manipulations to overstate revenue; and the constant stream of reports showing the restructuring was failing.

**E.     Throughout The Class Period, Defendants Knew That Customers Were Leaving Celestica In Droves Due To The Failure Of The Restructuring Constant Manufacturing Problems**

133.     Defendants also withheld from investors that the failed restructuring was resulting in key customers pulling their business from Celestica.

134.     Specifically, according to CW13, Celestica was simply not equipped to effectively manage the rapid influx of customer units from the U.S. facilities into Monterrey. The inability to cope with the inflow affected the facility's production schedules, directly impacting customers' demands and expectations.

135.     Numerous customers fled.  All told, the restructuring and the poorly planned transfer to Monterrey undermined Celestica's relationships and caused it to lose significant

contracts with a number of its key customers, including those with Lucent, AMD, Dell and Cisco. One of the most troubled customers in Monterrey was Avaya. According to CW13, the Company was in a "very good position with Avaya," but, by the second quarter of 2005, things got "really bad." CW13 explained that Avaya grew increasingly dissatisfied in the second quarter of 2005 because, following the transfer of its operations to Mexico, its customer account was impacted by numerous performance delays. Yet, when Defendants were faced with specific questions regarding Celestica's deteriorating relationship with Avaya, they affirmatively lied. Indeed, rather than disclose this material information, Puppi falsely informed analysts during a March 14, 2006 conference call that "[w]e feel very good about the customers that we have . . . [s]o as to work through those issues, we feel that those—that relationship [Avaya] will continue in the same size and magnitude and degree of robustness that it's had for five years."

136.    Similarly, during the Class Period, Teradyne, the Company's second largest customer in Salem, pulled its business from Celestica in June 2005 because it was unhappy with having its manufacturing transferred to Monterrey, according to CW9. Cisco and Lucent, who were similarly dissatisfied with Monterrey and the constant delay in the production of products, as well as "disappearing" inventory issues, apparently caused by Monterrey's weak internal controls, withdrew its contracts from Monterrey, according to CW9.

137.    At all relevant times, Defendants were well aware of these problems. Indeed, according to CW4, whenever customer issues arose, Homer was constantly on-site at Monterrey to address the problems, and reported directly back to Delaney.

138.    As Celestica finally admitted at the close of the Class Period, these "material losses" of customers, including the departures of Lucent and Nortel, undermined Celestica's profitability.

### F.    Defendants' Motive and Opportunity to Commit Fraud

139.    Defendants each had motive and opportunity to perpetrate their fraudulent scheme.  Indeed, each Defendant gained significant sums during the Class Period, the amount of which was largely dependent on the Company's stock price.

140.    Throughout the Class Period, defendants Delaney and Puppi, the Company's CEO and CFO, respectively, both of whom served as the Company's most senior officers during the Class Period, were motivated to engage in the fraudulent scheme described herein.  Specifically, Delaney and Puppi's compensation was based largely upon the Board's assessment of their individual performance, Celestica's stock price, and the Company's relative performance with respect to its peers.  These factors, coupled with the fact that approximately *60 percent* of their annual compensation was provided in equity, motivated both Delaney and Puppi to engage in a scheme to fraudulently inflate earnings and, in turn, to artificially inflate the Company's stock price.  Based upon publicly available information, Plaintiffs also understand that Delaney and Puppi received significant sums of Celestica options, and may have exercised at least certain of those options during the Class Period.

141.    Defendants Onex and Schwartz, which effectively control Celestica's affairs, were also motivated to engage in the fraudulent scheme alleged herein.  As a direct result of Onex's controlling stake in Celestica, it was required to record its *pro rata* portion of Celestica's gains and losses.  Accordingly, during the Class Period, Celestica's artificially inflated earnings also inflated Onex's, and thus Schwartz's, bottom line.  Moreover, during 2005 and 2006, the Company paid Onex management-related fees totaling at least $2.6 million as consideration for services that were purportedly rendered in connection with a Management Agreement between Onex and Celestica.

142.     In addition, Onex and Schwartz's scienter is demonstrated by the fact that, during the Class Period, Onex reaped approximately **$750 million** (CAD) in gross proceeds by cashing out on two hedging strategies that Schwartz designed in 2000 and 2001.  Importantly, Onex and Schwartz executed these strategies during the early months of the Class Period before Celestica's stock price was fully inflated; indeed, these hedging strategies were rendered more profitable to Schwartz and Onex if Celestica's share price was *low*.  Tellingly, although Onex could have executed these strategies at its complete discretion through 2025, it chose to do so at the outset of the fraud.

143.     Specifically, in January 2005, during the first month of the Class Period, Onex redeemed debentures worth a total of $729 million (CAD).  This financial hedge, which was described in a June 22, 2007 article published in the Report on Business Magazine entitled "*Onetime Tech Star Celestica Tanked, But Its Parents Still Got Rich.  How Come?  Because Investors Don't Come Any Savvier Than Onex Czar Gerry Schwartz,*" provided that this debt could be repaid with either cash or 9.2 million one-vote Celestica shares at Onex's discretion.  Thus, if the share price of Celestica increased, Onex could pay back the debenture in cash, but if the price of Celestica's share decreased Onex could pay back the debentures with 9.2 million shares of Celestica, which resulted in a gain.  Recognizing that Celestica's share price would likely increase as their scheme was implemented, Onex and Schwartz cashed in, redeeming 9.2 million shares of Celestica for a profit of $560 million (CAD).

144.     Then, in June 2005, Onex and Schwartz executed their second hedge, a forward sales contract with Merrill Lynch Canada, Inc.  Pursuant to the terms of that agreement, Onex pledged 1,757,467 Celestica subordinated voting shares as collateral.  When Onex and Schwartz

executed the forward sales contract they collected another large payday, reaping a pre-tax gain of $189 million (CAD) based upon the carrying value of Celestica stock as of March 31, 2005.

145.     During the Class Period, Defendants also capitalized on the fraud to entice investors to purchase the Company's 7.625 percent senior subordinated notes.  Specifically, in reliance on the Company's overstated revenues, materially false and misleading financial results, and materially false and misleading statements, investors purchased approximately $250 million of these notes in June 2005.

**G.     Additional Evidence of Scienter**

**1.     Additional Evidence of Defendants' Scienter, Generally**

146.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such documents or documents were issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the truth regarding Celestica, their control over, and/or receipt and/or modification of Celestica's materially false and misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Celestica, participated in the fraudulent scheme alleged herein.

147.     As set forth below, Defendants also had extensive knowledge about numerous issues that were impacting the Company's performance at Monterrey and various other facilities, which further demonstrate that Defendants had no reasonable basis to believe that the Company could achieve operating margins of 3.5 percent by year-end 2006 and meet Defendants' projected earnings guidance for fiscal years 2005 and 2006.

**(a)** **Defendants Knew that Monterrey was Plagued with Inventory Problems as Early as Year-End 2004**

148.     Plaintiffs' extensive investigation confirms that, as of the start of the Class Period, Defendants knew that Monterrey suffered from inventory and supply chain issues, manufacturing delays, customer dissatisfaction and weak internal controls. Accordingly, from the outset of the Class Period, Defendants knew or recklessly disregarded facts sufficient to conclude that Monterrey was ill-suited to be the focal point of the restructuring plan.

149.     At all relevant times, Monterrey was inundated with excess and obsolete inventory. According to CW1, beginning in 2004 and extending to 2005, Monterrey constantly struggled with its inventory, specifically because the "supply chain was spread way too thin." As a result, CW1 stated that Monterrey always had a definitive amount of excess or obsolete inventory at the end of each quarter, much more than one would expect to find in a well-run manufacturing operation.

150.     Moreover, according to CW2, the Individual Defendants knew that Monterrey suffered from serious inventory problems as early as the middle of 2003, during which time Delaney was serving as President of the Americas, and was specifically responsible for transferring certain business units from the U.S. to Mexico. These early inventory transfers did not go smoothly, providing the Individual Defendants knowledge that, prior to commencing the Company's global restructuring in 2005, they needed to sufficiently stagger the transfer of inventory, significantly increase the Company's resources and capacity in Monterrey and/or strengthen the facility's internal controls so that they were synchronized with the inventory management systems used by the U.S. facilities.

151.     Rather than learn from their mistakes, however, the Individual Defendants initiated the restructuring in 2005 without adequate planning, as they admitted. According to

CW2, the Company essentially tried to shut all of the facilities down in the U.S. at once, and "storm over the fence" in Mexico. Indeed, CW2 stated that these ill-conceived transfers caused numerous inventory problems in Monterrey, as inventory from the U.S. was essentially "thrown over the border." Consistent with Defendants' lack of planning, CW2 noted that Monterrey never had a systematic process in place to effectively manage its inventory, let alone the influx of new inventory that was being transferred from facilities in the U.S.

152. CW1, CW2 and CW3 also confirmed that, at the start of the Class Period, the Individual Defendants were fully aware that Monterrey was suffering from inventory problems by virtue of their participation on monthly operational review conference calls. During these conference calls, the Company's senior management, including the Individual Defendants, discussed the problems affecting Monterrey in detail. For example, CW2 recalled that these detailed discussions included problems affecting sales, operations, on-time deliveries, customer satisfaction, profit and loss margins, and the amount of inventory.

### (b) Defendants Knew that Celestica's Deficits Were Fraudulently Manipulated

153. Unknown to investors, Defendants had actual knowledge that Celestica's operating deficits were intentionally understated through manipulation facilitated by the Company's ineffective internal control. As a result, Celestica's earnings were artificially inflated during the Class Period.

154. For example, according to CW11, the Reynosa facility's site controller (Efren Miranda) masked monthly deficits on Celestica's Motorola account during the Class Period by creating fictitious journal entries that understated deficits and overstated earnings, totaling at least several million dollars. CW11 explained that, "if the plant had a loss that month and didn't make [its] numbers, the site controller would add the amount of that loss to the work-in-process

account" to increase the facility's performance. CW12 stated that the variance affecting the Motorola account alone totaled approximately $10 million.

155. This manipulation was ultimately uncovered shortly after a new General Manager (Ali Fami) was assigned to Reynosa in June 2006. Indeed, CW11 stated that, about six weeks after Fami took over Reynosa, he instructed his staff to perform a manual inventory count. This inventory count, according to CW11, uncovered "a lot of issues," including the controller's fictitious journal entries. After the General Manager informed Corporate that he uncovered fraud, the Individual Defendants had no choice but to send numerous senior managers from Corporate to Reynosa to address the issue during Summer 2006.

156. Yet, notwithstanding the fact that Defendants knew that a fraud was committed at Reynosa, they never disclosed this material fact to the market, let alone apprised the Company's investors that Celestica's internal controls had been compromised.

157. According to CW12, this inventory variance "irreparably damaged" the business relationship between Celestica and Motorola. Consequently, CW12 stated that Motorola significantly cut back its orders with Celestica by December 2006. In fact, CW11 confirmed that Motorola has now moved all of its repair business to Jabil, a competitor of Celestica.

### (c) Defendants Knew that the Company Suffered from Weak Internal Controls

158. The foregoing improper accounting practices were facilitated by the chronic and systematic breakdown of Celestica's internal accounting controls throughout the Class Period. These failures contributed to an inherently corrupt financial reporting system, resulting in materially false and misleading financial statements.

159. Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: (A) make and keep books, records and accounts which, in reasonable detail,

accurately and fairly reflect the transactions and disposition of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP. These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

160. Celestica violated Section 13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its restructuring costs and proper valuation of inventory. Celestica's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods, from at least January 2005. Accordingly, Celestica violated Section 13(b)(2)(A) of the Exchange Act.

161. In addition, Celestica violated Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Celestica failed to put into place proper reviews and checks to ensure that its management did not engage in accounting improprieties. It failed to ensure that transactions were reported in accordance with its own policies and with GAAP. Accordingly, Celestica violated Section 13(b)(2)(B) of the Exchange Act.

162. Nonetheless, throughout the Class Period, the Company regularly issued quarterly press releases and annual reports (20-F's) without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

163.     More specifically, as is illustrated in the foregoing, Celestica's financial statements were materially false and misleading because is its earnings were falsely inflated, its costs were decreased Throughout the Class Period, the Company's inventory management was critically flawed due to the fact that Monterrey had two separate MRP systems, neither of which could accurately track the facility's inventory.  This problem was exacerbated by the fact that the Company's U.S. facilities used a different MRP system than Monterrey, which thus prevented Monterrey from accurately tracking (or valuing) the inventory that it received in connection with the inventory transfers during 2005.

164.     As discussed above, for companies in the EMS industry, inventory is the key metric to measure performance, particularly with respect to a restructuring.  In that regard, an effective MRP system is one of the most basic—yet crucial—ways for an EMS company to internally track and monitor its inventory, and thus measure its own performance.  As CW2 explained, the MRP system controls all of the inventory management at a given facility; if it is not accurate, however, the facility's inventory will fluctuate to unsuitable levels causing problems with operations.

165.     Celestica was a prime example of a company that suffered the consequences of a flawed MRP system.  Specifically, CW2 stated that Delaney's attempt to globally implement an MRP system known as SAP.  CW2 explained that, if Celestica implemented SAP effectively, it would have controlled and tracked the Company's inventory in all of its global facilities, managed procurement issues, and forecasted orders from specific customers.  Yet, according to CW2, the Company's ability to accurately assess its global performance suffered, because certain facilities acquired by Celestica during early 2000-2001 used a different MRP system than the rest of the Company, and thus were not linked-in to the Company's global operations.

166.     The Individual Defendants were well aware of the problems that arose due to its facilities' disparate MRP systems.  For example, CW2 stated that senior management was absolutely aware of the problems that arose due to Austin's MRP system, noting that 11 employees from Austin lived in Toronto for six months during Winter 2004 to prepare for Austin's implementation of SAP.  Nevertheless, the MRP system was never implemented in Austin because of the severe problems it caused in other recently-acquired facilities.  In fact, CW2 noted that the Company's failed implementation of SAP in Fort Collins "pretty much brought Fort Collins to its knees."

167.     Notwithstanding the fact that these weaknesses in internal controls caused serious problems for the Company's ability to accurately monitor and track the inventory transferred in connection with the restructuring, it also caused production delays.  In fact, CW2 confirmed that these internal control issues were so severe that they directly caused Celestica to lose customers in 2004, and resulted in the closure of certain facilities.

