**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————x
:
:          Civil Action No.: 07-CV-00312-GBD
:
IN RE CELESTICA INC. SEC. LITIG.          :          (ECF CASE)
:
:          Hon. George B. Daniels
:
:          <u>Oral Argument Requested;</u>
:          <u>Contains Information Subject To</u>
:          <u>Protective Order</u>
:
:
—————————————————x


**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**


**LABATON SUCHAROW LLP**
Joseph A. Fonti (JF-3201)
Stephen W. Tountas (ST-8395)
Jeffrey R. Alexander (JA-3849)
140 Broadway
New York, New York 10005
(212) 907-0700

*Counsel for Lead Plaintiffs New Orleans*
*Employees' Retirement System, Millwright*
*Regional Council of Ontario Pension Trust*
*Fund, Drywall Acoustic Lathing and Insulation*
*Local 675 Pension Fund, and Carpenters' Local*
*27 Benefit Trust Funds*

November 13, 2013


CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

TABLE OF DEFINED TERMS ...................................................................................................v

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF UNDISPUTED FACTS (LOCAL CIVIL RULE 56.1) ...................................3

I.    THE EVIDENCE DEMONSTRATES MATERIALITY.......................................................3

      A.    Background ................................................................................................................3

      B.    The Evidence Demonstrates The Materiality Of Statements Regarding The
            2005 Restructuring And The Monterrey Facility.......................................................5

      C.    The Evidence Demonstrates The Materiality Of Inventory Levels At The
            Monterrey Facility....................................................................................................7

      D.    The Evidence Demonstrates That The Impact Of The Restructuring On
            Monterrey Was A Chief Concern of Celestica's Board Of Directors..........................11

      E.    Reports Published By Securities Analysts And Rating Agencies Confirm the
            Importance Of The 2005 Restructuring and Monterrey.................................................13

      F.    Defendants' Experts Do Not Dispute Materiality........................................................18

II.   DEFENDANTS DO NOT DISPUTE THE EFFICIENCY OF THE MARKET FOR
      CELESTICA COMMON STOCK ..................................................................................20

III.  DEFENDANTS DO NOT DISPUTE LOSS CAUSATION AND ECONOMIC
      LOSSES ARISING FROM FOUR CORRECTIVE DISCLOSURE DATES .....................21

ARGUMENT ........................................................................................................................23

I.    THE LEGAL STANDARDS GOVERNING PARTIAL SUMMARY JUDGMENT..........23

II.   THERE IS NO GENUINE DISPUTE AS TO THE MATERIALITY OF CERTAIN
      CATEGORIES OF MISSTATEMENTS AND OMISSIONS ...........................................24

      A.    Statements Relating To The 2005 Restructuring Are Material......................................25

      B.    Statements Relating To Monterrey's Effectiveness, Profitability, And Ability
            To Execute The 2005 Restructuring Plan Are Material...............................................26

      C.    Statements Relating To Monterrey's Inventory Levels Are Material............................28

      D.    Statements Within Celestica's Management Discussion And Analysis
            Disclosures Are Inherently Material ..........................................................................30

i

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

    E.   SOX Certifications Are Inherently Material ................................................................31

III.  THERE IS NO GENUINE DISPUTE CONCERNING CLASS-WIDE RELIANCE ..........32

IV.  THERE IS NO GENUINE DISPUTE THAT FOUR CORRECTIVE
     DISCLOSURES CAUSED THE CLASS TO INCUR ECONOMIC LOSSES ...................33

CONCLUSION .....................................................................................................................34

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,*
   133 S. Ct. 1184 (2013) ........................................................................................32

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ............................................................................................24

*Bacolitsas v. 86th & 3rd Owner, LLC,*
   2010 WL 3734088 (S.D.N.Y. Sept. 21, 2010) ....................................................23

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ............................................................................................32

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336 (2005) ............................................................................................33

*Erica P. John Fund v. Halliburton,*
   131 S. Ct. 2179 (2011) ........................................................................................33

*FDIC v. Great Am. Ins. Co.,*
   607 F.3d 288 (2d Cir. 2010) ................................................................................24

*Gebhardt v. ConAgra Foods, Inc.,*
   335 F.3d 824 (8th Cir. 2003) ..............................................................................29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.,*
   475 U.S. 574 (1986) ..................................................................................26, 27, 30

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.,*
   455 F. App'x 10 (2d Cir. 2011) ....................................................................2, 24, 29

*TSC Indus. v. Northway, Inc.,*
   426 U.S. 438 (1976) ..............................................................................24, 25, 27, 30

*In re Veeco Instruments, Inc. Sec. Litig.,*
   235 F.R.D. 220 (S.D.N.Y. 2006) .........................................................................29

*In re WorldCom, Inc. Sec. Litig.,*
   346 F. Supp. 2d 628 (S.D.N.Y. 2004) ............................................................24, 28

**Statutes**

15 U.S.C. § 78u-4(b)(5) ...............................................................................................3

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

28 U.S.C. § 1746 .......................................................................................................1

**Other Authorities**

17 C.F.R. § 229.303 ................................................................................................30

17 C.F.R. § 229.303 (a)(3)(ii) ................................................................................30

17 CFR 243.100-243.103 ........................................................................................28

Fed. R. Civ. P. 56 .....................................................................................................1

Fed. R. Civ. P. 56(a) ..............................................................................................23

L. Civ. R. 56.1 ......................................................................................................1, 3

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

## TABLE OF DEFINED TERMS

**For convenience, the terms used herein are defined as follows:**

| Term | Definition |
|---|---|
| 2005 Restructuring or Restructuring | $225 to $275 million restructuring announced by Celestica on January 27, 2005 |
| Bar | Celestica Corporate Controller, Peter Bar |
| Binder | Celestica Senior Vice President of Finance for the Americas Region, Frank Binder |
| Binder Tr. | Transcript of the Deposition of Frank Binder, March 13, 2013 |
| Celestica, the Company, or CLS | Celestica, Inc. |
| Class | All persons and entities that purchased or acquired Celestica common stock registered and listed on the NYSE, during the Class Period and who were damaged thereby, subject to specified exclusions |
| Class Period | January 27, 2005 to January 30, 2007 |
| CMX or Monterrey | Celestica's Monterrey, Mexico Facility |
| Coffman | The Class's expert on economic issues, Chad Coffman, CFA |
| Coffman Opening Rpt. | Expert Report of Chad Coffman, CFA, June 14, 2013 |
| Coffman Reply Rpt. | Expert Report of Chad Coffman, CFA, In Reply to The Expert Report of Dr. Vinita M. Juneja, August 6, 2013 |
| Complaint | Consolidated Class Action Complaint For Violation of the Federal Securities Laws, dated November 21, 2007 (Dkt. No. 37) |
| Crandall | Celestica Chairman of the Board of Directors, Member of the Board's Audit Committee, Robert Crandall |
| Crandall Tr. | Transcript of the Deposition of Robert Crandall, December 4, 2012 and May 15, 2013 |
| Defendants | Celestica Inc., Stephen Delaney, and Anthony Puppi |
| Delaney | Celestica Chief Executive Officer ("CEO"), Stephen Delaney |
| EC | Celestica Executive Committee |
| Etherington | Member of the Celestica Board of Directors, Member of the Audit Committee, William Etherington |
| Etherington Tr. | Transcript of the Deposition of William Etherington, December 7, 2012 |

