## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

——————————————————— x
: 
:      Civil Action No.:  07-CV-00312-GBD
: 
IN RE CELESTICA INC. SEC. LITIG.      :      (ECF CASE)
: 
:      Hon. George B. Daniels
: 
:      **Oral Argument Requested;**
     **Contains Information Subject To**
     **Protective Order**
——————————————————— x

## LEAD PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

**LABATON SUCHAROW LLP**
Joseph A. Fonti (JF-3201)
Stephen W. Tountas (ST-8395)
140 Broadway
New York, New York  10005
(212) 907-0700

*Counsel for Lead Plaintiffs New Orleans*
*Employees' Retirement System, Millwright*
*Regional Council of Ontario Pension Trust*
*Fund, Drywall Acoustic Lathing and Insulation*
*Local 675 Pension Fund, and Carpenters' Local*
*27 Benefit Trust Funds*

June 28, 2013

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

TABLE OF DEFINED TERMS ............................................................................................. vi

I.  INTRODUCTION .......................................................................................................1

II.  SUBSTANTIVE BACKGROUND ............................................................................2

    A.  Defendants Touted Celestica's 2005 Restructuring.................................................3

    B.  The 2005 Restructuring Commenced Without Appropriate
        Planning And Was Plagued By Significant Execution Failures ............................3

    C.  Delaney And Puppi Knew About The Inventory Buildup In
        Monterrey..................................................................................................................6

    D.  Celestica's Relationships With Its Key Customers Suffered
        Because Of The Problems In Monterrey ..................................................................8

    E.  Celestica's Stock Price Declined By Statistically Significant
        Amounts Upon Each Partial Disclosure Of Celestica's True
        Financial Condition..................................................................................................9

III.  PROCEDURAL BACKGROUND...........................................................................10

IV.  ARGUMENT ............................................................................................................11

    A.  The Proposed Class Satisfies the Prerequisites of Rule 23(a) .............................12

        1.  The Members Of The Proposed Class Are So Numerous
            That  Joinder Of All Members Is Impracticable .......................................12

        2.  Questions Of Law Or Fact Are Common  To The Members
            Of The Proposed Class................................................................................13

        3.  The Proposed Class Representatives' Claims  Are Typical
            Of The Proposed Class................................................................................14

        4.  The Interests Of The Class Will Be Fairly And Adequately
            Protected ....................................................................................................15

    B.  The Proposed Class Action Satisfies The Requirements Of Rule
        23(b)(3) ...................................................................................................................17

        1.  Common Questions Of Law And Fact Predominate Over
            Questions Affecting Only Individual Members Of The
            Proposed Class............................................................................................18

            (a)  *Cammer* Factor One: Average Weekly Trading Volume .............20

            (b)  *Cammer* Factor Two: Analyst Coverage .......................................20

             (c)  *Cammer* Factor Three: Market Makers..........................................21

            (d)  *Cammer* Factor Four: SEC Form S-3 Eligibility ..........................22

(e) *Cammer* Factor Five: Price Reaction To New Information ........................................................................22

(f) Additional Indicators Of Market Efficiency ...................................23

2. Class Action Treatment Is Superior To Other Available Methods............................................................................................24

V. CONCLUSION.............................................................................................25

## TABLE OF AUTHORITIES

Page(s)

CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d. Cir. 2012)................................................................12

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (2007)................................................................18

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013)................................................................11

*In re Bank of America Corp. Sec., Deriv., and Employee Ret. Income Security Act
    (ERISA) Litig.*,
    281 F.R.D. 134 (S.D.N.Y. 2012) ................................................................25

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................19

*Billhofer v. Flamel Technologies, S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) ................................................................1

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ................................................ passim

*Consol. Rail Corp. v. Hyde Park*,
    47 F.3d 473 (2d Cir. 1995)................................................................12

*Damassia v. Duane Reade, Inc.*,
    250 F.R.D. 152 (S.D.N.Y. 2008) ................................................................13

Dukes *v. Wal-Mart Stores*,
    131 S. Ct. 2541 (2011)................................................................11

*In re Dynex Capital, Inc. Sec. Litig.*,
    2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ................................................15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011)................................................................18

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
    2007 WL 2230177 (S.D.N.Y. July 27, 2007) ................................................14, 15

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)................................................................14, 15

*Fogarazzo v. Lehman Bros., Inc.*,
   232 F.R.D. 176 (S.D.N.Y. 2005) ...........................................................................13

*In re Globalstar Sec. Litig.*,
   2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) ......................................12, 13, 14, 18

*Katz v. Image Innovations Holdings, Inc.*,
   2010 WL 2926196 (S.D.N.Y. July 22, 2010) .........................................................12

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) ...........................................................................20

*In re Marsh & McLennan Cos. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ........................................................13

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002) .................................................................................18

*Morrison v. Nat'l Austl. Bank Ltd.*,
   130 S. Ct. 2869 (2010) ......................................................................................12, 13

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) .............................................................................18

*In re Oxford Health Plans, Inc.*,
   191 F.R.D. 369 (S.D.N.Y. 2000) ...........................................................................13

*Pennsylvania Ave. Funds v. Inyx Inc.*,
   2011 WL 2732544 (S.D.N.Y. July 5, 2011) ................................................... passim

*Public Employees' Ret. System of Mississippi v. Merrill Lynch & Co., Inc.*,
   277 F.R.D. 97 (S.D.N.Y. 2011) ........................................................................14, 18

*In re Sadia, S.A. Sec. Litig.*,
   269 F.R.D. 298 (S.D.N.Y. 2010) ...........................................................................19

*In re SCOR Holdings (Switzerland) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008)......................................................................25

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ..............................................................................1

*In re Vivendi Universal S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) .....................................................................11, 12, 15

*Wagner v. Barrick Gold Corp.*,
   251 F.R.D. 112 (S.D.N.Y. 2008) ....................................................................20, 21, 25

*In re Winstar Communications Securities Litig.,*
    2013 WL 1700993 (S.D.N.Y. Apr. 17, 2013) (Daniels, J.) ........................................... passim

*In re WorldCom, Inc. Sec. Litig.,*
    219 F.R.D. 267 (S.D.N.Y. 2003) ...........................................................................16

**STATUTES**

15 U.S.C. §78j(b) .........................................................................................................13

15 U.S.C. § 78u-4(a)(3)(B)(iii) .....................................................................................17

**OTHER AUTHORITIES**

1995 U.S.C.C.A.N. 679 ...............................................................................................16

Fed. R. Civ. P. 23(a) .............................................................................................. passim

Fed. R. Civ. P. 23(a)(4) ...........................................................................................15, 16

Fed. R. Civ. P. 23(b) .....................................................................................................17

Fed. R. Civ. P. 23(b)(3).................................................................................................25

Fed. R. Civ. P. 23(b)(3)........................................................................................2, 11, 17

H.R. Rep. No. 104-369 (1995) (Conf. Rep.)................................................................16