168.     Following the end of the Class Period on January 30, 2007, analysts were stunned to learn that Monterrey had suffered from a systemic failure due to its use of *two* MRP systems. In fact, in a research report dated January 31, 2007, analysts with Bear Stearns stated that "[t]he complexity [of the restructuring] obviously overwhelmed the Monterrey site, which to our surprise, had *two* ERP systems."  Remarkably, Bear Stearns noted that, following the ouster of Delaney and Puppi, Celestica consolidated its controls in Monterrey to one MRP system in short order.

**(d)     Defendants Knew The Payment of Expenses Was
Manipulated In Order to Inflate Earnings,
Often Exacerbating Production Problems**

169.     Defendants knew that Celestica routinely delayed paying expenses in order to inflate earnings. Indeed, at Corporate, quotas were set to limit the number of invoices that could

be paid in a given period, according to CW7.  Similarly, the accounts payable group, which was under the direct reporting line of Puppi, would regularly "lose" bills or "forget" to enter invoices in the Corporate accounting system for the sole purpose of ensuring that earnings appeared more favorable to Wall Street, recalls CW7.

170.    While Defendants conduct may have boosted earnings within the current period, it undermined the Company's ability to manufacture products in a timely manner.  As a result of these manipulations, both at the Corporate and facility levels, vendors placed Celestica's facilities on credit-holds, refusing to ship more materials until the bills, resulting in production delays and discontent customers.

171.    For example, facilities like Carrollton were oftentimes placed on credit-hold because Celestica missed its payment deadlines to various vendors.  According to CW6, the Company was regularly past due on its payments for amounts up to $1 million.  Indeed some bills were held past due by as much as *two years*.  CW6 confirmed that the facility's management were well aware of this problem, as he was specifically hired to "clean up" this situation.

172.    These woes had a direct impact on Celestica's customer relationships.  Because vendors were being paid in an untimely manner and were imposing credit holds on Celestica, the Company's facilities were unable to produce and deliver product on time.  Consequently, according to CW6, customers were "always upset" with Celestica's "poor performance" during the relevant time period.  For instance, CW6 recalled that one customer (Research-in-Motion) grew so "upset" and "stressed" with by the resulting delays that it insisted upon keeping its own personnel on-site to ensure that Celestica performed to its satisfaction.

173.     Similarly, CW7 noted that one of Carrollton's local suppliers (Corrugate), which essentially kept the Carrollton facility running, was constantly owed significant sums from Celestica.  Specifically, CW7 stated that there were many times when Celestica owed Corrugate upwards of $250,000, and would be in arrears for such payments for over six months.  CW7 personally brought these issues to Puppi's attention, yet no action was taken and the problems kept reoccurring.

## VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

174.     The Class Period begins on January 27, 2005.  On that day Celestica announced in a press release its fourth quarter 2004 results.  Revenues were up for the quarter, but earnings were impacted by restructuring charges:

> For fiscal 2004, revenue increased 31% to $8,840 million compared to $6,735 million for the same period in 2003.  Net loss on a GAAP basis was ($854) million or ($3.85) per share compared to a net loss of ($267) million or ($1.23) per share last year.  Adjusted net earnings for the year were $95.8 million or $0.43 per share compared to an adjusted net loss of ($24) million or a loss of ($0.11) per share for the same period in 2003.

175.     Defendant Delaney commented on the results of the fourth quarter and announced plans for a new restructuring to reduce underutilized assets throughout Celestica's organization and provide its customers with exceptional service:

> Although we are very disappointed with the charges taken in the quarter, we were pleased to see that the fourth quarter delivered solid revenue growth and continued expansion of operating margins, said Steve Delaney, CEO, Celestica.  Over the past few quarters, we have been focused on executing our restructuring plans while meeting our customers' needs, and I am encouraged with the progress we have made.  Our revenue has shown solid growth; operating margins have shown steady improvement; we are building a vibrant lean manufacturing culture; and we have improved our operations footprint and cost profile.  All these factors have contributed to our improved operating results.

While we have substantially strengthened our operations, further improvement is needed. We have spent the past nine months carefully reviewing the business and assessing our operating footprint and, as a result, we have made the decision to further consolidate operations, largely in the higher cost geographies. This initiative will allow us to reduce underutilized assets throughout our organization. In the future, we believe we can generate satisfactory returns while providing our customers with exceptional service.

176. In a conference call held later that day, defendant Delaney outlined the new restructuring plan, touting the "hard benefits" achieved in the previous restructuring and the benefits that would result from the new restructuring:

We were able to drive improvements in manufacturing by growing out our lean culture throughout the global network and delivering higher customer satisfaction. We continued to improve our footprint through expansion and lower-cost geographies and the expansion of services to meeting the growing outsourcing needs of our customers. And importantly, we delivered marketing expansion every quarter in 2004. Though we are encouraged by our progress, the reality is that our returns are still below where they need to be to earn our cost of capital. As a result, after evaluating the needs of our customers and assessing the best roadmap to get back to sustainable and acceptable levels of profitability, we have made the decision to significantly reduce the amount of excess capacity in our system through a new restructuring program that will bring our utilization rates higher and accelerate margin expansion.

In the fourth quarter, our capacity utilization returned to just over 60 percent the first time in two and half years. At the completion of this major initiative, we would expect our EMS production utilization to get to the 70 percent range. At this level, the Company will be able to earn its cost of capital on a more consistent basis while still giving customers the flexibility for upside growth.

In the past year, we have delivered hard benefits from our recent restructuring activities. ***And upon the completion of this new initiative, we believe Celestica will have the highest proportion of capacity in the infrastructure and low-cost geographies among the Tier 1 EMS providers***, while still having the necessary capacity and capability in the high-cost regions in order to offer

broad-based outsourcing solutions to our customers.  [emphasis added].

177.    In response to a question from an analyst during the January 27, 2005 conference call, defendant Delaney represented that the Company would transition 85 percent of its workforce to low-cost geographies:

> In terms of the detail behind your question, let me—I guess I would comment that we expect we will take our population and low-cost geographies to about 85 percent I think is what the number turned out today as we counted it out.  That is spread between Asia, Mexico and Central Europe.

178.    The statements referenced above in ¶¶ 174-77 were materially false and misleading when made because they failed to disclose that Defendants engaged in extensive fraud-related conduct, which misrepresented the Company's financial and operating condition, including the Company's reported earnings, by, *inter alia*:  (a) fraudulently inflating earnings by overstating the value of obsolete inventory; (b) booking false entries to manipulate the level of inventory reflected on Celestica's books; (c) delaying recording new inventory until after the quarter-end; (d) prematurely booking revenue by shipping products to customers near quarter-end that such customers did not order; (e) falsifying the Company's books to manipulate the level of inventory; (f) shipping inventory off-site to temporarily move it off Celestica's books; (g) manipulating the recording and payment of expense in order to inflate earnings; and (h) withholding information concerning the true state of the restructuring and client relations.

179.    In addition, these statements were materially false and misleading when made because they failed to disclose that Celestica's restructuring was a complete failure because: (a) the Company's facilities were suffering from performance issues and manufacturing delays because of excess and obsolete inventory and supply-chain mismanagement; (b) Celestica's internal controls could not handle the magnitude of the business transferred from the U.S.; and

(c) due to the resulting inefficiencies and production delays, key customers, such as Lucent, Cisco, Motorola and AMD, were terminating their dealings with Celestica.

180.    Nonetheless, analysts reacted positively to defendants' materially false and misleading statements.  For example on January 27, 2005, analysts at Deutsche Bank issued a report which stated, "[i]n addition to heavy writedowns in the quarter, CLS announced another $225-275 [million] restructuring program (~80% cash).  These charges represent a painful admission and ***should improve the company's excess capacity situation.***  (~60% utilization; ~10% reduction) ***and support future profitability.  We raise our FY05 EPS estimate from $0.60 to $0.70 to reflect the new restructuring.***"  (Emphasis added.)

181.    The next day, on January 28, 2005, analysts at Key Banc Capital Markets also issued a positive report stating that the accelerated restructuring initiative by Celestica should provide it with a further upside.  The restructuring "should make CLS leaner and most cost competitive as its low-cost manufacturing increases to 85%, ***allowing for better operating leverage and higher returns.***"  (Emphasis added.)  "We expect higher revenues and improving utilization, a continued transition to lower-cost regions and lean six-sigma initiatives on track, we forecast gross margins should improve to 6.1% and 6.6% in FY05 and FY06 respectively (vs. 5.1% in FY04).  Operating margins should also expand, as we forecast 2.7% and 3.3% for FY05 and FY06 respectively (vs. 1.4% in FY04) due to declining SG&A as a percent of sales."

182.    Several analysts raised their recommendations and earnings estimates for Celestica as a result of the new restructuring as follows:

- RBC Capital Markets - "outperform" and raising price target to $18 from $17

- Citigroup, Smith Barney—comments "good cost control—a result of restructuring, better utilization & lean mfg = ***increased margins***"

- Equity Research—comments when referred to new restructuring "[w]e believe they are taking the right measures to rationalize their geographic footprint." ***Strong Buy***.

- Kaufman Brothers Equity Research—***upgrade*** rating to hold and increasing EPS projection to $0.75 from $0.61.

183.    On March 7, 2005, Celestica participated in a conference at Morgan Stanley ("Morgan Stanley Conference").

184.    Defendant Delaney responded to a Morgan Stanley analyst's question regarding an update on the restructuring plan announced on January 27, 2005:

> So our intention is [that the restructuring] will get us to really the strategic footprint that we want to have in place, ***and with it of course it generates savings as well in the $120 to $150 million range of savings associated with this. And I think the restructuring program we said was 225 to 275 million***. And so that process is underway. We've announced a couple of plant closures in Iowa and in Raleigh, as well as some other reductions in the Company and we are not quite done with kind of all of the work that you have to do to get these things in place. ***So that plan is pretty much on track***. So what that really means to you guys is that we have still some additional benefits to get in this quarter and next from last year's restructuring program. This current restructuring probably doesn't really take effect until second half of this year is really when you're going to start seeing most of those benefits will flow through the first half of next year in terms of the incremental benefits of that restructuring. [Emphasis added.]

185.    At the same conference, an audience member asked defendant Delaney about the challenges associated with transferring client's businesses to lower cost geographies and if there was any client dissatisfaction as a result of the restructuring. Defendant Delaney falsely stated that the Company will not lose business from its customers as a result of the restructuring:

> [W]e rarely lose business as a result of [a restructuring], and I expect that to be the case going forward as well. So these restructuring announcements generally improve our value proposition with our customers and don't cause them to deteriorate. I mean especially in the case of major customers, which would be probably obvious. I won't get into any specific

customer relationships—that doesn't make a lot of sense to do publicly, but I would say tentative as a general rule our relationships with our customers over the past year has **improved pretty dramatically and not deteriorated in any way**. [Emphasis added.]

186.    Furthermore, at the Morgan Stanley Conference an audience member asked defendant Delaney if there were any problems with excess inventory at any of Celestica's facilities. Defendant Delaney touted that "[t]here are no big glowing spots on the radar screen in terms of problems spots for anything else that I can see at this point." ***I think in general at least compared to third quarter it feels like there is less inventory…"***. (Emphasis added.)

187.    On April 21, 2005 Celestica issued a press release announcing its financial results for the first quarter of 2005:

> Revenue was $2,151 million, up 7% from $2,017 million in the first quarter of 2004. Net loss on a GAAP basis for the first quarter was ($11.6) million or ($0.05) per share, compared to a GAAP net loss for the first quarter of 2004 of ($12.1) million or ($0.06) per share. Included in these results is $31.9 million in charges associated with the company's previously announced restructuring activities.

188.    In the press release, defendant Delaney was quoted stating that the restructuring was experiencing ***"steady progress"*** and that the Company was executing well and ***"driving efficiency in all areas of the operations"***:

> "Results for the quarter were as expected and continue to demonstrate the steady progress being made at Celestica," said Steve Delaney, CEO, Celestica. "Our employees continue to execute well and are ***driving efficiency in all areas of the operations***. For the remainder of the year, our focus will be to further improve our financial returns, complete our restructuring initiatives, and grow our revenue base through additional penetration of diversified end markets, expansion of our services offering and superior execution for our customers." (Emphasis added.)

Furthermore, defendant Delaney announced Celestica's "increased" guidance for the second

quarter of 2005:

> For the second quarter ending June 30, 2005, the company anticipates revenue to be in the range of $2.1 billion to $2.35 billion, and adjusted earnings per share ranging from $0.13 to $0.21.

189.    In a conference call held later that day defendant Delaney continued to make

false misrepresentations and touted the steady progress that the Company was making with the

restructuring in the first quarter of 2005, highlighting its "excellent manufacturing" at its

Monterrey, Mexico facility:

> In terms of profitability, our focus on margins and returns are also playing out, with a very solid year-over-year improvement. Working capital progress is positive. And our teams are expecting to drive even better performance in the coming quarters.
>
> On the operations front, a drive for greater efficiency throughout our global operations **is contributing to our profitability progress**, particularly in the areas of Lean Six Sigma. As you recall, from the quarter our Lean expertise was dually noted with the winning of the prestigious shingo price for excellent manufacturing [at our Monterrey Mexico facility].
>
> ***
>
> Restructuring is also progressing as planned with cost reductions expected to show up in the second half of this year. These actions have been difficult for our organization, but I can't say enough about how our people have responded and have been so centrally focused on **ensuring our customers are not disrupted by these activities.** [Emphasis added.]

190.    On the April 21, 2005 conference call, Patrick Parr, a UBS analyst asked

defendant Puppi if the Company is still on target to have $225 to $275 million worth of

restructuring costs, since it already took $30 million in restructuring costs the first quarter of

2005. Defendant Puppi positively responded that there would be no change in estimate: "So we

expect that we're still in that range. Comfortable in that range, with no real change in our expectations from a quarter ago."

191.     The statements referenced above in ¶¶ 183-90 were materially false and misleading when made because they failed to disclose that Defendants engaged in extensive fraud-related conduct, which misrepresented the Company's financial and operating condition, including its reported earnings, by, *inter alia*: (a) fraudulently inflating earnings by overstating the value of obsolete inventory; (b) booking false entries to manipulate the level of inventory reflected on Celestica's books; (c) delaying recording new inventory until after the quarter-end; (d) prematurely booking revenue by shipping products to customers near quarter-end that such customers did not order; (e) falsifying the Company's books to manipulate the level of inventory; (f) shipping inventory off-site to temporarily move it off Celestica's books; (g) manipulating the recording and payment of expense in order to inflate earnings; and (h) withholding information concerning the true state of the restructuring and client relations.