v

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Term | Definition |
|------|-----------|
| Fernandez-Stoll | Celestica Director of EMS for Latin America and Celestica Monterrey Site Controller, Antonio Fernandez-Stoll |
| Fernandez-Stoll Tr. | Transcript of the deposition of Antonio Fernandez-Stoll, January 29, 2013 |
| Homer | Celestica President of the Americas Region, Michael Homer |
| Juneja | Defendants' merits expert on economic issues, Vinita M. Juneja, Ph.D. |
| Juneja Rpt. | Expert Report of Vinita M. Juneja, Ph.D., August 6, 2013 |
| Lead Plaintiffs or Plaintiffs | New Orleans Employees' Retirement System, Drywall Acoustic Lathing and Insulation Local 675 Pension Fund, Millwright Regional Council of Ontario Pension Trust Fund, and Carpenters' Local 27 Benefit Trust Funds |
| MD&A | Management Discussion and Analysis section of annual and quarterly financial statements, filed with the SEC |
| Muhlhauser | Celestica President, Worldwide Sales and Business Development, and CEO following Delaney departure, Craig Muhlhauser |
| Muhlhauser Tr. | Transcript of the Deposition of Craig Muhlhauser, November 20, 2012 |
| MOR | Celestica Monthly Operating Review |
| Nicoletti | Celestica Corporate Treasurer, Paul Nicoletti |
| Plaintiffs or Lead Plaintiffs | New Orleans Employees' Retirement System, Millwright Regional Council of Ontario Pension Trust Fund, Drywall Acoustic Lathing and Insulation Local 675 Pension Fund, and Carpenters' Local 27 Benefit Trust Fund |
| Plaintiffs' Class Certification Opening Brief | Plaintiffs' Memorandum of Law In Support of Their Motion for Class Certification, filed on June 28, 2013 (ECF No. 122) |
| Porter Tr. | Transcript of the Deposition of Dr. Thomas L. Porter, September 26, 2013 |
| Puppi | Celestica Chief Financial Officer ("CFO"), Anthony Puppi |
| Puppi Tr. | Transcript of the Deposition of Anthony Puppi, April 12, 2013 |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Regan | The Class's accounting expert, Greg J. Regan, CPA |
| Regan Opening Rpt. | Expert Report of Greg J. Regan, June 28, 2013 |

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Term | Definition |
|------|------------|
| Regan Rebuttal Rpt. | Rebuttal Report of Greg J. Regan, October 2, 2013 |
| Schwartz | Celestica Controlling Shareholder and<br>Member of the Celestica Board of Directors, Gerald Schwartz |
| SEC | U.S. Securities and Exchange Commission |
| SCM | Supply Chain Management |
| SOX | Sarbanes-Oxley Act of 2002 |

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

Lead Plaintiffs, on behalf of themselves and the proposed Class, by and through their undersigned counsel, respectfully submit this brief in support of their Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1.[1]

## PRELIMINARY STATEMENT

This securities class action arises from Defendants' false and misleading statements during the Class Period regarding Celestica's 2005 Restructuring plan, the impact of the Restructuring on Celestica's financial condition, and the effectiveness of Celestica's internal controls. Having conducted extensive fact discovery and exchanged expert disclosures, there are three elements of Plaintiffs' securities fraud claim for which there is no genuine issue of dispute.

First, there is no genuine issue of dispute with respect to the materiality of four categories of Defendants' misstatements (quoted in full in Appendices (A) – (D)):

    A.  Statements relating to the 2005 Restructuring;

    B.  Statements relating to the status, effectiveness, efficiency, inventory levels, and profitability of the Company's Monterrey, Mexico facility ("CMX");

    C.  Statements within Celestica's Management Discussion and Analysis ("MD&A") section of the Company's annual and quarterly financial statements, filed with the SEC; and

    D.  Defendants' certifications of the Company's internal controls over financial reporting and the accuracy of the Company's financial statements, mandated under SOX.

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meaning defined in the Table of Defined Terms at p. v-vii above.  Unless otherwise e noted, all emphasis is added.  References to "PSJ __" refer to Exhibits of the Decl. of Joseph A. Fonti In Support of Lead Plaintiffs' Motion for Partial Summary Judgment.

    In compliance with the Court's Order of October 31, 2013 (ECF No. 132), Lead Plaintiffs' Memorandum of Law In Support of Their Motion For Partial Summary Judgment is under 40 pages, inclusive of an affirmative Rule 56.1 statement of undisputed facts.

    Pursuant to the Stipulated Protective Order (ECF No. 93), Plaintiffs have filed Defendants' documents marked "confidential" under seal in connection with this Memorandum of Law.  In an abundance of caution, and in anticipation of further guidance from the Court, Plaintiffs have filed deposition transcripts in redacted form, to the extent the transcripts reference documents marked "confidential."

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

As explained herein, there is substantial evidence demonstrating "the significance of the restructuring effort to the company's operations and profitability." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011). For example, in its Form 20-F for fiscal 2005, Celestica admitted in its Risk Disclosures that "[a]ny failure to successfully execute" the restructuring "can have a ***material adverse impact*** on our results."[2] Thus, any suggestion that the restructuring was not, in fact, material is simply at odds with Defendants' public disclosures.

Likewise, no genuine dispute exists as to the materiality of Defendants' misstatements concerning Celestica's operations and inventory levels in Monterrey, Mexico. As CFO Puppi privately acknowledged in ████████████████████████████████████████

████████████████████████████████ █████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

Similarly, information contained in Celestica's quarterly and annual MD&A disclosures, and the SOX certifications that were publicly filed therewith, are inherently material because they are required by statute to ensure that investors are provided with timely information that is accurate in light of the context in which it is made. Moreover, the Class's accounting expert, Greg J. Regan, and its expert on economic issues, Chad Coffman, both opine that these types of public disclosures are material. Defendants' experts do not disagree.

<u>Second</u>, Lead Plaintiffs have established a presumption of class-wide reliance by proving that Celestica common stock trades in an efficient market. In support of their motion for class certification, Plaintiffs submitted the Expert Report of Chad Coffman, who opined that Celestica

---

[2]   PSJ 1, Delaney Ex. 24, Celestica Form 20-F, for the year ended Dec. 31, 2005.
[3]   PSJ 2, Fernandez-Stoll Ex. 3 (all caps in original).
[4]   PSJ 3, Bar Ex. 24.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

stock traded on an efficient market. Defendants did not dispute class-wide reliance under Rule 23(b)'s "predominance" requirement. And, Defendants' merits expert on economic issues, Vinita M. Juneja, Ph.D., did not challenge Coffman's opinion on market efficiency, nor did she present any evidence or opinion to rebut the presumption of class-wide reliance.

Third, the PSLRA requires Plaintiffs to prove that Defendants caused the loss for which the Class seeks to recover damages. 15 U.S.C. § 78u-4(b)(5). In that regard, Coffman opined that there were five dates on which there was a causal connection between Celestica's share price decline and the alleged misstatements and omissions. With respect to four of those dates – January 27, 2006, October 27, 2006, December 12, 2006, and January 31, 2007 – neither Defendants nor Juneja dispute that the Class suffered some quantum of economic damages.

## STATEMENT OF UNDISPUTED FACTS

### (LOCAL CIVIL RULE 56.1)

**I.     THE EVIDENCE DEMONSTRATES MATERIALITY**

**A.     Background**

1.     On January 27, 2005, Celestica announced a $225 to $275 million restructuring (the "2005 Restructuring").[5] According to Celestica, a critical purpose of the 2005 Restructuring was to improve the Company's reported profit margins.[6] Specifically, the Company anticipated that it would realize substantial savings as a result of moving manufacturing to lower-cost regions, including Monterrey, Asia, Romania, and the Czech Republic.[7]

---

[5]  PSJ 4, Delaney Ex. 2, Celestica Q4 2004 Earnings Conference Call.

[6]  *Id.* at 4.

[7]  *Id.*

3

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

2.      Celestica's facility in Monterrey, Mexico[8] was the focal point of the 2005 Restructuring.[9]  As CEO Delaney explained in April 2006, upon implementation of the restructuring, "Mexico will become our largest manufacturing operation in the Americas.  This quarter we expect the site's revenue to be more than double the revenue that it experienced in the third quarter last year as a result of the transfer from high cost geography plants . . ."[10]

3.      According to Celestica, a critical purpose of the 2005 Restructuring was to improve the Company's profit margins.[11]  During Celestica's Q4 2004 Earnings Conference Call, an analyst asked: "[J]ust wondering if the new restructuring was required to be able to accomplish the 3.5% [operating margin], or if now with the new restructuring you, in fact, expect to be able to exceed that by some amount?"  Puppi answered, "I hope to exceed that, frankly, but we needed to do this restructuring in order to get further market expansion from where we are right now."[12]  Given that operating margins were 2.2% in Q1 2005, a 1.3% point improvement to 3.5% would yield significant gains in expected future cash flows.[13]

4.      In its Form 20-F for fiscal 2005, the Company acknowledged in its Risk Disclosures that a failure to execute the restructuring plan, for whatever reason, could have a "*material adverse impact*" on its financial results.[14]

5.      Throughout the Class Period, in the MD&A section of each of Defendants' publicly-filed annual and quarterly financial statements, Defendants made explicit

---

[8]    The Monterrey facility was known by the acronym "CMX," short for "Celestica Mexico."  PSJ 5, Fernandez-Stoll Tr. 27:20-28:02.  Although Celestica had at least one additional facility in Mexico, in Reynosa, "CMX" referred specifically to the Monterrey facility. *Id.*; *see also* PSJ 6, Muhlhauser Tr. 48:20-25.