## TABLE OF DEFINED TERMS

### For convenience, the terms used herein are defined as follows:

| Term | Definition |
|---|---|
| Bar, Peter ("Bar") | Celestica Corporate Controller |
| Bar Ex. | Exhibit of the Deposition of Peter Bar, June 4, 2013 |
| Binder, Frank ("Binder") | Celestica Senior Vice President of Finance |
| Binder Ex. | Exhibit of the Deposition of Frank Binder, March 13, 2013 |
| Binder Tr. | Transcript of the Deposition of Frank Binder, March 13, 2013 |
| Boucher, John ("Boucher") | Celestica Senior Vice President of Supply Chain Management |
| Boucher Ex. | Exhibit of the Deposition of John Boucher, April 5, 2013 |
| Burden, Richard ("Burden") | Celestica Director of Supply Chain Management |
| Celestica, the Company, or CLS | Celestica, Inc. |
| Class | All persons and entities that purchased or acquired Celestica common stock registered and listed on the NYSE, during the Class Period and who were damaged thereby, subject to specified exclusions |
| Class Period | January 27, 2005 to January 30, 2007 |
| CMX or Monterrey | Celestica's Monterrey, Mexico Facility |
| Coffman Declaration | Expert Report of Chad Coffman, CFA, June 14, 2013 |
| Crandall, Robert ("Crandall") | Celestica Chairman of the Board of Directors, Member of the Audit Committee |
| Crandall Ex. | Exhibit of the Deposition of Robert Crandall, December 4, 2012 and May 15, 2013 |
| Crandall Tr. | Transcript of the Deposition of Robert Crandall, December 4, 2012 and May 15, 2013 |
| CSAT | Celestica Customer Satisfaction Metric |
| Defendants | Celestica Inc., Stephen Delaney, and Anthony Puppi |
| Delaney, Stephen ("Delaney") | Celestica Chief Executive Officer ("CEO") |
| Delaney Ex. | Exhibit of the Deposition of Stephen Delaney, April 30, 2013 |

| Term | Definition |
|---|---|
| Delaney Tr. | Transcript of the Deposition of Stephen Delaney, April 30, 2013 |
| Etherington, William ("Etherington") | Member of the Celestica Board of Directors, Member of the Audit Committee |
| Etherington Tr. | Transcript of the Deposition of William Etherington, December 7, 2012 |
| Evans, Jesse ("Evans") | Rule 30(b)(6) Designee for Lead Plaintiff New Orleans Employees' Retirement System |
| Evans Tr. | Transcript of the Deposition of Jesse Evans, April 24, 2013 |
| Fernandez-Stoll, Antonio ("Fernandez-Stoll") | Celestica Director of EMS for Latin America and Celestica Monterrey Site Controller |
| Fernandez-Stoll Tr. | Transcript of the deposition of Antonio Fernandez-Stoll, January 29, 2013 |
| Form S-3 | Securities Registration Form filed with the SEC |
| Form S-3ASR | An Automatic Shelf Registration Form used by companies well-known to the SEC, including Celestica |
| Homer, Michael ("Homer") | Celestica President of the Americas Region |
| Homer Ex. | Exhibit of the Deposition of Michael Homer, April 23, 2013 |
| Kawaye, Nate ("Kawaye") | Celestica Senior Vice President of Global Customer Business Units |
| MOR | Celestica Monthly Operating Review |
| Neheli, Michael ("Neheli") | Rule 30(b)(6) Designee for Lead Plaintiffs Millwright Regional Council of Ontario Pension Trust Fund, Drywall Acoustic Lathing and Insulation Local 675 Pension Fund, and Carpenters' Local 27 Benefit Trust Fund |
| Neheli Tr. | Transcript of the Deposition of Michael Neheli, April 25, 2013 |
| Nicoletti, Paul ("Nicoletti") | Celestica Corporate Treasurer |
| Nicoletti Ex. | Exhibit of the Deposition of Paul Nicoletti, January 9, 2013 |
| NYSE | New York Stock Exchange |
| Plaintiffs or Lead Plaintiffs | New Orleans Employees' Retirement System, Millwright Regional Council of Ontario Pension Trust Fund, Drywall Acoustic Lathing and Insulation Local 675 Pension Fund, and Carpenters' Local 27 Benefit Trust Fund |
| Priest, Kelly ("Priest") | Celestica General Manager of the Cisco Global Customer Business Unit |

| Term | Definition |
|---|---|
| Puppi, Anthony ("Puppi" | Celestica Chief Financial Officer ("CFO") |
| Puppi Ex. | Exhibit of the Deposition of Anthony Puppi, April 12, 2013 |
| Puppi Tr. | Transcript of the Deposition of Anthony Puppi, April 12, 2013 |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Rowan, James ("Rowan") | Celestica  Executive Vice President of Worldwide Operations James |
| Schwartz, Gerald ("Schwartz") | Celestica Controlling Shareholder and Member of the Celestica Board of Directors |
| Schwartz Tr. | Transcript of the Deposition of Gerald Schwartz, March 21, 2013 |
| SEC | U.S. Securities and Exchange Commission |
| SCM | Supply Chain Management |
| TSX | Toronto Stock Exchange |

Lead Plaintiffs New Orleans Employees' Retirement System, Millwright Regional Council of Ontario Pension Trust Fund, Drywall Acoustic Lathing and Insulation Local 675 Pension Fund, and Carpenters' Local 27 Benefit Trust Funds (collectively "Lead Plaintiffs" or "Plaintiffs") hereby submit this brief in support of their motion for class certification, the appointment of Lead Plaintiffs as Class Representatives, and the appointment of Labaton Sucharow LLP as Class Counsel.[1]

## I.    INTRODUCTION

Lead Plaintiffs seek to certify a class of all persons and entities that purchased or acquired Celestica common stock registered and listed on the NYSE, during the period between January 27, 2005 and January 30, 2007, inclusive (the "Class Period"), and who were damaged thereby (the "Class").[2]

Courts in the Second Circuit have consistently recognized that the class action mechanism is well-suited for securities actions.  *See, e.g.*, *Billhofer v. Flamel Technologies, S.A.*, 281 F.R.D. 150, 155 (S.D.N.Y. 2012); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 237 (S.D.N.Y. 2006) ("The Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation . . . Accordingly, in an alleged securities fraud case, when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward.") (internal citation omitted).

---

[1] Unless otherwise defined herein, capitalized terms shall have the meaning defined in the Table of Defined Terms at p. vi-viii above.  Citations to "¶__" refer to paragraphs of the Consolidated Class Action Complaint For Violation of the Federal Securities Laws, dated November 21, 2007 ("Complaint") (Dkt. No. 37).  Unless otherwise noted, all emphasis is added.

[2] Excluded from the Class are: (a) the current or former Defendants; (b) members of the immediate families of the current or former Individual Defendants; (c) all subsidiaries and affiliates of the current or former Defendants; (d) any person or entity who was a partner, executive officer, director, or controlling person of Celestica; (e) all entities in which any current or former Defendant has or had a controlling interest; (f) the current or former Defendants' directors' and officers' liability insurance carriers, and all affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors and assigns of any such excluded party.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

Here, the four prerequisites of Rule 23(a) are easily satisfied.  First, joinder of the many thousands of members of the Class would be impracticable.  Second, this securities fraud action raises numerous questions of misrepresentation, materiality, and scienter that are paradigmatic common questions of law or fact.  Third, Lead Plaintiffs' claims are typical of and co-extensive with the claims of absent Class members.  And fourth, Lead Plaintiffs are adequate representatives of the Class, do not have any conflicts of interest with other Class members, and will continue to prosecute this action vigorously on behalf of the entire Class.