192.     Moreover, these statements were also materially false and misleading when made because they failed to disclose that:

          (a)     Celestica's Mexican facilities were wholly unsuitable for the surge in customers, and were inundated with excess and obsolete inventory;

          (b)     Defendants' assurances that Celestica's customers were not dissatisfied as a result of restructuring was completely fictitious when made. Defendants knew or recklessly disregarded that certain customers, including Lucent, Cisco, Motorola, Teradyne and AMD, were dissatisfied with Celestica's performance was plagued by severe manufacturing delays and inventory management problems; and

(c)     Defendants' express representation that the restructuring was making "steady progress" and was going to continue to improve operations and implement the Company's lean footprint was false when made.  Indeed, Defendants knew or were reckless in not the restructuring was a failure because Defendants knew that: (i) the restructuring cost accruals of $225-$275 million were too low due to all of the problems at Celestica's facilities, as alleged herein; (ii) the promised benefit of $125-$150 million was going to be offset by inventory management problems at Celestica's facilities; and (iii) weak internal controls surrounding inventory would prevent it from manufacturing customers' products effectively.

193.    Even though the end markets from Celestica's OEMs, such as IBM and Sun Microsystems were weak for the quarter ended, analysts still remained impressed with Celestica's restructuring efforts because of defendants' false and misleading statements.  For example, on April 21, 2005, National Bank Financial reported that "[w]e still ***remain impressed with management's ability and continued plans to cut costs and improve efficiencies***."  Also in CIBC World Market report dated April 21, 2005, analysts commented that "restructuring benefits should ***continue to drive further margin expansion***" and maintained its forecast of "sector outperformer."  Moreover, on April 21, 2005, Citigroup Smith Barney reported that Celestica's "***restructuring is on track***—should help propel operating margins toward CLS target of 3.5% by end of CY05 & north of 4% long term."  (Emphasis added.)

194.    Further, on April 22, 2005, analysts at Independent Research PLC were also optimistic about the Company's restructuring based upon defendants' false and misleading statements and reported that the restructuring was helping to reduce its losses.  Specifically analysts commented that "despite a moderate outlook for revenue growth, the company is expected to be profitable through restructuring initiatives such as moving production to lower

cost geographies and reducing the workforce." Echoing the views above, RBC Capital markets reported on April 22, 2005 that Celestica continued to turnaround despite end-markets. Specifically analysts noted that "CLS took a $32MM charge relating to its 2nd round of restructuring, which encompasses 5 plant closures and 1,900 layoffs." "Results should begin to show a meaningful impact from Q305 onwards." *We maintain our Outperform.*"

195.    On both June 1, 2005 and June 2, 2005, various analysts released reports on their expectations for the Company's second quarter 2005 financial results. RBC Capital Markets analysts wrote a report titled "CLS: Continues To Move In The Right Direction" the article commented that "CLS continues to see incremental cost savings from restructuring/lean initiatives. We believe *restructuring is progressing as planned* and we should hear about more plant closures in the coming months." Additionally, Key Banc Capital Markets commented that "[a]fter a one-on-one meeting with Chief Executive Officer Steve Delaney, we feel more confident about CLS' ability to achieve its financial goals and complete its aggressive restructuring on schedule. CLS remains our *favorite name in the group*, as we believe that by 4Q05 it should cover its cost of capital, *benefit from strong margin expansion, continue aggressive capacity reductions, and yet remain attractively valued*." (Emphasis added.)

196.    On July 21, 2005, Celestica issued a press release announcing the following results for its second quarter of 2005:

> Revenue was $2,251 million, compared to $2,314 million in the second quarter of 2004. Net earnings on a GAAP basis for the second quarter were $12.6 million or $0.06 per share, compared to a GAAP net loss for the second quarter of 2004 of ($7.9) million or ($0.04) per share. Included in GAAP earnings for the quarter is a recovery of $13.8 million or $0.06 per share for amounts relating to a customer that were previously provided for in the fourth quarter of 2004.
>
> Adjusted net earnings for the quarter were $39.8 million or $0.17 per share compared to $22.8 million or $0.10 per share for the

same period last year.  Adjusted net earnings is defined as net earnings before amortization of intangible assets, gains or losses on the repurchase of shares and debt, integration costs related to acquisitions, option expense, other charges net of tax.  These results compare with the company's guidance for the second quarter, announced on April 21, 2005, of revenue of $2.1 - $2.35 billion and adjusted net earnings per share of $0.13 to $0.21.

197.    Defendant Delaney attributed the beneficial results of the second quarter of 2005 to the purportedly effective restructuring initiatives, representing as follows:

"Our second quarter results continue to ***show the benefits from reducing excess capacity and implementing efficiency initiatives across the organization***," said Steve Delaney, CEO, Celestica. "While the second quarter environment was stable, third quarter demand is rolling up weaker than the seasonality we would typically experience.  Despite the challenges of softening demand in some of our largest segments, we will continue to aggressively focus on expanding margins and returns on capital for the balance of the year."  (Emphasis added.)

198.    Later that same day, Celestica held a conference call to discuss their second quarter 2005 results and guidance for their third quarter 2005.  Defendant Delaney touted the Company's restructuring activities and further stated that the Company was doing an "effective job" of taking care of Celestica's customers during the transfer process.

Our restructuring activities are under way and ***the organization is doing an effective job at taking good care of our customers during the transfer process.***  And on the manufacturing front, our Lean activities continue to generate benefits for us and our customers.  Recently we've been recognized for our accomplishments in this area by Juniper Networks.  And I feel that with our Lean initiatives, we're building a distinct advantage in our Company.

\*\*\*

***The reason I feel our footprint remains in good shape, is that when our current restructuring program is completed, we will have over 80% of our EMS structure and 85% of our people in low-cost regions.***  These numbers still feel right to us based on the outsourcing and service offering opportunities and the unlaunched new business backlog that we are carrying.  [Emphasis added.]

199.    On the July 21, 2005 conference call, defendant Puppi updated analysts on the

restructuring "benefits" that will flow from the restructuring:

> As of June 30th, 2005, we had reported severance costs related to
> approximately 2,000 employees.  To date, five plants in the
> America's and three plants in Europe are working through their
> closure and transition activities.  We anticipate that most of the
> Americas activities will be completed by the end of 2005.  With
> European activities to be expected to be completed in early 2006.
>
> As these activities are completed, these actions should drive robust
> margin expansion for these regions.  In total, we are expecting to
> remove $125 to $150 million in annual costs.  ***There is really no
> change in this expectation.***  About $65 million in charges have
> been recorded so far in 2005 with about $48 million being cash
> costs paid out.  [Emphasis added.]

200.    On the same conference call, an analyst at RBC Capital Markets asked defendant

Delaney about the recent end market weakness that was leading to relatively lower guidance for

the Company's third quarter of 2005.  Amit Daryanani, an analyst at RBC Capital Markets,

asked if the decreased guidance was a result of inventory problems at Celestica's facilities or if

it was purely weak end-markets.  Defendant Delaney completely side-stepped the question by

responding "it's too early to tell":

> Well, Amit, it's a little ***bit too early to tell*** as we work our way
> through the quarter we'll know more.  I know there's at least one
> case was one customer where there's some inventory adjustments
> being made.  But as I've said, you've heard me say in the past,
> there's always things like the communications world, the big
> contracts or big deals as they were made to sort of come to an end
> of an implementation.  New ones start at different times and stuff
> like that.  [Emphasis added.]

201.    Another important question that was unanswered by defendant Delaney during

the July 21, 2005 conference call was from Bear Stearns analyst Thomas Hopkins:

> THOMAS HOPKINS:  Just a little more follow-up on a cautious
> end-market outlook.  It doesn't seem to fit with what we're hearing
> from some of the OEMs.  I know someone else mentioned this, but
> as well some of your competitors, Benchmark reported today and

actually said that the end-markets were strengthening for them beyond what they're getting from their outsourcing. And I know you guys share some key customers like Sun and EMC. So I'm just trying to reconcile what, in fact, it is in the revenue that's different from what your customers and competitors are saying.

DELANEY: Thomas, I'm sorry. I just can't do any bridging to competitors' and customers guidance that you're getting.

202.    Moreover, during the July 21, 2005 conference call defendant Delaney responded to analysts' questions regarding progress of the restructuring:

Well, from the program that we have underway just completed the second quarter, we have virtually none of this savings flowing in this quarter. *So we'll start seeing some of the benefits flowing mostly from the Americas*, as some of the Americas reduction in the second half of this year. And then the Europe savings will be flowing a little bit later. So more towards the first quarter next year with probably full benefits second quarter so. [Emphasis added.]

203.    Additionally, defendant Puppi stated that the Company is going to have substantial margin improvement in the coming year. An analyst at Wells Fargo questioned defendant Puppi's previous statement about margin improvement because according to management the full benefits from the restructuring are not going to be recognized until 2006. Defendant Puppi responded that the margin improvement is going to flow from "further efficient Americas operations."

204.    The very next day on July 22, 2005, Lucent Technologies confirmed its plans to shift the manufacturing services contract of its switching and optical business from Celestica to Solectron, Celestica's major competitor. The final contract with Solectron was not signed as of the date of the announcement. Celestica however will continue to provide manufacturing services for Lucent's wireless business.

205.    The statements referenced above in ¶¶ 196-203 were materially false and misleading when made because they failed to disclose that Defendants engaged in extensive

fraud-related conduct, which misrepresented the Company's financial and operating condition, including its reported earnings, by, *inter alia*: (a) fraudulently inflating earnings by overstating the value of obsolete inventory; (b) booking false entries to manipulate the level of inventory reflected on Celestica's books; (c) delaying recording new inventory until after the quarter-end; (d) prematurely booking revenue by shipping products to customers near quarter-end that such customers did not order; (e) falsifying the Company's books to manipulate the level of inventory; (f) shipping inventory off-site to temporarily move it off Celestica's books; (g) manipulating the recording and payment of expense in order to inflate earnings; and (h) withholding information concerning the true state of the restructuring and client relations.

206.     Furthermore, these statements were materially false and misleading when made because they failed to disclose that:

(a)     Contrary to Defendants' express representations, the weak guidance for the third quarter of 2005 was not just a result of weakened end-market demand. Defendants knew or were reckless in not knowing that the weak guidance was a result of the Company's operational and inventory problems at its Mexican and U.S. facilities, which were plagued by weak internal controls and poor inventory management;

(b)     Defendants' assurances that they were doing a good job of taking care of their customers during the restructuring and that there was no customer dissatisfaction was completely fictitious when made. Defendants knew or recklessly disregarded that their customers, including Lucent, Cisco, Motorola, Teradyne and AMD, were dissatisfied with Celestica's severe manufacturing delays and inventory management problems; and

(c)     Defendants knew or were reckless in not knowing that the restructuring was a failure because: (i) the restructuring cost accruals of $225-275 million were too low due

to all of the problems at Celestica's facilities, as alleged herein; (ii) the promised benefit of $125-$150 million was going to be offset by inventory management problems at Celestica's facilities; and (iii) weak internal controls surrounding inventory would prevent it from manufacturing customers' products effectively.

207.    Analysts were cautious in their ratings after management announced that reduced earnings guidance was expected for the third quarter of 2005.  Nonetheless, analysts were still persuaded by defendants' false and misleading statements regarding its "effective" restructuring and competitive foot print.  For example, on July 22, 2005, Wells Fargo Securities LLC commented that "[w]e expect the company to continue its aggressive restructuring, and believe that its efforts should result in improving margins."  On August 2, 2005, Independent Research PLC analyst reported an article titled "Restructuring helps to improve margins" and commented that "we view [m]anagement's target of achieving operating profit margins of 3.5% and 4.5% for FY 2005 and FY 2006 respectively, as reasonable and achievable."

208.    On September 13, 2005, Celestica participated in BMO Nesbitt Burns 2005 Media & Telecom Conference.  At the conference, Paras Bhargava, an analyst at BMO Nesbitt Burns, asked Delaney what Celestica intended to do if the pricing environment in the technology and communication markets stayed soft.  Delaney responded that Celestica was going to fight against weak end-markets by having the "best footprint" in the marketplace.

> So our solution to that is then to get the footprint right, which we've been working really hard at doing, get back-office costs at the lowest level that they can be, and low-cost geographies; make our execution stand apart, which we've been doing over the past 18 months and have a terrific reputation with our customers.  ***It has been improving every quarter.***  Implement lean manufacturing so that we get the respect of customer in terms of the best production system going on out there.  And then take to them solutions that include a variety of things that range from things like design solutions on lower-end cost or design savings to fulfillment-related

solutions as well, to get them the product and the geo [sic] it finally gets consumed in at the lowest cost.  [Emphasis added.]

209.    On October 20, 2005, the Company announced in a press release their third quarter 2005 earning results and fourth quarter guidance:

> Revenue was $1,994 million, compared to $2,176 million in the third quarter of 2004.  Net loss on a GAAP basis for the third quarter was ($19.6) million or ($0.09) per share, compared to a GAAP net loss for the third quarter of 2004 of ($24.4) million or ($0.11) per share.  Included in GAAP net loss for the quarter are charges of $40.9 million associated with previously announced restructuring plans, and a $6.8 million charge associated with the company's previously announced option exchange program approved by shareholders in April of this year.  Adjusted net earnings for the quarter were $27.1 million or $0.12 per share compared to $25.3 million or $0.11 per share for the same period last year.  Adjusted net earnings is defined as net earnings before amortization of intangible assets, gains or losses on the repurchase of shares and debt, integration costs related to acquisitions, option expense and option exchange costs, other charges net of tax.…  These results compare with the company's guidance for the third quarter, announced on July 21, 2005, of revenue of $1.9 - $2.2 billion and adjusted net earnings per share of $0.09 to $0.19.

210.    Defendant Delaney attributed the depressed results of the third quarter 2005 to end-market weakness, however the outlook for 2006 was positive due to the purported effective restructuring initiatives, representing as follows:

> "This quarter's results reflect the continued weakness we had previously highlighted from our largest communications and information technology end markets," said Steve Delaney, CEO, Celestica.  "Though our outlook for the December quarter is more moderate than what we would typically expect, I am very pleased with our new program wins, the customers we have added and the opportunities ahead of us.  We expect these wins to improve our endmarket diversification and to translate into revenue growth in 2006.  As these new programs ramp, *we will focus on completing our restructuring activities and aggressively managing our costs to ensure margins are maintained and improved in the coming quarters.*  We will also remain highly focused on our global Lean implementation, *which we believe can translate into the most competitive and robust supply chains for our customers*.  [Emphasis added.]