[9]    PSJ 4, Delaney Ex. 2.

[10]    PSJ 7, Delaney Ex. 28, Celestica Q1 2006 Earnings Conference Call.

[11]    *See* PSJ 8, Puppi Ex. 2 at p. 4; *see also* PSJ 9, Regan Opening Rpt. at 6.

[12]    PSJ 4, Delaney Ex. 2.

[13]    PSJ 10, Coffman Opening Rpt. ¶ 88.

[14]    PSJ 1, Delaney Ex. 24, Celestica Form 20-F for the year ended Dec. 31, 2005.

4

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

representations regarding the ways in which the 2005 Restructuring would purportedly improve the Company's margins and create substantial savings.[15]

6.      Additionally, throughout the Class Period, pursuant to SOX, Defendants executed certifications on a quarterly basis, attesting to the effectiveness of Celestica's internal controls over financial reporting, and the accuracy of the Company's financial statements.[16]

**B.      The Evidence Demonstrates The Materiality Of Statements Regarding The 2005 Restructuring And The Monterrey Facility**

7.



8.      During Celestica's initial announcement of the 2005 Restructuring, Mr. Delaney stated:  "The reality is that our returns are still below where they need to be to earn our cost of capital.  As a result, after . . . assessing the best *roadmap to get back to sustainable and*

---

[15]   *See* Appendix C.
[16]   PSJ 9, Regan Opening Rpt. at 13-14, FN 66; *see also* Appendix D.
[17]   PSJ 11, Crandall Ex. 3.
[18]   PSJ 12, Crandall Ex. 4.
[19]   PSJ 13, Bar Ex. 38.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

***acceptable levels of profitability***, we have made the decision to significantly reduce the amount of excess capacity in our system through a new restructuring program."[20]

9. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

10.     Puppi testified that, in August 2005, Mexico "was certainly experiencing problems in terms of executing all the change and additional work that was going in there. ***So because of the nature, the size, it was very important to the company that eventually it's successful*** . . ., and given the size that we anticipated . . . Mexico becoming, we certainly wanted [it] to be profitable and have a meaningful impact on the total company. . . . ████████████████

████████████████████████████████████████

11. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

12. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[20]   PSJ 4, Delaney Ex. 2.

[21]   PSJ 2, Fernandez-Stoll Ex. 3 (all-caps and ellipses in original).

[22]   PSJ 14, Puppi Tr. 71:12-74:09.

[23]   PSJ 15, Delaney Ex. 22.

[24]   PSJ 16, Crandall Ex. 13.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER



13.

14.

15.

**C.    The Evidence Demonstrates The Materiality Of
Inventory Levels At The Monterrey Facility**

16.

17.

---

[25]  PSJ 17, CEL00282759, July 26, 2006 presentation entitled, "Review of 2Q 2006 Financial Results."

[26]  PSJ 18, Crandall Ex. 12.

[27]  PSJ 19, Bar Ex. 26.

[28]  PSJ 20, Fernandez-Stoll Ex. 17.

[29]  PSJ 3, Bar Ex. 24.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

18. ███████████████████████████████████████████

███████████████████████████████████████████████

19. ███████████████████████████████████████████

██████████████████████████████

20.     On December 12, 2006, Celestica issued a pre-announcement press release warning that it would be unable to meet revenue and earnings guidance as stated in its third quarter 2006 press release; Celestica disclosed for the first time that Celestica's revenue was adversely affected by an increase in inventory provisions at the Monterrey facility.[32]    The Company reduced its previously reported earnings guidance for the fourth quarter to $0.00 - $0.06 per share, well short of the earnings guidance that Defendants disseminated less than six weeks earlier of $0.15 - $0.23 per share.[33]    Celestica specified that the primary cause of this decline "is an expected net charge of between $0.08 to $0.12 resulting ***predominantly from an increase in inventory provisions at the Monterrey, Mexico facility***."[34]

21.     On January 30, 2007, Celestica announced that an "increased inventory provision" in Monterrey accounted for $30 million of charges in the fourth quarter of 2006.[35] Celestica also announced losses for the quarter and year; annual EBIT losses totaled $136.1 million.[36]

22.     On the January 31, 2007 earnings call, the Company disclosed:[37]

---

[30]   PSJ 21, Delaney Ex. 30.
[31]   PSJ 22, Bar Ex. 23.
[32]   PSJ 23, Puppi Ex. 39.
[33]   *Id.*
[34]   *Id.*
[35]   PSJ 24, CEL00008364, Celestica Form 6-K, filed February 1, 2007.
[36]   *Id.*
[37]   PSJ 25, Muhlhauser Ex. 1, Celestica Q4 2006 Earnings Conference Call.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

In terms of profitability, our operating margins were down sequentially by 150 basis points to 1%, and adjusted EPS was down to $0.03 in Q4 versus the $0.18 earned in Q3. ***This decline was largely driven by previously announced $30 million net charge related to the inventory provision taken at our Monterrey, Mexico facility***.

23.    When Celestica announced it took an additional $30 million inventory charge in Q4 2006 (in addition to the $6 million charge in Q3 2006), a Scotia Capital analyst stated:[38]

This will be the second consecutive quarter where ***inventory issues have a materially negative impact on earnings*** for Celestica.  In the EMS industry, where logistics, supply chain management, and manufacturing comprise the key value proposition, we believe Celestica's inventory miscues are a major concern.

24.    Celestica's reported balance of inventory was the largest asset on its balance sheet.[39]  The consolidated inventory balance as of December 31, 2005 was $1.1 billion, and total assets were $4.9 billion.[40] ████████████████████████████████████

████████████████████████████████

25.    Celestica recorded an unexpected $6 million charge related to Inventories in Q3 2006 and an unexpected $30 million charge related to Inventories in Q4 2006.[42]  The Q4 2006 charge caused Celestica to pre-announce lower than expected earnings for that period.[43]

26.    After Celestica announced it took an additional $30 million inventory charge in Q4 2006, a Cowen & Co. analyst stated:[44]

Given the ongoing issues with the Mexico plant, multiple quarters with inventory write-offs (4Q06, 3Q06, and $161M 4Q04),

---

[38]    PSJ 26, "Reducing Estimates after Q4 Warning," *Scotia Capital*, December 13, 2006; *see also* PSJ 10, Coffman Opening Rpt. ¶ 102.  Later, Scotia Capital referred to such a charge as "an anathema to EMS companies." PSJ 27, "Q4: Guidance Disaster," *Scotia Capital*, January 31, 2007; *see also* PSJ 10, Coffman Opening Rpt. ¶ 102.

[39]    PSJ 9, Regan Opening Rpt. at 17 (citing Celestica 2005 Form 20-F, F-3).

[40]    *Id*.

[41]    *Id*. at 17-18.

[42]    *Id*. at 38.

[43]    PSJ 25, Muhlhauser Ex. 1.

[44]    PSJ 28, "Another Negative Preannouncement; Moving to Neutral," *Cowen & Co.*, December 13, 2006

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

restructuring problems, and the likelihood that we will not get true visibility on a turnaround until mid 2007, we are lowering our rating on the shares to Neutral from Outperform.

27.



28.

29.     VP of Finance Binder testified that, in light of the growing amounts of excess and obsolete inventory in Monterrey, he was concerned that Celestica's inventory reserves were not sufficient, and that he frequently discussed those concerns with Puppi:[47]

> [The topic of setting inventory reserves] was the **subject of a lot of discussions I had with [Puppi] over . . . many, many months** . . . **over the period of time in which excess and obsolete inventory became to be a larger and larger problem in Mexico** . . . the discussions I had with Tony is increasingly I thought that the judgments that the product managers were making . . . were inaccurate . . . I came to believe that based on several interactions which I was aware of with customers . . . that the judgments we used to set the inventory levels were incorrect . . . they were becoming more incorrect as time went on.