The predominance and superiority requirements of Rule 23(b)(3) are also satisfied. Questions common to all Class members predominate over any questions affecting only individual Class members.  As set forth more fully below and in the Expert Report of Chad Coffman, CFA, dated June 14, 2013 (the "Coffman Declaration") (PX A)[3], Celestica common stock traded on an efficient market throughout the Class Period, and Class members are thus entitled to a presumption of reliance under the "fraud-on-the-market" doctrine.  Accordingly, individual issues of reliance will not predominate.  Further, proceeding as a class action is superior to other available methods for fairly and efficiently adjudicating this complex action.

For these reasons, as set forth further below, the Court should certify the Class, appoint Lead Plaintiffs as Class Representatives, and appoint Labaton Sucharow LLP as Class Counsel.

## II.    SUBSTANTIVE BACKGROUND

This action arises from Defendants' alleged false and misleading statements and omissions during the Class Period regarding Celestica's 2005 restructuring plan, Celestica's financial condition, and the effectiveness of Celestica's internal controls.

---

[3] References to "PX __" refer to Exhibits of the Decl. of Joseph A. Fonti In Support of Lead Plaintiffs' Motion for Class Certification.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

## A.  Defendants Touted Celestica's 2005 Restructuring

On January 27, 2005, Celestica announced a $225 to $275 million restructuring for 2005 and 2006 that would purportedly increase profitability, reduce costs, and ensure customer satisfaction.  ¶ 65.  Celestica's facility in Monterrey, Mexico (referred to at Celestica as CMX) was the centerpiece of the 2005 restructuring.  "The reason for the restructuring [was that] many of [Celestica's] US based sites were not competitive on a labor basis," prompting Celestica to implement a "megasite strategy [that] would move customers to lower labor rate environments . . ."  Etherington Tr. at 62:8-21 (PX B-1).  Monterrey "was the site particularly in the Americas which was accepting the most amount of transfer activity from other sites as part of the restructuring program and as part of . . . growth in accounts as well."  Puppi Tr. 64:6-11 (PX B-2).

## B.  The 2005 Restructuring Commenced Without Appropriate Planning And Was Plagued By Significant Execution Failures

The 2005 restructuring was executed "without appropriate planning," as CEO Delaney himself admitted a little more than a year and a half after it began.  ¶ 10.  The 2005 restructuring required a massive influx of customers to Monterrey.  Yet the site was already plagued with inventory-management problems as early as year-end 2004.  ¶ 148.  For example, on November 30, 2004, the Senior V.P. of Celestica's Global Customer Business Units (Nate Kawaye) sent an email to Celestica's President of the Americas (Michael Homer) characterizing CMX as a "fragile [] environment" into which transfers would be "difficult to execute in a high quality manner and on time."  CEL00028966 (PX C-1).  On January 11, 2005, a Monterrey Inventory Management Audit indicated that, as of October 2004, CMX received a rating of 4 on a scale of 1 to 5.  Crandall Ex. 3 (PX C-2).  A rating of 4 meant that ***CMX failed its audit***, *see*

3

Binder Ex. 11 (PX C-3); Binder Tr. 35:11-36:8 (PX B-3), and the overall result given to the Audit Committee was "***Unsatisfactory.***"  Crandall Ex. 3 (PX C-2).

In fact, internal documents confirm that, throughout the Class Period, CMX ***never*** received a rating better than "Unsatisfactory."  Indeed, the site also received a score of 4 in February 2005, September 2005 and February 2007.  *See* Binder Ex. 2 (PX C-4), Bar Ex. 38 (PX C-5).  Thus, Monterrey was ill-equipped to handle the complexity of so many transfers in such a short time frame, as Celestica admitted at the end of the Class Period: "We created the *perfect storm* for the Company and this site by *attempting to implement an accelerated transfer plan. . . . Desire to move rapidly to Mexico and drive the required cost productivity into the Americas has come at great cost to our Company and our shareholders*."  ¶ 270.

Moreover, Defendants were aware, but did not disclose, that the 2005 restructuring was plagued by execution problems.  ¶¶ 125-132.  For example, according to CMX's Site Controller (Antonio Fernandez-Stoll), there were problems at CMX in 2005 because too many transfers were "happening at the same time which created a significant bottleneck," making it impossible "to digest all of those transfers in that short period of time."  Fernandez-Stoll Tr. 20:8-22:4 (PX B-4).  On December 11, 2005, Delaney discussed the persistent problems at CMX with Puppi and Homer, opining on each item from a "CMX Board Summary" entitled "CMX Corrective Action Plan," and acknowledged, *inter alia*, that director labor planning had been "inadequate" and there were forecasting errors due to "lack of diligence."  Crandall Ex. 2 (PX C-6).

Ten days later, Delaney admitted "we have a disaster in our Mexico performance right now. . . .  [W]e have failure after failure."  Delaney Ex. 16 (PX C-7).  On December 28, 2005, Celestica's Senior Vice President of Finance (Frank Binder) expressed to Puppi that a "core part

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

of the problem in CMX" is that Celestica "keep[s] jamming things in there believing they have an infinite ability to absorb large changes without unraveling . . ."  Binder Ex. 1 (PX C-8).

Furthermore, even after Delaney assured shareholders in January 2006 that issues at CMX would not persist because he had his "arms around the mistakes," the evidence shows otherwise.  ¶ 223. For example, on February 22, 2006, Puppi described as "mind numbing" CMX's failure to achieve "any increased efficiencies . . ."  Binder Ex. 7 (PX C-9).  On April 2, 2006, Celestica's Treasurer (Paul Nicoletti) told Puppi that he is "becoming convinced that fundamentally [M]exico is just more expensive than we have been assuming."  Nicoletti Ex. 15 (PX C-10).  On April 23, 2006, Puppi circulated a draft of his presentation to Celestica's Board of Directors regarding 1Q06 results, indicating that:  "Mexico and to a much smaller extent Romania are significantly off their cost plans as they struggle to execute.  We have added way too much complexity for the skills and leadership in these growing sites. **This is killing us again in the 2nd qtr and will likely burden us for the rest of the year in a material way**."  Crandall Ex. 13 (PX C-11).  ¶ 239.

Meanwhile, only four days later, on April 27, 2006, Delaney told the public, "[a]s our new programs ramp, material flows stabilize and restructuring activities continue as planned, we expect to show improvements in our operating results in the coming quarters." ¶ 236.  When asked whether he believed this should be Celestica's final restructuring, Delaney responded "[w]e think this footprint is a pretty solid footprint for us."

In addition, in a June 22, 2006 mid-year review of Puppi's performance as CFO, Delaney expressed his lack of confidence about the restructuring and questioned the basis for Defendants' public statements regarding the purported profitability of the restructuring plan:

> **I'm no longer confident that we adequately understand the implications of our restructuring plans on profitability, nor our**

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

> *actions to get to 3.5%+ Operating Margins, even though we've spoken publicly about both. . . . [W]e say publicly that we still expect $18 M worth of profitability improvements to flow from restructuring . . . and I'm hard pressed to put my finger on where that will come from.*

Crandall Ex. 6 (PX C-12).[4]   And, in the self-evaluation portion of the same mid-year review, Puppi expressed grave concerns about the restructuring:

- "*[W]hat is surfacing is the lack of true plans in place to achieve what is being forecasted...Mexico is a perfect example of this, where we still do not have a set of actions that addresses all the issues we highlighted month's [sic] ago.*"

- "Our tools/systems are **inadequate** and we are asking the teams to conduct brain surgery with gardening tools."