211.    Later that same day, the Company held a conference call with analysts to discuss

the Company's third quarter results and year end 2005 guidance.  Defendant Delaney opened up

the conference call with a discussion on third quarter results and the positive outlook for 2006.

> As we highlighted in our last call in July, the September quarter
> was challenging for us as our largest end markets in
> communications and IT were expected to experience weaker
> demand in what's already a soft quarter in our business.  Demand
> from our top ten customers, which has made up over 65% of our
> revenue in past quarters was especially hard hit.  Nine of our top
> ten represented an aggregate 18% decline in this group.
>
> ******
>
> As we look into the fourth quarter, we see marginal recovery in
> revenue.  Certainly a lot less than I would expect from a normally
> strong December quarter.  This weakness seems to be more
> concentrated in server storage and telecommunications areas,
> continuing the weak demand profile in these areas relative to what
> we saw in the first half of this year.  While the immediate demand
> is disappointing, I'll highlight what we've been doing about it.
> Despite a tumultuous demand environment **we've been executing
> well, generating good customer satisfaction from our efforts
> while making dramatic improvements in our costs.**  [Emphasis
> added.]

212.    Thereafter, defendant Puppi provided analysts with an update on the Company's

restructuring activities, he assured analysts that the Company was still on track, but the estimate

for the cost of the restructuring was going to be on the high side of the previous announced

guidance due to weak end-market demand:

> I'll now provide you with an update on our restructuring activities.
> As of September 30th, 2005, we have recorded severance costs
> related to approximately 2400 employees.  To date, six plants in
> the Americas, three plants in Europe are part of the restructuring
> program, and we are working through their closures and transition
> activities.  We anticipate that most of the Americas' activity should
> be completed by the end of 2005.  The European activities
> expected to be completed in mid 2006.  **Though some of these
> activities could extend by a quarter,** due to customer decisions
> around the timing of program moves.

We announced our program at the beginning of the year, and
estimated restructuring charges of $225 to $275 million. We
expect this program to reduce the global workforce by about 5500
employees. Particularly in high cost geographies, and we expect
the majority of the program to be completed by March 2006,
though this could extend by about a quarter as I just mentioned.
***We believe we will migrate to the higher end of the range
considering the end market pressure.***

When completed, we continue to remain comfortable that we will
remove $125 to $150 million in annual costs, and other utilization
factors and margins will expand as a result. $105 million of
charges have been recorded so far in 2005 with about $90 million
of cash costs being paid out this year. [Emphasis added.]

213.    Interestingly, on the October 20, 2005 conference call, Alex Blanton, an analyst

at Ingalls & Snyder, asked defendant Delaney about the inventory buildup during the third

quarter and if its customers were responsible for paying inventory overages. Defendant

Delaney agreed that there were some overages of inventory, but the excess inventory was not

obsolete and that the Company was going to still use the inventory and not write it off.

[P]ay, practice or policy is still in effect here. This inventory
buildup is simply related to, I guess what I would call a short term
buildup that occurred because the demand fell out in front of us. It
didn't become obsolete, Alex and so it didn't get—***the inventory
that was built up wasn't in the category of inventory that we
would put back to a customer because it's expected to be used in
the reasonably near future***. [Emphasis added.]

Moreover, defendant Delaney mentioned that "[v]irtually all of the [inventory overages] was [a

result] of decline in stated customer demand" as opposed to expecting order that never came in.

214.    Furthermore, on the October 20, 2005 conference call, Carter Shoop, an analyst

with Deutsche Bank asked defendant Delaney if he could discuss the restructuring and the

impact it has had on the Company's top line. Specifically, Mr. Shoop stated "[y]ou guys have

been definitely… pretty aggressive in closing down plants or anticipating to close down plants.

Can you talk specifically about expediting some orders, maybe moving orders around here or

there and if that affected the second half of '05 at all?" Defendant Delaney responded that there was no significant affect on the second half of '05, and that there were only a few small customers that did not want to move their operations which had no major effect.

215.    Also on the October 20, 2005 conference call, Scott Craig, a Banc of America analyst asked defendant Delaney about how much time it took to manufacture a product for a customer. Specifically, Mr. Craig said, "I guess I'm a little bit confused on an inventory perspectives, with lead times being so short, and you guys putting a focus on LEAN manufacturing et cetera, I'm curious why [Celestica] can't turn off the components purchases quite as fast as what needs to be done, particularly in light of those short lead times right now?" Defendant Delaney responded by blaming the Company's vendors for the delay in manufacturing.

> DELANEY: Well, the simple answer is the lead times aren't short. That's the problem. They're short in our plants, so the product races through our plants in very little time generally, but the problem is a 14-week lead time oftentimes on some of the components coming in. That's clearly the problem that we have to solve, is our customers are getting much better lead times from us then we're getting from our suppliers. Guess what we're working on?

216.    The statements referenced above in ¶¶ 208-15 were materially false and misleading when made because they failed to disclose that Defendants engaged in extensive fraud-related conduct, which misrepresented the Company's financial and operating condition, including its reported earnings, by, *inter alia*: (a) fraudulently inflating earnings by overstating the value of obsolete inventory; (b) booking false entries to manipulate the level of inventory reflected on Celestica's books; (c) delaying recording new inventory until after the quarter-end; (d) prematurely booking revenue by shipping products to customers near quarter-end that such customers did not order; (e) falsifying the Company's books to manipulate the level of

inventory; (f) shipping inventory off-site to temporarily move it off Celestica's books; (g) manipulating the recording and payment of expense in order to inflate earnings; and (h) withholding information concerning the true state of the restructuring and client relations.

217.     In addition, these statements were materially false and misleading when made because they failed to disclose that:

(a)     Contrary to Defendants' express representations that Celestica was going to have the best footprint in the EMS industry and that the Company was going to aggressively manage costs of the restructuring to ensure that margins of 3.5 percent were met, Defendants knew that they could not implement a competitive footprint because its facilities were plagued with inventory problems and, as a result, those problems would reduce operating margins;

(b)     Defendants' false assurances that they were doing a good job of taking care of their customers during the restructuring and that there was no customer dissatisfaction was completely fictitious when made.  Defendants knew or recklessly disregarded that their customers, including Lucent, Motorola, Cisco, Teradyne and AMD were dissatisfied with Celestica's severe manufacturing delays and inventory management problems;

(c)     Defendants knew or were reckless in not knowing that the restructuring was a failure because:  (i) the restructuring cost accruals of $225-275 million were too low due to all of the problems at the Company's facilities, as alleged herein; (ii) the promised benefit of $125-$150 million was going to be offset by inventory management problems at Celestica's facilities; and (iii) weak internal controls surrounding inventory would prevent it from manufacturing customers' products effectively; and

(d)     Defendants' false assertions that Celestica was experiencing delays in manufacturing because vendors were late in producing inventory parts is deceptive because

defendants knew or were reckless in not knowing that delays from vendors were a result of Celestica's severe credit problems which were not disclosed to investors.

218.    Analysts were cautious in their reports after reduced guidance was expected again for fourth quarter of 2005.  Nonetheless, based upon defendants' false and misleading statements analysts were persuaded to issue positive reports.  For instance, on October 20, 2005, CIBC World Market reported that "restructuring benefits should continue to drive further margin expansion but the full impact will most likely be felt in 2H/06."  Additionally, on October 21, 2005, Credit Suisse First Boston reported that "***Celestica is making continued progress on its restructuring plans***.  We believe the 2005 plan will result in charges at the top end of the $225-275 million range, but will drive $125-150 million in annual cost savings." (Emphasis added.)  Moreover, on the same day, RBC Capital Markets stated that "current valuations and managements focus to aggressively attack its cost-structure—make CLS our preferred turnaround story in the industry."

219.    Further, on December 12, 2005, analysts at Halpern Capital reported that "[a]s restructuring programs wind down, operating leverage should gain momentum."  … "after laboring for the better part of the last 4-years to restructure its operating model, ***we believe Celestica is now beginning to see tangible benefits from this drawn out process***."  (Emphasis added.)

220.    On January 26, 2006, Celestica announced its 2005 results.  In a press release, the Company reported the following results:

> For 2005, revenue was $8,471 million compared to $8,840 million in 2004.  Net loss on a GAAP basis was ($47) million or ($0.21) per share compared to a net loss of ($854) million or ($3.85) per share last year.  Adjusted net earnings for the year were $129 million or $0.57 per share compared to adjusted net earnings of $96 million or $0.43 per share in 2004.

Defendant Delaney commented on the results, noting that the Company had addressed restructuring issues in a plant in the Americas:

> "Demand in the quarter showed some modest seasonal strength, particularly in our server segment," said Steve Delaney, CEO, Celestica. "Profitability was adversely affected by the cost of supporting significant transfer activity combined with a late surge in demand in one of our Americas plants. Transition activity continues in the site in the first quarter, but we have deployed the necessary resources **to restore efficiencies by the second quarter**." [Emphasis added.]

221. In a conference call held later that day, defendants admitted that the Company's Mexican facilities experienced some difficulties the past quarter, but assured analysts that the situation had been remedied with the allocation of additional resources, that the "biggest challenges are behind the Company," and that new customer orders would help the Company:

> On a sequential basis, operating margins were flat at 2.3%, while returns on invested capital increased to 8.7%, up from 8.1%. Given the stronger revenue, we typically would expect better profit performance, but this was not the case, as **we incurred higher costs in our Americas region to support the major program transfers that occurred throughout the region**. Specifically, the transformation of one particular plant [in Mexico] was significant. With major growth in head count, space, and equipment as a result of transfers and demand increases. In addition to programs transferring from other sites this plant is also ramping through new wins and additional customers in the first quarter. While I won't give specific customer names these new wins include a major consumer win with a Japanese OEM that will be ramping in both the Americas and in Europe, and multiple new programs in some major aerospace and communications companies.
>
> To support this activity we will incur ramp costs due to the learning curves and we will deploy more resources in the short term to ensure strong execution in the first quarter. This will have a moderating effect on margins for the March quarter as well. However, we are comfortable and excited with the prospects for this region as we progress through the year. Asia continued to be our strongest region for the Company and our teams continued to deliver solid results. Margins improved 20 basis points sequentially to 4% and customer satisfaction levels continue to be very high. In Europe, we continued to experience quarterly

operating losses, though the completion of our restructuring over the next two quarters should get the operations back to positive operating profit later this year.

***

***On the profitability side, we expect to continue to make steady progress on margin improvement***, particularly in the second half of the year as restructuring is completed and new programs start to contribute to our top line.  The first half of the year and then particularly the first quarter will show some moderating pressure as we incur the ramp expenses that I highlighted earlier, but we are optimistic that we will be back on track by the second quarter and hit our 3.5% operating margin target and exceed our cost of capital by the December quarter.  Overall we believe the biggest challenges are behind the Company, but recognize there's still substantial work to be completed this year.  We will be a successful business because we will build on the improvements that we have been making over the last two years."  [Emphasis added.]

222.　　Defendant Puppi's statements echoed defendant Delaney's statements on the

January 26, 2006 conference call.  Puppi stated "[w]e continue to target operating margins of

3.5% as we exit 2006.  We believe this is a realistic goal, and a necessary result supported by

the achievement of approximately $150 million in annualized cost savings upon completion of

the restructuring."  Notwithstanding the foregoing, defendant Puppi announced that:

Operating margins came in at 2.3%, unchanged from the third quarter.  Despite our revenue increases and some incremental benefits from our restructuring, our profitability was severely impacted as a result of higher than expected costs incurred in one of our America's plants.  These additional costs were as a result of significant transfer activities, new program ramps, and changes in customer demand later in the quarter.  These factors severely impacted our efficiency in labor and equipment, as well as causing premiums to be incurred to execute higher demand.  Furthermore, we had to delay the completion of some of the restructuring to the first quarter in order to assist with the capacity relief in the month of December.

***

In terms of restructuring update as of the end of the year, we had recorded $160 million in restructuring charges in 2005, the balance of the $275 million program is to be incurred in 2006, of the $160 million charge, cash charges amounted to $149 million. To date, six plants in the Americas and three plants in Europe have been announced for closure as part of the restructuring program. Of these, three plants were closed by December 31, with the final three plants expected to be closed by the end of the second quarter. Over 5500 employees will be affected in total when complete.

223. On the January 26, 2006 conference call, Bernie Mahon an analyst at Morgan Stanley asked defendant Delaney why he has confidence that the problems both with ramping and the restructuring will be fixed as the company heads into the June quarter and the second half of 2006. Defendant Delaney responded that:

As we go into the first quarter, we understand what these problems are and the amount of transfers that we have remaining from areas such as the rest of our Americas plants, where there's been a major amount of restructuring is coming to a close. And so we're going to complete that program. We understand the problems that we caused for ourselves relative to transfer planning and also then in the second quarter, I'm expecting a pickup coming from some of these new programs, as we start to gain the revenue from some of the launches that take place in the late in the first quarter as well. That's why I'm confident. ***We have our arms around the mistakes that we made relative to transfer planning, but we then we'll start seeing the benefits of some of this new revenue too.*** [Emphasis added.]

224. Moreover, on the January 26, 2006 conference call, Brian White, an analyst at Kaufman Brothers, asked if the problematic transfers in the Americas had any impact on customer relationships. Defendant Delaney responded that "we threw lots of time, money, and energy at these transfers to get them to execute well. ***I don't expect any adverse effects*** and in some cases we had a very tough time getting out this demand from some of these customers. But we remain committed to recover and get back on track for these customers." (Emphasis added.)

225.    After Celestica released their fourth quarter 2005 results, analysts were cautious in their ratings and reports.  Faced with this skepticism, Defendants provided a false optimistic assessment of Celestica's restructuring in order to dispel suspicions.  For example, CIBC World Market analysts reported on January 26, 2006 that "[i]f successful, CLS' new program ramps and restructuring will lead to positive operating leverage in Q2."  …  "Going forward, the company will continue to experience limited gross margin expansion as new product ramps continue.  However these should subside by Q1, when gross margin expansion should come to fruition as cost-cutting initiatives and the past and current restructuring come to an end."  Moreover, on January 27, 2006, RBC Capital Markets reported that "[w]e believe long-term turnaround potential remains, given Q4 06 revenue growth and $500MM of ramps occurring in 2006."