---

[45]  PSJ 29, Bar Ex. 20.

[46]  PSJ 30, Homer Ex. 3.

[47]  PSJ 31, Binder Tr. 143:20-148:18; PSJ 32, Binder Ex. 20; *see also* PSJ 33, Lead Plaintiffs' Supplemental and Superseding Responses and Objections to Defendants' First Set of Contention Interrogatories at 51-55 (describing Celestica's maintenance of inadequate inventory reserves).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

### D.    The Evidence Demonstrates That The Impact Of The Restructuring On Monterrey Was A Chief Concern of Celestica's Board Of Directors

30.    Director Etherington testified that "***we looked at Mexico at every [Board of Directors] meeting*** . . . Once we started to centralize in Mexico and we had issues there[,] we were looking at that as part of our operations reviews in every meeting."[48]

31.



32.

33.

34.    When asked about his priorities as of June 30, 2006, Chairman Crandall admitted that "[e]verything" needed to get fixed in Monterrey:[53]

> The site was not operating satisfactorily, it wasn't making money, it wasn't pleasing our customers, it needed to be fixed . . . ***We made it clear, all of us, all of us on the Board made it clear to management that we wanted Monterrey fixed***.

---

[48]    PSJ 34, Etherington Tr. 122:24, 123:04-07.

[49]    PSJ 35, Etherington Ex. 1.

[50]    PSJ 36, Delaney Ex. 10.  "EC's" refers to Executive Committee Meetings and "MOR's" refers to Monthly Operating Reviews.  Both Executive Committee Meetings and Monthly Operating Reviews were periodic meetings of senior Celestica executives.

[51]    PSJ 14, Puppi Tr. at 70:23-71:6.

[52]    PSJ 37, Muhlhauser Ex. 2.

[53]    PSJ 38, Crandall Tr. 30:23-34:12.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

35. 

36.

37.     On January 31, 2007, Muhlhauser, Delaney's replacement as CEO, described in a conference call with analysts the effects on Celestica of the massive influx of customers to Monterrey that was required by the 2005 Restructuring:[58]

> ***The impact of CMX in Mexico has hurt this Company very badly.*** The reality of the situation is that our ***operational execution issues in Mexico*** over the past 12 months ***have resulted in over $75 million of losses for EBIT losses for 2006 and $46 million for the fourth quarter from this one site***. A loss of customer confidence and the need to get this situation under control quickly has resulted in disengagements with some customers. The failure to deliver timely resolution of the issues and deliver the projected operational and financial results quarter after quarter have ***undermined our credibility and eroded shareholder value in the Company***.

38.     On the same call, Muhlhauser explained how the restructuring caused the execution issues in Monterrey:[59]

---

54    PSJ 39, Fernandez-Stoll Ex. 12.
55    PSJ 40, Etherington Ex. 7.
56    PSJ 34, Etherington Tr. 52:25-53:05.
57    PSJ 41, Schwartz Ex. 13.
58    PSJ 25, Muhlhauser Ex. 1, Celestica Q4 2006 Earnings Conference Call.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

To emphasize what is different from last year, we have just returned last night from Celestica's – with Celestica's board of directors from a meeting which was held in Monterrey for the past three days. We held an in depth review of the situation, outlined our 2000 plan for recovery, both with the board and with the CMX management team, including a very extensive site tour. Why did this situation in CMX develop? *We created the perfect storm for the Company and this site by attempting to implement an accelerated transfer plan*, which required the transfer of over 16 customers to Mexico, which required over 50 SMT lines with multiple SMT platforms from various North American facilities, over 6,000 people in an 18-month period into a facility with two ERP systems.  The complexity we introduced was over 50,000 active part numbers, over 1,500 ship codes, requiring over 28,000 pallet locations and creating nine warehouses, seven external to the site, and manage the material required to support the customer demand here.  *Desire to move rapidly to Mexico and drive the required cost productivity into the Americas has come at great cost to our Company and our shareholders*.

### E.    Reports Published By Securities Analysts And Rating Agencies Confirm the Importance Of The 2005 Restructuring and Monterrey

39.    Securities analysts reacted positively to the Company's announcements regarding the 2005 Restructuring and its purported benefits.[60]  For instance, the day of the announcement, an analyst at CIBC wrote:[61]

The new round of restructuring is needed in the current climate and should drive further margin expansion. . . . We would expect that this restructuring together with the company's other efforts will help to drive the company's operating margin to 3.5% by the end of the year.

\*                    \*                    \*

Our Sector Outperformer rating seems appropriate in view of these better-than expected results, the guidance in the context of a difficult market together with the anticipation of benefits from the new restructuring plan.

---

[59]    *Id.*

[60]    *See* PSJ 10, Coffman Opening Rpt. ¶ 89.

[61]    PSJ 42, "Focus On Margin Expansion While Top-Line Growth Is Modest," *CIBC World Markets*, Jan. 27, 2005.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

40. 

41.     After the initial announcement and throughout the Class Period, analysts treated the 2005 Restructuring as a focal point in their evaluation of Celestica.[64]  The Company maintained that it was making great progress throughout the Class Period, increasing operating margin forecasts, to which analysts responded favorably.  For example:

- On July 22, 2005, Citigroup Smith Barney raised its target price based on Celestica's restructuring program.[65]  That same day, Wells Fargo largely attributed improvements in Celestica's operating margins to the success of the restructuring and wrote that "[w]e believe **restructuring** completed so far in FY05 will begin to **materially impact margins in 4Q05**."[66]

- Towards the end of 2005, an analyst at Halpern Capital described the upside to Celestica's ongoing Restructuring process:[67]

  Although Celestica has had a decent value component to its story over the last several quarters, continued uncertainly in the company's restructuring initiatives did not make the shares a terribly exciting growth investment on a risk-reward basis. ***However, given our confidence that Celestica is close to completing its restructuring activities, we can now view the earnings growth we are projecting with lower relative risk via restructuring dynamics.*** Indeed, we estimate Celestica has a

---

[62]    PSJ 43, CEL000410150, *Moody's Press Release*, February 4, 2005.

[63]    *Id.*

[64]    PSJ 10, Coffman Opening Rpt. ¶ 90.

[65]    PSJ 44, "CLS: June Q In-Line; But Weaker Than Expected Near-Term Outlook," *Citigroup Smith Barney*, July 22, 2005; *see also* PSJ 10, Coffman Opening Rpt. ¶ 91.

[66]    PSJ 45, "Operating Progress, but Guidance Disappoints; Lowering Estimates," *Wells Fargo Securities, LLC*, July 22, 2005; *see also* PSJ 10, Coffman Opening Rpt. ¶ 92.

[67]    PSJ 46, "While 'Street' Indecision Lingers, we Like CLS Here!" *Halpern Capital*, December 12, 2005; *see also* PSJ 10, Coffman Opening Rpt. ¶ 93.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

considerable earnings growth opportunity in 2006, at roughly
24.6% year-over-year.

● On an October 20, 2005 earnings call with investors, an analyst questioned the
progress of the restructuring, and Delaney confirmed that the plan was on track:[68]

**Q.   Martin Cecchetto**: And then just to follow-on on the
restructuring. . . . You're basically three quarters into a five quarter
restructuring program. . . . [C]an you explain whether or not you
did expect these terminations to be more back end loaded or does
this indicate that you're behind?

**A. Stephen Delaney**: No, we're not behind. We had a -- we had a
plan to deploy most of the restructuring and the heavy lifting if you
will in the Americas this year, and the follow-on impact in Europe
in the first part of next year. We're continuing to be on that track.
So there is a process around closure and transferring programs, and
migration of people . . . and work around the network. So I think
all of those numbers are on our expectations and I continue . . . to
see the Americas being done first, as we've said in the scripted
portion of the call, those should be largely complete by the end of
this year.