- "*I'm embarrassed by the depth and persistence of our issues . . . I have lost confidence in our team's ability to turn the situation around.*" *Id.*

In contrast, five weeks later, on July 27, 2006, Defendants, in a press release to investors, reassured that "[t]he anticipated improvement in adjusted earnings is being driven by continued benefits from our restructuring activities and increased efficiencies in our Mexico and European operations." ¶ 244.

### C.   Delaney And Puppi Knew About The Inventory Buildup In Monterrey

Throughout the Class Period, Defendants assured investors that Celestica's inventory levels, and the Company's financial condition, were accurately represented.   ¶¶ 69-108.   In reality, Delaney and Puppi regularly received information concerning rising increasing obsolete inventory levels in Monterrey.   ¶ 84.   For example, they both personally participated in monthly operational review ("MOR") conference calls where they, senior management, and plant managers discussed the operational metrics for their facilities.   *Id.*   These detailed discussions

---

[4] Delaney also exhorted Puppi to "[f]ix the forecasting process so that we don't get garbage for forecasts.  Not only for the current quarter, but the outlook for future quarters escapes good judgment completely."  *Id.*

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

often concerned levels of obsolete inventory, problems affecting sales, profit and loss margins,

customer satisfaction, and on-time deliveries.  ¶ 85.  For example:

- Homer's notes to a September 2005 MOR concerning the Americas Region indicate that Delaney and Puppi were in attendance.  Homer noted: "Overall (very high level) concern on CMX SCM [Supply Chain Management] . . . . Overall, ***Tony P[uppi] sees the Americas as a slow train wreck in the happening***."  Homer Ex. 3 (PX C-13).

- On April 20, 2006, Celestica's Director of Supply Chain Management (Richard Burden), distributed to top Celestica executives, including Delaney and Puppi, "the base data for the E&O," or Excess & Obsolete inventory.  Puppi had requested the information after observing that "Obsolete inventories grew by $11m sequentially to $51.4m at end of march. . . .  ***These results concern me especially in a demand rich environment***, which puts more priority on getting these down now."  Puppi Ex. 27 (PX C-14).

- The October 16, 2006 MOR was attended by Delaney and Puppi.  Inventory-related discussions included Delaney relating that there were "***no positive developments on inventory; demand supply process not fixing the problem***," that Celestica "ha[s] yet to hit an inventory forecast***; we are not meeting requirements and commitments regarding turns or cash flow; ***there is a big gap between what we promised and what we are delivering***"; and that there is "***an almost infinite level of inventory***" at CMX**.  Executive VP of Worldwide Operations James Rowan reported that CMX "must clear 60m of E&O."  Binder Ex. 12 (PX C-15).

On December 15, 2006, Celestica's Executive V.P. of Worldwide Operations (Jim

Rowan) told Puppi and other senior executives: "As you guys know very well - ***we have put the***

***company into serious risk*** due to the continued underperformance of Mexico in both the closing

of the SOX VP's and the materials controls procedures at the site. . .*I have lost a great deal of*

*confidence in the site/regional management and controls due to the continued missed*

*promises on many major items, all of which we have documented before*. . .  I am extremely

disappointed that we ended up in this position given all of the feedback, meetings and

discussions we have had around these issues."  Binder Ex. 15 (PX C-16).  In the aggregate,

Defendants' false statements concealed that Celestica's earnings were overstated by at least $116

million, or $0.51 per share, during the Class Period.  ¶¶ 1, 15.  To put this in perspective,

Celestica had reported roughly $200 million of net profits from 2000 through the end of the

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

Class Period.  The overstatement thus wiped out more than half the profits that Celestica earned in a 10-year period.

### D.    Celestica's Relationships With Its Key Customers Suffered Because Of The Problems In Monterrey

Celestica suffered customer dissatisfaction and disengagements from numerous key customers as a result of CMX's constant execution failures.  ¶¶ 133-138.  For example:

- On December 10, 2005, Delaney relayed the results of his call with the Board: "most of the conversations was around Monterrey. . . . *I told them the major customers affected were Motorola, Lucent, and Avaya. . .I expect to take CSAT [Customer Satisfaction metric] hit, probably in 1Q*."  Crandall Ex. 1 (PX C-17).

- On December 28, 2005, an Avaya executive emailed Delaney: "The situation is worsening. . . . *I continue to reiterate that these operating failures in Monterrey are impacting Avaya's performance*, and are creating carry forward customer impacts and risks.  This has been the case since you and I spoke in November, and yet many key commitments to recover have been inconsistent, inadequate[,] or flawed."  Delaney Ex. 44 (PX C-18).

- On February 9, 2006, a Lucent executive wrote Delaney: "*this is truly the worst experience I have had with a partner ever*.  I know we are also personal friends, but I just can not believe the []hole  you guys put us in. . . .  *I do not have trust that I can count on Celestica* . . ."  Delaney Ex. 48 (PX C-19).

- Puppi testified that, as of April 2006, "some of our largest customers had [] significantly more inventory than the plan would have targeted. . . . 60 percent, 63 percent, 42 percent [off plan] is not pretty…those are big variances. . . .  [I]f you added up all the customers inside Mexico, they were off by 48%. Too much inventory . . . It is not pretty—it's not a good thing."  Puppi Tr. at 142:2-143:8 (PX B-5).

- On August 10, 2006, Delaney told the General Manager of the Cisco account (Kelly Priest) that he was "going to get a beating from [a senior Cisco executive]" due to CMX's poor performance.  Priest agreed: "Yes, you will take beating for CMX and there is no way around it. . . . . *[Y]ou need to understand the severity of how CMX has impacted the total Cisco relationship*."  Delaney Ex. 46 (PX C-20).

- On August 28, 2006, Delaney, headed to a meting with the same senior Cisco executive, stated "I'm . . . livid about the lack of progress [with respect to Cisco referrals/credit holds]. . . .  *I've had it, guys.  We run the risk of losing our largest customer. . . .  In the mean time, I'll beg [the senior Cisco executive] for forgiveness and a millionth chance to fix it*."  Delaney Ex. 47 (PX C-21).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

- Delaney was "distraught" to learn the extent to which Panasonic was upset with Celestica in September 2006: "We worked very hard to get into the consumer [electronics] business. Panasonic was our first marquee account into that business, a very demanding Japanese customer and good business for us, and we had worked very hard to make sure that we prepared properly. . . .  And *yet I get a response like this saying we might lose the account*."  Delaney Tr. 257:02-259:02 (PX B-6).

Indeed, Delaney admitted it was Celestica's poor execution – not lack of customer demand – that caused Celestica's financial performance to suffer.  On April 27, 2006, Delaney sent an email to all Celestica employees:

> *Material supply and capacity challenges in a few sites prevented us from . . . capitalizing on the true demand in the quarte*r.  Both our revenue and profit were in line with our financial guidance. However, I must tell you *that I am very disappointed that we missed the opportunity to use the strong demand to generate profitability* and cash flow that would launch us ahead of our plan and expectations. . . .  This did not happen in the first quarter. Instead, *we did not execute as efficiently as we had planned* and, therefore, our costs were considerably higher than [planned]. . . . Inventory was another significant disappointment.[5]

**E.**     **Celestica's Stock Price Declined By Statistically Significant Amounts Upon Each Partial Disclosure Of Celestica's True Financial Condition**

Defendants partially disclosed the truth about Celestica's inability to execute its restructuring plan on January 26, 2006, revealing that Celestica's "profitability was severely impacted as a result of higher-than-expected costs incurred in one of our Americas plants. . . . as a result of significant transfer activities" causing its stock price to decline 3.70%.  *See* Coffman Decl. ¶¶ 124-34; PX A at Ex. 14.  Delaney continued to conceal the truth, however, falsely stating: "We have our arms around the mistakes that we made relative to transfer planning, but we then we'll start seeing the benefits of some of this new revenue too."  ¶ 223.