226.    The statements referenced above in ¶¶ 220-24, were materially false and misleading when made by defendants because they failed to disclose that Defendants engaged in extensive fraud-related conduct, which misrepresented the Company's financial and operating condition, including its reported earnings, by, *inter alia*: (a) fraudulently inflating earnings by overstating the value of obsolete inventory; (b) booking false entries to manipulate the level of inventory reflected on Celestica's books; (c) delaying recording new inventory until after the quarter-end; (d) prematurely booking revenue by shipping products to customers near quarter-end that such customers did not order; (e) falsifying the Company's books to manipulate the level of inventory; (f) shipping inventory off-site to temporarily move it off Celestica's books; (g) manipulating the recording and payment of expense in order to inflate earnings; and (h) withholding information concerning the true state of the restructuring and client relations.

227.     Additionally, these statements were materially false and misleading when made because they failed to disclose that:

(a)     Contrary to Defendants' express representations, the problems associated with Celestica's Mexican facility were not an isolated instance.  As Defendants knew but failed to disclose, the Mexican facility (and, indeed, certain of Celestica's other facilities) suffered from severe inventory management and operational problems that would be impossible to turn around in one quarter;

(b)     Defendants' false assurances that they were doing a good job of taking care of their customers during the restructuring and that there was no customer dissatisfaction was completely fictitious when made.  Defendants knew or recklessly disregarded that their customers, including Lucent, Cisco, Motorola and AMD, were dissatisfied with Celestica's performance because its facilities were suffering from severe manufacturing delays and inventory management problems; and

(c)     Defendants knew or were reckless in not knowing that the restructuring was a failure because:  (a) the restructuring cost accruals of $225-275 million were too low due to all of the problems at the Company's facilities, as alleged herein; (b) the promised benefit of $125-$150 million was going to be offset by inventory management problems at Celestica's facilities; (c) weak internal controls surrounding inventory which would prevent it from manufacturing customers' products effectively.

228.     On February 9, 2006, Celestica and Powerwave Technologies, announced a strategic multi-year outsourcing relationship.  As part of this transaction, Celestica purchased Powerwave's Philippines manufacturing operations.  Kaufman Brothers Equity Research released a report on the same day which stated "[i]n our view, this transaction enhances

Celestica's footprint in a low-cost geography and strengthens the company's relationship with Powerwave." Similarly, on February 22, 2006, RBC Capital Markets reported that Celestica is "[o]n-track to resolve transfer issues." "Essentially CLS needed to rehire employees at the facility to handle a late 4Q surge in demand coupled with product ramps."

229. On March 14, 2006, Celestica participated at Deutsche Bank Securities Technology Conference ("Deutsche Bank Conference"). Defendant Puppi spoke about the restructuring and the "positive" outlook he had for the upcoming year:

> We feel very strongly this is ***our last kick at the cat***, actually, and we have, probably, the most meaningful restructuring underway. We're about a ***third of the way through in terms of kind of benefit realization***. So there has been some flow from what I would call largely an Americas-based restructuring set of actions that have been taken to date.
>
> We've announced closures, as well, in Continental Europe that will effect themselves through the course of the first three quarters and I then I think you'll get the completion of the program by then and the full swing of the cost reduction that we anticipate. And just for— as a reminder, those cost reductions should amount to around $150 million a year when all told. So that's between a $35 and a $40 million quarter sort of improvement and we're about a third of the way through there.
>
> So I think that's kind of a—and you'll see the charges get effected through the course of the year, as well. ***We did about $120 or so million of charges last year, but our belief is that this is the last round. We will have, at the end of this, one of the most competitive footprints in the industry***. We will have north of 80% of our capacity in -- in the low-cost geographies. So when we look at the sustainability of that other 20%, we feel extremely good that it's the right stuff for the right markets and the right customers. [Emphasis added.]

230. At the same conference, Carter Shoop an analyst with Deutsche Bank questioned defendant Puppi about the bad press with its customer, Avaya[1] and also about potential

   [1]   On January 23, 2006, Avaya held a conference call with its analyst. On the conference, Don Peterson, Avaya's Chairman, CEO stated "Celestica moved production of our products to a plant in Mexico. This created

problems with customers associated with transferring its business to lower-cost geographies. Defendant Puppi falsely stated that the restructuring to lower cost geographies had not affected customer loyalty. "I'd say that has not been an issue." "We feel very good about the customers that we have…. [s]o as we work through those issues, we feel that those-- that relationship [Avaya] will continue in the same size and magnitude and degree of robustness that it's had for five years. And if you want more color on that, you might want to talk to that company that I think has made some public statements around their interest in renewal."

231. Further, at the Deutsche Bank Conference, even though there was a lot of excess and obsolete inventory at the Monterrey facility as alleged above, defendant Puppi responded to a question from an unidentified audience member at the Deutsche Bank and characterized inventory as "reasonable":

> Unidentified Audience Member: "Are inventories high, low, middle through the chain, et cetera? How would you characterize them?"
>
> Puppi: "I'd say that they're **reasonable**. We're not building inventory on spec. Okay? And I don't feel our customers are. I think their channels are pretty rational right now as I look out into their MRPs, which are linked to ours, as you know."
>
> "I talked about $200 million of what I would call **opportunity from the Celestica point of view**. I wouldn't call that a buildup based on demand, more a reaction on how we actually bring in components in our company, trying to react to some of the upside in having enough room and flexibility for our customers." [Emphasis added.]

232. On March 21, 2006, Celestica filed its 2005 annual report, Form 20-F with the SEC. The report contained certifications signed by defendants Delaney and Puppi, respectively,

---

some challenges during the quarter from a supply stand point. We're continuing to work with Celestica to manage this issue and to make sure we minimize any impact going forward.

representing that the information contained in the report was true, that it did not omit material facts, and that the Company's disclosure on controls and procedures were adequate:

1.      I have reviewed this annual report on Form 20-F of Celestica Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.      The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the company and have:

(a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

***

(c)      Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.      The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably

likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

233.     In the Form 20-F, Defendants reported on Celestica's restructuring, under the headline "key strategic initiatives," stating in relevant part as follows:

> In response to the downturn in the EMS industry, we initiated restructuring plans to rebalance our global manufacturing network and reduce capacity. During the technology downturn, the EMS industry began a major transformation of its manufacturing network. OEM customers wanted their EMS providers to shift more of their production to lower-cost regions, lowering product lifecycle costs and allowing the customers to better compete in their own highly competitive markets.
>
> In 2001, we announced our first restructuring plan. As the downturn continued, and excess capacity in higher-cost geographies remained, we announced additional restructuring plans through to 2006. The restructuring plans are focused on consolidating facilities, thereby ***improving capacity utilization while increasing production in lower-cost geographies and accelerating margin expansion***. Our capacity utilization was approximately 62% in the fourth quarter of 2005. When all of the planned restructuring actions are completed, we expect to have more capabilities and a significant portion of our global manufacturing network in lower-cost regions. As a result of our past and current restructuring efforts, approximately 80% of our employees as of December 31, 2005 were in lower-cost geographies, up from approximately 60% at the end of 2002.
>
> Although our 2005 revenue decreased from 2004, we increased our operating margins and further diversified our customer base by increasing our penetration into markets beyond traditional telecommunications and computing markets. Our focus for 2005 and into 2006 is to complete our restructuring, align our capacity, improve our operating margins, increase our business in industry market sectors such as aerospace and defense, consumer, automotive and industrial, and maintain our strong customer focus by further expanding our electronic product solutions offerings to bring about even greater competitive advantage to our customers.

In support of these goals, we will:

• continue to implement Lean and Six Sigma principles to enhance efficiencies and improve operating margins;

• restructure the remaining underutilized facilities by the end of 2006;

• divest unprofitable and non-strategic activities;

• acquire companies which will allow us to grow in diversified markets;

• continue to offer innovative technology solutions, such as our Green Services™ offering which enables OEMs to comply with emerging environmental legislation while maintaining their focus on their core business initiatives; and

• further grow our culture of innovation, agility, responsiveness, and leadership.

234.    The statements referenced above in ¶¶ 229-233 were materially false and misleading when made because they failed to disclose that Defendants engaged in extensive fraud-related conduct, which misrepresented the Company's financial and operating condition, including its reported earnings, by, *inter alia*: (a) fraudulently inflating earnings by overstating the value of obsolete inventory; (b) booking false entries to manipulate the level of inventory reflected on Celestica's books; (c) delaying recording new inventory until after the quarter-end; (d) prematurely booking revenue by shipping products to customers near quarter-end that such customers did not order; (e) falsifying the Company's books to manipulate the level of inventory; (f) shipping inventory off-site to temporarily move it off Celestica's books; (g) manipulating the recording and payment of expense in order to inflate earnings; and (h) withholding information concerning the true state of the restructuring and client relations.

235.    Moreover, these statements were materially false and misleading when made because they failed to disclose that:

(a)     Contrary to Defendants' express representations, the growing amount of excess and obsolete inventory at facilities such as Monterrey was not "reasonable," and, in fact, was materially inflating the Company's reported earnings;

(b)     Defendants' false assurances that they were doing a good job of taking care of their customers during the restructuring and that there was no customer dissatisfaction was completely fictitious when made.  Defendants knew or recklessly disregarded that their customers, including Lucent, Cisco, Motorola, Teradyne and AMD, were dissatisfied with Celestica's severe manufacturing delays and inventory management problems;

(c)     Defendants knew or should have known that Celestica's facilities were going to continue to suffer from operational issues due to their weak internal controls and poor inventory management and as a result decrease the operational margins;

(d)     Defendants knew or were reckless in not knowing that the restructuring was a failure because:  (i) the restructuring cost accruals of $225-275 million were too low due to all of the problems at Celestica's facilities, as alleged herein; (ii) the promised benefit of $125-$150 million was going to be offset by inventory management problems at Celestica's facilities; and (iii) weak internal controls surrounding inventory which would prevent it from manufacturing customers' products effectively;

(e)     Defendants failed to disclose the above-referenced inventory management and operational problems in the 2005 20-F's discussion entitled "key strategic initiatives," which purported to provide investors with the "goals" and strategic initiatives relating to the restructuring; and

(f)     Defendants' SOX certifications, which falsely certified that the report was free from material misstatements and that Celestica's internal controls did not suffer from

significant deficiencies or material weaknesses, were materially false and misleading for the reasons detailed above.

236.    On April 27, 2006, Celestica issued a press release announcing the following results for the first quarter of 2006:

> Revenue was $1,934 million, compared to $2,151 million in the first quarter of 2005.  Net loss on a GAAP basis for the first quarter was ($17.4) million or ($0.08) per share, compared to a GAAP net loss for the first quarter of 2005 of ($11.6) million or ($0.05) per share.  Included in GAAP net loss for the quarter are charges of $17.0 million associated with previously announced restructuring plans.

> Adjusted net earnings for the quarter were $17.4 million or $0.08 per share compared to $33.4 million or $0.15 per share for the same period last year…  These results compare with the company's guidance for the first quarter, announced on January 26, 2006, of revenue of $1.8 to $2.0 billion and adjusted net earnings per share of $0.04 to $0.12.

Defendant Delaney attributed the decreased results to seasonal revenue decline and restructuring costs, but did not come clean about the extent of the problems facing the Company in Mexico:

> "Our results in the first quarter reflected the impact of a seasonal revenue decline from the fourth quarter as well as substantial investments being made to support our major new program launches and growth in our low-cost facilities," said Steve Delaney, CEO, Celestica.  "We continue to see a positive demand environment into the second quarter.  *As our new programs ramp, material flows stabilize and restructuring activities continue as planned, we expect to show improvements in our operating results in the coming quarters*."  (Emphasis added.)

237.    Later that day, Celestica held a conference call to discuss the first quarter 2006 results with analysts.  On the call, defendants Delaney and Puppi both attributed the first quarter's poor results to weak customer demand and restructuring costs, but both did not mention the extent of the problems facing the facility in Mexico.  Instead they touted Mexico as their "largest manufacturing operation in the Americas."

DELANEY:  After three years of some very volatile end market demand, results in the first quarter and for the outlook in the second quarter are starting to show some benefits of our growth and diversification efforts.

***

Operationally, we're in the final phases of the very aggressive restructuring program that we began early last year.  Though our margins in the Americas and Europe continue to be impacted by the transitions ramping and structuring activities, we are committed to establishing sustainable, highly effective low-cost capabilities in these 2 major regions by the end of this year.

This year, Mexico will become our largest manufacturing operation in the Americas.  This quarter we expect the site's revenue to be more than double the revenue that it experienced in the third quarter last year as a result of the transfer from high cost geography plants, mixed business strength and new business wins. Naturally, this amount of growth has required investment in people training and equipment.

On the working capital front, our performance was weak this quarter, due primarily to a modestly constrained environment for parts.  This resulted in a more back end loaded quarter, which impacted inventory levels, revenue, and receivables, therefore cash flow.  We will be working hard to reverse part of this trend in the second quarter, ***but will support the growth needs of our customers as volumes increase and transitions are completed***. [Emphasis added.]

238.    Moreover, on the April 27, 2006 conference call, Paras Bhargava, an analyst at BMO Nesbitt Burns, asked defendant Delaney what was causing the problems at the Monterrey facility in Mexico because Avaya, Celestica's client, indicated in a press release that it was more than "just back end loading."  Defendant Delaney refused to answer that part of Mr. Bhargava's question and continued to conceal the true gravity of the problems at the Mexican facility.  Defendant Delaney stated that he "really do[esn't] want to get into specific customer comments," but that the restructuring costs increased because "[w]e … added manufacturing

lines in capacity that will focus in some more depreciation in order to just handle the growth but doubling the size of the [Mexican] plant you expect that to happen."

239.    Additionally, on the April 27, 2006 conference call, Lou Miscioscia, an analyst at Cohen Brothers, asked Delaney if he believes that this should be Celestica's final restructuring.  Defendant Delaney, with knowledge of all the severe problems in its Mexican facility responded "[w]e think this footprint is a pretty solid footprint for us."