42.    During the April 27, 2006 earnings conference call an analyst asked about

Mexico's drag on Celestica's earnings per share and requested specifics about the facility

including "square footage and mix of business."[69]  Later in the call an analyst asked "a question

on what is exactly going on in Mexico."   The analyst sought details about Monterrey's

manufacturing capabilities and whether the facility's operations had "made significant

progress."[70]  The same analyst pressed Delaney on why problems occurring at Monterrey had not

occurred at Celestica's Colorado facility:

Q. [W]hy is it happening in Mexico? It wasn't happening in
Colorado and maybe you could – the nickel [the $0.05 EPS drag
attributed to Mexico] that you're talking about, you could tell us
exactly what is causing that drag. What kinds of costs are causing
that drag? Is it that you're having to expedite stuff, that you're

---

[68]  PSJ 47, Delaney Ex. 12, Celestica Q3 2005 Earnings Conference Call; see also PSJ 10, Coffman Opening
Rpt. ¶ 94.

[69]  PSJ 7, Delaney Ex. 28.

[70]  *Id.*

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

paying more for inventory, are you actually taking inventory risks now? What's happening there? Because it's a little confusing why it's happening now in Mexico, it wasn't happening in Colorado…[71]

43.    In light of Defendants' public disclosures regarding the Restructuring through 2006, analysts maintained their belief that positive results were forthcoming.[72]  For example:

- Blackmont Capital, April 28, 2006:

    *When we initiated coverage on Celestica on April 4, 2006, our primary thesis was that it had materially completed its restructuring.* The logical extension of this thesis was that the company could then focus on improving profitability, and investors would benefit from the forecast improvement in profitability. We believe Q1/06 results support our thesis. . . . Hence, we believe the "light at the end of the tunnel" is almost tangible.[73]

- CIBC World Markets, July 24, 2006:

    *We are encouraged by its proactive restructuring actions, which should yield improvements and positive operating leverage in late 2006*. . . . We expect that with the restructuring program largely complete some operating leverage should begin to play out. . . . The restructuring program should lead to some margin expansion during H2/06.[74]

44.    During the July 27, 2006 earnings conference call, the very first analyst question was, "[c]ould you quantify the progress in Mexico – how much of an EPS reduction was it?"[75] Another analyst, in light of past problems with Mexico operations, asked  "how much confidence

---

[71]    *Id.*

[72]    PSJ 10, Coffman Opening Rpt. ¶ 95.

[73]    PSJ 48, "Q1/06: Margin Improvement Forecast for Balance of Year," *Blackmont Capital*, April 28, 2006; *see also* PSJ 10, Coffman Opening Rpt. ¶ 95.

[74]    PSJ 49, "Q2 Could Be Impacted By Operational Issues Due To Ramping & Transfer Programs," *CIBC World Markets*, July 24, 2006; *see also* PSJ, 10, Coffman Opening Rpt. ¶ 95.

[75]    PSJ 50, Delaney Ex. 35.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

[do] you have that when . . . you have to increase your volumes…that we won't face similar operational issues?"[76]

45.    CIBC issued an analyst report prior to the Q3 2006 earnings announcement and expected positive news with a focus on Mexico:  "Operating leverage should play out this quarter, as the restructuring is largely complete as are the Mexico transition issues."[77]

46.    Similarly, Cowen and Company's report issued days before the Q3 2006 earnings announcement focused on Mexico:

> Mexico, which has been a difficult situation for Celestica all year, should see a $7M/3c incremental benefit in September, and $3M/2c in December. However, we are less confident in the timing and magnitude of fixing Mexico, which has been captured in our estimates.[78]

47.    During  the October 26, 2006 earnings call, an analyst inquired:

> Q. Then question for you, Steve [Delaney].  *I'm not going to let you off the hook that easy on your Mexico response* to the earlier guy.  Every quarter, we have to make estimates on your Company, and put our names down with a recommendation.  So, *on a view of the stock, I would like to hear your view on when you think Mexico is going to get better*.[79]

48.    Following Celestica's December 12, 2006 pre-announcement, analysts began to focus on the systemic problems and operational issues that occurred at Monterrey:

> JP Morgan - "Revenue bleed likely continues.  In our view, the revenue shortfall this quarter is a precursor to more challenges in 2007 as our checks indicate the company is losing material market share  with  several  large  customers  on  the  heels  of  continuing

---

[76]    *Id.*

[77]    PSJ 51, "We Expect Positive Operating Leverage for Both Q3 and Q4," *CIBC World Markets,* October 23, 2006.

[78]    PSJ 52, "This Should be the Quarter of Turn," *Cowen and Company*, October 23, 2006.

[79]    PSJ 53, Puppi Ex. 38, question from Chris Umiastowski from TD Newcrest; *see also* PSJ 54, Regan Rebuttal Rpt. at 5; PSJ 9, Regan Opening Rpt. at 38-41 (considering reports by securities analysts).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

quality issues at one of the company's manufacturing facilities in **Mexico**."[80]

Bear Stearns - "The poorly run **Mexico operations**, which we believe led to the previous CEO dismissal, continue to weigh on CLS, and have resulted in a $8M loss in the June quarter, $7M in the September quarter, and will expand to $18M+ in the December quarter. The expanded December quarter inventory charge was due to poor inventory management, which has resulted in inventory write-offs. However, in our opinion, the charge could also be the result of customers' disengagement."[81]

RBC – "[W]e see continued risks to CLS's turnaround due to ongoing operational issues in **Mexico**, which could lead to customer disengagements over time."[82]

49.    On January 31, 2007, one day after the end of the Class Period, a Deutsche Bank analyst observed that the restructuring had not, in fact, improved Celestica's operating margins:

Despite taking $340 million in restructuring charges since beginning its latest program in early 2005, Celestica's margins have yet to show any improvement as operating margin in Q4 06 was 120 bps below Q1 05's margin of 2.2%.[83]

**F.    Defendants' Experts Do Not Dispute Materiality**

50.    Lead Plaintiffs' economics expert Coffman opined that the alleged misstatements and omissions in this case were material.[84] Coffman based this opinion on:

● the Company's own public statements that failure to execute the Restructuring Plan could have a material impact;

● the strong positive reaction by analysts and the investing public to the announced restructuring plan;

● analysts' continued focus over the course of the Class Period on the restructuring and its promised benefits;

---

[80] PSJ 55, "The Arctic Chill Comes a Bit Early," *JP Morgan*, December 12, 2006.

[81] PSJ 56, "CLS Lowers Its Guidance for 4Q06; Is CLS Cleaning House for the New CEO" *Bear Sterns*, December 12, 2006.

[82] PSJ 57, "CLS – Lowers Q406 Guidance," *RBC Capital Markets*, December 12, 2006.

[83] PSJ 58, "Celestica: Q4 In-Line, Q1 Outlook Disappointing," *Deutsche Bank*, Jan. 31, 2007; *see also* PSJ 10, Coffman Opening Rpt. ¶ 98.

[84] PSJ 10, Coffman Opening Rpt. ¶¶ 10, 83-107.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

- the economic importance of inventory (and adequate inventory controls) to investors especially in the low-margin electronic manufacturing systems business, as supported by (i) the abundance of analyst coverage of CLS's inventory levels throughout the Class Period and (ii) the demonstration of how a write-off of even a small percentage of inventory would substantially affect CLS's earnings;

- his event study analysis which indicates that upon multiple partial releases of corrective information related to the restructuring, inventory, and internal controls the market value of Celestica common stock fell significantly; and

- the general importance of a company maintaining effective internal controls.

51.    Lead Plaintiffs' accounting expert Regan also opined that the alleged misstatements and omissions in this case were material.[85]   In his Opening Report, Regan opined specifically on the following:

- Celestica materially misstated its inventory;[86]

- CMX inventory reserves were material to Celestica's consolidated inventory;[87]

- CMX was material to Celestica's consolidated financial statements;[88]

- The 2005 Restructuring plan was material to Celestica;[89]

- Celestica's SOX certifications are material;[90]

- Celestica's control deficiencies increased the risk of a potential material misstatement of reported inventories;[91]

- MD&A statements are by definition material;[92]

---

[85]   *See* PSJ 54, Regan Rebuttal Rpt. at 2-13.

[86]   PSJ 9, Regan Opening Rpt. at 2, 6-7, 17-20, 38-41.

[87]   *Id*. at 6-7.

[88]   *Id*. at 6-9, 33-36, 49-51, 53-59.

[89]   *Id*. at 6, 47-49, 51-53, 59-61.

[90]   *Id*. at 9-17.

[91]   *Id*. at 17-20, 36.