---

[5] Boucher Ex. 5 (PX C-22); *see also* Nicoletti Ex. 7 (PX C-23) ("Obsolete inventories grew by $11m. . . . [Non-Conforming Material] grew close to $2m. . . . These results concern me especially in a demand rich environment . . ."); Crandall Ex. 13 (PX C-11) ("Production cost mgt and operational execution in Mexico is singlehandedly driving all the numbers way off plan . . ."); Delaney Ex. 47 (PX C-21) (email from Delaney regarding the lack of progress fixing problems with Cisco; and corresponding attachment indicating Celestica's Monterrey site scored below other Cisco North America partner sites in terms of customer satisfaction).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

On October 26, 2006, Defendants announced restructuring charges over and above the amount originally budgeted; $6 million in inventory write-offs; the "unstable" condition of the Monterrey facility; and lowered guidance on end-user demand, causing Celestica stock to fall 13.46% (¶¶ 252-60). *See also* Coffman Decl. ¶¶ 135-60; PX A at Ex. 14.

On November 27, 2006, Celestica announced the "resignation" of Delaney as CEO, causing Celestica stock to drop 4.44% (¶ 261-63). *See also* Coffman Decl. ¶¶ 161-67; PX A at Ex. 14. Gerald Schwartz, Celestica's controlling shareholder, confirmed that Delaney was indeed fired by Celestica's Board of Directors. Schwartz Tr. 74:12-77:11 (PX B-7); *see* Crandall Tr. 164:11-17 (PX B-8) ("Q. And that press release says that Mr. Delaney resigned to pursue other business interests. Do you see that? A. That's correct. Q. All right. Is it fair to say that's a polite way of saying that he was fired? A. Yes.").

On December 12, 2006, Celestica revised its earnings guidance due to customer desertions and the partial impact of inventory issues in Monterrey, causing its stock to decline 12.17% (¶ 264-68). *See also* Coffman Decl. ¶¶ 168-76; PX A at Ex. 14.

Finally, on January 31, 2007, Celestica announced the "resignation" of Puppi as CFO amid poor fiscal-year 2006 results and revelation of the full extent of problems in Monterrey and related restructuring issues, sending Celestica stock down 22.90% (¶ 269-77). *See also* Coffman Decl. ¶¶ 177-88; PX A at Ex. 14. Again, Schwartz testified that Puppi was fired as a result of a decision by Celestica's Board of Directors. Schwartz Tr. 96:4-13 (PX B-9).

## III.   PROCEDURAL BACKGROUND

In an order dated September 25, 2007 (Dkt. No. 29), the Court granted Plaintiffs' motion for the appointment of New Orleans Employees' Retirement System as Lead Plaintiffs, and approved their selection of Labaton Sucharow LLP as Lead Counsel, pursuant to the PSLRA.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

On November 21, 2007, Lead Plaintiffs filed the Complaint asserting claims under Sections 10(b) and 20(a) of the Exchange Act (Dkt. 37). Thereafter, on October 14, 2010, the Court issued a memorandum decision and order granting Defendants' motion to dismiss (Dkt. 60). However, on January 20, 2012, the U.S. Court of Appeals for the Second Circuit issued a mandate reversing the Order and remanding the action for further proceedings (Dkt. 67).

Pursuant to the Scheduling Order entered on March 18, 2013 (Dkt. 115), Lead Plaintiffs have responded to Defendants' first set of document requests and interrogatories, analyzed Defendants' production of over 600,000 pages of documents, and conducted thirty (30) fact depositions. Fact discovery concluded on April 30, 2013, Lead Plaintiffs' expert reports were served on June 14 and June 28, 2013, and expert discovery will conclude by September 27, 2013.

## IV.   ARGUMENT

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *In re Winstar Communications Securities Litig.*, 2013 WL 1700993, at *2 (S.D.N.Y. Apr. 17, 2013) (Daniels, J.) (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)). As explained below, Lead Plaintiffs easily do so here by satisfying each of the four requirements of Rule 23(a), and by satisfying the preponderance and superiority requirements under Rule 23(b)(3).

Courts are not permitted to engage in "free-ranging merits inquiries at the certification stage." *Id*. (citing Dukes *v. Wal-Mart Stores*, 131 S. Ct. 2541, 2551, (2011)); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013). Rather, the Court should only resolve factual issues that are relevant to a particular Rule 23 requirement. *See In re Vivendi Universal S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) (citing *In re IPO Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)). The Court must "assure that a class certification motion does not

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

become a pretext for a partial trial of the merits." *Id*.; *see also Katz v. Image Innovations Holdings, Inc.*, 2010 WL 2926196, at *2 (S.D.N.Y. July 22, 2010) (similar).

### A.    The Proposed Class Satisfies the Prerequisites of Rule 23(a)

Pursuant to Rule 23(a), the moving party must demonstrate that the proposed Class satisfies the following four prerequisites:

> (1)    **Numerosity:** the class is so numerous that joinder of all members is impracticable;
>
> (2)    **Commonality:** there are questions of law or fact common to the class;
>
> (3)    **Typicality:** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)    **Adequacy:** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  As explained below, each of these prerequisites is satisfied here.

### 1.    The Members Of The Proposed Class Are So Numerous That Joinder Of All Members Is Impracticable

In this Circuit, "numerosity is presumed at a level of 40 members . . ." *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *see also In re Globalstar Sec. Litig.*, 2004 WL 2754674, at *3 (S.D.N.Y. Dec. 1, 2004).  "[C]ourts in this district have certified plaintiff classes based on the volume of outstanding shares." *Pennsylvania Ave. Funds v. Inyx Inc*., 2011 WL 2732544, at *3 (S.D.N.Y. July 5, 2011) (collecting cases).  "The exact number of class members need not be known." *Winstar*, 2013 WL 1700993, at *3 (citation omitted).

Here, the proposed Class meets the numerosity threshold.  Celestica was a large, publicly held company whose securities were registered with the SEC and listed on the NYSE.[6]  During

---

[6] Because, during the entirety of the Class Period, all of Celestica's common stock was registered and listed on the NYSE, the Class's claims fall within the first of the two-pronged transactional test outlined in *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2884 (2010) ("And it is in our view only transactions in securities listed on domestic exchanges . . . to which § 10(b) applies.").  *See also Absolute Activist Value Master Fund Ltd. v. Ficeto*,

*(continued ... )*

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

the Class Period, Celestica had between 184.5 million and 200.4 million common shares outstanding, an average market capitalization of $2.5 billion, and an average daily trading volume of 1.8 million shares. *See* Coffman Decl. ¶¶ 32, 49, 71-72; *see also id.* ¶ 76, PX A at Ex. 12 (institutional ownership of CLS common stock ranged from 73.91% to 80.72% of outstanding shares). From this evidence, the Court can conclude that the proposed Class includes thousands of members. Therefore, joinder of the thousands of members of the Class would be "impracticable," and the numerosity prerequisite of Rule 23(a)(1) is satisfied.