240.    The statements referenced above in ¶¶ 236-39 were materially false and misleading when made because they failed to disclose that Defendants engaged in extensive fraud-related conduct, which misrepresented the Company's financial and operating condition, including its reported earnings, by, *inter alia*: (a) fraudulently inflating earnings by overstating the value of obsolete inventory; (b) booking false entries to manipulate the level of inventory reflected on Celestica's books; (c) delaying recording new inventory until after the quarter-end; (d) prematurely booking revenue by shipping products to customers near quarter-end that such customers did not order; (e) falsifying the Company's books to manipulate the level of inventory; (f) shipping inventory off-site to temporarily move it off Celestica's books; (g) manipulating the recording and payment of expense in order to inflate earnings; and (h) withholding information concerning the true state of the restructuring and client relations.

241.    These statements were also materially false and misleading when made because they failed to disclose that:

    (a)    Contrary to Defendants' express representations, the problems associated with Monterrey were not an isolated instance.  As Defendants knew but failed to disclose that the Monterrey facility was plagued by severe inventory management and operational problems that would not be resolved in one quarter;

(b)     Defendants' false assurances that they were doing a good job of taking care of their customers during the restructuring and that there was no customer dissatisfaction was completely fictitious when made.  Defendants knew or recklessly disregarded that their customers, including Lucent, Cisco, Motorola and AMD were dissatisfied with Celestica's severe manufacturing delayed and inventory management problems;

(c)     Defendants knew or should have known that their Mexican facilities were going to continue to suffer with operational issues due to other weak internal controls and poor inventory management and as a result decrease the Company's operational margins.

(d)     Defendants knew or were reckless in not knowing that the restructuring was a failure because Defendants knew that:  (i) the restructuring cost accruals of $225-275 million were too low due to all of the problems at the Company's facilities, as alleged herein; (ii) the promised benefit of $125-$150 million was going to be offset by inventory management problems at Celestica's facilities; and (iii) weak internal controls surrounding inventory which would prevent it from manufacturing customers' products effectively; and

(e)     Contrary to Defendants' express representations, the Company did not correct the significant operational issues experienced in Mexico which stemmed from the fundamental shortcoming that the facilities simply were unable to handle the increased workload.

242.    Following Defendants' false and misleading statements regarding the progress of the restructuring and the turnaround of the Company, analysts at Blackmont Capital reported on April 28, 2006 that "the gross margin improvements that should be visible owing the restructuring are being masked by problems at the Mexican facility (which are revenue ramp issues as opposed to revenue decline issues), and continued underpeformance in Europe, which

should be rectified in the next quarter or two. Nevertheless, we see the light at the end of the tunnel." Moreover, on the same day, analysts at CIBC World Markets rated Celestica as a "sector outperformer." "The operating issues push out EPS leverage by one quarter. This is expected to end in Q3, when CLS should benefit from restructuring and higher production volume."

243. While analysts grew skeptical, they relied on Defendants' false reassurance to maintain confidence. SG Cowen issued a report on April 28, 2006, which stated that "we remain neutral on the shares near term, but with a ***positive bias***, believing that time and effort, should fix the issues here.

244. On July 27, 2006, Celestica issued a press release reporting results for the second quarter of 2006, which represented sequential revenue growth and third quarter guidance:

> Revenue was $2,224 million, [up 15% from the first quarter] down 1% from $2,251 million in the second quarter of 2005. Net loss on a GAAP basis for the second quarter was ($30.3) million or ($0.13) per share, compared to GAAP net earnings of $12.6 million or $0.06 per share for the same period last year. Included in GAAP net loss for the quarter are charges of $20 million associated with previously announced restructuring plans and a $33 million non-cash loss associated with the sale of the company's plastics business in the quarter.
>
> ****
>
> For the third quarter ending September 30, 2006, the company anticipates revenue to be in the range of $2.15 billion to $2.35 billion, and adjusted earnings per share ranging from $0.12 to $0.20. The revenue outlook reflects a stable end market environment as well as additional volume from ramping new programs. The anticipated improvement in adjusted earnings is being driven by continued benefits from our restructuring activities and increased efficiencies in our Mexico and European operations.

Defendant Delaney touted the results, noting purported improved efficiencies and announcing the purported completion of restructuring activities:

The sequential revenue growth reflects the growing benefits from our focus on revenue diversification," said Steve Delaney, CEO, Celestica. "With a backdrop of stable end markets, improved efficiencies in our high growth facilities, ramping new programs, and the completion of our restructuring activities, we are confident in continued revenue growth and stronger margins throughout 2006.

245.    Later that same day, Celestica held a conference call with analysts to discuss the

Company's second quarter 2006 results.  On the call defendant Delaney falsely stated that the

Mexican facility has improved and that they expect to improve operating margins:

As we discussed in our Q1 call, we've been dealing with some significant programs ramping in Mexico, and to a lesser extent in Europe, which have also been impacting our operating margins. The scale of these ramps has been steep and significant, and the workforces in the affected regions have been more than doubling in size of the past few quarters and the capacity -- and we added capacity to absorb these new programs.  From a production performance standpoint, ***both regions have improved allowing with our Mexican and European sites to deliver greater volumes for our customers***.  As anticipated, we saw moderate pickup in profitability from these sites, ***but anticipate a more meaningful improvement this quarter as we complete the ramps and deliver increased efficiencies***.

In terms of restructuring, we're entering an ***important final phase*** of our major program that we launched a year and a half ago. When we started this major restructuring initiative in 2005, we feel there was too much underutilized capacity in Celestica and too much idle capacity in the EMS industry overall.  We believe we're undertaking the most aggressive restructuring program in our industry.  And while this ambitious plan came with execution risks, we're confident we'll achieve the [end to date] that we planned with over 80% of our capacity in low-cost regions.  [Emphasis added.]

246.    Moreover, during the July 27, 2006 conference call, Paras Bhargava, an analyst

with BMO Capital Management, asked defendant Delaney to predict guidance for the third

quarter 2006.  Delaney falsely stated that:

I think it feels much better than it did the last couple years.  I will tell you that for sure.  Part of it, we created a real benefit for

ourselves this quarter with a launching consumer business, so that's growing. That's traditionally going to be the strongest quarter for consumers, so we're happy to get that kind of diversification in our base.

At the July 27, 2006 Conference Call, Kevin Kessel a Bear Stearns analyst asked defendant Puppi if there was going to be any further restructuring necessary for the Company still in the fourth quarter 2006. Defendant Puppi fraudulently responded that "There will be some residual restructuring charges in the fourth quarter, but we expect to get the lion's share of the benefits by the fourth quarter."

247.    As a follow up-question, Amit Daryanani, an RBC Capital Markets analyst, asked Delaney whether the increased volume of inventory in Mexico would pose similar operational issues in the fourth quarter of 2006. Defendant Delaney falsely responded that he was confident that Mexico operations were repaired and that the facility would be able to deliver, even though he knew that there were terrible existing inventory management and control problems. Specifically, defendant Delaney responded:

> ***The issues that we had in Mexico have been related to the amount of change that we were creating in there, building… has done quite a good job recently of executing the volumes***, but it's been a change, some branded consumer stuff in there that it's new to the site, so there is some recent investments in that area. So I am quite confident that our team in Mexico can deliver the fourth quarter as needed. [Emphasis added.]

248.    The statements referenced above in ¶¶ 244-47 were materially false and misleading when made for the reasons set forth in ¶¶ 240-44, namely, the Company was concealing the extent and severity of problems at the Mexican facility. Defendants' express representations that Mexican operations have improved and we expect the Mexican facility to deliver greater volumes to customers was false when made. Defendants were well aware of not only the severe operational problems at the facility but also the weak internal controls, poor inventory management, and excess and obsolete inventory. Moreover, Defendants' false statements that the restructuring activities will be completed by the end of 2006 and no further

restructuring will be necessary for the Company was false because defendants knew that their facilities were chaotic and required additional restructuring to attempt to fix.

249.    Relying on Defendants' false statements, analysts improved their outlook on the Company's stock this quarter.  For example, RBC Capital issued a report on July 27, 2006 that indicated there may be signs of a turnaround for the Company.  Specifically, "[i]nefficiencies / component supply issues at CLS's Mexico facility negatively impacted EPS by $0.03 in Q206 vs. $0.05 in Q106.  We believe the inefficiencies and ramp costs (consumer programs) more than offset any benefits from restructuring thus far.  Based on management comments during the conference call we **expect minimal impact from these issues in Sept-qtr** (less than 1c)."  (Emphasis added.)

250.    CIBC World Markets commented on July 28, 2006 that "[t]he America's . . . saw a significant improvement this quarter, with operating margin increasing to 2% from 0.4% as the Mexican operations improved efficiency.  CLS expects **more improvement next quarter** as volumes ramp in this region."  "We reiterate our Sector Outperformer rating and our price target of $14.  The shares are trading at 13x and 7x our C2006 and C2007 estimates.  **We are encouraged by CLS's proactive restructuring actions**.  We are pleased to finally see an acceleration in the operating leverage into 2006.  As this favorable In-Line Q2 Results, New Program Ramps Should Lead To A Strong Q3 - leverage plays out it will **no doubt yield improvements in ROIC driving Celestica's valuation higher**."  (Emphasis added.)

251.    Moreover, several analysts raised their recommendations and earnings estimates for Celestica as a result management's false and misleading statements as follows:

- Cowen and Company:  "we are **picking up** our revenue estimate to $8.76B, for 3% growth y/y"

- Credit Suisse:  "We attribute the better performance to a near-resolution to the ERP issues that plagued the Juarez, Mexico facility for over the last

two quarters . . . and the ***restructuring program which has helped the company achieve 80% of capacity in low cost regions***."

- Jefferies & Company: "Overall we believe that Celestica has done a ***good job of improving its cost structure***."

- National Bank Financial—"Not only did the company meet expectations and provide a solid outlook for Q3, but also we are ***impressed that it has been able to reduce the impact of issues at its fast growing Mexico facility*** (with more benefits to come in Q3)."

### THE TRUTH BEGINS TO EMERGE

252.    On October 26, 2006, Celestica issued a press release announcing its results for

the third quarter of 2006.  Revenues were up while earnings were down year-over-year:

> Revenue was $2,392 million, up 20% from $1,994 million in the third quarter of 2005.  Net loss on a GAAP basis for the third quarter was ($42.1) million or ($0.19) per share, compared to GAAP net loss of ($19.6) million or ($0.09) per share for the same period last year.  Included in GAAP net loss for the quarter are charges of $82 million associated with previously announced restructuring plans.  For the same period in 2005, restructuring charges of $41 million were incurred.

Defendant Delaney commented on the results, acknowledging some challenges but still failing to

disclose the full extent of the operational issues in Mexico:

> "Revenues were very strong sequentially and year over year driven primarily by the growth realized in our consumer segment.  Other segments were solid as well in this seasonally lower quarter," said Steve Delaney, CEO, Celestica.  "I'm pleased with the added diversification and the improvement in operating margins, despite the setbacks we've had in the performance of some of our facilities in the Americas and Eastern Europe.  We remain focused on overcoming these challenges and accelerating the improvement in our returns on capital."

In the press release, the Company represented that it expected revenues for the fourth quarter in

range of $2.25 billion to $2.45 billion, and adjusted earnings per share to range from $0.15 to

$0.23, for the fourth quarter of 2006.

253.     Later that same day, after the market closed, Celestica held a conference call with investors to discuss the third quarter results and outlook for the fourth quarter 2006.  On the call defendant Delaney mentioned that there were continuing problems in Mexico, but still did not disclose the pervasiveness of the fundamental problems existing at its Mexican facility.

> As we discussed our Q1 and Q2 calls, we have been addressing some operational issues in Mexico and Europe.  From a profitability standpoint, improvements in both Mexico and Europe regions have been progressing slower than anticipated.  We made improvements in Mexico's operational performance, but we continue to experience efficiency shortfalls caused by the growth and complexity introduced there.  ***Our team is methodically improving the processes to ensure that we get strong execution for our customers as the first priority.***  Stabilize first, then optimize for efficiency.  I see this taking place over the next few quarters.
>
> Restructuring should help improve profitability in the fourth quarter, and our efforts over the next several quarters are focused on bringing more growth to this region, which is now highly concentrated with an excellent offering in low-cost eastern Europe.  In terms of restructuring, we're ***entering the important final phases of a major program that we announced in January 2005***.  [Emphasis added.]

Defendant Puppi also stated that there were continuing problems in Mexico, but did not disclose the severity of the problems, and for the first time defendant Puppi mentioned inventory management control problem, but packaged it as an isolated incident.

> Gross margin was 5.6%, and operating margins came in at 2.7%, compared to 5.6% and 2.2% respectively in the second quarter.  Our gross margins were ***adversely impacted by a $6 million inventory charge***, relating to a physical inventory variance at one of our sites in the Americas.  We have made various process and systems changes to ***mitigate reoccurrence***, ***and should finalize corrective actions this quarter***.  Excluding this item, our gross margins for the quarter would have reflected a 30 basis point improvement.  [Emphasis added.]

Defendant Puppi later clarified on the conference call that the $6 million inventory write-down was not in the Mexico facility.

254.     In response to a question from an analyst from RBC Capital Markets, defendant Delaney falsely responded, without disclosing the nature of the inventory control problem that the Company does not expect to take any more inventory write-down charges similar to the $6 million write-down, which was allegedly not at the Mexican facility.

> ***We don't foresee taking any more of those charges. We've certainly taken a lot of actions to prevent reoccurrence.*** But in essence, we had a particular site ramping some new business with inadequate inventory controls, and ***so we have corrected that***. We have made series of changes. We have got a few more changes to fully affect this quarter, and we don't anticipate any further charges in that department. [Emphasis added.]

255.     In response to a similar question from the Deutsche Bank analyst, Delaney again stated:

> ***We won't have another inventory charge***—or certainly I pray we don't. And that would certainly release some operating earnings and margin expansion on the gross profit. We've got the restructuring benefits that are largely going to hit that line. So we expect more than all of the improvement, sequential basis in margin to come at that line. And recall what I also said about SG&A, that it will be higher in the fourth quarter, as we normally have in the fourth. [Emphasis added.]

256.     Moreover, with knowledge that Mexican operations were completely chaotic, defendant Puppi sidestepped a question from a Citigroup analyst and stated that he could not speculate as to when Mexican operations would generate a profit and fraudulently stated "[b]ut expect us to improve our [Mexican operations] performance over the next few quarters."

257.     Defendant Delaney continued to falsely represent the problems at the Mexico facility by not disclosing their severity. For example, an analyst at TD Newcrest continued to prod defendant Delaney on when Mexican operations were going to improve. Defendant Delaney fraudulently responded that Mexican operations are getting better every day and that they are making sure that their customers are satisfied.