[92]   *Id*. at 41-46.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

- Celestica's control deficiencies constituted a material weakness;[93] and

- Celestica's inventory management deficiencies constituted a material weakness.[94]

52.     None of Defendants' experts—Juneja, Robert G. Freid, nor Dr. Thomas L. Porter—contradicted Coffman's or Regan's opinions concerning materiality, nor did any of Defendants' experts render any opinion concerning the materiality of Defendants' alleged false statements and omissions.[95]

## II.    DEFENDANTS DO NOT DISPUTE THE EFFICIENCY OF THE MARKET FOR CELESTICA COMMON STOCK

53.     The Coffman Report analyzes the factors relevant to market efficiency in accordance with prevailing law.  Specifically, Coffman opined that:

- Celestica's stock was actively traded at a substantial volume (Coffman Opening Rpt. ¶ 35);

- there was an abundance of analyst coverage of Celestica (*id*. ¶ 40);

- Celestica's trading on the NYSE and TSX is at least an equivalent factor for the existence of sufficient market makers for the stock (*id*. ¶ 50);

- Celestica was able to file SEC Form F-3 registration statements (*id*. ¶ 53);

- there is a clear cause and effect relationship between new unexpected public information about Celestica and the market price for its stock (*id*. ¶ 69);

- Celestica's market capitalization was consistently large relative to other publicly traded companies (*id*. ¶ 73);

- Celestica's bid-ask spreads were smaller than approximately 75% of common stocks trading on the NYSE and NASDAQ (*id*. ¶ 75);

---

[93]  *Id*. at 69-72.

[94]  *Id*. at 72-76.

[95]  *See* PSJ 59, Juneja Rpt.; PSJ 60, Expert Report of Robert G. Freid, June 26, 2013; PSJ 61, Expert Report of Thomas L. Porter, Aug. 30, 2013; *see also* PSJ 62, Coffman Reply Rpt. ¶ 17; PSJ 54, Regan Rebuttal Rpt. at 3; PSJ 63, Porter Tr. 17:18-22.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

- Celestica had a level of institutional ownership between 73.91% and 80.72% during the class period (*id.* ¶ 76);

- there was no persistent autocorrelation in Celestica's stock (*id.* ¶ 80); and

- there was considerable trading in Celestica options during the Class Period (*id.* ¶ 81).

Coffman concluded that "every factor analyzed supports my opinion that CLS Common Stock traded in an efficient market throughout the Class Period." *Id.* ¶ 82.

54.    None of Defendants' experts dispute market efficiency or reliance. In addition, Juneja's report does not opine that there were any truth-on-the-market issues prior to the first corrective disclosure on January 27, 2006.[96]

55.    In their opposition to Lead Plaintiffs' motion for class certification (ECF No. 126), Defendants did not dispute class-wide reliance under Rule 23(b)'s "predominance" requirement.[97]

## III.  DEFENDANTS DO NOT DISPUTE LOSS CAUSATION AND ECONOMIC LOSSES ARISING FROM FOUR CORRECTIVE DISCLOSURE DATES

56.    Coffman opined that on January 27, 2006, the Class learned information that partially revealed the truth concerning Defendants' alleged misstatements and omissions. Coffman concluded the price movement of this day was statistically significant. Coffman further opined that the disclosure that day was loss-causing and that the Class was damaged thereby.[98]

---

[96]  PSJ 59, Juneja Rpt.

[97]  *See* Lead Plaintiffs' Reply Memorandum of Law In Further Support of Their Motion for Class Certification at 1, n.2; 4 (ECF No. 127).

[98]  PSJ 10, Coffman Opening Rpt. ¶¶ 124-34.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

57.     Juneja does not dispute Coffman's opinion that at least a portion of the new information disclosed on January 27, 2006 was corrective and caused a portion of the share price decline on that day.[99]  Nor does Juneja dispute the statistical significance of that decline.

58.     Coffman opined that on October 27, 2006, the Class learned information that partially revealed the truth concerning Defendants' alleged misstatements and omissions. Coffman concluded the price movement of this day was statistically significant.  Coffman further opined that the disclosure that day was loss causing and that the Class was damaged thereby.[100]

59.     Juneja does not dispute Coffman's opinions that at least a portion of the new information disclosed on October 27, 2006 was corrective and caused a portion of the share price decline on that day.[101]  Nor does Juneja dispute the statistical significance of that decline.

60.     Coffman opined that on December 12, 2006, the Class learned information that partially revealed the truth concerning Defendants' alleged misstatements and omissions. Coffman concluded the price movement of this day was statistically significant.  Coffman further opined that the disclosure that day was loss causing and that the Class was damaged thereby.[102]

61.     Juneja does not dispute Coffman's opinions that at least a portion of the new information disclosed on December 12, 2006 was corrective and caused a portion of the share price decline on that day.[103]  Nor does Juneja dispute the statistical significance of that decline.

62.     Coffman opined that on January 31, 2007, the Class learned information that revealed the truth concerning Defendants' alleged misstatements and omissions.   Coffman

---

[99]  *See* PSJ 59, Juneja Rpt. at ¶¶ 31-49; *see also* PSJ 62, Coffman Reply Rpt. at ¶¶ 7, 23.
[100]  PSJ 10, Coffman Opening Rpt. ¶¶ 135-160.
[101]  *See* PSJ 59, Juneja Rpt. at ¶¶50-70; *see also* PSJ 62, Coffman Reply Rpt. at ¶¶ 7, 23.
[102]  PSJ 10, Coffman Opening Rpt. ¶¶ 168-176.
[103]  PSJ 59, Juneja Rpt. at ¶¶77-81; *see also* PSJ 62, Coffman Reply Rpt. at ¶¶ 7, 23.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

concluded the price movement of this day was statistically significant.  Coffman further opined that the disclosure that day was loss causing and that the Class was damaged thereby.[104]

63.    Juneja does not dispute Coffman's opinions that at least a portion of the new information disclosed on January 31, 2007 was corrective and caused a portion of the share price decline on that day.[105]  Nor does Juneja dispute the statistical significance of that decline.

64.    Juneja does not set forth an alternative quantum of damages and acknowledges that, if Lead Plaintiffs are successful in demonstrating Celestica's liability "related to the Restructuring involving shifting operations to Mexico,"[106] then Lead Plaintiffs suffered some measure of damages on each of these four disclosures.[107]

## ARGUMENT

## I.    THE LEGAL STANDARDS GOVERNING PARTIAL SUMMARY JUDGMENT

A party may move for summary judgment on any claim or defense or part of a claim or defense.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  *Id*.  A "genuine issue [of] material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party.  *Id*.

"When the moving party has met this initial burden . . ., the opposing party must 'set out specific facts showing a genuine issue for trial,' and cannot rest 'merely on the allegations or denials' of the facts asserted by the movant."  *Bacolitsas v. 86th & 3rd Owner, LLC*, 2010 WL 3734088, at *3 (S.D.N.Y. Sept. 21, 2010) (quoting Fed. R. Civ. P. 56(e)(2)).  To defeat a summary judgment motion, the non-moving party "must do more than simply show that there is

---

[104]  PSJ 10, Coffman Opening Rpt. ¶¶ 177-88.
[105]  PSJ 59, Juneja Rpt. ¶¶ 82-108; *see also* PSJ 62, Coffman Reply Rpt. ¶¶ 7, 23.
[106]  PSJ 59, Juneja Rpt. ¶ 3.
[107]  PSJ 62, Coffman Reply Rpt. ¶ 23.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). The essence of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When considering a motion for summary judgment, the Court is not asked to weigh the evidence, but rather "determine whether there is a genuine issue for trial." *Id*. at 249.