### 2. Questions Of Law Or Fact Are Common To The Members Of The Proposed Class

"The commonality requirement, particularly in securities fraud litigation, is generally considered a low hurdle easily surmounted." *In re Marsh & McLennan Cos. Sec. Litig.*, 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009); *see also Globalstar*, 2004 WL 2754674, at *4. "In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005); *see also In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 374 (S.D.N.Y. 2000). "Commonality 'does not mean that all issues must be identical as to each member . . .'" *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008) (citation omitted). Indeed, "[u]nder this court's jurisprudence, a single common question of law or fact may suffice." *Inyx*, 2011 WL 2732544, at *4.

Courts in this District have routinely held that the commonality requirement is satisfied where, as here, the losses incurred by Lead Plaintiffs and the Class arise from the same alleged

---

( *... continued*)

677 F.3d 60, 69 n.4 (2d. Cir. 2012) ("Of course, pursuant to the first prong of *Morrison*, §10(b) does apply to transactions in securities that are listed on a domestic exchange."). The language of §10(b) itself is clear: it is unlawful "[t]o use or employ, in connection with the purchase or sale of ***any security registered on a national securities exchange*** . . . any manipulative or deceptive device or contrivance . . ." 15 U.S.C. §78j(b).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

misrepresentations and omissions. *See, e.g., id.*, at *4 ("Common questions of law and fact include whether certain statements were false and misleading," whether they were material, and "whether [the] statements violated the federal securities laws . . ."); *see also Public Employees' Ret. System of Mississippi v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011) ("[C]ourts in this Circuit have held that the . . . commonality requirement is 'plainly satisfied [where] the alleged misrepresentations . . . relate to all the investors, [as the] existence and materiality of such misrepresentations obviously present important common issues.'") (citation omitted); *Globalstar*, 2004 WL 2754674, at *4.

Here, the questions of law or fact common to the proposed Class include, among other things whether: (i) Defendants' statements and omissions were false and misleading; (ii) these misstatements and omissions were material; (iii) Defendants acted with scienter; (iv) there is a causal connection between Defendants' misstatements and omissions and the losses of the proposed Class; (v) members of the proposed Class have sustained damages; and (vi) the proper measure of damages. Accordingly, the commonality prerequisite of Rule 23(a)(2) is satisfied. *See, e.g., Winstar*, 2013 WL 1700993, at *3 (finding that "the same misstatement and the same irregular accounting practices caused injury to all shareholders . . . Such a common course of conduct routinely satisfies the commonality requirement.").

### 3. The Proposed Class Representatives' Claims Are Typical Of The Proposed Class

Courts in this District "have emphasized that the typicality requirement is not demanding." *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *13 (S.D.N.Y. July 27, 2007). To establish typicality, plaintiffs need only show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings Ltd. Sec. Litig.*,

574 F.3d 29, 35 (2d Cir. 2009) (citation and internal quotations omitted); *see also Winstar*, 2013 WL 1700993, at *4 (similar).  Thus, "[w]hen the same unlawful conduct was directed at or affected both the named plaintiff and the prospective class, typicality is usually met." *Inyx*, 2011 WL 2732544, at *4 (citation omitted); *In re Vivendi*, 242 F.R.D. at 85 (same).  Importantly, "[t]ypicality 'does not require that the factual background of each named plaintiffs claim be identical to that of all class members.'" *EVCI*, 2007 WL 2230177, at *13 (citation omitted).

Here, Lead Plaintiffs' claims are typical of the claims of the Class.  Like other members of the Class, Lead Plaintiffs allege that they purchased Celestica common stock at artificially inflated prices due to Defendants' material misstatements and omissions.  *See, e.g.*, *Winstar*, 2013 WL 1700993, at *5 ("Lead Plaintiffs' claims are typical of the class because they arise out of the same alleged public misstatement that caused injury to all shareholders and bondholders alike.").  Additionally, the legal and factual arguments Lead Plaintiffs advance are the same as the arguments that other Class members would advance in support of their claims.  *See, e.g.*, *In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, at *8 (S.D.N.Y. Mar. 7, 2011) (finding claims typical where legal theories and proof would be the same for plaintiffs and other class members).

### 4.    The Interests Of The Class Will Be Fairly And Adequately Protected

Rule 23(a) requires plaintiffs to establish that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Adequacy entails an inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Flag Telecom*, 574 F.3d at 35 (citation and internal quotation marks omitted).

Here, based upon their purchases of CLS common stock during the Class Period, Lead Plaintiffs' interests are directly aligned with the interests of the Class, which was injured by the

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

same material misstatements and omissions.  *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) (explaining that "named plaintiffs' interests are directly aligned with those of the absent class members: they are purchasers of WorldCom equity and debt securities who suffered significant losses as a result of the investments.").  When Lead Plaintiffs prove their claims, they will also prove the Class's claims, thereby satisfying the adequacy requirement. *See, e.g.*, *Inyx*, 2011 WL 2732544, at *5.

Lead Plaintiffs have also demonstrated their commitment to monitor and supervise this Action on behalf of the Class.  For example, Lead Plaintiffs have (i) retained experienced counsel, (ii) kept abreast of developments in this litigation through quarterly and more timely updates from counsel, if necessary, (iii) received drafts of pleadings, (iv) spent substantial time preparing for, and appeared for, two full-day depositions, and (v) taken steps to monitor and oversee the litigation.  *See, e.g.*, Evans Tr. at 256:6-11; 267:12-16; Neheli Tr. at 52:8-16; 58:4-11; 280:10-18.  In addition, Lead Plaintiffs have attested to and certified that, if necessary, they will testify at trial.  *See* Complaint (Dkt. No. 37) at Exs. A – D.

Indeed, Lead Plaintiffs include several large public pension funds, collectively with billions of dollars under management, and are precisely the type of institutional investors Congress sought to empower when enacting the PSLRA.  *See* H.R. Rep. No. 104-369, at 28 (1995) (Conf. Rep.); 1995 U.S.C.C.A.N. 679, at 690, 1995 WL 372783, at *10 (June 19, 1995) ("The Committee intends [the PSLRA] to increase the likelihood that institutional investors will serve as lead plaintiffs . . .").  Plaintiffs who have a considerable interest in obtaining a recovery for the Class, like Plaintiffs here, easily satisfy the adequacy requirement of Rule 23(a)(4).

Furthermore, this Court has already made an adequacy determination by appointing the proposed class representatives as Lead Plaintiffs and their counsel as Lead Counsel pursuant to

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

the PSLRA.  *See* Order For Appointment Lead Plaintiff, Approval of Selection of Lead Counsel and Consolidation (Dkt. 29).  The PSLRA provides that the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be ***most capable of adequately representing the interests of class members***."   15 U.S.C. § 78u-4(a)(3)(B)(iii).  Thus, the Court's adequacy determination under the PSLRA supports a finding that Lead Plaintiffs will serve as adequate class representatives as well.