> *Mexico is getting better every day*.  And it's going to continue getting better every day.  But in order to get this things completely stabilized to get -- there's, like I said earlier, there's a lot of moving parts.  In fact, there's literally a lot of moving in the plant.  And with all of the rearrangements and everything we're doing relative to *fixing some logistics issues and other things*, it's going to take us the next few quarters to get it completely sorted out and stabilized.  In the meantime, *we're in containment mode to make sure that our customers don't suffer from any of this*.  [Emphasis added.]

258.    Moreover, defendant Delaney falsely represented to the public the status of inventory at Celestica's Americas facilities on the October 26, 2006 Conference Call:

> I would expect [inventory] to go down over the next few quarters.  I think we were impacted by a few things in the case of inventories.  Certainly the performance problems that we have been having in Mexico affected us there that in that category.  And I think frankly, all of the supply constraints that we were seeing just as a general rule worldwide in the second and the third quarter, I think caused a bit of conservatism maybe, in terms of demand planning and stuff by customers.  And I think that has driven to a bit more churn, as I mentioned earlier in the third quarter, and stuck us with a bit more inventory.  So we're trying to correct all of that here over the next few -- well, as quick as possible.  *But I still hope to get meaningful progress this quarter*.  [Emphasis added.]

259.    The statements referenced above in ¶¶ 252-58, were materially false and misleading when made for the reasons set forth in ¶¶ 240-41, 248, namely, that Defendants were concealing the extent and severity of the problems at the Mexican facility.  Defendants' express representations that the "Mexican problems are getting better everyday" was false when made because defendants' knew that their Mexican facility was plagued with weak internal control and poor inventory management problems.  Furthermore, Defendants' false representation that the $6 million inventory writedown, due to an inventory variance, was an isolated instance was made without any basis.  Defendants knew that the inventory variance was not an isolated

occurrence at any of their facilities but rather a very common occurrence. Nonetheless, Defendants did not disclose this information to the public.

260. Analysts continued to be fooled by Defendants' false and misleading statements about the Company's projected profitability and improvement in operations. For instance, analysts at Blackmont Capital issued at report on October 27, 2006 which reiterated a "Buy" for Celestica's stock. Also on October 27, 2006, analysts at Cowen and Company recommended that "Celestica is at the tail end of its restructuring efforts and is close to fixing operational problems which should greatly aid margins and cash flow in 2007, Outperform." Furthermore, analysts at Genuity reported that "Rome wasn't built in a day, and work remains to do at Celestica. However, the probability of *incremental margin improvements over the coming quarters is high, in our opinion. We reiterate our BUY recommendation*." (Emphasis added.)

261. Abruptly, on November 27, 2006, Celestica announced that defendant Delaney was stepping down as CEO, to be replaced by Craig H. Muhlhauser, formerly President of Celestica's Worldwide Sales and Business Development department. The only information provided by the Company was that Mr. Delaney resigned to "pursue other business interests."

262. Delaney's sudden resignation was Defendants' first confirmation that Celestica operations were not as previously presented. For example, on November 28, 2006, CIBC World Market reported that "[w]e believe Mr. Delaney's exit was essentially due to Celestica's inability to execute on increasing operating margins in the Mexican and European operations. These regions have been a key initiative for Mr. Delaney and we anticipate little progress to be reported next quarter based on this new development."

263. Furthermore, Genuity Capital Markets reported on the same day that according to Mr. Delaney's termination agreement with the Company, defendant Delaney would be

entitled to "3X his annual base salary ($750,000 in 2005) and 3X his annual target bonus ($750,000 in 2005), together with a pro-rated bonus for the fiscal year." This is very costly for the Company's shareholders.

264.    On December 12, 2006, Defendants' disclosure of the true state of affairs continued. The Company issued a pre-announcement press release warning that it will be unable to meet the operational targets as stated in its third quarter 2006 press release. The reduction was attributed to demand reductions and inventory write-offs at the Monterrey, Mexico facility:

> Based on its current estimates, the company now expects revenue in the range of $2.20 to $2.25 billion, and adjusted net earnings per share of $0.00 to $0.06. The company's previous guidance for the fourth quarter, which was provided on October 26, 2006, was for revenue of $2.25 to $2.45 billion and $0.15 to $0.23 adjusted net earnings per share.
>
> The revision in revenue is due to recent demand reductions from several customers. Included in the revised adjusted net earnings per share is an expected net charge of between $0.08 to $0.12 resulting **predominantly from an increase in inventory provisions at the Monterrey, Mexico facility**. [Emphasis added.]

265.    Celestica's stock price fell in response to this announcement, from $9.37 per share on December 11, 2006 to $8.23 per share on December 12, a one day drop of 12.1 percent. Volume for the day was 5.5 million shares, materially more than the average of 3.3 million shares. The Company, however, continued to conceal the truth about the Mexican operations, as alleged in ¶¶ 259.

266.    Later that same day, Celestica held a conference call to discuss their preannouncement for their inability to meet their operational targets as stated in the October 26, 2006 press release. The new CEO of Celestica, Craig Muhlhauser explained that the Company will **be unable to meet their fourth quarter guidance previously announced due to an overall**

*reduction of business from their top customer and an inventory writedown from their*

*Monterrey, Mexico facility*.  Defendant Puppi falsely stated in response to an analyst's question

from GMP Securities that the $6 million inventory writedown taken in the previous quarter was

unrelated to the inventory write-off of *$30 million this quarter at the Mexico facility*.

267.    The statements referenced above in ¶ 266, were materially false and misleading

for the reasons stated in ¶ 259, namely, the Company was still concealing the extent of the

problems at the Mexican facilities, which were not set-up to receive the heavy transfer of

business from other locations.  Unbeknownst to investors, the transfer was an operational

disaster that was still unfinished.  Defendants, instead of coming clean about the problems,

maintained, as detailed above, that the worst of it was behind the Company, which they knew

was untrue.  Indeed, it would take a "changing of the guard"—the ouster of Delaney, and Puppi,

for the Company to finally disclose the truth.

268.    Analysts began to see the light after defendants pre-announced poor results for

the fourth quarter and the problems that face their Mexico plant.  For example, on December 13,

2006, analysts at Cowen and Company downgraded to neutral.  "Given the ongoing issues with

the Mexico plant, multiple quarters with inventory write-offs (4Q06, 3Q06, and $161M 4Q04),

restructuring problems, and the likelihood that we will not get true visibility on a turnaround

until mid 2007, we are lowering our rating on the shares to Neutral.…"  "Although Defendants'

continued to deny the truth, this analyst began to believe that the negative situation in Mexico is

affecting customer relationships.  We have heard that Avaya has not been happy with recent

results.…"  On the same day, National Bank Financial reported "[j]ust when we thought we

were nearing the end of many years of restructuring, the recent events suggest to us more may

be needed."  Additionally, Scotia Capital reported the same day that they "have reduced [their]

sales growth and margin expansion forecasts to reflect additional end-market softness and

slower than expected operational improvements from Celestica's Mexican facilities.

**THE TRUTH IS FULLY REVEALED**

269.    On January 30, 2007, the Company stunned investors, announcing defendant

Puppi was "stepping down" from his role as Chief Financial Officer.  That day, after the close

of ordinary trading on the NYSE, Celestica issued a press release announcing results for 2006,

revealing the previously concealed the truth.  The results were dismal.  The Company's net loss

more than tripled to $150.6 million per share ($0.66 per share) compared to a loss of $46.8

million ($0.21 per share) in 2005.  Muhlhauser attributed the disappointing results to problems

at Celestica's Mexican facilities, and warned that additional charges are expected:

> While revenues for the fourth quarter came in above the high-end
> of the updated guidance, our financial results were extremely
> disappointing.  The year to year growth in the consumer segment
> was ***offset by higher than expected demand reductions from
> several key customers in the telecommunications segment***.  This
> demand reduction along with the impact of the inventory provision
> taken in Mexico significantly impacted operating margins," said
> Craig Muhlhauser, President and Chief Executive Officer,
> Celestica.  "We have implemented and will continue to implement
> aggressive actions to ***materially improve the performance of our
> Mexican facilities by standardizing our ERP platform, re-
> architecting our warehouse logistics and strengthening the local
> management team while driving more efficiency and cost
> reductions***.  In light of our current outlook, we are also reducing
> our overhead structures and costs globally.  These actions will
> result in an ***additional $60 to $80 million of restructuring
> charges, $40 million of which has been recorded in the fourth
> quarter***, with the remaining charges to be incurred during 2007."
> [Emphasis added.]

270.    The full extent of the operational quagmire in Mexico was revealed in a

conference call held the next day, January 31, 2007, at 8 a.m., during which Muhlhauser,

Celestica's new CEO, finally revealed what Celestica and its former CEO and CFO,

respectively, withheld from the public for almost two years: that the Mexico facilities could not

possibly have sustained the massive influx of customers from other facilities, and that the

situation had been a "perfect storm" from its inception:

> To emphasize what is different from last year, we have just returned last night from Celestica's -- with Celestica's board of directors from a meeting which was held in Monterrey for the past three days. We held an in depth review of the situation, outlined our 2000 plan for recovery, both with the board and with the CMX management team, including a very extensive site tour. Why did this situation in CMX develop? We created the *perfect storm* for the Company and this site by *attempting to implement an accelerated transfer plan*, which required the transfer of over 16 customers to Mexico, which required over 50 SMT lines with multiple SMT platforms from various North American facilities, over 6,000 people in an 18-month period into a facility with two ERP systems. The complexity we introduced was over 50,000 active part numbers, over 1,500 ship codes, requiring over 28,000 pallet locations and creating nine warehouses, seven external to the site, and manage the material required to support the customer demand here. *Desire to move rapidly to Mexico and drive the required cost productivity into the Americas has come at great cost to our Company and our shareholders*. [Emphasis added].

271. Defendants' deceptive failure also came at a high price. As the Class Period

progressed, the situation in Mexico evolved into a complete disaster. Indeed, the facilities'

inventory management problems and production delays grew so bad that it resulted in a loss of

material customers, such as Lucent, Nortel and Motorola, due to the Company's repeated failure

to execute. On the January 31, 2007 conference call, Muhlhauser stated as follows:

> The impact of CMX in *Mexico has hurt this Company very badly*. The reality of the situation is that our *operational execution issues* in Mexico over the past 12 months have resulted in over $75 million of losses for EBIT losses for 2006 and $46 million for the fourth quarter from this one site. A *loss of customer confidence* and the need to get this situation under control quickly has *resulted in disengagements with some customers*. The failure to deliver timely resolution of the issues and deliver the projected operational and financial results quarter after quarter have *undermined our credibility and eroded shareholder value in the Company*. [Emphasis added.]

272.    On the same call, Muhlhauser also discussed the final result of the fourth quarter,

and the impact of the $30 million net charge related to the inventory provision taken at the

Monterrey facility which "was simply unacceptable."

> Our final revenues came in slightly above the high end of the
> revised guidance, while the adjusted EPS came in at the mid point
> of our revised range.  Compared to the fourth quarter of 2005 our
> revenue growth was 9%, with growth in all sectors except telecom
> and the industrial automotive and defense segment.  However, our
> **revenue declined about 5% sequentially driven largely by a drop
> off in demand from our Telecom customers** and the seasonality in
> our consumer business.  In terms of profitability, ***our operating
> margins were down sequentially by 150 basis points to 1%, and
> adjusted EPS was down to $0.03 in Q4 versus the $0.18 earned in
> Q3.  This decline was largely driven by previously announced
> $30 million net charge related to the inventory provision taken at
> our Monterrey, Mexico facility.  This charge was simply
> unacceptable***.  [Emphasis added.]

Moreover, Muhlhauser confessed that further restructuring was a needed which amounted to $60

million to $80 million:

> In addition to the prior restructuring we now expect to incur an
> additional $60 million to $80 million of restructuring charges, $40
> million of which was already taken in the fourth quarter.  This is to
> establish the right cost base going forward.  These actions will be
> completed in -- by the end of 2007.

273.    On the January 31, 2007 conference call an analyst from Bear Stearns asked

Muhlhauser how the Company intends to transfer customers at the Mexico facility over to Asia

and not create the same downfall that occurred at the Monterrey facility.  Muhlhauser responded

that "[o]bviously we do not want to recreate what we created in Mexico":

> We've thought this through very carefully.  What we've done is
> actually identified centers of excellence in Asia, so these customers
> are being transferred to multiple sites where those sites have the
> specific capabilities those customers need.  In addition we've got
> our best-in-class material management capability.  We've got one
> instance of the ERP system over there, so we've got the system in
> place, we've got the disciplines in place and we've got the
> processes in place that I mentioned in terms of our world-class

processes. So bottom line is -- and those transfers have been
proceeding over the course of the fourth quarter primarily and will
be completed no later than the end of the second quarter.

Moreover, during the same conference call, Muhlhauser discussed why the inventory was written

off in Mexico. Muhlhauser stated that inventory write offs in Mexico were a result of "our

ability to handle parts as crisply as we should have." Additionally, Muhlhauser mentioned that

two large customers left the Company as a result of the problems in Mexico, they are "Lucent

wireline business, [and] we lost the Nortel acquisition that was acquired by Flex. . ."

274.   Furthermore, Carter Shoop, an analyst with Deutsche Bank, asked whether

Muhlhauser whether the Board has confidence in the current management team. Muhlhauser

made a great distinction between the old management and the new one:

> Well, I think the message is the board has the confidence in the
> Company, and I think the early signal to that is I took them directly
> to the site where we have the biggest challenge and went through a
> discussion with the people on the floor, so what they see is the
> alignment between what I'm saying, and what's being said on the
> floor. So I think the message there is they believe that we know
> what to do and the ***difference between the past and today is they
> also believe that we now have the understanding of what it takes
> to get it done***, so that's step one. [Emphasis added]

275.   In response to the revelation of this new information, the price of Celestica

common stock fell from $7.73 per share on January 30, 2007, to $5.96 per share on January 31,

2007, a drop of 23 percent. More than 13.3 million Celestica shares traded that day, compared

with 1.2 million average daily volume for the preceding 3 months.