## II.  THERE IS NO GENUINE DISPUTE AS TO THE MATERIALITY OF CERTAIN CATEGORIES OF MISSTATEMENTS AND OMISSIONS

It is well-settled that a misrepresentation or omission is "material" under Section 10(b) when there is a "substantial likelihood" that it "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Celestica, Inc.*, 455 F. App'x at 16 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011)). Materiality is "appropriately resolved as a matter of law by summary judgment" if the alleged misrepresentations or omissions "are so obviously important to an investor that reasonable minds cannot differ on the question of materiality." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). This is particularly true where, as here, there is evidence demonstrating that Defendants acknowledge or concede the materiality of the statements at issue. *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 661 (S.D.N.Y. 2004) (granting partial summary judgment on the materiality of certain statements based on defendants' admissions).[108]

---

[108] The Second Circuit's materiality ruling rested on Lead Plaintiffs' allegations of "(1) [Defendants'] distortion of Celestica's assets and earnings and concealment of the company's failure to meet analysts' expectations, (2) the significance of the restructuring effort to the company's operations and profitability, and (3) the precipitous decrease in share price that occurred after Celestica disclosed the true state of its inventory." *Celestica, Inc.*, 455 F. App'x at 16. The Second Circuit explained that "[t]hese qualitative factors are sufficient to support an inference at this stage that Celestica's inventory accounting was relevant to investors' investment decisions, defeating defendants' immateriality argument." *Id*. After extensive discovery, Lead Plaintiffs have adduced

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

## A.  Statements Relating To The 2005 Restructuring Are Material

The evidence corroborates the materiality of Defendants' misstatements and omissions regarding the 2005 Restructuring.  For example:

- During Celestica's initial announcement of the 2005 Restructuring, CEO Delaney acknowledged the stakes: "[T]he reality is that our returns are still below where they need to be to earn our cost of capital.  As a result, after . . . assessing the best *roadmap to get back to sustainable and acceptable levels of profitability*, we have made the decision to significantly reduce the amount of excess capacity in our system through a *new restructuring program*." (56.1 Stmt. ¶ 8);

- Celestica's future credit rating depended on the restructuring achieving (or at least approaching) its associated profitability targets:



- Celestica expressly acknowledged in the Risk Disclosures of its Form 20-F for 2005 that "any failure to successfully execute" the restructuring "can have a *material adverse impact* on our results" (*id*. ¶ 4);

- After the initial announcement and throughout the Class Period, analysts treated the restructuring as a focal point in their evaluation of Celestica.  (*id*. ¶¶ 39-49).

Defendants' public disclosures,[109] as well as their own internal documents, make clear that Company disclosures regarding the restructuring were "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality."  *TSC*, 426 U.S. at 450.  Any attempt by Defendants to now suggest that this information was somehow unimportant

---

evidence to support each of the factors relied upon by the Second Circuit.  *See* PSJ 33, Lead Plaintiffs' Supplemental and Superseding Responses and Objections to Defendants' First Set of Contention Interrogatories.

[109]   The regulatory mandate for "material" disclosure in MD&A (*see* §II.D, *infra*) further supports the materiality of the 2005 Restructuring misstatements.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

to investors would only raise an issue of "metaphysical doubt," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 586 (1986), regarding the significance of these facts to investors.  The Court should therefore grant partial summary judgment with respect to the materiality of the misstatements identified in Appendix A.

### B.    Statements Relating To Monterrey's Effectiveness, Profitability, And Ability To Execute The 2005 Restructuring Plan Are Material

Prior to the Class Period, Defendants knew that Monterrey was hampered with weak inventory controls.  56.1 Stmt. ¶ 7.



a fact that was not disclosed to investors,

*Id*.  At the end of the Class Period, Celestica acknowledged that it "created the perfect storm for the Company and this site [Monterrey] by attempting to implement an accelerated transfer plan."  Specifically:

> ***Mexico has hurt this Company very badly***.  The reality of the situation is that our operational execution issues in Mexico over the past 12 months have resulted in over $75 million of [EBIT] losses . . . for 2006[110] and $46 million for the fourth quarter from this one site.  A loss of customer confidence and the need to get this situation under control quickly has resulted in disengagements with some customers.  The ***failure to deliver timely resolution of the issues and deliver the projected operational and financial results quarter after quarter have undermined our credibility and eroded shareholder value*** in the Company.  (*Id*. ¶ 37).

On that earnings call, CEO Muhlhauser acknowledged that "***Mexico has hurt this Company very badly***" and acknowledged the "[d]esire to move rapidly to Mexico and drive the required cost productivity into the Americas has come at ***great cost to our Company and its***

---

[110]  Thus, losses attributable to "operational execution issues in Mexico," at "over $75 million" for 2006, comprised the majority of Celestica's $136.1 million in total EBIT losses for the year.  (*See* 56.1 Stmt. ¶¶ 21, 37).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

*shareholders*." (*Id.* ¶ 38).  In light of these admissions, Defendants cannot genuinely dispute the materiality of statements relating to the relative success or failure of Monterrey.

The evidence corroborates the materiality of statements relating to Monterrey's operational effectiveness and ability to execute the 2005 Restructuring.  Such evidence includes:



- Director Etherington testified that Celestica's Board of Directors "*looked at Mexico at every meeting*," during the Class Period, and that "Once we started to centralize in Mexico and we had issues there[,] we were looking at that as part of our operations reviews every meeting." (*id.* ¶ 30).

The above-cited evidence, coupled with the Company's express admission that dysfunction at the Monterrey facility had "hurt this company very badly," makes clear that Defendants' Monterrey-related statements were "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality."  *TSC*, 426 U.S. at 450.  Any attempt by Defendants to now suggest that this information was somehow unimportant to investors would only raise an issue of "metaphysical doubt," *Matsushita*, 475 U.S. at 586,

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

regarding the significance to investors of these facts.  The Court should therefore grant summary judgment with regard to the materiality of Defendants' misstatements listed in Appendix B-1 regarding the Monterrey facility.

### C.    Statements Relating To Monterrey's Inventory Levels Are Material

On December 12, 2006, Celestica pre-announced a decline in earnings per share for the fourth quarter of 2006.  (56.1 Stmt. ¶ 20).  In its press release, Celestica specified that the main cause of this drop "is an expected net charge of between $0.08 to $0.12 ***resulting predominantly from an increase in inventory provisions at the Monterrey, Mexico facility***."  (*Id.*).

Celestica's December 12, 2006 preannouncement press release, and subsequent disclosure of that press release in its 6-K filed the next day (*id.*), implicitly concedes the materiality of information relating to inventory levels at the Monterrey site.[111]    During Celestica's earnings call on January 31, 2007, the Company confirmed that its 83 percent sequential quarterly drop in adjusted EPS was "***largely driven by the previously announced $30 million net charge related to the inventory provision taken at our Monterrey, Mexico facility***." (*Id*. ¶ 22).  Defendants thus cannot genuinely dispute the materiality of statements relating to inventory levels at Monterrey.  *See WorldCom,* 346 F. Supp. 2d at 661.

The evidence further corroborates the materiality of statements relating to Monterrey's operational effectiveness and ability to execute the 2005 Restructuring, including:



---

[111] See 17 CFR 243.100-243.103 ("Regulation FD"), at § 243.100(a).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER



- Analysts recognized that corrective information regarding the value of Monterrey-based inventory was significant. (*id.* ¶¶ 23, 26). For example, an analyst from Scotia Capital, reacting to the Monterrey-inventory-driven $30 million increase in Celestica's inventory reserve, stated: "In the EMS industry, where logistics, supply chain management, and manufacturing comprise the key value proposition, we believe ***Celestica's inventory miscues are a major concern***." (*id.* ¶ 23). Later, Scotia Capital referred to such a charge as "an anathema to EMS companies." (*id.*).

Moreover, "[f]inancial reports stating profits and losses of a company are, of course, of great interest to investors, and are ordinarily material to the decision of a shareholder to buy or sell a share." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 234 (S.D.N.Y. 2006); *accord Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003) ("Most investors would consider it significant, no matter what the mix of information available, that a company was not earning as much as it was claiming to earn. The onus is on the defendants to demonstrate why this assumption should not stand."). Indeed, the Second Circuit already undertook such an analysis in this case, finding that "[m]isstatements of income, such as Celestica's net earnings statements based on incorrect inventory valuations, can be material 'because earnings reports are among the pieces of data that investors find most relevant to their investment decisions.'" *Celestica, Inc.*, 455 F. App'x at 16 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 164 (2d Cir. 2000)).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

The above-cited evidence demonstrates that Defendants' misstatements and omissions regarding Monterrey's inventory levels were "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *TSC*, 426 U.S. at 450. Any attempt by Defendants to now suggest that this information was somehow unimportant to investors would only raise an issue of "metaphysical doubt," *Matsushita*, 475 U.S. at 586, regarding the significance to investors of these facts. The Court should therefore grant summary judgment with regard to the materiality of the Monterrey inventory-related misstatements listed in Appendix B-2.