Finally, proposed Class Counsel is highly qualified and capable of prosecuting this Action.  *See* Mem. of Law In Further Support of the Motion of the Pension Fund Group For Appointment As Lead Plaintiff, Approval of Selection of Lead Counsel and Consolidation, And In Opposition To The Competing Motions (Dkt. 20).  *See, e.g., Winstar*, 2013 WL 1700993, at *5 ("The resumes and course of conduct of their attorneys have adequately demonstrated their qualifications, experience, and competence.  Plaintiffs' attorneys have diligently pursued this case . . . and this Court is satisfied that they will adequately prosecute it at trial.").  *See* PX D (firm resume of Labaton Sucharow LLP).

## B.  The Proposed Class Action Satisfies The Requirements Of Rule 23(b)(3)

Having met all four prerequisites of Rule 23(a), Plaintiffs must also show that the proposed Class satisfies the requirements of one of the provisions of Rule 23(b).  Plaintiffs seek class certification under Rule 23(b)(3) because, as set forth below, "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Both requirements are satisfied.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

       1.       **Common Questions Of Law And Fact Predominate Over Questions Affecting Only Individual Members Of The Proposed Class**

"Predominance is a test readily met in certain cases alleging . . . securities fraud . . ." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (2007).  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  Notably, "predominance does not require a plaintiff to show that there are no individual issues." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 75 (S.D.N.Y. 2009).  Indeed, while individual issues may arise "in all class action cases, . . .  to allow various secondary issues of plaintiffs' claim[s] to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws." *Merrill Lynch*, 277 F.R.D. at 111.

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).  Here, common issues predominate with respect to whether the alleged misstatements and omissions are actionable under Section 10(b) of the Exchange Act.  When trying their case, Lead Plaintiffs will establish the viability of these claims by relying upon evidence and legal theories that are common to all Class members.  Courts have deemed such common questions sufficient to satisfy the predominance requirement in securities class actions.  Further, as courts in this District have recognized, "common issues . . . include whether defendants publicly issued or disseminated information with . . . scienter and causation." *Inyx*, 2011 WL 2732544, at *6; *see also Globalstar*, 2004 WL 2754674, at *5.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

Section 10(b) claims also require a showing of reliance.  Here, however, reliance can be presumed under the "fraud-on-the-market" doctrine set forth in *Basic, Inc. v. Levinson*, 485 U.S. 224, 246 (1988).  Under the fraud-on-the-market doctrine, a presumption of reliance applies when the company's stock traded in an efficient market.  *Inyx*, 2011 WL 2732544, at *8; *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 307 (S.D.N.Y. 2010); *see also Winstar*, 2013 WL 1700993, at *6  ("To avail themselves of the fraud-on-the-market presumption, plaintiffs must demonstrate that (1) the alleged material misstatements were publicly known, (2) that the security traded on an efficient market, and (3) that the plaintiff purchased his shares between the time the misleading statement was made and the time the truth was revealed.") (citing *Halliburton,* 131 S. Ct. at 2185).

While *Basic* stated that an efficient market was one in which the price reflected all publicly available information, 485 U.S. at 247, it did not set forth a precise methodology for making such a determination.  Courts often conduct this analysis by evaluating the five factors enumerated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989):

(1)     a large weekly trading volume;

(2)     the existence of a significant number of analyst reports;

(3)     the existence of market makers;

(4)     the eligibility to file an S-3 registration statement; and

(5)     a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*See id.* at 1286-87.[7]  As the evidence submitted in support of this motion shows, each *Cammer* factor, as well as at least five additional indicia of efficiency, all confirm that CLS common stock traded in an efficient market during the Class Period.  *See* Coffman Decl., PX A at Section VI.

---

[7] "The Second Circuit has not adopted a test for the market efficiency of stocks or bonds, but has noted that use of the factors enumerated in *Cammer v. Bloom,* 711 F. Supp. 1264 (D.N.J.1989), may be appropriately used as analytical tool[s] to guide the efficiency inquiry." *Winstar,* 2013 WL 1700993, at *6 (citations omitted).

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

### (a)   *Cammer* Factor One: Average Weekly Trading Volume

The *Cammer* court held that "average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."  711 F. Supp. at 1286.  Here, during the Class Period, the average weekly turnover for CLS common stock was 4.7%.  *See* Coffman Decl. ¶ 35.  This level of trading well exceeds the 1-2% benchmark in *Cammer* and justifies a "strong presumption" that Celestica common stock traded in an  efficient market.

Moreover, courts have consistently recognized that securities listed on the NYSE, such as CLS common stock, presumptively trade in an efficient market.  *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument could be made that the [NYSE] is not an efficient market.");  *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) ("[I]f 'a security is listed on the NYSE . . ., the market for that security is presumed to be efficient.'").

### (b)   *Cammer* Factor Two: Analyst Coverage

The *Cammer* court held that "it would be persuasive to allege [that] a significant number of securities analysts followed and reported on a company's stock during the class period."  711 F. Supp. at 1286.  Here, "there were at least 247 analyst reports issued during the Class Period by 25 separate equity analysts for CLS."  Coffman Decl., PX A at ¶ 40.[8]  "Major firms such as Citigroup, Deutsche Bank, and Morgan Stanley frequently issued analyst reports on CLS.  These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analysis and recommendations to investors.  In addition, credit rating agencies issued reports that evaluated CLS's creditworthiness and publicly-traded securities.  The extensive coverage of CLS by securities analysts supports the conclusion that the

---

[8] The Complaint cites many of the analyst reports issued during the Class Period.  *See, e.g.*, ¶¶ 65-73.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

Common Stock traded in an efficient market throughout the Class Period." *Id. See also Wagner*, 251 F.R.D. at 119 (finding that shares traded in an efficient market, based, in part, on "cover[age] by a number of brokerage firms and other analysts . . .").

### (c)   *Cammer* Factor Three: Market Makers

"*Cammer* states that the number of market makers is relevant to consider the market efficiency of securities traded in an ***over the counter*** market with no volume reporting.  On such markets, there may be reason for concern regarding liquidity and information dissemination." Coffman Decl. ¶ 46; *see also Cammer*, 711 F. Supp. at 1286-87.  "However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE which are often assumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market."  Coffman Decl., PX A at ¶ 46.

Here, CLS common stock was registered and listed on both the NYSE and the Toronto Stock Exchange ("TSX") during the Class Period.  *Id.* ¶¶ 30-32, 36, 46-47.  It is undisputed that "[t]he NYSE is one of the largest and most liquid security exchanges in the world with billions of shares traded each day."  *Id.* ¶ 47.  "Rather than decentralized market makers providing liquidity for trading (as for the security at issue in *Cammer*), the NYSE conducts trading on a continuous auction system where an assigned specialist is physically present at all times during open trading."  *Id.*  "The NYSE has a market structure that combines both an auction system and electronic trading and does not rely on the less efficient mechanism of decentralized market makers to provide liquidity."  *Id.* ¶ 49.

Moreover, as explained in the Coffman Declaration, the single efficient market for Celestica common stock also included a parallel listing on the TSX.  *Id.* ¶46.  Like the NYSE, the TSX is among the largest exchanges in the world, with a domestic market capitalization above $2 trillion.  *Id.* ¶ 48.  "[T]he TSX, by virtue of providing guaranteed liquidity through its

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

electronic exchange does not rely on the less efficient mechanism of decentralized market makers to provide liquidity.  It does, however, use market markers 'only when necessary to provide a positive influence when natural market forces cannot provide sufficient liquidity' and thus the use of market makers in this circumstance helps 'maximizes market efficiency' to supplement liquidity beyond the TSX's primary auction market." *Id*. ¶ 49.

"Therefore, the number of 'market makers' itself is not a relevant metric here; however, CLS common stock, by virtue of trading on the NYSE and TSX, easily meets the spirit of this *Cammer* factor throughout the Class Period." *Id*. ¶ 50.

### (d)      *Cammer* Factor Four: SEC Form S-3 Eligibility

For issuers that qualify, Form S-3 "allows certain companies that have previously provided a sufficiently high level of public information to incorporate prior SEC filings by reference into current filings," rather than repeat information that "is already deemed to be widely publicly available."  Coffman Decl., PX A at ¶ 52.  For this reason, eligibility to file Form S-3 is an "indicator of efficiency."  *See id.*; *Cammer*, 711 F. Supp. at 1287 ("it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public offerings . . .").  Here, Celestica was S-3 eligible.  *See* Cofffman Decl., PX A at ¶ 53. For example, when Celestica registered its common shares, the Company filed a Form S-3ASR, which is an automatic shelf registration statement for use by well-known seasoned issuers.  *See id*.  Thus, this factor further supports the conclusion that the market for CLS's common stock was efficient.

### (e)      *Cammer* Factor Five: Price Reaction To New Information

The "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price . . . is the essence of an efficient market

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

and the foundation for the fraud on the market theory." *Cammer*, 711 F. Supp. at 1287; *see also Winstar*, 2013 WL 1700993, at *8 (citing *Bombardier,* 546 F.3d at 207).

Coffman's declaration demonstrates that "there is a clear cause and effect relationship between new public information about CLS and the market price of its common stock." *See* Coffman Decl., PX A at ¶ 55. For example, as explained therein, Coffman's event study revealed that, "of the nine earnings announcements CLS issued during the Class Period (including the final Corrective Disclosure Event), eight resulted in statistically significant price movements at the 95% confidence level." *Id.* ¶ 65. *See, e.g., Winstar*, 2013 WL 1700993, at *8 ("An event study that examines the effect of disclosure of material information on the price of a security has been considered *prima facie* evidence of the existence of this causal relationship.").

These results provide strong statistical evidence that Celestica's common stock traded in an efficient market. *See* Coffman Decl., PX A at ¶ 69; *Cammer*, 711 F. Supp. at 1287.

### (f)    Additional Indicators Of Market Efficiency

In addition to the *Cammer* factors, at least five other indicators of market efficiency support a finding that CLS common stock traded in an efficient market. *See* Coffman Decl. Section G, ¶¶70-81. The results for these additional indicators are summarized below:

- **Market Capitalization:** The market capitalization for the common stock averaged $2.46 billion during the Class Period. *Id.* ¶ 72. CLS common stock had a larger market capitalization than the vast majority of NYSE stocks. *Id.* ¶ 71.

- **Bid-Ask Spread:**[9] During the Class Period, the time-weighted bid-ask spread for CLS common stock ranged between 0.099% and 0.131%. *Id.* ¶ 75. In November 2005, the month in which CLS's bid-ask spread was largest during the Class Period, the time-weighted average bid-ask spread for CLS common stock was 0.141%, while the median time weighted average bid-ask spread for a randomly

---

[9] "The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. . . . Thus, the narrower the bid-ask spread, the greater indication of an efficient market." *Id.* ¶ 74.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

selected group of 100 other NYSE and NASDAQ stocks during this same time was 0.39%. *Id*. This ranked CLS as the 26th smallest bid-ask spread among this randomly selected group of 100 other NYSE and NASDAQ stocks and indicates that approximately 75% of common stocks trading on the NYSE and NASDAQ had higher bid-ask spreads (and therefore were more expensive to trade) than CLS common stock. *Id*.

- **Institutional Ownership:** As mentioned previously, institutional ownership of CLS common stock ranged from 73.91% to 80.72% of outstanding shares. *Id*. ¶ 76. These high levels of institutional ownership indicate that the market prices of these securities reflected "active trading by extremely sophisticated and knowledgeable investors . . ." *Id*.

- **Autocorrelation:**[10] CLS common stock did not exhibit systematic autocorrelation during the Class Period. *See id.* ¶ 80. To the extent there was any retrospective autocorrelation in April 2005, it was "fleeting and not systematic." *Id*. "[T]he regression results are inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits." *Id*.

- **Option Traders**: There was also considerable trading in CLS options during the Class Period. *Id*. ¶ 81. Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market; moreover, empirical evidence has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. *Id*.

Each of these additional factors is further evidence that the market for CLS common stock was efficient during the Class Period. *See id.* ¶ 82. Plaintiffs' showing of market efficiency triggers the fraud-on-the-market presumption of reliance for CLS common stock.

## 2. Class Action Treatment Is Superior To Other Available Methods

As a general matter, "securities suits such as this easily satisfy the superiority requirement . . ." *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 120 (S.D.N.Y. 2008). Here, Lead Plaintiffs seek to represent a Class consisting of a large number of purchasers of Celestica

---

[10] "If previous price movements of a security have the ability to predict future price movements, then it is said to be 'autocorrelated.'" *Id*. ¶ 77. "[I]f the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price." *Id*.

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

common stock who are geographically dispersed and whose individual damages are likely small enough to render individual litigation prohibitively expensive. Hence, a class action is well-suited for resolving Class members' claims. *See, e.g., In re Bank of America Corp. Sec., Deriv., and Employee Ret. Income Security Act (ERISA) Litig.*, 281 F.R.D. 134, 146 (S.D.N.Y. 2012) ("Given the potential class size and the likelihood that individual recovery for some class members may be relatively modest, class certification is appropriate.").

Moreover, the management of this case as a class action presents no unusual difficulties that would preclude class certification. To the contrary, litigating each claim separately would be a wasteful expenditure of judicial resources, and ignore numerous investors that would be unable to seek redress of their claims in the absence of class treatment. *In re SCOR Holdings (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008).

## V.   CONCLUSION

For the reasons stated herein, Lead Plaintiffs respectfully request that the Court: (1) certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3); (2) appoint Lead Plaintiffs to serve as the Class Representatives; (3) appoint Labaton Sucharow LLP as Class Counsel; and (4) grant such other and further relief as the Court deems just and proper.

Dated:   June 28, 2013

                                                  LABATON SUCHAROW LLP

                                                  By:
                                                  Joseph A. Fonti (JF-3201)
                                                  Stephen W. Tountas (ST-8395)
                                                  140 Broadway
                                                  New York, New York  10005
                                                  (212) 907-0700

                                                  *Counsel for Lead Plaintiffs and*
                                                  *Proposed Class Counsel*

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ———————————————————— x | |
| : | Civil Action No.: 07-CV-00312-GBD |
| : | |
| IN RE CELESTICA INC. SEC. LITIG. : | (ECF CASE) |
| : | |
| : | Hon. George B. Daniels |
| : | |
| : | |
| ———————————————————— x | |

## CERTIFICATE OF SERVICE

I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 that on June 28, 2013, I

caused to be served upon the following, by electronic mail, a true copy of the Lead Plaintiffs'

Memorandum of Law In Support of Their Motion For Class Certification.

Phillip A. Geraci, Esq (phillip.geraci@kayescholer.com)
Kaye Scholer
425 Park Avenue
New York, NY 10022-3598
United States

Dated:   June 28, 2013

Joseph A. Fonti