276.   Following the Company's announcement, on January 31, 2007, analysts cut their

ratings of Celestica's common stock. Deutsche Bank lowered it price target to $5.50 from

$7.73; On the same day, Bear Stearns analysts rated Celestica stock as "underperform" and

stated:

## HOW DID CLS' MEXICO SITE FALL APART?

Unfortunately, we think ***this "wound" was self inflicted as a result of CLS' aggressive customer transfer plan.*** Over a period of 18 months, CLS transferred 16 customers to Mexico, which required over 50 SMT lines with multiple platforms from other facilities. Consequently, the transfer introduced more than 50,000 active part numbers and over 1,500 ship codes and created 9 warehouses. The complexity obviously overwhelmed the Monterrey site, which to our surprise, had **two** ERP systems. The only good news so far is that they were able to consolidate it to one ERP over the past weekend.

\*\*\*

## CUSTOMER LOSS CASTS A SHADOW OVER THE OUTLOOK

We believe the problem at Celestica's Mexico facility was exacerbated by some customer loss. We disagree with management's assessment of the impact of lost business, especially as it relates to telecom. In our opinion, market share loss is driving much more than 15% of the Q/Q decline and we found it surprising that the programs that management cited as losing (Lucent wireline and Nortel) are very old news and the transfers have essentially been completed. In our opinion neither FLEX or SLR is expecting much in the way of incremental transfers to them in the March qtr, whereas Celestica stated that its 20%+ Q/Q telecom decline is being further pressured by these disengagements. Management also alluded to ***industrial/defense/aerospace customer disengagements***, which with the exception of Radisys were … not as aware of others. ***We are more concerned by Celestica losing market share with some of its key customers including Cisco, Juniper and Avaya. All these negative signs further confirm our concern over Celestica's long-term growth prospects.***

277.    Also on January 31, 2007, Scotia Capital reported that "Operational issues at the heart of disappointment" … we are "reducing recommendation to 3-Sector Underperform."

## VII.    LOSS CAUSATION/ECONOMIC LOSS

278.    During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated Celestica's stock price and operated as a fraud or deceit on Class Period purchasers of Celestica stock by misrepresenting or omitting material facts concerning the

Company's business, operations, and financial results. Specifically, these false and misleading statements either misrepresented or failed to disclose that, *inter alia*: (i) Defendants were fraudulently overstating the value of inventory in Monterrey, Mexico, which materially inflated the Company's reported earnings by at least $0.11 per share; (ii) Celestica achieved quarterly targets by manipulating sales and inventory at quarter-end; (iii) certain of the Company's key customers were pulling their business from Celestica, resulting in decreased demand; (iv) the restructuring was a failure from inception, and could not possibly yield operating margins of 3.5 percent by year-end 2006; and (v) that the Company suffered from weak internal controls, which could not accurately monitor or track Celestica's global inventory, particularly in Monterrey.

279. During the Class Period, Lead Plaintiffs and the Class purchased Celestica stock at artificially inflated prices and suffered an economic loss when the artificial inflation was removed from Celestica's stock price from October 26, 2006 through the end of the Class Period, as investors learned the truth through a number of corrective disclosures.

280. On October 26, 2006, after the close of ordinary trading, the Company issued a press release announcing that Celestica's third-quarter revenue was $2,392 million, up 20 percent from $1,994 million in the third quarter of 2005, but that earnings were down due to $82 million in restructuring charges. Delaney assured investors, however, that "[r]evenues were very strong sequentially and year over year driven primarily by growth in our consumer segment.… I'm pleased with the added diversification and the improvement in operating margins, despite the setbacks we've had in some of our facilities in the Americas and Eastern Europe." Defendants' also represented that they expected the Company's fourth quarter

revenue to be in the range of $2.25 billion to $2.45 billion, with adjusted earnings per share from $0.15 to $0.23.

281. As alleged above, the Company also conducted an earnings conference call on October 26, 2006 with analysts, during which Delaney and Puppi mentioned in general terms that there were problems in Mexico, but stressed that "Mexico is getting better every day." While Defendants did ***not*** disclose the systemic and pervasive problems that were actually affecting Monterrey, they did specifically disclose that Celestica's gross margins were adversely impacted by a $6 million inventory charge, relating to a physical inventory variance at an unnamed site in the Americas. To mitigate the market's reaction to this news, Delaney emphasized that he did not "foresee taking any more [inventory] charges," as they made a "series of changes" to prevent reoccurrence. Puppi further assured investors that this inventory variance had no impact on the effectiveness of the Company's internal controls under Sarbanes-Oxley.

282. As a direct result of Defendants' October 26, 2006 disclosures, Celestica's stock price dropped from $11.74 per share to $10.16 per share on heavy trading volume of more than 6.2 million shares.

283. Notwithstanding the rumblings about potential problems in Mexico, analysts continued to be fooled by Defendants' false and misleading statements about the Company's projected profitability and improvement in operations. For example, as set forth above, analysts at Genuity reported on October 27, 2006 that "Rome wasn't built in a day, and work remains to do at Celestica. However, the probability of incremental margin improvements over the coming quarters is high, in our opinion. We reiterate our BUY recommendation."

284.    On November 27, 2006, after the close of ordinary trading, the Company issued a press release announcing that Delaney was stepping down as CEO effective immediately to "pursue other business interests," and would be replaced by Craig H. Muhlhauser, the former President of Celestica's Worldwide Sales and Business Development department. Following the November 27 disclosure, the Company's stock price dropped from $9.68 per share to $9.25 per share.

285.    Analysts were surprised to learn of Delaney's sudden resignation, and began to question whether it signaled additional problems in Mexico. For example, as set forth above, an analyst with CIBC World Market reported on November 28, 2006 that "[w]e believe Mr. Delaney's exit was essentially due to Celestica's inability to execute on increasing operating margins in the Mexican and European operations. These regions have been a key initiative for Mr. Delaney and we anticipate little progress to be reported next quarter based on this new development."

286.    On December 12, 2006, Defendants continued to disclose the true state of affairs at Celestica. Specifically, the Company issued a pre-announcement press release warning that it will be unable to meet the operational targets as stated in its third quarter 2006 press release. Importantly, the Company disclosed for the first time that Celestica's revenue was adversely affected by an increase in inventory provisions at the Monterrey, Mexico facility, and lower demand from several customers. Accordingly, the Company reduced its previously reported earnings guidance for the fourth quarter to $0.00 to $0.06 per share, well short of the earnings guidance that Defendants disseminated less than 6 weeks earlier of $0.15 to $0.23 per share. Following the filing of the December 12 disclosure, Celestica's stock price dropped from $9.37 per share to $8.23 per share on heavy trading volume of 5,571,600 shares.

287.     Ultimately, on January 30, 2007, after the close of ordinary trading, the Company issued a press release announcing that the Company's net loss more than tripled to $150.6 million per share ($0.66 per share) compared to a loss of $46.8 million ($0.21 per share) in 2005, and announced that Puppi was "stepping down" from his role as CFO.  In addition, the Company stunned investors by announcing that it would incur "an additional $60 to $80 million of restructuring charges, $40 million of which has been recorded in the fourth quarter, with the remaining of the charges to be incurred during 2007."  The Company also revealed that the "increased inventory provision" in Monterrey accounted for $30 million of the $40 million—or 75 percent—of the charges recorded in the fourth quarter of 2006.

288.     Following the January 30, 2007 press release, the Company's stock price fell from $7.73 per share to $5.96 per share, on extraordinarily heavy trading volume of 13,362,200 shares.  In total, from October 26, 2006 through January 31, 2007, the Company's stock price declined from $11.74 per share to $5.96 per share, marking a decline of nearly 50 percent wiping out more than $1.3 billion in market capitalization.

289.     Analysts reacted strongly to the January 30, 2007 disclosures.  For example, as set forth above, a Bear Stearns analyst issued a research report on January 31, 2007 rating Celestica stock as "underperform," and stating, *inter alia*, that Monterrey fell apart from a "wound" that was "self inflicted" as a result of Celestica's aggressive restructuring plan.

290.     Each of the declines in the Company's stock price described in ¶¶ 282, 284, 286, 288, were significant after taking into account changes on the same days in the overall stock market and in relevant industry indices.  Furthermore, as set forth above, each of these stock price declines was caused by the disclosure of previously concealed information relating to the materially false or incomplete statements alleged herein.

291.     In sum, as the truth about Defendants' fraud was revealed, the Company's stock price declined, the artificial inflation came out of the stock, and Lead Plaintiffs and other members of the Class were damaged.  Had Lead Plaintiffs and the Class known of the material adverse information alleged herein, they would not have purchased Celestica stock at artificially inflated prices.

## VIII.   FRAUD-ON-THE-MARKET PRESUMPTION

292.     The market for Celestica's stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Celestica's common stock traded at artificially inflated prices during the Class Period.  The artificial inflation continued until at least the end of the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Celestica stock relying upon the integrity of the market price of Celestica's stock and market information relating to Celestica, and have been damaged thereby.

293.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Celestica's stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

294.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Celestica's business, prospects and operations.

These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Celestica and its business, prospects and operations, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## IX.    **NO SAFE HARBOR PROTECTION**

295.    The statutory safe harbor for certain forward-looking statements does not apply to the misrepresentations and omissions alleged in this Consolidated Complaint. Many of the statements were not specifically identified as "forward-looking statements" when made. To the extent that there were any properly identified forward-looking statements, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable nonetheless because at the time each of the misrepresentations was made, the particular speaker(s) knew that the statement was materially false or misleading at that time, and/or the forward-looking statement was authorized and/or approved by an executive officer or director of Celestica who knew that the statement was materially false and misleading when made.

296.    Any warnings or other cautionary language contained in the press releases and other public statements described herein were generic, "boilerplate" statements of risk that would affect any similar company, and misleadingly contained no factual disclosure of any of the problems affecting the Company which placed the ability of the Company to accurately depict its

own financial situation into serious question. As such, any forward-looking statements complained of herein were not accompanied by meaningful cautionary language.

297. Any relevant purported risk disclosures were, in fact, false and misleading in and of themselves, by virtue of the fact that the events which the risk disclosures purported to warn against as contingencies had frequently already become a reality or a certainty.

## X.    CAUSES OF ACTION

### FIRST CLAIM

### VIOLATION OF SECTION 10(b) OF
### THE EXCHANGE ACT AND RULE 10b-5
### PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

298. Plaintiffs incorporate by reference and reallege each and every allegation contained above as if fully set forth herein.

299. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Celestica's stock; and (iii) cause Plaintiffs and other members of the Class to purchase Celestica's stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

300. Defendants, individually and in concert, directly and indirectly by the use of means and instrumentalities of interstate commerce, the mails, the facilities of national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain artificially

inflated market prices for Celestica's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants, Onex and Schwartz are also sued as controlling persons of Celestica as alleged below.

301. In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's stock would be based on truthful, complete and accurate information.

302. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Celestica's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Celestica and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Celestica's stock during the Class Period.

303.    The Individual Defendants' primary liability, and controlling person liability, also arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

304.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Celestica's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

305.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Celestica's stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Celestica's publicly-traded stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Celestica stock during the Class Period at artificially high prices and were damaged thereby.

306.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of Celestica, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Celestica stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

307.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

308.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's stock during the Class Period.

**SECOND CLAIM**

**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
AGAINST DELANEY, PUPPI, SCHWARTZ AND ONEX**

309. Plaintiffs incorporate by reference and reallege each and every allegation contained above as if fully set forth herein.

310. This claim is asserted against defendants Delaney, Puppi, Schwartz and Onex (collectively, the "Section 20(a) Defendants"). Throughout the Class Period, the Section 20(a) Defendants by virtue of their positions, stock ownership and/or specific acts described above, were controlling persons of Celestica within the meaning of Section 20(a) of the Exchange Act.

311. The Section 20(a) Defendants had the power to, and did, directly and indirectly, exercise control over Celestica, including the content and dissemination of statements which Plaintiffs allege are false and misleading. The Section 20(a) Defendants were each provided with and/or had access to reports, filings, press releases and other statements alleged to be misleading prior to and/or shortly after they were issued and had the ability to prevent the issuance or correct the statements. Defendants Delaney and Puppi had direct and supervisory involvement in the day to day operations of the Company and engaged in the acts constituting violations of the federal securities laws, as set forth in Count One above.

312. The Section 20(a) Defendants culpably participated in the matters alleged herein because, among other things, they knew, or were reckless in not knowing, that the statements set forth above were materially false and misleading, or omitted material information. Facts giving rise to the Section 20(a) Defendants' culpable participation are set forth in detail above.

**A.     The Individual Defendants**

313. The Individual Defendants acted as controlling persons of Celestica within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**B.      Onex Corporation**

314.      As Defendant admitted, Onex controlled Celestica throughout the Class Period. As stated in Celestica's public filings with the SEC, including the 2006 20-F, "Onex exercises a controlling influence over [Celestica's] business and affairs and has the power to determine all matters submitted to a vote of [Celestica's] shareholders where [Celestica's] shares vote together as a single class."  In addition to the foregoing, Onex's control over Celestica is demonstrated by the following:

- Onex owns approximately 29.6 million multiple voting shares of defendant Celestica, excluding shares held for Onex management investment rights; this represents a 12 percent ownership interest and a 79 percent voting interest

- Onex has the power to elect Celestica's directors and to approve significant corporate transactions such as certain amendments to Celestica's articles of incorporation, the sale of all or substantially all of Celestica's assets and plans of arrangement in certain circumstances.

- Onex's voting power could have the effect of deterring or preventing a change in control of Celestica that might otherwise be beneficial to Celestica's other shareholders."

## C. Schwartz

315. Defendant Schwartz exercised control over Celestica through his position on the Board of Directors of Celestica and his position as a majority shareholder. Specifically, from 1998 through present, Onex's founder, CEO and Chairman, Schwartz served as one of the Company's directors. Moreover, Celestica's 2006 20-F states that "Schwartz . . . owns shares with a majority of the voting rights of the shares of Onex. Mr. Schwartz, therefore, effectively controls [Celestica's] affairs." As a result, Schwartz's close relationship with Celestica enabled him to exercise control over the Company for his personal gain.

## XI. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action and appointing plaintiffs as Lead Plaintiffs and its counsel as Lead Counsel for the Class and certifying it as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: New York, New York
       November 21, 2007

**LABATON SUCHAROW LLP**

By: _____
              Joel H. Bernstein

Joel H. Bernstein (JB-0763)
Eric J. Belfi (EB-8895)
Joseph A. Fonti (JF-3201)
Stephen W. Tountas (ST-8395
Ann E. Gittleman (AG-8367)
140 Broadway
New York, New York 10005
(212) 907-0700

*Counsel for Lead Plaintiffs New Orleans,
Millwright, DALI, Carpenters 27 and the
Lead Counsel for the Class*