> **D.    Statements Within Celestica's Management Discussion**
> **And Analysis Disclosures Are Inherently Material**

The regulatory requirements underlying MD&A disclosures render them particularly suitable to summary judgment. "The purpose of MD&A is not complicated. It is to provide readers *information 'necessary to an understanding* of [a company's] financial condition, changes in financial condition and results of operations.'"[112] Thus, for example, MD&A must "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a *material* favorable or unfavorable impact on net sales or revenues or income from continuing operations."[113] Indeed, the instructions that accompany Item 303 state that MD&A "*must specifically focus on known material events and uncertainties* that would cause reported financial information not to be necessarily indicative of future operating results or future financial condition."[114]

Given the regulatory mandate that MD&A disclosures "must specifically focus on known *material events*," alleged misstatements made in the context of Celestica's MD&A disclosures

---

[112] PSJ 64, Financial Reporting Release (FR) 72, Dec. 29, 2003.

[113] Regulation S-K, Item 303, 17 C.F.R. § 229.303 (a)(3)(ii).

[114] Regulation S-K, Item 303, 17 C.F.R. § 229.303 (Instructions to paragraph 303(a)).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

are, by definition, material.  The Court should therefore grant summary judgment with regard to the materiality of the MD&A-related disclosures listed in Appendix C.

### E.    SOX Certifications Are Inherently Material

In the wake of widespread corporate fraud, Congress enacted the certification requirements of SOX to ensure that senior corporate management personally assess and certify whether the company's internal controls over financial reporting were effective, and attest to the accuracy of their public disclosures.[115]  As SOX and related SEC rules acknowledge, such certifications were intended to apply to "any change in the company's internal control over financial reporting . . . that has ***materially affected, or is reasonably likely to materially affect***, the company's internal control over financial reporting."[116]

Per the above-referenced statutory and regulatory guidance, the intrinsic subject matter of Celestica's SOX-mandated quarterly CEO/CFO certifications relate to matters that are, by their own definition, "material."  Throughout the Class Period, Defendants certified to the following:

- that "this report does not contain any untrue statement of a ***material*** fact or omit to state a ***material*** fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." (56.1 Stmt. ¶ 6, *citing* Appendix D);

- that Defendants had "designed such disclosure controls and procedures . . . to ensure that ***material*** information . . . is made known to" Defendants (*id.*);

- that Celestica had disclosed "any change in the company's internal control over financial reporting . . . that has ***materially*** affected, or is reasonably likely to ***materially*** affect the company's internal controls over financial reporting." (*id.*);

- that Celestica had disclosed "all significant deficiencies and ***material*** weaknesses in the design or operation of internal control

---

[115] SOX, §§ 302 and 404; PSJ 9, Regan Opening Rpt. §3.c.

[116] Final Rule: Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, http://www.sec.gov/rules/final/33-8238.htm.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

over financial reporting, which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" (*id*);

- that Celestica's quarterly and annual public disclosures "fairly presents, in all ***material*** respects, the financial condition and results of operations of the Company." (*id.*).

Because Celestica's SOX certifications are inherently material, the Court should grant summary judgment with regard to all such certifications listed in Appendix D.

## III.    THERE IS NO GENUINE DISPUTE CONCERNING CLASS-WIDE RELIANCE

Plaintiffs sought to establish a presumption of class-wide reliance by invoking the "fraud-on-the-market" doctrine, which provides that, where, as here, a security trades on an efficient market, all public information is assumed to be timely incorporated into its share price.   *See* Plaintiffs' Class Certification Opening Brief; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988).  As the Supreme Court recently concluded, proof that rebuts the presumption "is a matter for trial (and presumably also for a summary-judgment motion)."   *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1204 (2013) (internal citation omitted).

Here, there is no genuine triable issue with respect to the efficiency of the market for Celestica common stock.  In Plaintiffs' Class Certification Opening Brief, which is pending before the Court, Lead Plaintiffs argued that the market for Celestica shares was efficient.[117]  As part of that motion, Lead Plaintiffs submitted the expert report of Chad Coffman, who opined that the market for Celestica shares was efficient based on his analysis of each of the *Cammer* factors as well as five additional factors.[118]  The Coffman Report analyzes the factors relevant to market efficiency in great detail in accordance with  prevailing law.  (56.1 Stmt. ¶ 53).  Coffman

---

[117]  §IV.B.1 (a) - (f).

[118]  *See* PSJ 10, Coffman Opening Rpt. ¶¶ 25-82.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

concludes that "every factor analyzed supports my opinion that CLS Common Stock traded in an efficient market throughout the Class Period." (*Id*.).

Importantly, Defendants did not dispute class-wide reliance under Rule 23(b)'s "predominance" requirement and thus conceded class-wide reliance. (*Id*. ¶ 55). Further, Defendants' expert on economic issues (Juneja) did not dispute Coffman's opinion on the efficiency of the market and did not present any evidence or opinion to rebut the presumption of class-wide reliance. (*Id*. ¶ 54), In addition, Juneja's report does not opine that there were any truth-on-the-market issues prior to the first corrective disclosure on January 27, 2006. (*Id*.).[119]

Accordingly, given that there is no genuine dispute about Celestica's market efficiency, partial summary judgment should be granted as to class-wide reliance.

## IV.    THERE IS NO GENUINE DISPUTE THAT FOUR CORRECTIVE DISCLOSURES CAUSED THE CLASS TO INCUR ECONOMIC LOSSES

The PSLRA imposes on plaintiffs "'the burden of proving' that the Defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.'" *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (*citing* 15 U.S.C. 78u-4(b)(4)). Here, the Class's expert, Coffman, identifies five corrective disclosures that caused Plaintiffs to suffer economic losses. (56.1 Stmt. ¶¶ 56, 58, 60, 62).

If Plaintiffs prove at trial that Defendants are liable under Section 10(b), there is no genuine dispute that, with respect to four of those five dates, Plaintiffs suffered some quantum of damages. Indeed, Defendants' expert Juneja does not contradict Coffman's opinions that at least a portion of the new information disclosed on January 27, 2006, October 27, 2006, December 12, 2006, and January 31, 2007 was corrective and caused a portion of the share price declines on

---

[119] The predicate to a presumption of reliance, also undisputed by Juneja, includes proof "that the alleged misrepresentations were publicly known . . . and that the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" *Erica P. John Fund v. Halliburton*, 131 S. Ct. 2179, 2185 (2011) (quoting *Basic*, 485 U S at 248, n.27).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

those dates. (*See id.* ¶¶ 57, 59, 61, 63). Nor, does Juneja dispute the statistical significance of any of those four share price declines. (*Id.*). Accordingly, while the precise amount of economic loss per share is in dispute, there is no genuine dispute that the Class did, in fact, sustain some quantum of economic losses as a result of loss-causing corrective information disclosed on each of these four dates.

## CONCLUSION

For the foregoing reasons, the Class respectfully requests that the Court grant its motion for partial summary judgment.


Dated:   November 13, 2013

**LABATON SUCHAROW LLP**

By:    /s/ Joseph A. Fonti
Joseph A. Fonti (JF-3201)
Stephen W. Tountas (ST-8395)
Jeffrey R. Alexander (JA-3849)
140 Broadway
New York, New York  10005
(212) 907-0700

*Counsel for Lead Plaintiffs and*
*Proposed Class Counsel*

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ────────────────────────── x | |
| : | |
| : | Civil Action No.: 07-CV-00312-GBD |
| : | |
| IN RE CELESTICA INC. SEC. LITIG. : | (ECF CASE) |
| : | |
| : | Hon. George B. Daniels |
| : | |
| : | |
| ────────────────────────── x | |

## <u>CERTIFICATE OF SERVICE</u>

I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 that on November 13, 2013, I caused to be served upon the following, by electronic mail, a true copy of Lead Plaintiffs' Memorandum In Support of Its Motion for Partial Summary Judgment.


Phillip A. Geraci, Esq (phillip.geraci@kayescholer.com)
Kaye Scholer
425 Park Avenue
New York, NY 10022-3598
United States

Dated: November 13, 2013


                                        ─────────────────────────
                                        Joseph A. Fonti


CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER