# PX A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CELESTICA INC. SECURITIES LITIGATION ) ) ) ) ) | Civil Action No.: 07-CV-00312-GBD |

**<u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................... 1

II.     QUALIFICATIONS ................................................................................................ 2

III.    SUMMARY OF OPINIONS ................................................................................... 2

IV.     OVERVIEW OF CLS AND PLAINTIFFS' CLAIMS ........................................ 7

V.      DISCUSSION OF THE RELIANCE REQUIREMENT ...................................... 9

VI.     EFFICIENCY FACTORS - *CAMMER* ............................................................ 11

VII.    APPLICATION OF EFFICIENCY FACTORS TO CLS COMMON STOCK ............... 13

   A.   OVERVIEW ...................................................................................................... 13

   B.   *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME ........................... 16

   C.   *CAMMER* FACTOR 2: ANALYST COVERAGE ............................................... 18

   D.   *CAMMER* FACTOR 3: MARKET MAKERS ..................................................... 20

   E.   *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY .................................. 23

   F.   *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION ...................... 24

   G.   ADDITIONAL FACTOR 1: MARKET CAPITALIZATION ......................................... 31

   H.   ADDITIONAL FACTOR 2: THE BID-ASK SPREAD ......................................... 32

   I.   ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP ..................................... 33

   J.   ADDITIONAL FACTOR 4: AUTOCORRELATION ............................................. 34

   K.   ADDITIONAL FACTOR 5: OPTION TRADERS ................................................ 36

   L.   CONCLUSION .................................................................................................. 36

VIII.   MATERIALITY ................................................................................................... 36

IX.     LOSS CAUSATION ............................................................................................. 48

   A.   INVESTOR LOSSES WERE FORESEEABLE .................................................. 48

   B.   THE CORRECTIVE INFORMATION CAUSED ECONOMIC LOSSES TO CLASS
        MEMBERS ........................................................................................................ 53

        January 27, 2006 ........................................................................................... 54

        October 27, 2006 ........................................................................................... 59

        November 28, 2006 ....................................................................................... 72

        December 12, 2006 ........................................................................................ 74

        January 31, 2007 ........................................................................................... 79

X.      DAMAGES AND EVOLUTION OF INFLATION OVER THE CLASS PERIOD ........ 83

## I.   INTRODUCTION

1.      My name is Chad Coffman. I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation.

2.      I have been asked by counsel for the Lead Plaintiffs in this matter to opine on:

i.      Whether the shares of Celestica Inc. ("CLS", "Celestica" or the "Company") common stock ("CLS Stock" or "Common Stock") traded in an efficient market during the Class Period[1];

ii.     Whether the alleged misrepresentations and omissions were material;

iii.    Whether, and to what degree, investor losses were proximately caused by CLS's alleged misrepresentations and/or omissions (*e.g.,* "loss causation"); and

iv.     Rule 10b-5 damages suffered by Class members on a per share basis.

3.      The materials I have considered in forming my opinions are summarized in **Appendix A**.

4.      Global Economics Group is being compensated at an hourly rate of $550 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case or the opinions offered. My qualifications are described below.

---

[1] The putative Class Period is from January 27, 2005 to January 30, 2007 (Consolidated Amended Class Action Complaint ("Complaint")) at p. 1.

## II.   QUALIFICATIONS

5.      I hold a Bachelor's Degree in Economics with Honors from Knox College and a Masters in Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three exams over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

6.      I, along with several others, founded Global Economics Group in March 2008.[2] Prior to founding Global Economics Group, I was employed by Chicago Partners for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers and a prominent mediator to provide economic analysis and opinions in dozens of matters. As a result of my experience, much of my career has been spent analyzing how quickly, reliably and the degree to which new information impacts securities prices.

7.      My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III.   SUMMARY OF OPINIONS

8.      After analyzing CLS Common Stock throughout the Class Period and giving careful consideration to the efficiency factors described in detail in this report, I have formed the

---

[2] Global Economics Group was formerly known as Winnemac Consulting, LLC.

opinion that the market for CLS Common Stock was efficient throughout the Class Period. This opinion is based upon my analysis described in **Section VII**, below.

9.      My opinions regarding materiality, loss causation, and damages arising under Rule 10b-5 are based upon Defendants being found liable under the Securities Exchange Act of 1934. In particular, with regard to Plaintiffs' Securities Exchange Act Claims, I assume Plaintiffs will be able to prove that the Exchange Act Defendants (Celestica; Stephen W. Delaney, Celestica's CEO from April 22, 2004 to December 12, 2006; and Anthony P. Puppi ("Puppi"), Celestica's CFO from 1994 through January 30, 2007) knew or recklessly disregarded that they were issuing false and misleading statements and omissions during the Class Period regarding Celestica's 2005 Restructuring Plan ("Restructuring," "Restructuring Plan" or "Plan"), Celestica's inventory, and the effectiveness of Celestica's internal controls.

10.     Based on my analysis, the alleged misstatements and omissions in this case were material. I base this opinion on (1) the general importance to investors of a company maintaining effective internal controls; (2) the Company's own public statements that failure to execute the Restructuring Plan could have a material impact; (3) the strong positive reaction by analysts and the investing public to the announced Restructuring Plan; (4) analysts' continued focus over the course of the Class Period on the Restructuring and its promised benefits; (5) the economic importance of inventory (and adequate inventory controls) to investors especially in the low-margin electronic manufacturing systems ("EMS") business, as supported by (a) the abundance of analyst coverage of CLS's inventory levels throughout the Class Period and (b) the demonstration of how a write-off of even a small percentage of inventory would substantially affect CLS's earnings; and (6) my event study analysis which indicates that upon multiple partial

3

releases of corrective information related to the true status of the Restructuring, inventory, and internal controls the market value of Celestica Common Stock fell significantly.

11.     There is a clear economic link between the alleged misrepresentations and/or omissions and foreseeable investor losses. For example, if Plaintiffs' allegations are correct that the Defendants fraudulently concealed its failure to execute the Restructuring and the related adverse effects on the Company's business and operations,[3] it was foreseeable at the time the information was withheld from the market that when the truth became known, analysts and investors would realize that the expected current and future revenues and income would fall short of expectations[4] and the value of the Company and its Common Stock would fall. Likewise, with respect to inventory issues, Defendants could foresee that the lack of effective controls over inventory could result in write-offs and other negative consequences that would cause losses to investors. Finally, with regard to lack of effective internal controls generally, at the time that the Company failed to disclose to the market the heightened risks of ineffective internal controls, it was foreseeable that material accounting errors and/or other related issues would result in negative disclosures that would cause investor losses.

12.     Based on the allegations in the Complaint and my understanding of loss causation principles, in my view, Celestica-specific news that disclosed either (1) the true status of the Restructuring, (2) the true status of Celestica's inventory levels, (3) Celestica's insufficient and ineffective internal controls, or (4) the materialization of foreseeable risks stemming from such disclosures, represent corrective information in this matter. It is my opinion that corrective

---

[3] Complaint at ¶¶109-110.
[4] By "expectations" I mean the expectations in the market which were informed by (1) Company guidance that explicitly continued to include operating margin improvements from the 2005 Restructuring and (2) numerous positive statements regarding the Restructuring during the Class Period that I reviewed and as detailed in the Complaint.

disclosures in this matter occurred on the following dates: January 27, 2006, October 27, 2006, November 28, 2006, December 12, 2006 and January 31, 2007 (collectively the "Corrective Disclosure Events").[5]

13.     The event study analysis described in **Section VII** provides evidence that there were statistically significant declines in the price of Celestica Stock after controlling for market and industry effects concurrent with the Corrective Disclosure Events. It is also my opinion that the corrective information was a substantial cause of the price declines on the Corrective Disclosure Events. I base this opinion on (1) the content of the information disclosed, and (2) analyst reaction and commentary surrounding the information disclosed.

14.     The total abnormal price movement net of market and industry effects associated with the Corrective Disclosure Events for Celestica Common Stock was –$5.22 per share. In my view, this represents the net amount of economic loss that I can affirmatively demonstrate was causally related to the mix of information released on the Corrective Disclosure Events. All of the information (or at least all of the negative information) associated with the Corrective Disclosure Events represents corrective information and is not confounded by non-corrective information.

15.     Damages per share (prior to any statutory limitations) for any class member under Rule 10b-5 are calculated as the difference between inflation in the security price at purchase and inflation in the security price at sale. For example, if an investor bought Celestica Common Stock when the price inflation due to the fraud was $10 and sold it after a corrective disclosure that left $6 of inflation in the shares, the investor was harmed by $4 per share. Any class member

---

[5] For ease of exposition, the date of each Corrective Disclosure Event refers to the first trading day subsequent to the release of new corrective information.

that did not hold their share through at least one Corrective Disclosure Event has zero damages for that particular purchase. Under the assumption of constant dollar inflation (and also incorporating the effect of one "inflation creating day"), the artificial inflation per share on each day during the Class Period can be summarized as follows:

TABLE 1 – Artificial Inflation Per Share

| **Date Range:** | **Artificial Inflation Per Share:** |
|---|---|
| January 27, 2005 to January 26, 2006 | $3.62[6] |
| January 27, 2006 to July 27, 2006 | $3.19 |
| July 28, 2006 to October 26, 2006 | $4.79 |
| October 27, 2006 to November 27, 2006 | $3.35 |
| November 28, 2006 to December 11, 2006 | $2.95 |
| December 12, 2006 to January 30, 2007 | $1.83 |

16.     I reserve the right to amend this report to reflect new information that may become available to me.

17.     The remainder of this report is organized as follows: **Section IV** provides an overview of CLS and the claims in this case. **Section V** discusses the reliance requirement and the "fraud on the market" theory. **Section VI** introduces factors for evaluating market efficiency under the "fraud on the market" theory. **Section VII** evaluates the factors used to assess the efficiency of the market for CLS Common Stock. **Section VIII** contains my analysis of the materiality of the alleged misrepresentations and/or omissions. **Section IX** discusses loss causation. And **Section X** describes how damages should be calculated for each class member and how inflation evolved over the Class Period.

---

[6] While the total amount of the abnormal price declines caused by the Corrective Disclosures is $5.22 per share, this figure of $3.62 per share of inflation at the beginning of the Class Period reflects that an additional $1.60 per share of inflation was first introduced on July 28, 2006 via an "inflation creating event."

## IV.   OVERVIEW OF CLS AND PLAINTIFFS' CLAIMS

18.   During the Class Period, CLS described itself as "a world leader in the delivery of electronic manufacturing services (EMS). Celestica operates a global manufacturing network with operations in Asia, Europe and the Americas, providing a broad range of integrated services and solutions to leading OEMs (original equipment manufacturers)."[7] CLS supplied products and services to over 200 OEMs as of the end of 2005. CLS manufactured products that were components of many common electronic products.[8] CLS operated as a manufacturing unit of IBM for over 75 years until 1994 when IBM incorporated CLS as a wholly-owned subsidiary.[9] In October 1996, Onex Corporation ("Onex") and CLS's management (at the time) acquired CLS from IBM. As a result of this transaction, Onex currently owns 11.5 percent of the total outstanding equity shares, but as a result of holding "multiple voting" shares, Onex maintains approximately 79 percent of the voting interest and has effective control over the Company.[10]

19.   According to Plaintiffs' Complaint, CLS violated Section 10(b) of the Exchange Act by issuing public misrepresentations and omissions that caused investor losses.[11] I understand Plaintiffs assert, inter alia, that CLS had inadequate internal controls over its disclosures and financial reporting, including (but not necessarily limited to) controls over inventory. Plaintiffs allege that despite knowing about its lack of effective internal controls, the Company issued falsely positive information about its reported inventory levels, as well as the

---

[7] "Celestica Announces Third Quarter Financial Results," *Celestica Press Release*, October 26, 2006.

[8] CLS Form 20-F for the year ended December 31, 2005, p. 15.

[9] Id., pp. 14, 47.

[10] Complaint at ¶¶57-58. According to Bloomberg, as of February 15, 2013, Onex holds 18,946,368 shares of CLS Common Stock. In addition, Onex owns all of the "multiple voting shares" (CLS Form 20-F for the year ended December 31, 2005, pp. 14, 68). These shares are not registered to trade and are not included in any of the analyses I conduct unless otherwise specified.

[11] Complaint at ¶¶299-300.

financial and operational benefits that were purportedly derived from its Restructuring Plan, and as a result, the Company issued statements which were false and misleading including, but not limited to, the following:

       i.     Plaintiffs assert that CLS overstated the value of excess and obsolete inventory. Inventory comprised CLS's single largest asset during the Class Period, and the Company knew that a large write down of excess and obsolete inventory would have an adverse impact on earnings.[12]

      ii.     Plaintiffs assert that CLS (i) booked false entries to manipulate the level of inventory reflected on CLS's books, (ii) delayed recording new inventory until after the quarter-end by leaving trucks full of materials in the parking lots of facilities, (iii) prematurely booked revenue by shipping unordered products to customers near quarter-end while knowing full-well that these products would be returned, and (iv) shipped inventory off-site in order to temporarily remove the inventory from CLS's books.[13]

     iii.     Plaintiffs allege that Defendants misled the market by failing to inform analysts or investors of material issues that undermined Celestica's purported Restructuring Plan. Finally, at the end of the Class Period, once full disclosure was finally made, the restructuring charges booked in 2005-2006 totaled $338.2 million plus an additional $20-$40 million, a sum which exceeded what Defendants had initially told investors by as much as 68 percent.[14]

---

[12] Complaint at ¶¶9, 69-108.
[13] Complaint at ¶¶9, 93-104.
[14] Complaint at ¶¶9, 109-132.

        iv.     Plaintiffs allege that Defendants' failing Restructuring efforts and related execution problems caused several key customers to disengage some of if not all of their business from Celestica's Monterrey, Mexico facility ("CMX"). According to the Complaint, nearly two-thirds of CLS's revenue was derived from a mere ten customers, so it was crucial that CLS maintain these relationships.[15]

## V.    DISCUSSION OF THE RELIANCE REQUIREMENT

       20.     Class members' reliance on the alleged misstatements and omissions is a required element for the Class's claims. Plaintiffs assert that they are entitled to a presumption of reliance under the "fraud on the market" theory. The "fraud on the market" theory is based on the notion that in an efficient market (one in which widely-available public information is quickly incorporated into the market price), all purchasers implicitly rely on any misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. This is true whether or not the purchaser explicitly relied on any specific misrepresentation or omission.[16] The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic v. Levinson*:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in

---

[15] Complaint at ¶¶9, 133-145.

[16] Daniel R. Fischel, 1982, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, Vol. 38, p. 11 ("If the market price is distorted by fraudulent conduct, both active and passive investors suffer injuries.").

such a case is no less significant than in a case of direct reliance on misrepresentations.[17]

21.    As indicated in *Basic*, in an open, developed and efficient market, market prices reflect what is publicly known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated compared to what the price would have been if the truth were known (but-for the misleading information). Thus, in an efficient market where plaintiffs prove there were material misrepresentations, all purchasers implicitly relied on those misrepresentations.

22.    Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise. The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[18] He described different levels of efficiency which he called "weak-form," "semi-strong-form" and "strong-form" efficiency.[19] Twenty years later, Dr. Fama said that the "semi-strong-form" "give[s] the most direct evidence of efficiency. And the evidence is mostly supportive."[20]

---

[17] *Basic v. Levinson*, 485 U.S. 224, 240-242 (1988).

[18] Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance,* Vol. 25, 1970, p. 383.

[19] "Weak-form" efficiency is concerned with how well past returns predict future returns. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[20] Eugene Fama, "Efficient Capital Markets: II," *The Journal of Finance*, Vol. 46, 1991, pp. 1575-1617.

23.     The market efficiency standard adopted by *Basic* as necessary for the presumption of reliance conforms to Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that public information is reflected in a stock's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[21] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

24.     In the next section, I explain the factors that I understand are regularly considered by courts in determining whether the market for a particular security is efficient.


## VI.   EFFICIENCY FACTORS - *CAMMER*

25.     In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[22]

---

[21] *Basic v. Levinson*, 485 U.S. 224, 241 (1988).
[22] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

26.     The *Cammer* decision relied on Bromberg and Lowenfels' definition of efficiency.[23] As articulated below, the adopted definition of efficiency is clearly consistent with Fama's definition of "semi-strong" efficiency.[24] For the purposes of this exercise, I adopt Bromberg and Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.

> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

> An *efficient market* is one which rapidly reflects new information in price.

> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[25]

27.     While there is a clear and well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory.

28.     In the subsequent sections I evaluate each of the *Cammer* factors, as well as the following additional factors that are relevant to assessing market efficiency: 1) market

---

[23] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). Lewis Lowenfels is a long-time practicing corporate securities attorney and Alan Bromberg is Distinguished Professor of Law at the SMU Dedman School of Law. They wrote *Securities Fraud and Commodities Fraud* currently in its 7th edition.

[24] Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance,* Vol. 25, 1970, p. 383.

[25] *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 n. 17 (D.N.J. 1989) (citing Bromberg and Lowenfels, *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)) (emphasis added).

capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, 4) autocorrelation (meaning whether there is a pattern in a security's returns so that past returns have the ability to predict future returns), and 5) option traders.

29.     In **Section VII**, I empirically evaluate each factor for CLS Common Stock during the putative Class Period.

## VII.   APPLICATION OF EFFICIENCY FACTORS TO CLS COMMON STOCK

### A.  OVERVIEW

30.     After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports my opinion that the market for CLS Common Stock was efficient throughout the Class Period. This opinion makes no distinction between trading between CLS Common Stock on the NYSE (and other U.S. exchanges) or the Toronto Stock Exchange ("TSX"), which I consider a single market.[26] **Exhibit 1** shows that for each of the factors examined, the empirical evidence supports a finding that the Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2a** displays the Common Stock closing price on the NYSE and trade volume for each day throughout the Class Period. **Exhibit 2b** shows that after controlling for the U.S. Dollar-Canadian Dollar exchange rate ("USD-CAD"), the closing prices on the TSX and NYSE closely track each other throughout the Class Period.

---

[26] My opinions would not be altered if asked to assume that the CLS Stock exchanged on the NYSE and the CLS Stock exchanged on the TSX were traded in separate markets. In other words, the empirical evidence I present is sufficient to conclude the trading on the TSX is efficient independent of the trading on the NYSE and vice versa. For ease of exposition, I refer to "NYSE" as encompassing all domestic trading in the U.S.

31.     Further, because Celestica's Common Stock is fungible, and any share can be traded on either on the NYSE or on the TSX, it is economically proper to treat the market for Celestica Common Stock as a single market. Economists define a "product market" as a market in which products, "...are close demand or supply substitutes"[27] and a "geographic market" as a market in which "the increase in price in one location substantially affects the price in another."[28] Throughout the Class Period, Celestica shares traded (and continue to trade) in a single product and geographic market, as supported by: (1) an investor that purchases a share of CLS stock purchases the same good (an equity stake in Celestica) regardless of which exchange it was purchased on – they are perfect substitutes; and (2) after adjusting for currency conversion, the price of Celestica shares effectively moved in tandem. Furthermore, when analyzing the market for a U.S. stock that has its primary listing on the NYSE or NASDAQ, but also trades on other U.S. exchanges, financial economists typically treat it as a single market with consolidated volume and a single closing price.[29] In fact, about 31% of CLS Common Stock trades in the U.S. during the Class Period were executed on other exchanges.[30] This is further evidence that CLS Common Stock traded in an efficient market. The academic literature is clear that by trading on multiple exchanges, the market for a given security is indeed more efficient than if it only trades on a single exchange.[31] For the foregoing reasons, it is economically proper to treat the NYSE and TSX as a single market for Celestica Stock.

---

[27] Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization,* Fourth Edition, p. 646.

[28] Id., p. 648.

[29] This is no different for CLS, which also traded on NASDAQ, the National Stock Exchange (Cincinnati), NASD ADF (FINRA), the Chicago Stock Exchange, and ARCA.

[30] This figure is based on nominal trades, not volume, using trade data during the Class Period from Tick Data. It represents the trades executed on U.S. exchanges excluding NYSE and NYSE-ARCA.

[31] *See, e.g.,* Frederick H. deB. Harris, Thomas H. McInish, Gary L. Shoesmith, and Robert A. Wood, "Cointegration, Error Correction, and Price Discovery on Informationally Linked Security Markets,"

32.     In summary, and as discussed more fully below, CLS Common Stock traded in an efficient market. First, the average weekly trading volume of the Common Stock during the Class Period far exceed benchmarks that the Courts have established. During the Class Period, CLS Common Stock traded on the NYSE, TSX, and other exchanges where the Common Stock average daily trade volume was 1.8 million shares. As I demonstrate below, this average trading volume was similar to the average common stock traded on the NYSE and TSX during the Class Period. Second, there were a large number of securities analysts following and reporting on CLS. Third, CLS was eligible to file Form F-3 during the Class Period (the equivalent of Form S-3 for foreign issuers, which allowed the Company to incorporate its prior SEC filings by reference) because Celestica had previously provided sufficiently high levels of public information to the market in its SEC filings. Fourth, CLS Common Stock had one of the larger market capitalizations of all firms on the NYSE and NASDAQ. Fifth, CLS Common Stock had a relatively low bid-ask spread. Sixth, CLS Common Stock was actively traded on the NYSE and TSX, fulfilling the *Cammer* factor regarding market makers. Seventh, there was no evidence of consistent autocorrelation during the Class Period. Eighth, institutions, which are considered sophisticated and well-informed investors, held, on average, over 77% of shares outstanding. Ninth, there was considerable trading in CLS Options during the Class Period. Finally, there was also a strong cause and effect relationship between new Company-specific information and the

---

*Journal Of Financial And Quantitative Analysis*, Vol. 30, No. 4, 1995; Jonathan R. Macey and Maureen O'Hara, "Regulating Exchanges And Alternative Trading Systems: A Law And Economics Perspective," *Journal of Legal Studies,* Vol. 28, 1999; Chandra Shekhar Bhatnagar and Dyal Bhatnagar, "Stock Traversals and Arbitrage Possibilities: An Examination of Multiple Listings," *Journal of Business & Economic Studies,* Vol. 12, No. 2, 2006; Vanthuan Nguyen, Bonnie F. Van Ness, and Robert A. Van Ness, "Short- and Long-Term Effects of Multimarket Trading," *The Financial Review,* Vol. 42, 2007, pp. 349-372; William O. Brown, Jr., J. Harold Mulherin and Marc D. Weidenmier, "Competing With The New York Stock Exchange," *The Quarterly Journal of Economics,* November 2008; or Shantaram Hegde, Hao Lin, CFA, and Sanjay Varshney, CFA, "Competitive Stock Markets: Evidence from Companies' Dual Listings on the NYSE and NASDAQ," *Financial Analysts Journal,* Vol. 66, No. 1, 2010.

market price of Common Stock during the Class Period. These factors all support the conclusion

that CLS Common Stock traded in an open, developed, and efficient market throughout the Class

Period.

### B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

33.     The first *Cammer* factor is the average weekly trading volume of a security.

According to one authority cited by the *Cammer* court,

> [T]urnover measured by average weekly trading of 2% or more of the outstanding
> shares would justify a strong presumption that the market for a security is an
> efficient one; 1% would justify a substantial presumption.[32]

34.     Volume as a fraction of shares outstanding is an important indicator of market

efficiency. First, volume is objectively quantifiable and comparable across securities. Second,

high volume is generally indicative of continuity, liquidity, and market depth – which are highly

indicative of market efficiency.[33] Third, substantial volume would indicate there is likely a

market for the collection and distribution of information about the security. As Thomas and

Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects

---

[32] *Cammer v. Bloom*, 711 F. Supp. 1264-1293 (D.N.J. 1989) (citing Bromberg and Lowenfels, *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

[33] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 44-45. Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." Bromberg and Lowenfels, *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) as cited by *Cammer*, p. 2. Market depth refers to the number of shares that can be traded at quoted prices. A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Yakov Amihud, Haim Mendelson and Lasse Heje Pedersen, 2006, "Liquidity and Asset Prices," *Foundations and Trends in Finance* Vol. 1, No. 4, pp. 269-364.

information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[34]

35.     CLS Common Stock easily surpassed the higher 2% threshold level of average weekly trading volume. The average weekly turnover for the Common Stock was 4.7%.[35] **Exhibit 3** plots the Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[36] Indeed, the average *daily* volume during the Class Period was 1.8 million shares. The volume of trading for the Common Stock supports the conclusion that the market for this security was efficient throughout the Class Period.

36.     Another measure of the concepts underlying this *Cammer* factor (continuity, liquidity, and market depth) is annualized turnover velocity, which is essentially the first *Cammer* factor annualized and expressed in dollar terms.[37] The advantage of this measure is that CLS Common Stock's annualized turnover velocity can be compared directly with other stocks that trade on the same exchange. The average annualized turnover velocity ratio for CLS Common Stock traded on the NYSE was 201% and 210% for the years 2005 and 2006 respectively compared with the NYSE average of 99% for 2005 and 134% for 2006.[38] Thus, the

---

[34] Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems*, Vol. 63, p. 108. Randall Thomas holds a Ph.D. in Economics and a J.D. in Law and is The John Beasley Professor of Law and Business at Vanderbilt Law School and the Owen School of Business at Vanderbilt University. James Cotter holds a Ph.D. in Finance and is the Benson-Pruitt Associate Professor of Finance at Wake Forest University's Calloway School of Business.

[35] This figure for U.S. trading and TSX trading are 2.7% and 1.9% respectively. Thus, even if one considered the markets separately, which I do not, it would still support a finding of efficiency.

[36] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days starting with the first day of the Class Period (this may not follow the calendar week).

[37] Turnover velocity is simply the average turnover (the first *Cammer* factor) expressed in dollar terms: Turnover Velocity Ratio = (Volume x Price) / (Shares Outstanding x Price) = Dollars Traded / Dollars Outstanding.

[38] Turnover velocity statistics for the NYSE are from World Federation of Exchanges, http://www.world-exchanges.org/statistics. These calculations use full year data. I weighted the annual turnover velocity for the Common Stock to reflect the fraction of the years included in the Class Period and used only NYSE

Common Stock had an average annualized turnover velocity that was much greater than that of

the average stock that traded on the NYSE during the Class Period.[39]

37.     In short, the relatively high trading volume in the Common Stock throughout the

Class Period supports the conclusion that the market for this security was efficient.

## C. *CAMMER* FACTOR 2: ANALYST COVERAGE

38.     *Cammer* stated the following related to analyst coverage:

> …it would be persuasive to allege a significant number of securities analysts
> followed and reported on a company's stock during the class period. The
> existence of such analysts would imply, for example, the [auditor] reports were
> closely reviewed by investment professionals, who would in turn make buy/sell
> recommendations to client investors.[40]

39.     Analyst coverage, while not required for market efficiency in my opinion, is

important confirmatory evidence of efficiency. Significant analyst coverage implies that there is

sufficient interest in a company and its securities, that there is an active market for information

regarding the company and its securities, and that the information is widely distributed.

40.     During the Class Period, there was a large number of analysts covering CLS.

**Exhibit 4** shows that there were at least 247 analyst reports issued during the Class Period by 25

separate equity analysts for CLS.[41] Major firms such as Citigroup, Deutsche Bank, and Morgan

Stanley frequently issued analyst reports on CLS. These reports served the purpose of

disseminating publicly available information along with commentary, news, updates, analysis

---

[39] The average annualized turnover velocity ratio for CLS Common Stock traded on the TSX was 83% and 85% for the years 2005 and 2006 respectively compared with the TSX average of 69% for 2005 and 76% for 2006.

trading days. I did not run the comparison for 2007 as the Class Period includes only 19 trading days in this year.

[40] *Cammer v. Bloom*, 711 F. Supp. 1264-1286 (D.N.J. 1989).

[41] This almost certainly understates the total amount of analyst coverage since many analyst reports are not available through third party data providers.

and recommendations to investors. In addition, credit rating agencies issued reports that evaluated CLS's creditworthiness and publicly-traded securities.[42] The extensive coverage of CLS by securities analysts supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

    41.    Since 1989 when the *Cammer* decision was published, there has been an explosion of alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[43] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

    42.    Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of CLS, there were many other sources of information dissemination. For example, there was substantial public press regarding CLS. A search for articles classified as related to CLS by Factiva published by all sources in its database over the Class Period results in over one thousand articles. There were

---

[42] S&P, Moody's, and Fitch covered CLS during the Class Period.

[43] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions with links to additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasingly popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (http://www.rss-specifications.com/ and http://www.rss-specifications.com/what-is-rss.htm).

also numerous SEC filings available online at EDGAR at no out-of-pocket cost.[44] There were

numerous other sources of information available throughout the Class Period that I do not

attempt to quantify. The degree of news coverage and publicly available information further

supports the conclusion that there was substantial supply and demand for information regarding

CLS in the public arena throughout the Class Period.

43.     In summary, the number of analyst reports, other investment reports covering

CLS publicly-traded securities, and the substantial public dissemination of news and other

information regarding CLS provide evidence (1) of a robust and active market for information

about CLS, and (2) that the Common Stock traded in an efficient market.[45]

## D. *CAMMER* FACTOR 3: MARKET MAKERS

44.     The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market
> makers is probably the best single criterion. Ten market makers for a security
> would justify a substantial presumption that the market for the security is an
> efficient one; five market makers would justify a more modest presumption.[46]

45.     The basic premise that the number of market makers can serve as an efficiency

criteria relates to the notion that market makers are:

> …presumably knowledgeable about the issuing company and the stocks' supply
> and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger
> the number of market makers in a given security, the more information is
> available about it and the quicker its dissemination in the price.[47]

---

[44] Excludes SEC Forms 3, 4 and 5, which relate only to equity ownership by directors, officers, and owners of more than ten percent of a class of a company's equity.

[45] The analysis in this section would apply equally to an analysis of the TSX or U.S. Exchanges independent of the other.

[46] *Cammer v. Bloom*, 711 F. Supp. 1264-1293 (D.N.J. 1989) (emphasis added).

[47] Brad M. Barber, Paul A. Griffin and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law*, Winter 1994, 19 Iowa J. Corp. L. 285.

46.     As noted above, *Cammer* states that the number of market makers is relevant to consider the market efficiency of securities traded in an over the counter market with no volume reporting. On such markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE which are often assumed to be efficient,[48] report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[49]

47.     Throughout the Class Period, the Common Stock traded on the NYSE and the TSX. The NYSE is one of the largest and most liquid security exchanges in the world with billions of shares traded each day. Rather than decentralized market makers providing liquidity for trading (as for the security at issue in *Cammer*), the NYSE conducts trading on a continuous auction system where an assigned specialist is physically present at all times during open trading. These "specialists" are required by exchange rules to maintain a "fair and orderly" market and to take the other side of a trade even if it means having to buy or sell from their own accounts.[50] The specialist system thus provides continuous liquidity for the security. In addition, much of the trading (currently a vast majority) is accomplished by electronically matching orders without the involvement of a specialist or market makers at all.[51]

---

[48] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (citing Bromberg and Lowenfels, *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

[49] For example, there are rules for minimal market capitalization, and specialists are *required* to maintain an orderly market. *See* http://www.nyse.com/equities/nyseequities/1166830723427.html; William F. Sharpe, Gordon J. Alexander and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 45-53; Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[50] William F. Sharpe, Gordon J. Alexander and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 45-53; Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[51] Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

48.     The TSX is the eighth largest exchange in the world and the third largest exchange in the Americas with a domestic market capitalization of more than USD$2.1 trillion.[52] TSX Markets is an electronic system that facilitates trading on the TSX. On any given trading day it services trades that account for an average of 600 million shares per day for over 4,200 securities. The TSX provides guaranteed liquidity through its electronic market making programs which automatically fill orders which exceed the quote up to the stock's "Minimum Guaranteed Fill."[53] It is through this mechanism that the TSX guarantees liquidity for traders.

49.     The NYSE has a market structure that combines both an auction system and electronic trading and does not rely on the less efficient mechanism of decentralized market makers to provide liquidity. Likewise, the TSX, by virtue of providing guaranteed liquidity through its electronic exchange does not rely on the less efficient mechanism of decentralized market makers to provide liquidity. It does, however, use market markers "only when necessary to provide a positive influence when natural market forces cannot provide sufficient liquidity" and thus the use of market makers in this circumstance helps "maximizes market efficiency" to supplement liquidity beyond the TSX's primary auction market.[54, 55]

50.     Therefore, the number of "market makers" itself is not a relevant metric here; however, CLS Common Stock, by virtue of trading on the NYSE and TSX, easily meets the spirit of this *Cammer* factor throughout the Class Period.

---

[52] World Federation of Exchanges, Monthly Reports, January 2013, available at http://www.world-exchanges.org/statistics/monthly-reports.

[53] TMX Group, http://www.tmx.com/en/trading/index.html.

[54] http://www.tmx.com/en/trading/products_services/market_system.html

[55] According to the TSX website there are nineteen market makers as last updated on July 23, 2012. http://www.tmx.com/en/trading/products_services/market_makers_list.html.

### E. *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

51.    The fourth *Cammer* factor is SEC Form S-3 Eligibility:

It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[56]

52.    Through Form S-3 (and Form F-3 with respect to foreign issuers),[57] the SEC allows certain companies that have previously provided a sufficiently high level of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[58] Eligibility to file a Form S-3 or Form F-3 is confirmatory evidence of efficiency, not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

53.    Although Celestica did not file a Form F-3 during the Class Period, they did do so before and after the Class Period. In fact, Celestica issued a Form F-3ASR in 2008 which allows companies considered by the SEC as well-known seasoned issuers to register unspecified amounts of different specified types of securities using a single form. As a result of being able to file these registration statements under the SEC guidelines, CLS meets this *Cammer* efficiency factor which supports the conclusion that the Common Stock traded in an efficient market.[59]

---

[56] *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989).

[57] http://www.sec.gov/info/smallbus/secg/s3f3-secg.htm.

[58] To be eligible to issue a Form S-3, among other things a company must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year. In addition, the company must have filed all documents in a timely manner for the past twelve months and must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases. *See* www.sec.gov/about/forms/forms-3.pdf.

[59] This analysis would apply equally to an analysis of the TSX or NYSE as separate markets.

## F.   *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

54.     Establishing a causal connection between new company-specific news events and movements in the market price is further evidence of market efficiency. A technique often relied upon by academics (both inside and outside of the context of litigation) to establish such a causal connection is called an "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[60] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have now been used for over 30 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[61]

55.     To analyze cause and effect, I performed an event study to determine whether CLS Common Stock reacted swiftly and significantly to earnings announcements. Based on the event study I have performed, which explicitly controls for market and industry factors, I find that there is a clear cause and effect relationship between new public information about CLS and the market price of its Common Stock. I now describe in further detail the event study methodology, the events I tested, and the results.

56.     An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study begins by specifying a model of what price movements are "expected"

---

[60] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.

[61] John Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting,* Vol. 11, 1998, pp. 111-137.

based on outside market factors and then tests whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

57.      A well accepted method for performing an event study is to estimate a regression model over some period of time to observe the typical relationship between the market price of the relevant security and broad market factors. I have performed such an analysis where I evaluate the relationship between CLS Common Stock daily returns (percentage change in price) controlling for market and industry returns using the S&P 500 Total Return ("S&P 500") and a group of peers identified from CLS's SEC filings ("Peer Index").[62]

58.      For each trading day, I constructed a regression model using data from the prior 120 trading days.[63] This "rolling" regression model allows for the relationship between the Common Stock and the market factors as well as the firm-specific volatility to update over time according to the data observed over the most recent 120 trading day (roughly six month) period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is observed in the peer-reviewed literature.[64] I implemented the rolling regression model in this case because, as I demonstrate below, there is strong evidence that the relationship between CLS Common Stock returns and the market indices evolved over time and that volatility did not remain constant over the Class Period.

---

[62] Peers were determined by reviewing CLS's stated competitors on SEC Form 20-F filings for fiscal years 2004-2007. This resulted in identifying the following four peers: Flextronics International, Ltd., Jabil Circuit, Inc., Sanmina-SCI Corporation, and Solectron Corporation (*See, for example*, CLS From 20-F for year ended December 31, 2005, p. 6). Note that Hon Hai Precision Industry. Co., Ltd. is found on the 20-F filings but is not included in the peer index because it was not exchange-traded in North America

[63] *See*, A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature,* Vol. 35, No. 1, March 1997, pp. 13-39 ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.").

[64] Phillip A. Braun, Daniel B. Nelson, and Alain M. Sunier, "Good News, Bad News Volatility, and Betas," *Journal of Finance* 50, No. 5, 1995, p. 1597.

59.     The model indicates that there is a positive correlation between the Common Stock and the control variables. For instance, choosing a day in the Class Period purely as an example, February 16, 2006, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 0.90 which means that a 1% rise in the S&P 500 predicts a 0.90% increase in CLS's return. The estimated coefficient for the Peer Index is 0.11, meaning that the expected return for CLS is about a 0.11% increase for every 1% increase in the Peer Index over and above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the Common Stock rolling regression models for each day during the Class Period.

60.     Another important statistic from the regression is the Standard Deviation of the Errors which measures the degree of imprecision in the predictions from the model. For instance, on the example date, February 16, 2006, the model predicted that absent any new firm-specific information, the price of CLS Common Stock would increase by 0.73% because the S&P 500 was up 0.74%, the peer index was up an additional 0.54%. Because of the inherent randomness observed in stock price returns, we do not expect the model to predict returns exactly. In this example we observe an actual return of 1.88%. Thus, the "abnormal return" for this day is 1.15% (the actual return of 1.88% minus the predicted return of 0.73%). We then rely on the Standard Deviation of the Errors from the regression model to tell us if this abnormal return of 0.73% is sufficiently large that we reject random movement as the explanation.

61.     A "t-statistic" measures the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of 0.73% represents 0.65 standard deviations or a t-statistic of 0.65 (0.73% abnormal return divided by the Standard Deviation of the Errors of 1.77%). Using the standard assumption that, in the absence of new

firm-specific news, abnormal returns will be normally distributed around zero; probability theory tells us that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should only have a t-statistic of greater than 1.96 (or less than -1.96) standard deviations 5% of the time.[65] Stating this point another way, we have 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of 0.65, we would say that the abnormal return is not statistically significant at the 95% confidence level and we could not reject randomness as the cause with greater than 95% confidence. By contrast, if on a particular day we observe an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and we observe new firm-specific information, we reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

62.     **Exhibit 6** shows that the Standard Deviation of the Errors varies over the Class Period. By adopting the rolling regression model, my event study adjusts for the changing firm-specific volatility depicted in the exhibit.

63.     **Exhibit 7**, meanwhile, presents the abnormal returns and the threshold for statistical significance for each day during the Class Period. Statistically significant abnormal returns occur when the abnormal return crosses the significance threshold.

64.     To analyze cause and effect, I examined the price response of CLS Common Stock to earnings announcements that occurred during the Class Period. There are many academic articles and financial treatises that explain theoretically and demonstrate empirically

---

[65] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001. The financial economics literature often identifies the 90% threshold as a relevant boundary for significance.

that the release of company earnings announcements often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[66] Also, newly released earnings reports by the Company are an objective set of news to identify. Choosing one earnings report from the Class Period as an example (specifically, the earnings report which was released after the market closed on July 21, 2005), the Company reported a profit roughly in line with guidance and analysts estimates in its second quarter results, but cautioned weak third quarter demand.[67] In response, the market price of CLS Common Stock decreased 15.3%, compared to the predicted return of -0.89%. Thus, the abnormal return on July 22, 2005 was -14.42%. With a t-statistic of -9.51, this abnormal price movement is statistically significant, and I therefore have scientific evidence that CLS's stock price reacted rapidly to this new information.

65. Similar to this example earnings announcement, I analyzed the market reaction to CLS's other earnings announcements throughout the Class Period. I found statistically significant Common Stock price movements on a number of these days on which CLS reported earnings that either exceeded or fell short of market expectations. In total, of the nine earnings announcements CLS issued during the Class Period (including the final Corrective Disclosure Event), eight resulted in statistically significant price movements at the 95% confidence level. **Exhibit 8** presents a summary of the earnings announcements and **Exhibits 9A – 9I** chart the intraday price movements for all of the earnings announcement dates. These exhibits illustrate clear price changes on all of the earnings announcements with all but one reaching the 95%

---

[66] *See, e.g.*, William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968, pp. 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Journal of Accounting Research*, Vol. 9, Empirical Research in Accounting: Selected Studies 1971, pp. 119-163; Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980, pp. 1-12.

[67] "Celestica 2Q Rev $2.25B," *Dow Jones News Service,* July 21, 2005, 16:01.

confidence level of statistical significance. Just as the July 21, 2005 earnings report presented the market with negative news to which the market responded negatively, the market reacted on other earnings report days throughout the Class Period in a direction that is consistent with the total mix of information released on those days.[68]

66.     Compare these results against the 169 days during the Class Period when a Factiva search identified no CLS-related news and I did not identify any analyst reports:[69]

---

[68] On April 27, 2006, CLS issued an earnings report that contained both positive and negative news while earnings were "in line" with expectations. There was a positive significant price reaction on this day that could have resulted from better expected revenue, positive statements about the restructuring, or other positive aspects of the report. I include this day as supporting my cause and effect analysis but note that my conclusions would be no different if I excluded it as not having a clear "expected" direction.

[69] I identified days with and without news via a Factiva search for "all sources" with the company field identified as "Celestica" for the period January 27, 2005 through January 30, 2007. Analyst reports, meanwhile, were obtained through Investext. This almost certainly understates the full amount of news and analyst coverage of CLS during the Class Period.

TABLE 2. Comparison of Abnormal Returns on Days with Earnings Announcements and Days
without News or Analyst Reports

| Statistic | Earnings Announcement Dates | No-News, No Analyst Report Dates |
|---|---|---|
| N | 9 | 169 |
| Significant Days | 8 | 6 |
| % Significant Days | 88.89%[1] | 3.55%[3] |
| Average Absolute Abnormal Return | 9.50%[2] | 1.08% |

[1] 88.89% rate of statistical significance is statistically significantly higher than 3.55% on the basis of a Chi-Square test at the 95% confidence level.

[2] 9.50% absolute return is significantly higher than 1.08% based on a test for difference of means at the 95% confidence level.

[3] This 3.55% is statistically indistinguishable from the null hypothesis of 5%

67.     **Table 2** establishes a strong cause and effect relationship between new, unexpected news and rapid changes in CLS's prices. The earnings announcement days have a greater number of significant price movements and statistically significantly larger price changes than found on days with no news. In addition, the incidence of significant price movements on no-news dates (3.55%) is not statistically different at the 95% confidence level than the 5% expected in a well-specified event study model. This provides further evidence of the reliability of the event study analysis.

68.     The event study analysis in this section is based upon closing prices on the NYSE. As demonstrated in **Exhibit 2b**, after controlling for the exchange rate, the prices on the TSX closely track those on the NYSE. For completeness, I performed a separate event study using the closing prices on the TSX and found no meaningful differences. The results of this study are

contained in **Appendix C**. In addition, the intra-day charts in **Appendix C** plot both the NYSE and TSX prices to show that the two prices track each other on an intraday basis, not only at the close.

69.     The event study analysis and intraday charts presented in this section demonstrate a clear cause and effect relationship between new material news and changes in the market price of CLS. Note that I provide further evidence of a clear cause and effect relationship in **Section IX** where I analyze the price reaction to the Corrective Disclosure Events.

### G. ADDITIONAL FACTOR 1: MARKET CAPITALIZATION

70.     Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[70] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

71.     **Exhibit 10** presents Celestica's market capitalization over the relevant period. CLS Common Stock had a larger market capitalization than the vast majority of NYSE stocks during the Class Period, thus suggesting this factor is supportive of efficiency. During the Class Period, CLS had between 184.5 million and 200.4 million shares outstanding. Insiders at all times held less than 1.07% of the outstanding shares. CLS's public float (shares outstanding less insider holdings) ranged from 182.5 million to 198.5 million.[71]

72.     Based on the market price, the market capitalization for the Common Stock averaged $2.46 billion during the Class Period. **Exhibit 11** shows that the Common Stock's

---

[70] Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems,* Vol. 63, p. 117.

[71] The term "float" can also mean shares outstanding minus insider holdings *plus short interest*. For ease of exposition, I am not including the short interest in what I call the "float."

market capitalization ranked between the 70th and the 77th percentile of the combined NYSE and NASDAQ markets during the Class Period.[72]

73.     Given that the Common Stock's market capitalization was consistently large relative to other publicly traded companies during the Class Period, this factor is supportive of market efficiency for the Common Stock.[73]

## H. ADDITIONAL FACTOR 2: THE BID-ASK SPREAD

74.     Bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies. Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

75.     I analyzed bid-ask spreads for CLS Common Stock throughout the entire Class Period. During this period, the time-weighted bid-ask spread for CLS Common Stock for each calendar month on the NYSE ranged between 0.099% and 0.141%. I also compared the bid-ask spread of CLS Common Stock against the bid-ask spread of other publicly traded stocks in November 2005, the month in which CLS's bid-ask spread was largest during the Class Period. During November 2005, the time-weighted average bid-ask spread for the Common Stock was

---

[72] The market capitalization of all the companies that were traded on the NYSE and the NASDAQ as of December 31, 2005 and December 31, 2006 was acquired from Bloomberg.

[73] The market capitalization is independent of the distinction between exchanges. In other words, there is no economic concept of a separate "TSX market capitalization" or an "NYSE market capitalization" because any share could be traded on either exchange. As a result, this analysis supports the efficiency of each market separately as well.

0.141%, while the median time weighted average bid-ask spread for a randomly selected group of 100 other NYSE and NASDAQ stocks during this same time was 0.39%.[74] This ranked CLS as the 26th smallest bid-ask spread among this randomly selected group of 100 other NYSE and NASDAQ stocks and indicates that approximately 75% of common stocks trading on the NYSE and NASDAQ had higher bid-ask spreads (and therefore were more expensive to trade) than CLS Common Stock. Accordingly, this analysis suggests the Common Stock's bid-ask spread compared favorably with other exchange traded stocks and further supports a conclusion of market efficiency.[75]

## I.  ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP

76.     Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. Most institutions that hold over $100 million in assets are required to report their equity holdings on a quarterly basis on SEC Form 13F.[76] As **Exhibit 12** shows, these large institutions reported owning a majority of all CLS Common Stock during the Class Period. From

---

[74] The average bid-ask spread was calculated by taking a time-weighted average of the spread during trading hours on the primary exchange of each security. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang and Hans R. Stall, "Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE," *Journal of Financial Economics* Vol. 41, 1996, pp. 313-357.

[75] Note that the bid-ask spreads for CLS on the TSX are higher on average than those for CLS on the NYSE, but the bid-ask spreads for CLS on the TSX still compare favorably against most NYSE stocks and have an low cost to trade. For example, during November 2005, the time-weighted average bid-ask spread for the Common Stock was the 32nd smallest bid-ask spread among this randomly selected group of 100 NYSE and NASDAQ stocks.

[76] *See* http://www.sec.gov/about/forms/form13f.pdf.

the quarter end of March 31, 2005 to December 31, 2006, institutional holdings of CLS Common Stock ranged from 73.91% to 80.72% of the shares outstanding according to Thomson Reuters, Bloomberg and CLS's SEC Forms 20-F.[77] This high level of institutional ownership of CLS Common Stock during the Class Period indicates that the market price was reflective of active trading by extremely sophisticated and knowledgeable investors and supports a conclusion of market efficiency.[78]

### J.  ADDITIONAL FACTOR 4: AUTOCORRELATION

77.     If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price.

78.     Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[79]

79.     A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day

---

[77] These figures are slightly higher (74.66% to 81.54%) if shares outstanding are adjusted for insider holdings.

[78] Analysis of this factor applies equally to both trading on NYSE and TSX.

[79] Doron Avramov, Tarun Chorida, and Amit Goyal, "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance,* Vol. LXI, No. 5, 2006, pp. 2367-2368; Michael C. Jensen, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* Vol. 6, Nos. 2/3, 1978, pp. 95-101.

has a statistically significant effect on the abnormal return today.[80] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation. Even if the regression shows a significant result for a certain period, then one must ask whether the effect is persistently significant and large enough to suggest a predictable arbitrage opportunity in the next period.

80.    CLS Common Stock did not exhibit systematic autocorrelation during the Class Period. **Exhibit 13** shows the coefficient and the associated t-statistic for the regression of the CLS Common Stock abnormal return against the abnormal return from the previous day for each quarter during the Class Period. For the Class Period as a whole, the test for autocorrelation had a t-statistic of 1.71, meaning there was no persistent autocorrelation upon which an investor could earn risk-free returns. There were only two quarters during the Class Period in which the regression results show a t-statistic of greater than 1.96. Statistical significance for 2Q 2005 is driven by two consecutive days, April 14 and 15, 2005. On these days, Toronto stocks broadly fell in response to a variety of economic factors, including higher oil prices and slower consumer activity.[81] Excluding these days renders this quarter insignificant with regard to autocorrelation.[82] These results clearly demonstrate that any autocorrelation for that quarter was fleeting and not systematic. Stated differently, the regression results are inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

---

[80] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

[81] "Toronto Stks End Bearish Week With Broad Decline," *Dow Jones Newswires*, April 15, 2005, 16:20.

[82] There is not a parallel explanation for Q3 2006, but a statistically significant individual quarter over a two year class period is likely due to chance and does not show that investors could consistently predict abnormal movements and earn arbitrage profits.

## K.  ADDITIONAL FACTOR 5: OPTION TRADERS

81.    There was also considerable trading in CLS Options during the Class Period.[83] Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.[84] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[85]

## L.  CONCLUSION

82.    In sum, every factor analyzed supports my opinion that CLS Common Stock traded in an efficient market throughout the Class Period.

## VIII.    MATERIALITY

83.    The alleged misstatements and omissions in this case were material. For purposes of my analysis, I adopt the definition of "material" articulated by the Court:

> An omitted fact is "material" for purposes of § 10(b) if there is a "substantial likelihood" that its disclosure "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[86]

---

[83] According to Bloomberg, there were put and call options on CLS Common Stock that traded at multiple strikes throughout the Class Period.

[84] Stephen A. Ross, "Options and Efficiency," *The Quarterly Journal of Economics*, Vol. 90, February 1976, pp. 75-89.

[85] Raman Kumar, Atulya Sarin and Kuldeep Shastri, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *The Journal of Finance,* Vol. LIII, No. 2, April 1998, pp. 717-732.

[86] "Summary Order," Document 67, 07-cv-312 (GBD)filed January 20, 2012, p.10, quoting *Matrixx Initiatives Inc. v. Siracuasano,* 131 S. Ct. 1309 (2011).

84.     If Plaintiffs' allegations are correct, the misstatements and omissions related to internal controls, the Restructuring, and inventory significantly altered the "total mix" of information available to investors and therefore were material.[87] I base this opinion on (1) the general importance to investors of a company maintaining effective internal controls; (2) the Company's own public statements that failure to execute the Restructuring Plan could have a material impact; (3) the strong positive reaction by analysts and the investing public to the announced Restructuring Plan; (4) analysts' continued focus over the course of the Class Period on the Restructuring Plan and its promised benefits; (5) the economic importance of inventory (and adequate inventory controls) to investors especially in the low-margin EMS business, as supported by (a) the abundance of analyst coverage of CLS's inventory levels throughout the Class Period and (b) the demonstration of how a write-off of even a small percentage of inventory would substantially affect CLS's earnings; and (6) my event study analysis which indicates that upon multiple partial releases of corrective information related to the true status of the Restructuring, inventory, and internal controls the market value of Celestica Common Stock fell significantly.

85.     The presence of effective internal controls is generally an important part of the mix of information available to investors. The SEC has articulated the importance of effective internal controls and how they are material to investors. For instance, the SEC stressed the importance of internal controls when it issued a release pertaining to compliance with Section 404 of Sarbanes-Oxley when it stated: "As investors have made clear, Section 404 serves a critically important role in fostering the reliability of financial statements upon which investors

---

[87] The materiality requirement is met when there is "a substantial likelihood that the disclosure of the [truth] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc., et al. v. Siracusano, et al., No. 09-1156*

and our markets depend."[88] Similarly, in a release pertaining to Section 302, the SEC stated:
"The required evaluation should help to identify potential weaknesses and deficiencies in
advance of a system breakdown, thereby ensuring the continuous, orderly and timely flow of
information within the company, and, ultimately to investors and the marketplace."[89]

86.     Indeed, Celestica certified during the Class Period that it had effective internal
controls.[90] These certifications are required under Section 302 and 404 of the Sarbanes-Oxley
Act of 2002. Section 302 requires acknowledgement of effective internal controls by
management while Section 404 is an auditor endorsement of management's assertion that its
internal controls are sound. Therefore, the implication of this certification is that Celestica's
operations, including its newly announced projects, would be executed with compliance to
internal control requirements.

87.     In addition to the importance of internal controls generally, Plaintiffs allege that
CLS made misrepresentations and omissions regarding inventory, its ability to execute, and the
true status of the major Restructuring announced in 2005. The Company itself publically
described how a failure to execute the Restructuring Plan, for whatever reason, was material:

---

[88] "SEC Approves New Guidance for Compliance with Section 404 of Sarbanes-Oxley," *U.S. Securities and Exchange Commission*, May 23, 2007.

[89] "Certification of Disclosure in Companies' Quarterly and Annual Reports," *U.S. Securities and Exchange Commission*, August 30, 2002.

[90] *See*, for instance, CLS Form 20-F for the year ended December 31, 2005, pp. 76-77. "During 2005, there were no changes in our internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, such controls, except as noted in the preceding paragraph." Note in the preceding paragraph CLS simply noted that they outsourced a portion of their global IT systems and the processing of their accounts payable but did not expect the changes to affect their internal controls in any material way.

Also, *see*, 20-F for the year ended December 31, 2006, p. 68 where they state: "During 2006, there were no changes in our internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, our controls over financial reporting."

Any failure to successfully execute these initiatives [the Plan], including any delay in effecting these initiatives, can have a material adverse impact on our results.[91]

88.     On a January 27, 2005, analyst call, Mr. Delaney announced the Restructuring Plan to the public and emphasized the financial benefits it would bring to CLS's overall financial health. The Restructuring included the transfer of several customer accounts from its North American facilities to its facilities in low-cost geographies, including Monterrey, Mexico.[92] An analyst asked: "Just wondering if the new Restructuring was required to be able to accomplish the 3.5% [operating margin], or if now with the new restructuring you, in fact, expect to be able to exceed that by some amount?" Delaney said, "I hope to exceed that, frankly, but we needed to do this restructuring in order to get further margin expansion from where we are right now."[93] Given that operating margins were 2.2% in Q1 2005,[94] a 1.3 percentage point improvement to 3.5% would yield significant gains in expected future cash flows.[95] The Company claimed that the benefits of this Restructuring would be fully realized by the second quarter of 2006.[96]

89.     Analysts reacted positively to the announcement of the Restructuring and its purported benefits. For instance, the day of the announcement an analyst at CIBC wrote:

> **The new round of restructuring is needed in the current climate and should drive further margin expansion** – During the call Celestica announced additional restructuring charges in the range of $225-$275 million, of which approximately $180-$220 million (or 80%) will be in cash. The rationale of this new round of restructuring is to reduce the excess capacity in high-cost regions,

---

[91] CLS Form 20-F for the year ended December 31, 2005, pp. 5-6. This language is repeated in the other Form 20-F for year ended December 31, 2006.

[92] "Celestica Q4 2004 Earnings Call," *Bloomberg Transcript*, January 27, 2005.

[93] Id.

[94] "Q1 Results First Take," *Credit Suisse First Boston*, April 21, 2005.

[95] Celestica's annual revenues were approximately $8.81 billion in 2006. 1.3% of $8.81 billion is $115 million, or roughly $0.50 per share.

[96] "Celestica Q4 2004 Earnings Call," *Bloomberg Transcript*, January 27, 2005.

namely in Europe and North America, and improve capacity utilization from the present rate of 60% to approximately 70%. As a result approximately 10-15% of the current workforce (5,500 employees) will be affected. The [annual] cost savings of roughly $125-$150 million from this restructuring should start to contribute in the June quarter and more fully towards the second half of the year. **We would expect that this restructuring together with the company's other efforts will help to drive the company's operating margin to 3.5% by the end of the year.**

...

**Our estimates assume**: 1) modest single digit sequential revenue growth reflecting new program wins; and 2) **restructuring benefits on a quarterly basis**. Note that our estimates exclude a significant end-market recovery nor do they include the full benefits relating to the new restructuring plan. Both could lead to significant earnings leverage.

...

Our Sector Outperformer rating seems appropriate in view of these better-than expected results, the guidance in the context of a difficult market together with the **anticipation of benefits from the new restructuring plan**.[97]

90.     After the initial announcement and throughout the Class Period, analysts treated the Restructuring as a focal point in their evaluation of CLS. The Company maintained that it was making great progress throughout the Class Period and actually increased operating margin forecasts. For example, six months after the initial announcement, on a July 21, 2005, call with investors, CLS improved its Restructuring-related forecasts: "we should at least be expecting to crossover 3.5% [going into 2006] and through the productivity benefits of restructuring benefits we get through the first half of [2006], you know get close to 4, and hopefully 4.5% over time."[98]

91.     As a result, on July 22, 2005, Citigroup Smith Barney raised its target price based partially on account of Celestica's Restructuring program:

We are raising our target price to $14 from $13, which is approximately 15x our calendar 2006 EPS estimate of $0.92. We are raising our target multiple to 15x

---

[97] "Focus On Margin Expansion While Top-Line Growth Is Modest," *CIBC World Markets*, January 27, 2005 (emphasis added).

[98] "Celestica Q2 2005 Earnings Call," *Bloomberg Transcript*, July 21, 2005.

from 14x as **we believe there is potential for additional margin improvement in 2006 if Celestica gets better traction from its restructuring initiative** and if it generates additional revenue from new programs booked in the first half of 2005.[99]

92.     Similarly, on July 22, 2005, Wells Fargo largely attributed improvements in CLS's operating margins to the success of the Restructuring and wrote that "[w]e believe restructuring completed so far in FY05 will begin to materially impact margins in 4Q05."[100]

93.     Toward the end of 2005, an analyst at Halpern Capital described the upside to what they believed was the tail end of Celestica's ongoing Restructuring process:

> Value protection complements growth opportunity. Although Celestica has had a decent value component to its story over the last several quarters, continued uncertainty in the company's restructuring initiatives did not make the shares a terribly exciting growth investment on a risk-reward basis. **However, given our confidence that Celestica is close to completing its restructuring activities, we can now view the earnings growth we are projecting with lower relative risk via restructuring dynamics**. Indeed, we estimate Celestica has a considerable earnings growth opportunity in 2006, at roughly 24.6% year-over-year.[101]

94.     On an October 20, 2005, earnings call with investors, analysts questioned the progress of the Restructuring, and the Company confirmed that its plan was on track:

> **<Q - Martin Cecchetto>**: And then just to follow-on on the restructuring. So, I'm looking, you had -- have 700 terminations so far. You're basically three quarters into that 5 quarter restructuring program. And you need to get that 700 to 5,500. Can you explain whether or not you did expect these terminations to be more back-end loaded or does this indicate that you're behind?
>
> **<A - Stephen Delaney>**: **No, we're not behind.** We had a -- we have a plan to deploy most of the restructuring and the heavy lifting, if you will, in the Americas this year, and the follow-on impact in Europe in the first part of next year. We'll

---

[99] "CLS: June Q In-Line; But Weaker Than Expected Near-Term Outlook," *Citigroup Smith Barney*, July 22, 2005 (emphasis added).

[100] "Operating Progress, but Guidance Disappoints; Lowering Estimates," *Wells Fargo Securities*, LLC, July 22, 2005.

[101] "While 'Street' Indecision Lingers, we Like CLS Here!" *Halpern Capital*, December 12, 2005 (emphasis added).

continue to be on that track. So, there is a process around closure, and transferring programs, and migration of people, and work around the networks. So, I think all of those numbers are on our expectations. And I continue to see the Americas being done first, as we've said in the scripted portion of the call. **Those -- it should be largely complete by the end of this year, and Europe to follow.**[102]

95.     With such guidance from the Company, analysts remained optimistic with respect to Restructuring efforts through 2006, maintaining that positive results were forthcoming. For example:

> **Blackmont Capital, April 28, 2006:** "**When we initiated coverage on Celestica on April 4, 2006, our primary thesis was that it had materially completed its restructuring.** The logical extension of this thesis was that the company could then focus on improving profitability, and investors would benefit from the forecast improvement in profitability. **We believe Q1/06 results support our thesis**. … Hence, we believe the "light at the end of the tunnel" is almost tangible."[103]

> **CIBC World Markets, July 24, 2006: We are encouraged by its proactive restructuring actions, which should yield improvements and positive operating leverage in late 2006**. … We expect that with the restructuring program largely complete some operating leverage should begin to play out. … The restructuring program should lead to some margin expansion during H2/06.[104]

96.     Unbeknownst to investors, in disclosing positive information about the Restructuring over the Class Period, management had relied on forecasts which, according to Plaintiffs, Defendants knew were unreliable and unrealistic.[105] As time would show, the

---

[102] "Celestica Q3 2005 Earnings Call," *Bloomberg Transcript*, October 20, 2005 (emphasis added).

[103] "Q1/06: Margin Improvement Forecast for Balance of Year," *Blackmont Capital*, April 28, 2006 (emphasis added).

[104] "Q2 Could Be Impacted By Operational Issues Due To Ramping & Transfer Programs," *CIBC World Markets*, July 24, 2006 (emphasis added).

[105] Complaint at ¶¶122, 165; *See also,* Exhibit 24 to Deposition of Frank Binder March 13, 2013, which shows that on April 11, 2006, Delaney wrote in an email that he is "**tired of missing virtually every forecast**," "extremely disappointed" with the underperformance and calls on his exec team to "ensure that we start doing what we say." (emphasis added)

Company's forecasts proved to be significantly inaccurate with respect to the timetable of the

Restructuring, the cost of the Restructuring, and, by extension, the materialization of the

economic benefits management promised the Restructuring would yield.

97.     Indeed, the Company announced in October 26, 2006, that it would require an

additional $25 million in restructuring costs, bringing total costs related to the 2005 plan to $300

million. This was in addition to the high end of their original projected range of $225 million to

$275 million. Still, then-CEO Delaney stuck to the story that the Restructuring was wrapping up

and that full financial benefits would soon be realized. On a October 26, 2006 analyst call,

Delaney extended the Restructuring timetable by two quarters but said the project was "entering

the important final phases." CFO Puppi quantified the progress explaining that CLS had been

---

*See* also Exhibit 25 to Deposition of Stephen Delaney, April 30, 2013, a PowerPoint presentation titled "Mexico Status - April 2006" in which the Company stresses that "**financial forecasts always too optimistic**." (emphasis added)

*See* also Exhibit 32 to Deposition of Stephen Delaney, April 30, 2013, an email on June 19, 2006, in which Delaney asks why CLS "only has negative surprises." Puppi explains: "we do not have command of our numbers in the americas & europe..:.supply /demeaned unpredictability... transcends much of the variation we get...furthermore this issue is in our fastest growing, skill constrained sites (mex, rom, czech)....in general we do not like to give bad news and by extention [sic] are intellectually dishonest or intellectually challenged on our real issues i.e. we hope away our issues in the forecasts[,] which don't reflect the real changes needed to address the core issues."

*See* also Exhibit 6 Deposition of Robert Crandall, December 4, 2012, a June 22, 2006, Puppi Mid-Year performance review. "Required Improvements" section:  "**Fix the forecasting process so that we don't garbage for forecasts**." Also see "Self-Assessment" section:  "the supply/demand process is broken.  We can't yet predict next weeks [sic] shipments . . . how do we expect to reasonably forecast the rest of the year/understand future performance or control costs and cash from week to week?" (emphasis added)

*See* also Exhibit 12 to Deposition of Frank Binder, March 13, 2013, which contains October 2006 M.O.R Meeting Minutes. The "Americas Operations" section states "Call Mexico as you see it, Frank [Binder] took out wedge and put in risk and opportunities..."

In his deposition, Binder explained that he would enter a "wedge" into the forecast "a number, I recall it being $5 million of additional spending at the top level in the forecast...to allow for what I believe was going to be **Mexico underforecasting** so that I would be giving the company an accurate forecast for all of the Americas." Deposition of Frank Binder March 13, 2013,  p. 96:19 – 97:18 (emphasis added). Binder "had constant conversations with [CLS site controllers Stoll and Langarica] about being accurate in the forecast...that was a constant discussion...that occurred virtually every time that I had a conversation with finance people in Mexico." Deposition of Frank Binder March 13, 2013, p. 101:3-12.

running at approximately 75% of the cost savings benefit expected from the Restructuring, that margins would get "meaningful improvement" in Q4 2006, and "the full benefit" by Q1 2007.[106] However, by the end of Q4 2006, as I discuss in greater detail in the Loss Causation section, the Company announced it would actually require another $60 to $80 million in Restructuring charges to continue the original Restructuring Plan and rectify the negative effects of the original Plan.

98.     On the final Corrective Disclosure, January 31, 2007, a Deutsche Bank analyst summarized the Restructuring results as follows: "Despite taking $340 million in restructuring charges since beginning its latest program in early 2005, Celestica's margins have yet to show any improvement as operating margin in Q4 06 was 120 bps below Q1 05's margin of 2.2%."[107]

99.     Controlling for general market and industry factors, Celestica's stock price dropped by a substantial and statistically significant amount in response to the corective news related to the Restructuring.

100.    Had Celestica disclosed to the investing public at the time it announced its 2005 Plan that it did not have an effective internal control structure in place, the "total mix" of information available to investors would have been significantly different. Therefore, Celestica's misstatements and omissions related to its internal controls and to the true status of the Restructuring were material.

101.    In addition, Plaintiffs allege CLS made material misstatements and omissions regarding its inventory, including the fact that Celestica did not have effective internal controls in place to track its inventory. In addition to Restructuring efforts, Celestica's inventory

---

[106] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006.
[107] "Celestica: Q4 In-Line, Q1 Outlook Disappointing," *Deutsche Bank*, January 31, 2007.

remained a primary concern among equities analysts who covered Celestica.[108] This is not unusual given that companies that comprise the EMS industry historically operate with very thin margins. To put this into perspective with respect to Celestica, a disclosure of inventory loss that amounts to as little as $6 million represents a large portion of Celestica's quarterly profits. In Q3 2006, for example, Celestica's adjusted Net Earnings were approximately $40.5 million; the $6

---

[108] *See*, for instance, the following select examples throughout the Class Period and prior to the Corrective Disclosure Events:

"BALANCE SHEET REMAINS STRONG On the balance sheet, we anticipate inventories should remain steady in the March quarter around the $1.06 billion mark posted in December. Inventory turns should decline from last quarter's 7.9x figure, as turns usually reach their highest level in the December quarter. Last quarter's inventories fell 9.3% sequentially compared to a 7.2% revenue increase, so we are only looking for a slight deterioration of the company's working capital metrics, considering the expected sequential revenue decline." "CLS: 1Q Preview: Enterprise & Telecom Softness Driving Seasonality, *CitiGroup*, April 17, 2005.

"Working capital improvements came back a bit in Q2 driven mostly by inventory turn improvement." "That dang 'demand' thing again," *National Bank Financial*, July 21, 2005.

"Working capital and cash flow were lackluster in the qtr. Inventory rose $1M Q/Q despite sales falling 11% Q/Q which caused turns to drop to 6.9x from 7.7x." "Weak Quarter As Anticipated; Reiterate Underperform," *Bear Stearns & Co.*, October 20, 2005.

"The cash cycle increased by a day to 41 days from 39 days last quarter. The increase was due to a decrease in payable days by 3 days, and DSOs increased by 1 day offset by Inventory Days decreasing by 3 days. The better inventory turns were likely the result of the higher demand at the end of the quarter. Going forward, we expect that the initial cash demands of the new programs will drive inventories and the cash cycle higher in both Q1 and Q2." "Q4 Was In Line; The Q1 Guidance Was Below Estimates Due To Ramp Up Expenses," *CIBC World Markets*, January 26, 2006.

"Inventory Jumps by 9% Q/Q to $1.16B driving inventory turns to 6.6x, lowest level in 11-quarters. Management attributed the rise to a back-end loaded quarter along with strategic build-up for ramps." "CLS: Results Inline With RBC, But Will Temper Exuberant Expectations," *RBC Capital Markets*, April 27, 2006.

"Improving revenue exposure to emerging end markets as well as better inventory management should favor gross margin down the road." "Introducing Our FY2007 Forecast Model on Celestica; Maintaining at HOLD," *Kintisheff Research*, October 3, 2006

million inventory charge it took in that quarter, therefore, wiped out approximately 13% of expected quarterly profit, and 30 basis points of margin.[109]

102.    When the Company announced that it took an additional $30 million inventory charge in Q4 2006 (in addition to the $6 million charge it took in Q3 2006) Scotia Capital stated, "This will be the second consecutive quarter where inventory issues have a materially negative impact on earnings for Celestica. **In the EMS industry, where logistics, supply chain management, and manufacturing comprise the key value proposition, we believe Celestica's inventory miscues are a major concern.**"[110] Later, Scotia Capital referred to such a charge as "**an anathema to EMS companies.**"[111]

103.    On the January 31, 2007 earnings call, the Company disclosed that "[i]n terms of profitability, our operating margins were down sequentially by 150 basis points to 1%, and adjusted EPS was down to $0.03 in Q4 versus the $0.18 earned in Q3. This decline was largely driven by previously announced $30 million net charge related to the inventory provision taken at our Monterrey, Mexico facility."[112]

104.    As confirmed by Mr. Robert Crandall, the Chairman of the Board during the Class Period, Celestica in fact did not have adequate internal controls with respect to its inventory. At his deposition, he was asked: "Sitting here today, what's your understanding of what those inventory problems were?" Crandall responded: "**The company and its auditors**

---

[109] I describe the details of this write off in greater detail in the Loss Causation section herein.

[110] "Reducing Estimates after Q4 Warning," *Scotia Capital,* December 13, 2006 (emphasis added).

[111] "Q4: Guidance Disaster," *Scotia Capital,* January 31, 2007 (emphasis added).

[112] "Celestica Q4 2006 Earnings Call," *Bloomberg Transcript*, January 31, 2007.

**weren't able to accurately count or keep track of the amount of inventory that was on hand**
and as a consequence there were various restudies and recounts."[113]

105.    Celestica's 2005 Restructuring effort, which the Company commenced without
proper internal controls, was indeed a catalyst to its inventory problems. The problems became
very evident, in particular, as Celestica transferred sixteen customers from its high-cost North
American facilities to the supposedly more cost efficient facility in Monterrey, Mexico. On the
final Corrective Disclosure, the Company described the situation at the Monterrey as follows:

> We created the perfect storm for the company in this site by attempting to
> implement an accelerated transfer plan, which required the transfer of over 16
> customers to Mexico, which required over 50 SMT lines with multiple SMT
> platforms from various North American facilities, over 6,000 people in an 18-
> month period into a facility with two ERP systems.
>
> The complexity we introduced was over 50,000 active part numbers, over 1,500
> ship codes, requiring over 28,000 pallet locations and creating nine warehouses,
> seven external to the site, to manage the material required to support the customer
> demand here.
>
> Desire to move rapidly to Mexico and drive the required cost productivity into the
> Americas has come at great cost to our company and our shareholders.[114]

106.    Had Celestica disclosed to the investing public that it lacked internal control over
its inventory, the total mix of information available to investors would have been significantly
different. Therefore, Celestica's misstatements and omissions related to the true status of its
controls over inventory were material.

107.    When the truth began to emerge about Celestica's inventory charges and
restructuring status, the market reacted significantly. I find that on each of the Corrective
Disclosure Events, the price of Celestica's Stock declined by a statistically significant amount

---

[113] Deposition of Robert Crandall, December 4, 2012, p. 16:12-17 (emphasis added).

[114] "Celestica Q4 2006 Earnings Call," *Bloomberg Transcript*, January 31, 2007.

after controlling for market and industry factors. As described in **Section VII(F)**, such findings from my event study analysis provide strong empirical evidence that the alleged misstatements and omissions were material.

## IX.   LOSS CAUSATION

108.   For purposes of my report, I consider loss causation to be a combination of the "but for" test and the "foreseeability" test. In other words, would Plaintiffs have suffered an economic loss "but for" the Defendants' alleged violations, and was the economic loss a foreseeable consequence of Defendants' violations? The roles for economists in this type of inquiry include evaluating the economic impact of the alleged violations and determining whether there is economic evidence to link price declines (if any, after controlling for market and industry factors) to the revelation of the prior misstatements or omissions.

109.   First, I address why, in my view, there was a foreseeable causal link between Defendants' alleged wrongful acts and the Corrective Disclosure Events. Second, I explain how the event study methodology I employ demonstrates that the Corrective Disclosure Events caused economic losses to investors of Celestica Common Stock.

### A.  INVESTOR LOSSES WERE FORESEEABLE

110.   Recall that Plaintiffs allege, inter alia, that Defendants withheld, in violation of federal securities laws, material adverse information that it knew (or recklessly disregarded) about the effectiveness of Celestica's internal controls over its disclosures and financial reporting, its ability to execute the Restructuring Plan, and reporting and controls surrounding its inventory. If Plaintiffs' allegations are correct, and investors had a legal right to know additional

negative information about the effectiveness of CLS's internal controls, Restructuring Plan, and inventory, then investor losses were foreseeable to Defendants.

111.    With respect to internal controls, there is broad acceptance of the notion that effective internal controls are important in reducing the risk of material accounting misstatements and accounting fraud.[115] Indeed, the SEC stressed the importance of internal controls when it issued a release pertaining to compliance with Section 404 of Sarbanes-Oxley when it stated: "As investors have made clear, Section 404 serves a critically important role in fostering the reliability of financial statements upon which investors and our markets depend."[116] By extension, if a firm does not have effective internal controls, then it faces a greater risk of material accounting misstatements and investor losses are foreseeable.

112.    Moreover, the accounting for Celestica's Restructuring Plan relied upon the effectiveness of its internal controls. My understanding is that for a company to take advantage of GAAP accounting for a restructuring (thus allowing expenses that may have otherwise affected gross margins to be treated as special "charges") management must have committed to an exit or disposal plan. For example, to recognize a liability for one-time termination benefits, the plan must identify the number of employees to be terminated, their job classifications or functions and locations, the expected date of termination, the terms of benefit arrangements each

---

[115] *See*, the Public Company Accounting Oversight Board, Auditing Standard No. 5 ("Effective internal control over financial reporting provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes. If one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective."); *See also,* SEC Release No. 33-8810 regarding their definition of a material weakness ("As defined in Exchange Act Rule 12b-2 [17 CFR 240.12b-2] and Rule 1-02 of Regulation S-X [17 CFR 210.1-02], a material weakness is a deficiency, or a combination of deficiencies, in ICFR [internal control over financial reporting ] such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis.").

[116] "SEC Approves New Guidance for Compliance with Section 404 of Sarbanes-Oxley," *U.S. Securities and Exchange Commission*, May 23, 2007.

employee would receive and pending actions to complete the plan indicate that significant changes to the plan are unlikely. I further understand that Celestica was required to disclose, in part, a description of all contemplated exit or disposal activities, the facts and circumstances leading to such activities and their expected date of completion. I also understand that GAAP requires that liabilities must be adjusted as soon as management is aware that the values accrued are materially insufficient.

113.   Plaintiffs allege that there was really no such "plan" and, as a result of the lack of internal controls, Defendants as well as investors were unable to properly evaluate whether the announced reserves were adequate or would lead to the benefits promised. If these allegations are true, then investor losses were foreseeable. The successful execution of the Restructuring Plan, which called for the Company to move its operations from the U.S. to Mexico, had the potential to positively impact CLS's cash flows. As mentioned above, by transferring its operations to Monterrey, Mexico, CLS anticipated it would operate in a more cost-efficient way, improving margins to 3.5% by year-end 2006.[117]

114.   Market participants relied upon Celestica's accounting for and description of progress on the Restructuring Plan. For example, Citigroup Smith Barney cited the Restructuring budget when anticipating future charges: "**We believe that the company will likely have meaningful restructuring charges in 2006**, as only $105 million of its $225-275 million 2005 charge has been booked thus far."[118] Blackmont Capital analysts also based its outlook on the Restructuring success: "**When we initiated coverage on Celestica on April 4, 2006, our primary thesis was that it had materially completed its restructuring.** The logical extension

---

[117] Complaint at ¶111.

[118] CLS: Still on the Mend, 2S Rating and $10.00 Target Price. *Citigroup Smith Barney*. November 9, 2005 (emphasis added).

of this thesis was that the Company could then focus on improving profitability, and investors would benefit from the forecast improvement in profitability. **We believe Q1/06 results support our thesis**. … Hence, we believe the "light at the end of the tunnel" is almost tangible."[119]

115.    Thus, there is evidence that investors who purchased CLS Stock during the Class Period were informed by Celestica's accounting for and description of progress on the Restructuring Plan. If Plaintiffs are correct that Defendants knew or recklessly disregarded CLS's inability to successfully execute the Restructuring Plan and failed to update the market regarding its failure, then it was foreseeable that investors would suffer investment losses upon correction of those misstatements and omissions. Indeed Defendants' said as much in their 20-F filings which stated:

> Any failure to successfully execute these initiatives [the Plan], including any delay in effecting these initiatives, can have a material adverse impact on our results.[120]

116.    A generally accepted economic principle is that the value of a company is directly related to expectations of future cash flows.[121] Because of the economic link between the results of the corporate Restructuring and anticipated future cash flows, and the link between anticipated future cash flows and market value, there is a clear economic link between information regarding the outcome of the Restructuring and the market value of CLS Common Stock. As a result, it is

---

[119] "Q1/06: Margin Improvement Forecast for Balance of Year," *Blackmont Capital*, April 28, 2006 (emphasis added).

[120] CLS Form 20-F for the year ended December 31, 2005, pp. 5-6. This language is repeated in the other Form 20-F for year ended December 31, 2006.

[121] *See*, for example, David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001 ("the price of an efficiently traded stock is equal to the present value of the discounted future stream of free cash flows."); Also, Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, John Wiley & Sons, Inc., 1996, pp. 9-10 ("This [DCF] approach has its foundation in the `present value' rule, where the value of any asset is the present value of the future cashflows on it.").

entirely foreseeable that withholding from investors information that the Company was incapable of successfully implementing or properly accounting for the Restructuring would harm investors when the corrective information came to light. Therefore, it is my opinion that there is a direct and foreseeable causal link between the allegations related to the Restructuring and investor losses.

117.   Finally, with respect to Plaintiffs' inventory claims, investor losses from lack of controls over inventory are foreseeable. If Plaintiffs' allegations that the Company knew and failed to admit (1) that it had an overabundance of excess and obsolete inventory which would require margin-reducing write-downs, (2) that the Monterrey plant was unable to logistically handle the accounts that were transferred to it during the Restructuring, and (3) that as a result, key customers would disengage some or all of their business from Monterrey, then investors would ultimately be harmed by unexpected write-downs and charges (which would ultimately impact cash flows and therefore the value of the common stock).

118.   On the final Corrective Disclosure, the Company described the situation at the Monterrey as follows:

> We created the perfect storm for the company and this site by attempting to implement an accelerated transfer plan, which required the transfer of over 16 customers to Mexico, which required over 50 SMT lines with multiple SMT platforms from various North American facilities, over 6,000 people in an 18-month period into a facility with two ERP systems.

> The complexity we introduced was over 50,000 active part numbers, over 1,500 ship codes, requiring over 28,000 pallet locations and creating nine warehouses, seven external to the site, to manage the material required to support the customer demand here.

Desire to move rapidly to Mexico and drive the required cost productivity into the Americas has come at great cost to our company and our shareholders.[122]

## B. THE CORRECTIVE INFORMATION CAUSED ECONOMIC LOSSES TO CLASS MEMBERS

119.     Economists assessing loss causation typically conduct an event study to evaluate whether there is economic evidence to link corrective information regarding prior misstatements or omissions to price declines in the subject security. In this case, corrective information consists of instances in which Celestica-specific news informed the market of: (1) Celestica's lack of effective internal operational and financial controls and/or manifestations of the associated risks; (2) the true costs and outcomes of its Restructuring Plan that were inconsistent with prior affirmative statements for which there was insufficient basis; (3) CLS's insufficient and ineffective controls over inventory; and (4) the defection of key customers resulting from failed execution and/or poor operational controls over the Restructuring.

120.     In determining which days constituted Corrective Disclosure Events, I gathered and reviewed Celestica news events during the Class Period. Among other items, my news search included over one thousand articles from Factiva, hundreds of analyst reports issued by equity research firms covering Celestica, and numerous Celestica SEC filings. My evaluation of what represented corrective information did not depend on the market response, but rather whether the news fit the categories described above. I then subsequently rely upon the event study to determine whether the market reaction was statistically significant.

121.     **Exhibit 14** summarizes the results of the event study and loss causation analysis by showing each identified disclosure event, the daily abnormal price changes, and tests for

---

[122] "Celestica Q4 2006 Earnings Call," *Bloomberg Transcript*, January 31, 2007.

statistical significance. **Exhibit 14** indicates that the total net abnormal price movement on the Corrective Disclosure Events was -$5.22 per share.

122.     All of the information (or at least all of the negative information) associated with the Corrective Disclosure Events represents corrective information and is not confounded by non-corrective information.

123.     I describe below the rationale behind considering the aforementioned dates as Corrective Disclosure Events.

**January 27, 2006**

124.     After the market had closed on January 26, 2006, Celestica announced Q4 and full-year 2005 financial results and conducted a conference call. The Company reported an 11% decline in revenue and a net GAAP loss of $0.12. Included in the net GAAP loss was a quarterly restructuring charge of $57 million.

125.     In terms of profitability, the Company attributed the Q4 decline to "higher-than-expected costs incurred in one of our Americas plants" due to transferring in of current customer accounts, the "ramping up" of new accounts, and changes in demand. As the Company later revealed, the reference to "one of our Americas plants" was in fact a reference to CLS's Mexico facility.[123]

> Despite our revenue increases and some incremental benefits from our restructuring, **our profitability was severely impacted as a result of higher-than-expected costs incurred in one of our Americas plants.**

---

[123] "Celestica Q4 2005 Earnings Call," *Bloomberg Transcript*, January 26, 2006:

> <Q - Alexander Blanton>: And you're not naming the site that is getting the transfers; is that correct? You're not naming where it is?

> <A - Stephen Delaney>: I think it's pretty clear to everyone it's in Mexico.

**These additional costs were as a result of significant transfer activities, new program ramps and changes in customer demand later in the quarter.** These factors severely impacted our efficiency in labor and equipment as well as causing premiums to be incurred to execute higher demand.

Furthermore, we had to delay the completion of some of the restructuring to the first quarter in order to assist with the capacity relief in the month of December. We did not handle the complexity as well as we would have liked or expected. These issues amounted to an approximate $0.04 per share impact in the fourth quarter.

While we have made many adjustments and changes, we anticipate that we will not be fully back on track until the second quarter.[124]

126.     The Company guidance was well below consensus for Q1 2006, with revenue in the range of $1.8 billion to $2.0 billion, and adjusted earnings per share ranging from $0.04 to $0.12 (midpoint of $0.08), while the midpoint of consensus EPS was $0.14. According to Orion Securities, poor Q1 guidance was due to "ongoing costs in major program transfers and new product ramp in the Americas, which will cause most of the negative impact in the first quarter."[125]

127.     Delaney explained on the analyst call that while declines related to transfers and new ramps would continue to be issues in Q1 2006, the Company had its "arms around the mistakes" so that they would not persist:

<Q - Bernard Mahon>: Hi, good evening. A question for you. So it seems like in the December quarter and in the guidance for the March quarter, that it's negatively impacted by the new programs that are ramping and also transferring some programs. I guess I just don't understand why you have confidence that as we go into the June quarter, and the second half of 2006, that those problems will be fixed, given that – I would think that there's still some more programs that you're ramping and it seems that just in general there's always programs transferring to low cost regions?

---

[124] "Celestica Q4 2005 Earnings Call," *Bloomberg Transcript*, January 26, 2006 (emphasis added).

[125] "Q4 and F2005 Results," *Orion Securities, Inc.,* January 27, 2006.

<A - **Stephen Delaney**>: Bernie, the fourth quarter was a combination of transfers and some pretty high volatility that took place late in the quarter that caused us to really expend some pretty significant dollars to try and execute our customers' requirements. As we go into first quarter, we understand what these problems are and the amount of transfers that we have remaining from areas such as the rest of our Americas plants where there's been a major amount of restructuring is coming to a close. So, we're going to complete that program. We understand the problems that we caused for ourselves relative to transfer planning. And also then in the second quarter, I'm expecting a pick-up coming from some of these new programs as we start getting the revenue from some of the launches that take place late in the first quarter as well. **That's why I'm confident we have our arms around the mistakes that we made relative to transfer planning**, but we then will start seeing the benefits of some of this new revenue too.[126]

128.     The news that the Monterrey plant was struggling with the Restructuring was a partial disclosure of Celestica's inability to execute the Restructuring Plan. This was not a full disclosure because the Company indicated that these costs were one-time events in part due to the Restructuring and in part due to demand. Defendants also stated "… the completion of our restructuring over the next two quarters should get operations back to positive operating profit later this year," and "On the profitability side, we expect to continue to make steady progress on margin improvement, particularly in the second half of the year as restructuring is completed and new programs start to contribute to our top line."[127] If Plaintiffs' allegations are correct, the Company continued to issue misleading statements on this day, as CLS had no basis to claim that it had its "arms around the mistakes", it would restore efficiencies by the second quarter, or that it would restore efficiencies during any quarter during the Class Period.

129.     The market and analysts reacted negatively to the news on this day, and CLS's share price dropped. Many analysts cut projection and recommendations for CLS, citing issues with Restructuring. For instance, Credit Suisse reported the following: "In Q4 CLS added flawed

---

[126] "Celestica Q4 2005 Earnings Call," *Bloomberg Transcript*, January 26, 2006 (emphasis added).

[127] "Celestica Q4 2005 Earnings Call," *Bloomberg Transcript*, January 26, 2006.

execution to its ongoing (and increasingly apocryphal) complaint about weak demand. 3 yrs of

restructuring have been utterly ineffective, and non-IT business is not growing fast enough to

move the needle. Until mgmt abandons its restructuring-based strategy and performs radical

surgery on its customer and product portfolio, we see much more downside."[128]

130.    Kaufman Bros. contributed the following commentary in their report titled

"Restructuring Snafu Trips up EPS Outlook…"

> Margins were negatively impacted (EPS were negatively impacted by $0.04) by
> a snafu in transitioning business from facilities in the United States to Mexico.
> This will also impact EPS in the March quarter by at least $0.02.
> <div align="center">***</div>
> Recall, in our earnings preview yesterday, we indicated that margins could be
> negatively impacted in light of Avaya experiencing supply challenges with
> Celestica in the December quarter as production was moving to a plant in
> Mexico.[129]

131.    In addition, CIBC released the following set of bullet points, attributing the

lowered performance to program transfer costs as all other measures, including seasonality and

end-user demand were in line with expectations.[130]

- Q4/05 results were in line with the Street, but **they would have beat estimates without program transfer costs**. Q1 guidance calls for a decline of 8% q/q and is in line with the peer group. If successful, CLS' new program ramps and restructuring will lead to positive operating leverage in Q2.
- Q4 rev. $2.075B (with upside of $75m) and adj. EPS was $0.13 (lower by $0.01) were largely in line. End markets improved q/q yielding the higher rev. primarily due to servers for IBM, HPQ and SUN (up 23% q/q 19%). EPS would have been $0.04 higher ex. program transfer costs.
- The Q1/06 guidance is for a range of rev. $1.8 - $2.0B and EPS of $0.04 -$0.12. At the mid-point, this outlook is consistent with normal seasonality and the peer group, i.e. supply chain outlooks from JBL, SLR and Merix in the related end markets. **The transfer drag on EPS will continue until Q2.**

---

[128] "Q4 Results," *Credit Suisse*, January 27, 2006.

[129] "Restructuring Snafu Trips up EPS Outlook…," *Kaufman Bros. Equity Research,* January 27, 2006.

[130] "Q4 Was In Line; The Q1 Guidance Was Below Estimates Due To Ramp Up Expenses," *CIBC World Markets,* January 26, 2006 (emphasis added).

- We reiterate our SO rating and our price target $14. Our PT implies a forward C06 P/E of 20x and compares to the peer group of 18x. We believe the shares will move higher as CLS provides visibility to its new program ramps and the restructuring benefits later in Q1/06 and into Q2.

132.    National Financial Bank reported: "Q4 revenue expectations had already been lowered, but what appear to be significant logistical issues at their Mexico Plant (hinted at by Avaya earlier this week) caused the bottom line to surprise to the downside. These issues will also impact Q1 margins and EPS. This issue highlights how one 'rogue' plant issue can significantly impact low margin EMS business."[131]

133.    The total mix of information released on this day was clearly material to investors as the abnormal dollar price decline, after removing general market and industry effects, fell 4.21%, or -$0.43 per share. This price decline is statistically significant at the 95% confidence-level with a t-statistic of –2.49 (See **Exhibit 14**). **Exhibit 15a** plots the Common Stock price and volume as well as the prices of the indices included in my regression model over a three day window before and after January 26, 2006. **Exhibit 15b** displays intraday volume and prices for CLS Common Stock on the day preceding and day of the Q4 2005 earnings report and conference call. These exhibits clearly show that CLS underperformed its peers and that CLS's stock price reacted quickly to the new information released on this day.

134.    I did not find any negative information released on this day that was substantially unrelated to disclosures of problems with the ongoing Restructuring. If Plaintiffs prove that the problems with the ongoing Restructuring were causally related to Celestica's ongoing execution failures and lack of effective operating and financial controls present since the beginning of the Class Period, the entire abnormal return on this day is related to Plaintiffs' allegations.

---

[131] "How much patience do you have?" *National Bank Financial,* January 26, 2006.

**October 27, 2006**

    135.   After market hours on October 26, 2006, Celestica issued a press release

announcing its Q3 2006 financial results and later that evening, CLS hosted a conference call

with analysts.[132] Analysts were expecting good news, both generally and with respect to the

Restructuring. From the time Celestica had disclosed some operational problems in Mexico

during Q1 2006 (the first partial corrective disclosure), there had been no disclosure of any

ongoing problems at that location. Q2 2006 had been a good quarter and analysts had noted that

Celestica's customers had been reporting good earnings and guidance going forward. For

example, Bear Stearns summarized its views heading into the Q3 earnings announcement:

> "*** ALL YOU NEED TO KNOW. **We are upgrading CLS to Peer Perform
> from Underperform based on an improving near-term outlook that has been
> primarily driven by recent restructuring progress** as well as stability with its
> core customer base . . . We still feel the long-term outlook is unclear given our
> checks indicate that CLS could be negatively impacted by share loss at key
> customers such as CSCO [Cisco], AV [Avaya], and JNPR [Juniper].
>
> ***THE WORD – RESTRUCTURING. A large part of our Underperform thesis
> on CLS was the slow pace of its restructuring as well as the lack of cost savings to
> date. However, CLS has recently made some significant strides in its European
> restructuring with the recent sale of its Vimercate, Italy plant to Bartolini as well
> as the transfer of 850 employees. In addition, both of its France sites are now
> closed and **the inefficiencies in its Mexico plant are improving**."[133]

    136.   Further discussion within this same analyst report shows that the analysts were

relying on CLS's originally disclosed plan for the projected total costs of the Restructuring

($225-275 million), how much was complete, and what benefits were yet to be realized:

---

[132] "Celestica Announces Third Quarter Financial Results," *Celestica Press Release*, October 26, 2006
(www.celestica.com/News/News.aspx?id=606); "Celestica Q3 2006 Earnings Call," *Bloomberg
Transcript*, October 26, 2006.

[133] "Near-Term Outlook Improving, But Long-Term Outlook Still Unclear; Upgrading From
Underperform to Peer Perform," *Bear Stearns,* October 23, 2006 (emphasis added).

RESTRUCTURING UPDATE (FINALLY GETTING TO THE END OF IT) In an effort to reduce its cost structure, in January 2005 Celestica announced a $225-$275 million restructuring program with a cost savings target of $150 million after the elimination of approximately 5,500 employees over the next 15 months

. . .

As of June 30, 2006, Celestica had taken $197 million or 72% of the $275 million in charges . . . According to Celestica, its cost savings as a result of its plant closings were $23 million at the end of the June quarter. With an expected annualized cost savings target of $150 million or $37.5 million on a quarterly basis, this equates to about a 60% run rate for cost savings to date with 40% left to complete now by the end of Q406.[134]

137.   CIBC issued an analyst report just prior to the Q3 2006 earnings announcement

and also expected positive news based upon the Restructuring nearing its end:

CLS will report its Q3/O6 results and provide guidance for Q4/06 after the market close on Thursday, October 26 . . . **We expect positive guidance for revenue and margins** . . . This outlook reflects . . . continued margin improvement due to restructuring benefits.

We expect a good quarter from the communications and IT segments, as Cisco (CSCO-OTC, SO) and IBM (IBM–NYSE) two of CLS's largest customers reported better than expected results. Solectron (SLR-NYSE, SU) also recently reported a stronger top line, due to good growth from CSCO. The consumer segment should benefit from several new programs that continue to ramp [i.e. Xbox (MFST-NASDAQ, SU) and flat panel TVs for Panasonic (6752- JP)]. **Operating leverage should play out this quarter, as the restructuring is largely complete as are the Mexico transition issues**.

The Restructuring Program **The restructuring program should lead to margin expansion during 2H/06.** Recall that in January 2005, Celestica pro-actively moved forward with another round of needed cost cutting. Today, it is expected that the company will implement the plan at the high end of the forecasted cost range of $225-$275 million, of which approximately $180-$220 million (or 80%) will be in cash.[135]

---

[134] Id.

[135] "We Expect Positive Operating Leverage for Both Q3 and Q4," *CIBC World Markets,* October 23, 2006 (emphasis added).

138.    Cowen and Company also gave its view of how the Restructuring was nearing its

end and the benefits were soon to be realized:

> **Update to our September 13th CLS Upgrade** When we upgraded the shares
> from a Neutral to an Outperform rating (Celestica's Turn is at Hand, 9/13/06) it
> was firstly on the premise that tech spending would see normal trends in the
> September and December quarters. We believe results from EMC, Intel, IBM and
> Oracle confirm our comments and thoughts. **The second part of our thesis was
> that after five years of on and off restructuring Celestica was finally getting
> its cost structure in line with demand, and that business trends were going
> well.** In the September quarter we expect a $3M/2c benefit from the restructuring
> and another $10M/4c benefit in December. Mexico, which has been a difficult
> situation for Celestica all year, should see a $7M/3c incremental benefit in
> September, and $3M/2c in December. However, we are less confident in the
> timing and magnitude of fixing Mexico, which has been captured in our estimates.
>
> **Completion of Restructuring Should Improve Margins** In its entirety **the
> restructuring programs should benefit the I/S by $150M annually (60%
> already in the 2Q06 numbers),** but a portion of this will be shared with OEMs in
> order to drive revenue growth. Recently, Celestica announced it has closed the
> divestiture of the Vimercate, Italy operations to Bartolini Progetti S.p.A. We take
> this as a positive sign with regard to the company's European restructuring, which
> can always be problematic. The company's goals are 3.5% OM in 4Q06, up from
> 2.3% in 4Q05, and earning a minimum of 13% return on capital. We are only
> modeling 3.10% OM, as is the Street, so the closer management gets to actually
> achieving its goal should lead to upside to expectations.[136]

139.    The analysts' expectations are important for several reasons. First, they provide

evidence that leading up to the additional partial corrective disclosures, securities analysts

continued to rely upon the assumptions provided by CLS in January 2005 that the Restructuring

would cost between $225 and $275 million. Second, despite some previous negative information

regarding trouble with the Restructuring in Mexico, analysts continued to believe that the

Restructuring would largely succeed and that such issues did not imply the need to go over-

budget or require further Restructuring efforts. Thus, any news to the contrary would be new to

the market. Third, Celestica's customers, which provided the source of end-user demand, were

---

[136] "This should be the Quarter of Turn," *Cowen and Company*, October 23, 2006 (emphasis added).

doing better than expected, so any reported downturn in CLS's business would unlikely be due to industry demand.

140.    Throughout the prior year, Celestica communicated to the market that the previously disclosed issues in Mexico were either one-time problems or inefficiencies that were improving over time. For instance, on the January 26, 2006 conference call, in response to a question regarding why Celestica had confidence that its current problems would not continue into the future, CEO Delaney said,

> Bernie, the fourth quarter was a combination of transfers and some pretty high volatility that took place late in the quarter that caused us to really expend some pretty significant dollars to try and execute our customers' requirements. As we go into first quarter, we understand what these problems are and the amount of transfers that we have remaining from areas such as the rest of our Americas plants where **there's been a major amount of restructuring is coming to a close.** So, we're going to complete that program. We understand the problems that we caused for ourselves relative to transfer planning. And also then in the second quarter, **I'm expecting a pick-up coming from some of these new programs as we start getting the revenue from some of the launches that take place late in the first quarter as well. That's why I'm confident we have our arms around the mistakes that we made relative to transfer planning, but we then will start seeing the benefits of some of this new revenue too.**[137]

141.    When asked about the potential for losing customers, Mr. Delaney said "So **I don't expect any adverse effects**. In some cases, we had a very tough time getting out this demand from some of these customers. But we remain committed to recover and get back on track for these customers."[138]

142.    In July, Mr. Delaney reported that the Mexican plant was moving up the learning curve and was expected to keep improving. For instance, during the January 2006 call he noted that the problems in Mexico were caused about a five cent drag on EPS, but in July 2006 he

---

[137] "Celestica Q4 2005 Earnings Call," *Bloomberg Transcript*, January 26, 2006 (emphasis added).

[138] "Celestica Q4 2005 Earnings Call," *Bloomberg Transcript*, January 26, 2006 (emphasis added).

stated, "In terms of Mexico, we probably picked up $0.02 EPS in terms of the sequential improvement." In addition, Mr. Delaney was very positive looking forward: "Yes, $0.03 and more actually; that plant can do even better, all right? So, the impact from the problems we talked about in the past, we've said was $0.05. So, yes, you can expect $0.03 and then more as we go through time and that plant continues to improve." And later in the July 2006 call he added, "The issues that we had in Mexico have been related to the amount of change that we were creating in there, building – the site actually has done quite a good job recently of executing the volumes, but it's been a change, some brand new consumer stuff in there that it's new to the site, so there is some recent investments in that area. So, I am quite confident that our team in Mexico can deliver the fourth quarter as needed."[139]

143.    Given this background, the Q3 earnings announcement surprised the market. Some news was positive, as CLS announced revenue was $2.39 billion, which was higher than expectations (prior guidance had a midpoint of $2.25 billion) and consistent with the positive trends in the market and the expected ramping up of business related to the X-Box and Panasonic. Furthermore, what CLS calls "adjusted" earnings per share, which removes the effect of Restructuring charges, was $0.18 per share and was higher than the midpoint guidance of $0.16 per share. However, CLS also indicated that it was taking $82 million in Restructuring charges during the quarter, which pushed its GAAP EPS to *negative* $0.19, ten cents lower than the same quarter of 2005.[140] This $82 million in Restructuring charges also brought the grand total of charges to $280 million – which exceeded the high-end of the originally announced plan, and CLS indicated there would be more charges in Q4 2006 so that the total would rise to $300

---

[139] "Celestica Q2 2006 Earnings Call," *Bloomberg Transcript*, July 27, 2006.

[140] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006.

million.[141] This new information was the first time the Company acknowledged that the Restructuring would cost more than planned and, if Plaintiffs' claims are accurate, led to investor losses that are causally tied to their allegations.

144.     Moreover, despite higher than expected spending on the Restructuring, the market learned that the Restructuring was not yet leading to the promised operating margin benefits because CLS's Monterrey and Eastern Europe plants had operated at a net loss of $7 million and $6 million, respectively (for a total operating loss of $13 million).[142] CLS described how the Restructuring activities had created an "**unstable condition**" in Monterrey, where the facility was ill-equipped to handle the mass and complexity of the orders that had been rerouted there.[143] Delaney said, "**we're still digging out of the problem that we created in Mexico through all of the complexity that we put in place, without the appropriate planning for that site**."[144]

145.     Plaintiffs assert that Defendants were aware of or were reckless in not knowing that its internal operational and financial controls were ineffective and incapable of handling a Restructuring of this nature and that it had an insufficient Restructuring plan. If Plaintiffs' allegations are correct, then market price declines caused by the disclosure of continuing and expected losses due to creation of "unstable conditions" that were caused by the "complexity . . . put in place, without the appropriate planning" represent losses caused by the alleged misrepresentations and omissions.

146.     In addition, the Company announced that a plant in the Americas had suffered a $6 million inventory write-down due to a physical inventory variance (*i.e.*, the inventory was

---

[141] "Running With Scissors Into Q4," *CIBC World Markets,* October 27, 2006.

[142] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006.

[143] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006 (emphasis added).

[144] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006 (emphasis added).

missing). A loss of $6 million in inventory was material as it represented 13% of the quarter's adjusted net earnings.[145] CFO Anthony Puppi reassured analysts that the Company had made changes to its inventory system and processes so that such inventory issues would not persist:

> Our gross margins were adversely impacted by a $6 million inventory charge, relating to a physical inventory variance at one of our sites in the Americas. **We have made various process and systems changes to mitigate reoccurrence**, and should finalize corrective actions this quarter. **Excluding this item, our gross margins for the quarter would have reflected a 30 basis point improvement**.[146]

147.     Management also insisted that they did not expect to take any more inventory charges:

> **<Q - Amit Daryanani>:** All right. And then just the $6 million inventory charge that you took, could you just provide some color on what exactly happened there? And are there any residual charges that you foresee taking in Q4 for that?
>
> **<A - Stephen Delaney>:** Well, we don't foresee taking any more of those charges. We've certainly taken a lot of actions to prevent reoccurrence. But in essence, we had a particular site ramping some new business with inadequate inventory controls. And so we have corrected that, we've made a series of changes. We have got a few more changes to fully effect this quarter, and we don't anticipate any further charges in that department.[147]

148.     When further pressed by a Citigroup analyst about whether the inventory issue would raise internal control concerns under Sarbanes-Oxley, Mr. Puppi said, "**No, we have remediated the issue, so that will not be a factor**."[148] However, the internal control and inventory issues would continue. If Plaintiffs' claims of prior misrepresentations and omissions

---

[145] Celestica's adjusted Net Earnings in Q3 2006 was approximately $40.5 million. The $6 million inventory charge wiped out approximately 13% of expected quarterly profit. Adjusted net earnings is defined as net earnings before amortization of intangible assets, gains or losses on the repurchase of shares and debt, integration costs related to acquisitions, option expense, option exchange costs and other charges, net of tax and significant deferred tax write-offs.

[146] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006 (emphasis added).

[147] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006.

[148] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006 (emphasis added).

regarding internal controls related to inventory are accurate, the market reaction to this

information also reflects investor losses causally tied to the alleged misrepresentations and

omissions.

149.    Furthermore, CLS lowered its guidance for Q4 2006. In particular, Celestica's Q4

guidance reflected a 2% decline in revenue and 14% decline in EPS relative to previous

projections primarily due to continued difficulties in Mexico and "reduced end-user demand." [149]

For reasons described above, any market price declines associated with the continued difficulties

in Mexico are appropriately considered as corrective of the alleged misstatements and omissions.

In addition, CLS's internal documents demonstrate that the lowered guidance due to end-user

demand was really the result of failed execution and poor operational controls. Even without

such an explicit link being drawn by Defendants, analysts were skeptical of the Company's

explanation given prior trends in seasonality and the better than expected financial performance

of Celestica's customers. For example, JP Morgan, described the effects of the Restructuring

project on customer demand as follows: "Our checks indicate that **the teething here is not only**

**costing CLS in the form of higher labor costs and inventory write-downs (roughly $6mm**

**this quarter), but also in the form of lost revenue opportunities as customers divert orders**

**to other partners while CLS works through its issues**." [150]

---

[149] *See* "Celestica East vs. West; Making Progress, But Still Not On The Same Page; Maintain Peer
Perform," *Bear Stearns & Co.*, October 26, 2006; "Running With Scissors Into Q4," *CIBC World
Markets*, October 27, 2006. First call figures were $2.4 billion and $0.22 for revenue and EPS,
respectively. On October 26, 2006, the Company projected revenue of $2.35 and EPS of $0.19,
representing a 2% and 14% reduction in previous expectations.

[150] "Still Some Work Left to Do," *JP Morgan,* October 26, 2006 (emphasis added).

150.     This skepticism about the real reason behind the lower guidance was evident in

analyst questions regarding whether CLS was losing customers as a result of the execution

problems with the Restructuring. For example, a Bear Stearns analyst asked:

> I just wanted to understand a little bit better the comments you are making about
> consumer in terms of having a material decline in December. I think you're
> correct, a lot of consumer programs do peak in September but this seems
> somewhat unusual to see such a steep decline in the December quarter. Is there
> something to do with the product types you're dealing with, or are certain
> products coming to end of life? Could you help explain that? Quantify it
> maybe?[151]

151.     An analyst from BMO Capital asked, "you wouldn't expect any major shift in

your existing top customers?" Delaney responded with, "No", with respect to the top 10

customers which represented 59% of revenue.[152] When later pressed about Cisco moving

business from CLS to Flextronics,[153] Delaney stated "I won't give any comments on any

customers, that one, or any others. They are certainly a customer of ours, and an important one."

152.     In reality, there is clear evidence that just weeks prior to the call, Cisco expressed

deep frustration with the Celestica's Monterrey site in particular.[154] For instance, on August 10,

2006, NYPAC, a manufacturer, wrote to Cisco, "I was told you may be able to help me with a

non-payment issue we are having with the Celestica-Monterrey site. As you can see from the

string below, they are currently delinquent on over $500,000 worth of invoices. As a result, we

have put them on shipment hold for all Cisco parts." [155] This was forwarded to a group at

---

[151] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006.

[152] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006.

[153] Brian White, Jefferies & Co. analyst asked, "… one of your competitors announced a new relationship with Cisco today. Cisco is notorious for decreasing their suppliers, not increasing their suppliers. Can you comment on your relationship with Cisco, and give us comfort that in 12 to 18 months we won't be looking at a decline in the Cisco business at Celestica?"

[154] Exhibit 33 to Deposition of Paul Nicoletti, January 9, 2013.

[155] Exhibit 33 to Deposition of Paul Nicoletti, January 9, 2013.

Celestica: "John: You are on the thread not too far down, as well Steve Radewych ... Even i[f] the truth lies somewhere in the middle, ***CMX [Monterrey] appears to be the problem ... Come on guys, get this fixed. It's inexcusable ...***"[156] This email was then escalated to Steve Delaney, Paul Nicoletti, and Frank Binder: "This is the 3rd credit issue just this week - an example of the broken support systems at CMX that I wrote in my last mail to you…. We need to make fixing this a priority, and assign an 'A' team to it. ***It has been way too visible to Cisco, as the suppliers turn around and call them for payment***."[157]

153.     By early- to mid-August, Cisco (and its manufacturer) was clearly frustrated with Celestica's performance, specifically at the Monterrey site. One NYPAC employee even quipped, "[t]his is way beyond ridiculous, [i]s there anything that can be done? We're close to putting an ad in the WSJ stating that Celestica doesn't pay its bills…."[158] Thus, it is apparent that, at the very least, Cisco had legitimate incentive to defect to Flextronics based on Celestica's inability to effectively operate its Monterrey facility.

154.     Credit Suisse summarized analysts' general reaction to the Company's explanation for reduced "end-user demand":

> Mgmt pointed to **consumer seasonality (down 15% q/q, which doesn't match our understanding of product leadtimes)**, customer departures in enterprise (**we believe Cisco**) and communications (possibly Juniper), and demand weakness in storage (key custs EMC, Sun, IBM).[159]

---

[156] Exhibit 33 to Deposition of Paul Nicoletti, January 9, 2013, (emphasis added).

[157] Exhibit 33 to Deposition of Paul Nicoletti, January 9, 2013, (emphasis added).

[158] Exhibit 33 to Deposition of Paul Nicoletti, January 9, 2013.

[159] "Q3 results," *Credit Suisse,* October 27, 2006 (emphasis added).

155.    Review of internal Company documents indicates the "weak end user demand" that resulted in lowered guidance is specifically tied to CLS's weak operating and internal controls.

156.    For instance, as of August 1, 2006, Panasonic cancelled products for which it had originally placed orders with Celestica, due to quantity- and quality-based problems at CMX. A presentation from Panasonic, given in an August 1, 2006, meeting with Celestica noted that "[c]ommitment made on July 3, did not fulfill Panasonic demand."[160] The presentation concluded with, "[b]ased on current condition of CMX delivery and quality, PAVCA [Panasonic AVC Networks Company America] foresees high risk keeping all board supply from CMX. Therefore, [the] following product[s] and quantit[ies] will be withdrawn from the current forecast [for October, November, December] to avoid the risk."[161] Panasonic explicitly pinned the blame on Celestica's Monterrey site rather than a decline in end user demand when they wrote in an email to Simon Willcox at Celestica on November 1, 2006, "Our TV set demand had never decreased between June and October. Please remember that you were the one who could not meet our requirement [and] as a result we were force[d] to reduce our business quantity. Even today, you are still having a problem to keep your delivery on time…. [A]lthough we reduced our demand, you still could not catch up with your delivery schedule. As a result we were forced to change supplier from you to Japan….We did not change [sic? – 'would not have changed'?] our demand (forecast) if you kept your promise (your delivery)."[162] These

---

[160] Exhibit 4 to Deposition of Rachel Turpin, March 19, 2013..

[161] Exhibit 4 to Deposition of Rachel Turpin, March 19, 2013..

[162] CEL00034956.

communications were later escalated to Craig Muhlhauser, Frank Binder and Paul Nicoletti, and when asked if he was aware of the situation, Mr. Nicoletti replied "[y]es I am aware."[163]

157.    Indeed, after the end of the fourth quarter, a script for the Board of Directors stated in part, "Panasonic lost $19M in the quarter, due mostly to $15M in inventory provisions booked in Mexico in the quarter. This was due to a contractual dispute with the customer where they are indicating no liability for the parts as a result of Celestica's inability to ship goods they had ordered on a timely basis, resulting in lost sales to Panasonic."[164]

158.    For the reasons described above, CLS's lowered guidance due to "end-user demand" issues was also causally related to failures associated with CLS's inability to successfully execute its Restructuring. As a result, I include the full abnormal return on this day as revealing artificial inflation.

159.    **Exhibit 16a** plots the Common Stock price and volume as well as the prices of the indices included in my event study regression model over a three day window before and after the release of the corrective information. **Exhibit 16b** displays intraday volume and prices for CLS Common Stock on the day preceding and day of the Q3 2006 earnings report and conference call. Other than the Q3 2006 earnings disclosure, management's conference call to discuss the earnings disclosure, and securities analysts' reports issued in response to those events, there was no material firm-specific information that would have impacted CLS's stock price. Based on my event study, which explicitly controls for market and industry effects, CLS Common Stock declined by $1.44 per share in reaction to the new news on October 26, 2006. This decline represents an abnormal return of -12.23%, with a t-statistic of -8.13, statistically

---

[163] Id.

[164] Exhibit 41 to Deposition of Anthony Puppi, April 12, 2013.

significant at well above the 95% significance level. If Plaintiffs' allegations are correct, the entire price decline on this day was causally related to the alleged misrepresentations and omissions.

160.     Nevertheless, the full truth was yet to come out, and Defendants released statements on this day that partially mitigated the impact of the corrective information. In particular, Mr. Delaney reassured investors stating, "**Mexico is getting better every day. And it's going to continue getting better every day**."[165] Mr. Delaney also said the Restructuring project was "entering the important final phases." CFO Puppi quantified the progress explaining that CLS had been running at approximately 75% of the cost savings benefit expected from the Restructuring, that margins would get "meaningful improvement" in Q4 2006, and "the full benefit" by Q1 2007.[166] Mr. Puppi also said customer relationships were intact and that CLS had not lost key customer orders. These statements appear to have had an ameliorative effect on some analysts' views as Bear Stearns wrote, "**Celestica does not foresee having to take subsequent charges related to this matter,**"[167] and Blackmont Capital chalked up the poor performance to isolated, events: "**The inability to capitalize on the higher sales level was due to two one-time events:** a $6.0 million inventory adjustment and continuing issues at the Mexican plant that resulted in a loss of $7.0 million in the quarter."[168]

---

[165] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006 (emphasis added).

[166] "Celestica Q3 2006 Earnings Call," *Bloomberg Transcript*, October 26, 2006.

[167] "Celestica East vs. West Making Progress But Still Not on the Same Page; Maintain Peer Perform," *Bear Stearns,* October 26, 2006.

[168] "Q3/06 – 3.5% Margins in Sight; Reiterate Buy," *Blackmont Capital,* October 27, 2006 (emphasis added).

**November 28, 2006**

161.     After market hours on November 27, 2006, CLS announced that its CEO Stephen

Delaney had resigned, effective immediately, "to pursue other business interests."[169] The

Company appointed Craig Muhlhauser, former President of Celestica's Worldwide Sales and

Business Development, to take his place.[170] In response, the market price of Celestica fell

sharply.

162.     Many analysts expressed surprise at the timing of Delaney's exit, given that the

ambitious Restructuring project that he spearheaded was scheduled to be nearing completion. For

example,

- *Reuters News* - As the new chief executive of Celestica Inc. took the reins at the
  contract electronics manufacturer, **analysts speculated on Tuesday about why
  his predecessor had left the company so close to finishing a major
  restructuring drive.**[171]

- *Reuters News* – "**We believe management and the board were caught by
  surprise, and we are somewhat concerned Delaney would leave so close to the
  completion of his goals**," UBS analyst Robert Dennison wrote in a note to
  clients.[172]

- *Bear Stearns* **- The move comes as a surprise to us,** but we welcome the change
  as CLS continues to work through its restructuring.[173]

163.     Some analysts also interpreted his departure to be symptomatic of the struggling

Restructuring and signs that the Restructuring was not on schedule. For instance, according to

---

[169] "Celestica Appoints Craig Muhlhauser President and Chief Executive Officer," *CLS Press Release*,
November 27, 2006 (www.celestica.com/News/News.aspx?id=610).

[170] Complaint at ¶284

[171] "Celestica CEO's Exit Spurs Analysts' Questions," *Reuters News,* November 28, 2006 (emphasis
added).

[172] Id.

[173] "Out With the Old In With the New; Celestica Appoints New CEO Effective Immediately," *Bear
Stearns,* November 27, 2006 (emphasis added).

Longbow Research analyst Shawn Harrison, "the company's latest round of restructuring actions have yet to deliver the promised improvement in margins."[174] Also, CIBC World Markets reported, "[w]e believe Mr. Delaney's exit was essentially due to **Celestica's inability to execute on increasing op. margins in the Mexican and European operations**. These regions had been a key initiative for Mr. Delaney and **we anticipate little progress to be reported next quarter based on this new development.**"[175] In addition, an RBC Capital Markets report interpreted the move as a negative signal:

> CLS has been a turnaround story for several years; while some may welcome a change at the top; **we see the event raising more questions regarding CLS's turnaround. We anticipate investors reacting negatively to the event, as it clearly has come as a surprise to CLS board and remaining management team.**[176]

164.   The surprise change led analysts to downgrade CLS Common Stock.[177] For example, Kintishiff Research downgraded CLS because:

> The abrupt management change after less than three years of Delaney's tenure as CEO serves to us as a clear indication that Celestica continues to be a restructuring story. In our view, it is quite likely that in the near-term the new CEO will undertake yet another round of restructuring actions, potentially based on a completely revised set of strategic targets, with all the ensuing risks and uncertainties.[178]

165.   **Exhibit 17a** plots the Common Stock price and volume as well as the prices of the indices included in my event study regression model over a three day window before and

---

[174] "Celestica CEO's Exit Spurs Analysts' Questions," *Reuters News,* November 28, 2006.

[175] "CEO Steve Delaney Has Been Replaced As Margin Improvement Remains Elusive," *CIBC World Markets,* November 28, 2006 (emphasis added).

[176] "CLS – Surprising Resignation from CEO, Replacement Named," *RBC Capital Markets,* November 28, 2006 (emphasis added).

[177] "Celestica CEO's Exit Spurs Analysts' Questions," *Reuters News,* November 28, 2006.

[178] "Celestica's Top Management Change Creates a New Layer of Risks and Uncertainties; Sell," *Kintisheff Research,* November 30, 2006.

after the CEO Delaney left the Company. **Exhibit 17b** displays intraday volume and prices for

CLS Common Stock on the day preceding and the Corrective Disclosure date.

166.    Nevertheless, Defendants did not reveal the full truth and its new CEO only

reiterated prior statements that the Restructuring project was nearing completion.

167.    I found no other potentially confounding information that could explain the firm-

specific decline of 4.22% or $0.41 per share on this day after controlling for market and industry

factors. This decline is statistically significant at the 95% confidence-level with a t-statistic of -

2.92. Therefore, the abnormal dollar return of -$0.41 per share represents losses to investors

caused by the misrepresentations and omissions.

**December 12, 2006**

168.    Prior to the market opening on December 12, 2006, CLS released an update to its

Q4 financial guidance. The Company now told the market it expected revenue of $2.20 billion to

$2.25 billion, 5% lower than its October 26, 2006 projections, and adjusted net earnings per

share of $0.00-0.06 which was **84% lower than the prior projection based upon additional**

**inventory charges**.[179] The Company said the revenue revision "is due to recent demand

reductions from several customers. Included in the revised adjusted net earnings per share is an

expected net charge of between $0.08 to $0.12 resulting predominantly from an increase in

inventory provisions at the Monterrey, Mexico facility."[180]

169.    At 9:30 a.m., CLS hosted a conference call and elaborated on the drivers of the

lower guidance. New CEO Muhlhauser explained that the Company had experienced troubles

---

[179] The midpoint of Q3 revenue projections is $2.335, while the midpoint of the 12/12/06 revised revenue is 2.225, representing a 5% downward revision. Likewise, the midpoint of Q3 adjusted EPS is $0.19, while the midpoint of the 12/12/06 revised figure is $0.03, representing an 84% downward revision.
[180] "Celestica Updates Guidance for Fourth Quarter," *CLS Press Release*, December 12, 2006 (www.celestica.com/News/News.aspx?id=612).

with "**being able to find parts when you need them…without having to reorder**." Even

though Restructuring was supposedly near completion, CLS was still working to "**get a better**

**understanding of operations and the material management at the site.**"[181] These statements

disclosed to the market that CLS had continued execution problems, as well as ineffective

internal controls which manifested itself as problems with inventories and customer

disengagements. The Company further stated:

> **The change in revenue is based on the overall reductions in demand from several of our largest customers. The reduction in EPS is due to the decline in our volumes and to inventory provisions that we expect to establish this quarter. Obviously, this is extremely disappointing given that last week we felt our prior revenue range would be achievable.** However, with another week of actual revenues under our belt and lower than expected customer polls from our hubs, we are no longer comfortable with the revenue range we had previously guided for the quarter. On the adjusted EPS front, the inventory provisions that we are establishing relate to our Monterrey operations. **With reduced demand and as we get a better understanding of operations and the material management at the site, it has become apparent that we have a situation where we have ordered more material than what was required by our customers**.[182]

170.      Analysts were shocked at CLS's inability to track and control inventory. For

instance National Bank Financial expressed concern: "The lower EPS guidance of $0.00 - $0.06

(vs. $0.15 to $0.23) includes a provision of $0.08 - $0.12 EPS (or $18 - $23 million) for

inventory in the Monterrey, Mexico location. **Huh? That is a lot of excess inventory! This**

**leads us to suspect that Celestica is at risk of losing a customer program or part thereof.**"[183]

171.      Scotia Capital raised warning flags to investors. "This will be the second

consecutive quarter where inventory issues have a materially negative impact on earnings for

---

[181] "Celestica Updates Guidance for Fourth Quarter," *CLS Press Release*, December 12, 2006 (www.celestica.com/News/News.aspx?id=612) (emphasis added).

[182] "Celestica Q4 2006 Guidance Call," *Bloomberg Transcript*, December 12, 2006 (emphasis added).

[183] "Weaker Demand, Excess Inventory… Party Like Its 2002!" *National Bank Financial,* December 13, 2006 (emphasis added).

Celestica. **In the EMS industry, where logistics, supply chain management, and manufacturing comprise the key value proposition, we believe Celestica's inventory miscues are a major concern.**"[184]

172.   CLS cited lower end-user demand as the driver of lower revenue,[185] while end-market trends appeared stable,[186] suggesting that the reduced demand was attributable to customer disengagement in reaction to CLS's problems. As Bear Stearns warned, "**we remain cautious in light of potential market share loss due to operating challenges.**"[187] JP Morgan cautioned, "Revenue bleed likely continues. In our view, the revenue shortfall this quarter is a precursor to more challenges in 2007 as our checks indicate the company is losing material market share with several large customers on the heels of continuing quality issues at one of the company's manufacturing facilities in Mexico."[188] RBC Capital recommended that investors "remain on the sidelines with regard to CLS as we see continued risks to CLS's turnaround due to ongoing operational issues in Mexico, which could lead to customer disengagements over time."[189]

173.   Overall, analysts reacted negatively to the news, citing the Restructuring problems, inventory write-offs and potential customer disengagements.

- *Cowen and Co* - "Given the **ongoing issues with the Mexico plant, multiple quarters with inventory write-offs (4Q06, 3Q06, and $161M 4Q04),**

---

[184] "Reducing Estimates after Q4 Warning," *Scotia Capital,* December 13, 2006 (emphasis added).

[185] "Celestica Q4 2006 Guidance Call," *Bloomberg Transcript*, December 12, 2006.

[186] "CLS – Lowers Q406 Guidance," *RBC Capital Markets*, December 12, 2006 ("Implicitly CLS has guided sales to be down 7% Q/Q in Dec-qtr, a stark contrast to overall end-market trends, which appear stable.")

[187] "CLS Lowers Its Guidance for 4Q06; Is CLS Cleaning House for the New CEO," *Bear Stearns*, December 12, 2006 (emphasis added).

[188] "The Artic Chill Comes a Bit Early," *JP Morgan*, December 12, 2006.

[189] "CLS – Lowers Q406 Guidance," *RBC Capital Markets*, December 12, 2006.

**restructuring problems**, and the likelihood that we will not get true visibility on a turnaround until mid 2007, we are lowering our rating on the shares to Neutral from Outperform."[190]

- *Bear Stearns* – "The poorly run Mexico operations, which we believe led to the previous CEO dismissal, continue to weigh on CLS, and have resulted in a $8M loss in the June quarter, $7M in the September quarter, and will expand to $18M+ in the December quarter. **The expanded December quarter inventory charge was due to poor inventory management, which has resulted in inventory write-offs. However, in our opinion, the charge could also be the result of customers' disengagement**"[191]

- *RBC Capital Market* - We recommend investors remain on the sidelines with regard to CLS as **we see continued risks to CLS's turnaround due to ongoing operational issues in Mexico, which could lead to customer disengagements over time.**[192]

174.    Indeed, internal documents confirm that the lower than expected demand was the result of customer defections due to operating problems, not due to broader economic or industry trends. For example, in an August 10, 2006, email to Delaney and others, Kelly Priest wrote: "We have signaled to Cisco that we are willing to move everything to Asia to avoid losing the business entirely… Our GCU opinion is that CMX will not get fixed anytime soon – there is no sense of urgency, especially around material movement from Laredo to the line. I know this is not great news, but you need to understand the severity of how CMX has impacted the total Cisco relationship."[193] An email exchange in August of 2006 from James Rowan to Tony Puppi explicitly stated that losing customers due to operational issues was a concern: "In summary we have two major "hotspots" in the operations network where **performance is greatly affecting either our ability to grow or on some cases poses a real threat to losing the customer for**

---

[190] "Another Negative Preannouncement; Moving to Neutral," *Cowen and Co.,* December 13, 2006 (emphasis added).

[191] "CLS Lowers Its Guidance for 4Q06; Is CLS Cleaning House for the New CEO?" *Bear Stearns,* December 12, 2006 (emphasis added).

[192] "CLS – Lowers Q406 Guidance," *RBC Capital Markets,* December 12, 2006 (emphasis added).

[193] Presentation to Celestica Board of Directors, Dated January 29, 2006, (CEL00132835).

**that site or even from the company**….The key customers affected across both sites are:
Monterrey – Cisco, Panasonic, Sun, Lucent, Industry accounts in general."[194]

175.    My event study indicates there was a statistically significant decline in CLS's stock price as a result of news released on December 12, 2006. After removing market and industry effects, CLS's stock price fell 11.86%, or $1.11 per share. This decline is statistically significant at the 95% confidence-level with a t-statistic of -8.49. **Exhibit 18a** plots the Common Stock price and volume as well as the prices of the indices included in my event study regression model over a three day window before and after the news on this day. **Exhibit 18b** displays intraday volume and prices for CLS Common Stock on the day preceding and the Corrective Disclosure date.

176.    I understand Plaintiffs expect to prove the inventory charges announced on this day materialized as a result of Celestica's ongoing execution failures and the lack of effective internal controls that had been misrepresented from the beginning of the Class Period. If Plaintiffs' allegations are correct, this disclosure represents CLS-specific news that is causally related to the misrepresentations and omissions. Furthermore, the evidence indicates that the lowered revenue guidance was also causally related to lower demand from customers frustrated with CLS's failed execution and ineffective operating controls. I found no other confounding negative information released on this day. As a result, I attribute the full abnormal price decline of $1.11 (after controlling for market and industry factors) to the corrections of the misrepresentations and omissions.

---

[194] August 14, 2006 email from James Rowan to Tony Puppi (CEL00046026- CEL00046030).

**January 31, 2007**

177.     After market hours on January 30, 2007, CLS issued a press release that announced its Q4 performance and Q1 2007 projections, and also announced the resignation of CFO, Anthony Puppi, effective as soon as a replacement could be found. Celestica's revenue performance was generally in line with expectations,[195] however, its losses on a GAAP basis as well as its Q1 2007 projections surprised investors.

178.     On a GAAP basis, Celestica's reported losses for Q4 were $60.8 million, or a loss of $0.27 per share. The unexpectedly large net loss included: (1) a net charge to gross profit of $30 million from an increase in inventory provisions, and (2) an unexpected $59 million restructuring charge.[196] The $30 million charge due to an increase in inventory provisions was a "surprise" of about $7.5 million, or just over 3 cents per share, as CLS had indicated the charge would be approximately $22.5 million just a few weeks earlier.[197]

179.     In addition, CLS projected lower-than-expected Q1 2007 performance with revenues expected to fall in the $1.7 billion to $1.9 billion range and adjusted net loss per share from $(0.15) to $(0.04). Scotia Capital referred to the guidance as "disastrous," noting that the projected revenue was 15% below market expectations.[198]

180.     The next morning at 8:00 a.m., CLS hosted a conference call with analysts during which CEO Muhlhauser admitted that execution problems regarding the Restructuring and

---

[195] "Celestica Announces Fourth Quarter and 2006 Fiscal Year End Financial Results," *Celestica Press Release*, January 30, 2007 (www.celestica.com/News/News.aspx?id=614).

[196] "Celestica Announces Fourth Quarter and 2006 Fiscal Year End Financial Results," *Celestica Press Release*, January 30, 2007 (www.celestica.com/News/News.aspx?id=614).

[197] CLS expected a net charge related to inventory provisions of $0.10 per share (the midpoint of $0.08 and $0.12 from its December 12, 2006 press release), which translates to a net charge of $22.5 million.

[198] "Q4: Guidance Disaster," *Scotia Capital*, January 31, 2007, 10:02.

inventory control continued and that the Company had not been able to solve these issues,

despite prior claims to the contrary. Mr. Muhlhauser stated:

> …[a] loss of customer confidence and the need to get this situation under control quickly has resulted in disengagements with some customers. **The failure to deliver timely resolution of the issues and deliver the projected operational and financial results quarter after quarter have undermined our credibility and eroded shareholder value in the [c]ompany**.[199]

181.   In addition, Mr. Muhlhauser described the lack of a true plan for Restructuring:

> We created the perfect storm for the company in this site by attempting to implement an accelerated transfer plan, which required the transfer of over 16 customers to Mexico, which required over 50 SMT lines with multiple SMT platforms from various North American facilities, over 6,000 people in an 18-month period into a facility with two ERP systems.[200]

182.   Mr. Muhlhauser further explained that the Company's poor financial performance

was directly related to the Restructuring and move to Mexico, as the Mexican operation resulted

in EBIT losses of $75 million in 2006, 60% of which was incurred in the fourth quarter alone:

> The impact of CMX in Mexico has hurt this company very badly. Reality of the situation is that our operational execution issues in Mexico over the past 12 months have resulted in over $75 million of EBIT losses for 2006 and $46 million for the fourth quarter from this one site…
>
> In terms of profitability, our operating margins were down sequentially by 150 basis points to 1%, and adjusted EPS was down to $0.03 in Q4 versus the $0.18 earned in Q3. **This decline was largely driven by previously announced $30 million net charge related to the inventory provision taken at our Monterrey, Mexico facility.** This charge was simply unacceptable, remedial actions are in place to correct the issues that caused this problem. **Without this inventory charge, our operating margins would have been 2.4%, while adjusted EPS would have been $0.14 per share.**"[201]

---

[199] "Celestica Q4 2006 Earnings Call," *Bloomberg Transcript*, January 31, 2007 (emphasis added).

[200] "Celestica Q4 2006 Earnings Call," *Bloomberg Transcript*, January 31, 2007.

[201] "Celestica Q4 2006 Earnings Call," *Bloomberg Transcript*, January 31, 2007 (emphasis added).

183.     The markets and analysts expressed their surprise that the Restructuring plan had clearly failed and that further Restructuring was needed. For example, Bear Stearns proffered the following assessment of how Mexico "fell apart":

> Over a period of 18 months, CLS transferred 16 customers to Mexico, which required over 50 SMT lines with multiple platforms from other facilities. Consequently, the transfer introduced more than 50,000 active part numbers and over 1,500 ship codes and created 9 warehouses. The complexity obviously overwhelmed the Monterrey site, which **to our surprise, had two ERP systems**. The only good news so far is that they were able to consolidate it to one ERP over the past weekend.[202]

184.     CLS's plan to remedy the situation in Mexico included additional restructuring which would involve transferring six accounts from Mexico to Asia.[203] CLS projected that for the current Restructuring an additional $60 to $80 million of charges would be necessary, $40 million of which it booked in Q4 2006.[204] However, at this point, analysts generally seemed to observe that these additional charges were necessary due to Celestica's ongoing execution failures and deficient internal controls. For instance, National Bank Financial said, "We are weary of such incremental, never-ending reductions that seem to deliver too little benefit too late."[205] A Credit Suisse analyst added:

> We were very disappointed to find no indication on CLS's Q4 call that the newly installed CEO, Craig Muhlhauser, has been given a mandate to strategically realign or sell the company. Instead, he trotted out yet another restructuring plan, telling us that **mgmt still has not recognized that the execution issues in Mexico and Europe are a function of deep-running structural problems within the company. This will manifest in continuing customer losses, which are likely only in the early stages.**[206]

---

[202] "Has Celestica Bottomed Out?" *Bear Stearns,* January 31, 2007.

[203] "Celestica Q4 2006 Earnings Call," *Bloomberg Transcript*, January 31, 2007.

[204] "Celestica Announces Fourth Quarter and 2006 Fiscal Year End Financial Results," *Celestica Press Release*, January 30, 2007 (www.celestica.com/News/News.aspx?id=614).

[205] "Q4 Results: Do You Like Black Diamond Ski Slopes?" *National Bank Financial,* February 1, 2007.

[206] "Q4 Results," *Credit Suisse,* January 31, 2007 (emphasis added).

185.    A Jefferies & Co. analyst report expressed both surprise at the continuing

problems and skepticism that Celestica's Restructuring plans had any chance of succeeding:

> **We have highlighted our concerns regarding Mexico morphing into a
> situation similar to Europe (i.e., losses lasting much longer than expected),
> however, even we are surprised by the magnitude of the problems.** In an
> effort to avoid customer defections, the company announced plans to transfer six
> customers from the Monterrey, Mexico facility to Asia by 2Q07. However, there
> are risks involved in transferring these customers. Additionally, the company has
> now transitioned the Monterrey site to one ERP system from two. Despite these
> and other changes, we are not sure the Monterrey site can ever be fixed and one
> solution may be to shut down the facility and transfer the business to existing low-
> cost operations. We doubt many customers want to risk having a product built at
> this operation in the future. **In our view, this reputational hit goes beyond the
> Monterrey plant and has tarnished the reputation of Celestica as a whole.**[207]

186.    Finally, a Deutsche Bank analyst added:

> Celestica reported $0.01 below our 4Q EPS estimate on better than expected
> sales, but provided extremely cautious guidance. We believe the guidance is a
> result of 1) share loss at key accounts, 2) poor operational control, 3) softening
> end market demand and 4) the new CEO setting the bar low. Given CLS' poor
> competitive positioning and customer service, we believe they will continue to
> lose market share and incur restructuring charges for the foreseeable future.[208]

187.    Additionally, the market reacted strongly to CLS's negative reported results and

poor Q1 outlook as the Common Stock price fell. **Exhibit 19a** plots the Common Stock price

and volume as well as the prices of the indices included in my event study regression model over

a three day window before and after the news on this day. **Exhibit 19b** displays intraday volume

and prices for CLS Common Stock on the day preceding and the Corrective Disclosure date.

Controlling for general market and industry-specific effects, the abnormal return on this day was

-23.73% with a t-statistic of -20.00. This translates to a highly statistically significant abnormal

decline of $1.83 per share observed on this day after controlling for market and industry factors,

---

[207] "Falling Back into the Red, Cutting Estimates," *Jefferies & Co.,* February 1, 2007 (emphasis added).
[208] "Celestica: Q4 In-Line, Q1 Outlook Disappointing," *Deutsche Bank*, January 31, 2007.

and represents a loss suffered by investors that is causally tied to the correction of the misrepresentations and omissions.

188.    I did not find any negative information released on this day that was unrelated to the disclosure of the impacts of the failed Restructuring. If Plaintiffs prove that the failure of the Restructuring is causally related to Celestica's ongoing execution failures and the lack of effective operating and financial controls present since the beginning of the Class Period, the entire abnormal return on this day is related to Plaintiffs' allegations.

## X.    DAMAGES AND EVOLUTION OF INFLATION OVER THE CLASS PERIOD

189.    The analysis in the previous section established that there were statistically significant price impacts on Celestica Common Stock as a result of the Corrective Disclosure Events. For Celestica Common Stock, the loss causation analysis suggests there was a total of $5.22 in artificial inflation on the day prior to the first corrective disclosure if all of the events on the Corrective Disclosure Events were related to Plaintiffs' allegations. However, the event study and analysis of losses on the Corrective Disclosure Events do not, in isolation, suggest how inflation evolved over the Class Period.

190.    Damages in securities class actions are calculated using two sets of information: 1) the inflation per share of the subject company's security during the Class Period, and 2) the trading activity of the investors who purchased the inflated security during the Class Period. The calculation of damages suffered by a single share is the difference in the inflation per share on the date of the purchase less the inflation per share on the date the security is sold,[209] or in other

---

[209] If the security is not sold, the inflation per share is calculated using the average closing price in the "90 days period beginning on the date on which the information correcting the misstatement or omission that

words, damages per share is equal to the change in the stock price caused by revelation of the fraud from the time of purchase to the time of the sale. For example, if an investor purchased a share of a company's common stock when some unrevealed fraud had falsely inflated the share price by five dollars, and subsequently sold the shares after the truth was revealed to the market and the stock price dropped by five dollars (inflation dropped to zero), then the investor suffered five dollars in damages due to the decrease in the stock price caused by the fraud. Alternatively, if during the period between the purchase and sale the inflation per share increased, then the investor benefited or gained from the fraudulent activities of the subject company.

191.    To determine the inflation per share throughout the Class Period, I implement a "constant dollar" approach. This means that barring a statistically significant event that is related to the fraud, the inflation per share on day *t-1* is the same as the inflation on day *t*. I note that the constant dollar methodology is used by a wide variety of experts in matters such as this and in my experience is often advocated by Defense experts. Furthermore, Plaintiffs allege that the misstatements and omissions related to the effectiveness of internal and operational controls extend back to the beginning of the Class Period when Defendants first touted the benefits of the Restructuring "plan."[210]

192.    Even under the constant dollar approach, one must consider whether there were specific positive events that were "inflation creating." In other words, if there was a positive and statistically significant event during the Class Period that would not have occurred but-for the

---

is the basis for the action is disseminated to the market."15 U.S.C. §78u-4(e)(1). This is referred to as the "90 day 'lookback' price."

[210] For example, I understand that prior to the Class Period, CLS's internal auditors found that controls around inventory management at Monterrey were rated a "4" – which stands for "Unsatisfactory - Ineffective Process Controls." (Exhibit 42 to the Anthony Puppi Deposition, Email and attachment from Ana R Perez, Tuesday, January 11, 2005).

fraud, then it is appropriate to consider whether a smaller portion of the inflation existed prior to that day.

193.    In determining the inflation per share, I have incorporated one inflation creating day (July 28, 2006) into the calculation because, in my view, this increase in price would not have occurred but-for the alleged fraud. On this day there was a statistically significant positive market reaction to alleged misstatements about the condition of the Monterrey facility announced after market hours the previous day.

194.    In particular, after market hours on July 27, 2006, Celestica released its second quarter financial results and held a conference call with analysts. In its press release, the Company disclosed that revenue in 2006 Q2 was $2.2 billion and adjusted net earnings were $0.13 per share. The Company also provided adjusted earnings per share outlook for Q3 in the range of $0.12 to $0.20.[211] The Q2 results were slightly above analysts' estimates, which averaged at $0.12 adjusted earnings per share on $2.13 billion in revenue.[212] The outlook was in line with analysts' expectations, which averaged unadjusted earnings per share of $0.16.[213]

195.    In the conference call, CEO Delaney further disclosed that the Mexican site had improved, delivering greater volume to customers, and that the Company anticipated "a more meaningful improvement this quarter [Q3], as we complete the ramps and deliver increased

---

[211] "Celestica Announces Second Quarter Financial Results," *Celestica Press Release*, July 27, 2006 (www.celestica.com/News/News.aspx?id=602); "Celestica Q2 2006 Earnings Call," *Bloomberg Transcript*, July 27, 2006.

[212] *See* "Celestica 2Q Rev $2.22B," *Dow Jones News Service,* July 27, 2006, 16:00; "RPT-UPDATE 2-Celestica See Stable Market in Third Quarter," *Reuters News,* July 27, 2006, 16:09.

[213] *See* "CLS: Detecting Signs of Turn-Around, But We Still Recommend Waiting…," *RBC Capital Markets,* July 27, 2006; "Celestica, Inc. Issues Q3 2006 Guidance," *Reuters Significant Developments,* July 27, 2006.

efficiencies."[214] CFO Puppi echoed this sentiment, claiming that Mexico was "stabilizing from an operational perspective."[215] Analysts on the call pursued the issue further, confirming that the total expected charges related to Mexico in the Restructuring Plan were only to be $0.05 per share. In response, Mr. Delaney confirmed and actually suggested that the Mexican plant could do even better than expected.[216] One analyst stated that "it sounds like the $0.03 headwind for Mexico will be gone in the September quarter," then inquired to confirm that Q4 would not see Mexico experiencing any further operational issues. Mr. Delaney responded by claim that "the site actually has done quite a good job recently," and stated that "**I am quite confident that our team in Mexico can deliver the fourth quarter as needed**."[217]

196.    Analysts generally reacted positively to this news of improvements in Mexico. Credit Suisse upgraded CLS from "Underperform" to "Neutral," citing improved margins as a result of near-resolution to the Mexico issues and the success of Restructuring in increasing utilization in low-cost regions.[218] An analyst with RBC Capital wrote under the heading "Mexico Operational Issues Start to Improve" that "based on management comments during the conference call we expect minimal impact from these issues in Sept-qtr (less than 1c)."[219] An analyst with Jefferies & Co. wrote, "The company's Mexico situation showed improvement sequentially and further progress is expected in the September quarter."[220] An analyst with CIBC, meanwhile, related that the Mexican issues were essentially behind the Company and that

---

[214] "Celestica Q2 2006 Earnings Call," *Bloomberg Transcript*, July 27, 2006.

[215] "Celestica Q2 2006 Earnings Call," *Bloomberg Transcript*, July 27, 2006.

[216] "Celestica Q2 2006 Earnings Call," *Bloomberg Transcript*, July 27, 2006.

[217] "Celestica Q2 2006 Earnings Call," *Bloomberg Transcript*, July 27, 2006 (emphasis added).

[218] "Upgrading to Neutral," *Credit Suisse,* July 28, 2006.

[219] "CLS Detecting Signs of a Turnaround, But We Still Recommend Waiting…," *RBC Capital,* July 27, 2006.

[220] "Improved Performance…," *Jefferies & Co.,* July 28, 2006.

the transition issues had been "largely dealt with."[221] Finally, an analyst with National Bank wrote that "we are impressed that it has been able to reduce the impact of issues at its fast growing Mexico facility (with more benefits to come in Q3)."[222]

197.    The market reaction confirms that investors considered the information about the state of Celestica's Mexican operations as positive and material news: after controlling for general market and industry factors, my event study shows a highly significant abnormal return of 20.4%, a t-statistic of 12.72, and an abnormal dollar change of $1.60. While there was some positive news regarding Q2 results exceeding analyst estimates, analysts' responses seem to focus on the turn-around in performance as indicative that issues with Mexico and the Restructuring in general were under control and close to conclusion.

198.    For these reasons, I opine that all of the significant positive abnormal return on this date represents an increase in inflation, because but-for the misstatements of the Defendants regarding the allegations of internal controls, particularly in Mexico, there would not have been a significantly positive return on this day. This $1.60 increase in inflation is likely conservative because it assumes all of the positive reaction is attributable to the misstatements.

199.    Taking both the corrective disclosures and the inflation creating event into account, **Table 3** below shows the evolution of artificial inflation per share in the Common Stock.

---

[221] "In-Line Q2 results, New Program Ramps Should Lead to a Strong Q3," *CIBC World Markets*, July 28, 2006.
[222] "Baby Steps Forward," *National Bank,* July 28. 2006.

TABLE 3. Artificial Inflation Per Share

| Date Range: | Artificial Inflation Per Share: |
|---|---|
| January 27, 2005 to January 26, 2006 | $3.62[223] |
| January 27, 2006 to July 27, 2006 | $3.19 |
| July 28, 2006 to October 26, 2006 | $4.79 |
| October 27, 2006 to November 27, 2006 | $3.35 |
| November 28, 2006 to December 11, 2006 | $2.95 |
| December 12, 2006 to January 30, 2007 | $1.83 |

200.    Because I estimate that the inflation per share is constant during the Class Period prior to the first Corrective Disclosure Event (January 27, 2006), there is no economic loss for any investor who sold their shares prior to the first Corrective Disclosure Event.

201.    Recoverable damages for a Class Period purchase start from the calculated economic loss, but also incorporate a legal limitation on recovery. In particular, the Private Securities Litigation Reform Act of 1995 (PSLRA) specifies that recoverable damages cannot exceed the purchase price less the average closing price over the 90 days following release of the corrective information.[224]

---

[223] While the total amount of the abnormal price declines caused by the Corrective Disclosures is $5.22 per share, this figure of $3.62 per share of inflation at the beginning of the Class Period reflects that an additional $1.60 per share of inflation was first introduced on July 28, 2006 via an "inflation creating event."

[224] If the share is sold within the 90 day "lookback" period, then the average closing price up to that day is used.

202.    I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.


Respectfully                    Submitted on June 14, 2013


Chad Coffman

Exhibit 1

## Summary of Efficiency Factors for CLS

| Factor | Summary of Factor | CLS CS |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 4.67%, as a percentage of shares outstanding, well exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 1.8 million shares traded daily on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, that [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 25 securities analysts issued 247 analyst reports, which implies that important information relevant to trading CLS was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because the CLS was exchange-traded on the NYSE, not over the counter, this factor is satisfied. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • CLS was F-3 (i.e. S-3 equivalent for foreign companies) eligible as they filed a Form F-3 on 11/17/2000, 09/12/2001, and 03/19/2004; therefore, this factor is satisfied. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price of CLS CS. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 12/30/2005 and 12/29/2006, CLS's market capitalization was $2.4B and $1.8B which is at or above the 70th percentile of NYSE and NASDAQ stocks. CLS therefore easily meets this criteria.<br>• Insiders held as much as 1.1% of the shares outstanding. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • Based on a random sample of 100 stocks that traded on the NYSE and NASDAQ, CLS's CS had the 26th smallest bid-ask spread. This supports a finding of efficiency. |
| Institutional Holdings | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • Institutions held at least 73.9% of the shares outstanding, which further supports finding that CLS traded in an efficient market (Note: Institutions held a max of 80.7% of the shares outstanding and an average of 77.6% shares outstanding during the Class Period). |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • No evidence of consistent autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading CLS based solely on its past price movements. |



**Exhibit 2a**
**CLS Closing Price & Volume**
**1/27/2005 - 1/31/2007**

Source: Bloomberg

Notes: Prices are not adjusted for dividends. Volume represents combined NYSE CLS trading volume and TSX CLS trading volume.

**Exhibit 2b**

# CLS NYSE Closing Prices and CLS TSX Closing Prices indexed to $100 at the beginning of the Class Period
## 1/27/2005 - 1/31/2007



Source: Bloomberg

Notes:
1) TSX closing prices were converted to US dollar based on historical USD-CAD exchange rate.
2)  Non-trading days and holidays for New York Stock Exchange are excluded from the analysis. Prices are not adjusted for dividends.

**Exhibit 3**
## CLS CS Average Weekly Trading Volume as a Percentage of Shares Outstanding
### 1/27/2005 - 1/30/2007



**Average Weekly Volume as Percentage of Shares Outstanding:**
Average: 4.67%
Median: 4.15%

"1% average weekly trading volume of the outstanding shares justify a substantial presumption" (*Cammer*)

"2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one" (*Cammer*)

■ Volume as a Percentage of Shares Outstanding

Sources: Bloomberg.
Note: Average weekly turnover is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on January 27, 2005. Volume represents combined NYSE CLS trading volume and TSX CLS trading volume.

**Exhibit 4**
# CLS Summary of Securities Analyst Reports Issued
## During the Class Period

| | Analyst Name | Reports Issued |
|---|---|---|
| [1] | BEAR, STEARNS & CO., INC. | 24 |
| [2] | CANACCORD GENUITY | 8 |
| [3] | CIBC WORLD MARKETS INC. (CANADA) | 19 |
| [4] | CITI | 8 |
| [5] | COWEN AND COMPANY | 7 |
| [6] | CREDIT SUISSE - NORTH AMERICA | 12 |
| [7] | DEUTSCHE BANC | 27 |
| [8] | HALPERN CAPITAL, INC. | 2 |
| [9] | IIR GROUP | 13 |
| [10] | JEFFERIES & COMPANY, INC. | 4 |
| [11] | JP MORGAN | 11 |
| [12] | KAUFMAN BROTHERS | 12 |
| [13] | KEYBANK CAPITAL MKTS | 5 |
| [14] | KINTISHEFF RESEARCH ET | 6 |
| [15] | MORGAN STANLEY | 9 |
| [16] | NATIONAL BANK FINANCIAL | 9 |
| [17] | ORION SECURITIES INC. (CANADA) | 13 |
| [18] | RAYMOND JAMES & ASSOCIATES, INC. | 1 |
| [19] | RBC CAPITAL MARKETS | 25 |
| [20] | SCOTIABANK GBM | 8 |
| [21] | SMITH BARNEY CITIGROUP (MORNING MEETING NOTES) | 9 |
| [22] | STANFORD FINANCIAL GROUP | 1 |
| [23] | STONECAP SECURITIES INC. | 8 |
| [24] | TRADITION ASIEL SECURITES | 3 |
| [25] | WELLS FARGO SECURITIES, LLC | 3 |
| | **Total** | **247** |

Source: Investext.

Note: The Class Period is from 1/27/2005 to 1/30/2007.

# Exhibit 5
## CLS CS Regression Model: S&P 500 and Peer Weighted Index Coefficients
## 1/27/2005 - 1/31/2007



Source: Bloomberg.

Notes: For each trading day I constructed a regression using data from the prior 120 trading days. This rolling regression model estimates the relationship between CLS's CS returns with the returns of the S&P 500, and value-weighted peer index. For the peer index, I used the following firms identified in the CLS's 2004-2007 20-F filings: Flextronics International Ltd, Sanmina-SCI Corporation, Solectron Corporation, and Jabil Circuit. CLS's earnings dates and identified corrective disclosure dates are excluded from the regression. The corrective disclosures are: 1/27/2006, 10/27/2006, 11/28/2006, 12/12/2006, and 01/31/2007.

## Exhibit 6
## CLS CS Regression Model: Standard Deviation of Errors
## 1/27/2005 - 1/31/2007



Source: Bloomberg.

Notes: For each trading day I constructed a regression using data from the prior 120 trading days. This rolling regression model estimates the relationship between CLS's CS returns with the returns of the S&P 500, and value-weighted peer index. For the peer index, I used the following firms identified in the CLS's 2004-2007 20-F filings: Flextronics International Ltd, Sanmina-SCI Corporation, Solectron Corporation, and Jabil Circuit. CLS's earnings dates and identified corrective disclosure dates are excluded from the regression. The corrective disclosures are: 1/27/2006, 10/27/2006, 11/28/2006, 12/12/2006, and 01/31/2007.

**Exhibit 7**
# CLS CS Regression Model: Abnormal Returns
## 1/27/2005 - 1/31/2007



Source: Bloomberg.

Notes: For each trading day I constructed a regression using data from the prior 120 trading days. This rolling regression model estimates the relationship between CLS's CS returns with the returns of the S&P 500, and value-weighted peer index. For the peer index, I used the following firms identified in the CLS's 2004-2007 20-F filings: Flextronics International Ltd, Sanmina-SCI Corporation, Solectron Corporation, and Jabil Circuit. CLS's earnings dates and identified corrective disclosure dates are excluded from the regression. The corrective disclosures are: 1/27/2006, 10/27/2006, 11/28/2006, 12/12/2006, and 01/31/2007. 95% confidence interval is based on Student's t-distribution.

# Exhibit 8
# Event Study Analysis of CLS Earnings Announcements

| # | Date | Market Date | Event | CLS CS Price | CLS CS Return | Abnormal Return | Abnormal Dollar Change | T-Stat | Sig Level |
|---|------|-------------|-------|--------------|---------------|-----------------|------------------------|--------|-----------|
| 1 | 1/27/2005 | 1/28/2005 | Earnings Announcement | $12.85 | -3.53% | 0.09% | $0.01 | 0.05 | |
| 2 | 4/21/2005 | 4/21/2005 | Earnings Announcement | $11.50 | -3.36% | -6.18% | -$0.74 | -3.86 | ** |
| 3 | 7/21/2005 | 7/22/2005 | Earnings Announcement | $12.17 | -15.31% | -14.42% | -$2.07 | -9.51 | ** |
| 4 | 10/20/2005 | 10/21/2005 | Earnings Announcement | $9.46 | -10.50% | -9.66% | -$1.02 | -7.35 | ** |
| 5 | 1/26/2006 | 1/27/2006 | Earnings Announcement | $9.90 | -3.70% | -4.21% | -$0.43 | -2.49 | ** |
| 6 | 4/27/2006 | 4/27/2006 | Earnings Announcement | $11.90 | 5.22% | 4.31% | $0.49 | 2.52 | ** |
| 7 | 7/27/2006 | 7/28/2006 | Earnings Announcement | $9.54 | 21.22% | 20.39% | $1.60 | 12.72 | ** |
| 8 | 10/26/2006 | 10/27/2006 | Earnings Announcement | $10.16 | -13.46% | -12.23% | -$1.44 | -8.13 | ** |
| 9 | 1/30/2007 | 1/31/2007 | Earnings Announcement | $5.96 | -22.90% | -23.73% | -$1.83 | -20.00 | ** |

** Denotes statistical Significance at the 95% confidence level or greater.

Source: Bloomberg

Notes:

1) For each trading day I constructed a regression using data from the prior 120 trading days. This rolling regression model estimates the relationship between CLS's CS returns with the returns of the S&P 500, and value-weighted peer index. For the peer index, I used the following firms identified in the CLS's 2004-2007 20-F filings: Flextronics International Ltd, Sanmina-SCI Corporation, Solectron Corporation, and Jabil Circuit. CLS's earnings dates and identified corrective disclosure dates are excluded from the regression. The corrective disclosures are: 1/27/2006, 10/27/2006, 11/28/2006, 12/12/2006, and 01/31/2007. 95% confidence interval is based on Student's t-distribution.

**Exhibit 9A**
**CLS CS NYSE Intraday Price and Volume**
**1/27/2005 - 1/28/2005 (Q4 FY 2004 Earnings Announcement)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Exhibit 9B**
**CLS CS NYSE Intraday Price and Volume**
**4/20/2005 - 4/21/2005 (Q1 FY 2005 Earnings Announcement)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Exhibit 9C**
**CLS CS NYSE Intraday Price and Volume**
**7/21/2005 - 7/22/2005 (Q2 FY 2005 Earnings Announcement)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Exhibit 9D**
**CLS CS NYSE Intraday Price and Volume**
**10/20/2005 - 10/21/2005 (Q3 FY 2005 Earnings Announcement)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Exhibit 9E**
**CLS CS NYSE Intraday Price and Volume**
**1/26/2006 - 1/27/2006 (Q4 FY 2005 Earnings Announcement and Corrective Disclosure)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Exhibit 9F**
**CLS CS NYSE Intraday Price and Volume**
**4/26/2006 - 4/27/2006 (Q1 FY 2006 Earnings Announcement)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Exhibit 9G**
**CLS CS NYSE Intraday Price and Volume**
**7/27/2006 - 7/28/2006 (Q2 FY 2006 Earnings Announcement)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Exhibit 9H**
**CLS CS NYSE Intraday Price and Volume**
**10/26/2006 - 10/27/2006 (Q3 FY 2006 Earnings Announcement and Corrective Disclosure)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.



**Exhibit 9I**
**CLS CS NYSE Intraday Price and Volume**
**1/30/2007 - 1/31/2007 (Q4 FY 2006 Earnings Announcement and Corrective Disclosure)**

Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Exhibit 10**
## CLS Market Capitalization (in Billions)
## 1/27/2005 - 1/31/2007



Source: Bloomberg
Note: Bloomberg Market Capitalization on June 22, 2005 in US dollars appeared to be an errant data point at roughly $3.8 billion. Market capitalization for that date is calculated from the Canadian Dollar figure using the spot exchange rate on that day.

**Exhibit 11**
**CLS CS Market Capitalization**
**Compared to Companies Traded on NYSE & NASDAQ**

| Last trading day of: | CLS Market Capitalization (in millions) | Percentile Rank in NYSE | Percentile Rank in NYSE & NASDAQ |
|---|---|---|---|
| 2005 | $2,400 | 52nd | 77th |
| 2006 | $1,768 | 39th | 70th |

Source: Bloomberg.

# Exhibit 12
# CLS CS Shares Outstanding, Insider Holdings and Institutional Holdings

| Date | Shares Outstanding (in 000s) | Insider Holdings (in 000s) | Public Float: Shares Outstanding Less Insider Holdings (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|
| 12/31/2004 | 184,465 | 413 | 184,052 | 0.22% | 131,726 | 71.41% | 71.57% |
| 3/31/2005 | 184,465 | 1,972 | 182,493 | 1.07% | 137,818 | 74.71% | 75.52% |
| 6/30/2005 | 187,385 | 1,972 | 185,413 | 1.05% | 146,250 | 78.05% | 78.88% |
| 9/30/2005 | 200,423 | 1,972 | 198,451 | 0.98% | 155,408 | 77.54% | 78.31% |
| 12/31/2005 | 196,429 | 1,972 | 194,457 | 1.00% | 145,180 | 73.91% | 74.66% |
| 3/31/2006 | 196,840 | 1,962 | 194,878 | 1.00% | 157,128 | 79.83% | 80.63% |
| 6/30/2006 | 197,161 | 1,962 | 195,199 | 1.00% | 156,552 | 79.40% | 80.20% |
| 9/30/2006 | 197,252 | 1,962 | 195,290 | 0.99% | 159,230 | 80.72% | 81.54% |
| 12/31/2006 | 197,425 | 1,962 | 195,463 | 0.99% | 151,747 | 76.86% | 77.63% |
| **Average:** | | | | **0.92%** | | **77.63%** | **78.42%** |

Sources: Thomson Reuters; Bloomberg; SEC Forms 20-F, 2005 - 2006.

**Exhibit 13**

**CLS CS Autocorrelation Coefficients For the Class Period and By Calendar Quarter**

| Quarter | Coefficient on Previous Day Abnormal Return | T-statistic |
|---|---|---|
| 2005Q1 | 0.10 | 0.62 |
| 2005Q2 | 0.25 | 2.06 |
| 2005Q3 | 0.03 | 0.26 |
| 2005Q4 | -0.07 | -0.51 |
| 2006Q1 | 0.08 | 0.59 |
| 2006Q2 | 0.07 | 0.55 |
| 2006Q3 | 0.29 | 2.38 |
| 2006Q4 | 0.01 | 0.08 |
| 2007Q1 | -0.14 | -1.07 |
| **Class Period** | **0.07** | **1.71** |

Source: Bloomberg.

**Exhibit 14**
**Abnormal Returns and Abnormal Dollar Movements on Corrective Disclosure Dates**

| Market Date | Summary of Partially Corrective Information | CLS Observed Return | Abnormal Return | Abnormal Return T-stat | Abnormal Dollar Change | Significance Level |
|---|---|---|---|---|---|---|
| 1/27/2006 | Partial Disclosure of Issues at Monterrey Facility | -3.70% | -4.21% | -2.49 | ($0.43) | ** |
| 10/27/2006 | Announced Restructuring Charges over and above Original Budget, $6 Million in Inventory Write-Offs, "Unstable" Condition of Mexico Facility and Lowered Guidance on End-User Demand | -13.46% | -12.23% | -8.13 | ($1.44) | ** |
| 11/28/2006 | Resignation of CEO | -4.44% | -4.22% | -2.92 | ($0.41) | ** |
| 12/12/2006 | Earnings Guidance Revised on Customer Desertions and Partial Impact of Monterrey Inventory Issues | -12.17% | -11.86% | -8.49 | ($1.11) | ** |
| 1/31/2007 | Resignation of CFO amid poor FY2006 Results and Revelation of Full Extent of Monterrey and Related Restructuring Issues | -22.90% | -23.73% | -20.00 | ($1.83) | ** |
| | | | | Total Abnormal $ Change: | ($5.22) | |

Source: Bloomberg and Factiva.
Notes:
1)For each trading day I constructed a regression using data from the prior 120 trading days. This rolling regression model estimates the relationship between CLS's CS returns with the returns of the S&P 500, and value-weighted peer index. For the peer index, I used the following firms identified in the CLS's 2004-2007 20-F filings: Flextronics International Ltd, Sanmina-SCI Corporation, Solectron Corporation, and Jabil Circuit. CLS's earnings dates and identified corrective disclosure dates are excluded from the regression. The corrective disclosures are: 1/27/2006, 10/27/2006, 11/28/2006, 12/12/2006, and 01/31/2007. 95% confidence interval is based on Student's t-distribution.



**Exhibit 15A**
**Value of CLS Compared to S&P 500 and Peer Weighted Index on 3 Day Window Before and After January 27, 2006**

Source: Bloomberg.
Note: Price of S&P 500 Index and Peer Weighted Index on first day (3 days prior to Corrective Disclosure Event) is pegged to the price of CLS.

**Exhibit 15B**
**CLS CS NYSE Intraday Price and Volume**
**1/26/2006 - 1/27/2006 (Q4 FY 2005 Earnings Announcement and Corrective Disclosure)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.



**Exhibit 16A**
**Value of CLS Compared to S&P 500 and Peer Weighted Index on 3 Day Window Before and After October 27, 2006**

Source: Bloomberg.
Note: Price of S&P 500 Index and Peer Weighted Index on first day (3 days prior to Corrective Disclosure Event) is pegged to the price of CLS.

**Exhibit 16B**
**CLS CS NYSE Intraday Price and Volume**
**10/26/2006 - 10/27/2006 (Q3 FY 2006 Earnings Announcement and Corrective Disclosure)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.



**Exhibit 17A**
**Value of CLS Compared to S&P 500 and Peer Weighted Index on 3 Day Window Before and After November 28, 2006**

Source: Bloomberg.
Note: Price of S&P 500 Index and Peer Weighted Index on first day (3 days prior to Corrective Disclosure Event) is pegged to the price of CLS.

**Exhibit 17B**
**CLS CS NYSE Intraday Price and Volume**
**11/27/2006 - 11/28/2006 (Corrective Disclosure)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.



**Exhibit 18A**
**Value of CLS Compared to S&P 500 and Peer Weighted Index on 3 Day Window Before and After December 12, 2006**

Source: Bloomberg.
Note: Price of S&P 500 Index and Peer Weighted Index on first day (3 days prior to Corrective Disclosure Event) is pegged to the price of CLS.

**Exhibit 18B**
**CLS CS NYSE Intraday Price and Volume**
**12/11/2006 - 12/12/2006 (Corrective Disclosure)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.



**Exhibit 19A**
**Value of CLS Compared to S&P 500 and Peer Weighted Index on 3 Day Window Before and After January 31, 2007**

Source: Bloomberg.
Note: Price of S&P 500 Index and Peer Weighted Index on first day (3 days prior to Corrective Disclosure Event) is pegged to the price of CLS.

**Exhibit 19B**
**CLS CS NYSE Intraday Price and Volume**
**1/30/2007 - 1/31/2007 (Q4 FY 2006 Earnings Announcement and Corrective Disclosure)**



| Return | Abn. Return | T-Stat |
|---|---|---|
| -22.9% | -23.7% | -20.00 |

4:00 pm - $7.73
**NYSE Close**

9:30 am - $6.63
Celestica announces fourth quarter and 2006 fiscal year end financial results (*CNW Group, 1/30/2007, 8:00 PM*)

4:00 pm - $5.96
**NYSE Close**

Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

## Appendix A

## Documents Considered

### Court Documents

- Consolidated Amended Class Action Complaint, filed November 21, 2007.
- "Summary Order," Document 67, 07-cv-312 (GBD) filed January 20, 2012.
- "Memorandum Decision and Order," Document 60, 07 CV 312 (GBD) filed October 14, 2012.

### Court Decisions and Securities Law

- *Basic v. Levinson*, 485 U.S. 224, 240 (1988).
- *Cammer v. Bloom*, 711 F. Supp 1264 (D.N.J. 1989).
- "Certification of Disclosure in Companies' Quarterly and Annual Reports," *U.S. Securities and Exchange Commission*, August 30, 2002.
- *Matrixx Initiatives, Inc., et al. v. Siracusano, et al.,* No. 09-1156
- 15 U.S.C. §78u-4(e)(1).

### SEC Filings/Forms

- Celestica Inc. Form 20-F for the year ended December 31, 2004, filed March 21, 2005.
- Celestica Inc. Form 20-F for the year ended December 31, 2005, filed March 21, 2006.
- Celestica Inc. Form 20-F for the year ended December 31, 2006, filed March 20, 2007.
- Celestica Inc. Form 20-F for the year ended December 31, 2007, filed March 25, 2008.
- Celestica Inc. Form 20-F for the year ended December 31, 2008, filed March 24, 2009.
- Celestica Inc. Form 6-K for the month of November 2006, filed November 28, 2006.
- Celestica Inc. Form F-3, filed November 17, 2000.
- Celestica Inc. Form F-3, filed September 10, 2001.
- Celestica Inc. Form F-3, filed November 14, 2008.
- Celestica Inc. Form F-3, filed November 14, 2011.
- Celestica Inc. Pre-Effective Amendment No. 1 to Form F-3, filed March 24, 2004.
- Flextronics International Ltd. Form 10-K for the fiscal year ended March 31, 2007, filed May 29, 2007.
- Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.
- http://www.sec.gov/about/forms/form13f.pdf.

### Security Data

- Historical data for Celestica Inc. Common Stock, selected peers, S&P 500 Total Return Index, and CAD-USD exchange rate obtained from Bloomberg.
- Quote data for Celestica Inc. during the Class Period and one hundred random companies trading on the New York Stock Exchange and NASDAQ for November 2005 were obtained from www.tickdata.com.
- Option contract data for Celestica Inc. Common Stock shares obtained from Bloomberg.
- Institutional holdings data obtained from Thomson Reuters.
- Turnover velocity statistics for the NYSE and TSX are from the World Federation of Exchanges, http://www.world-exchanges.org/statistics.
- The market capitalization of all the companies that were traded on the NYSE and the NASDAQ as of December 31, 2005 and December 31, 2006 was acquired from Bloomberg.

## Celestica Inc. News and Press Releases

- Celestica Inc. news headlines and select articles downloaded from Factiva using a search for "all sources" with the company field identified as "Celestica" for the period January 27, 2005 through January 30, 2007.
- Select news articles from Bloomberg.
- News articles contributing to Event Study analyses.
- News articles including, but not limited to:
  - "Q4 2004 Earnings Call," *Bloomberg Transcript,* January 27, 2005.
  - "Q1 2005 Earnings Call," *Bloomberg Transcript,* April 21, 2005.
  - "Q2 2005 Earnings Call," *Bloomberg Transcript,* July 21, 2005.
  - "Q3 2005 Earnings Call," *Bloomberg Transcript,* October 20, 2005.
  - "Q4 2005 Earnings Call," *Bloomberg Transcript,* January 26, 2006.
  - "Q1 2006 Earnings Call," *Bloomberg Transcript,* April 27, 2006.
  - "Q2 2006 Earnings Call," *Bloomberg Transcript,* July 27, 2006.
  - "Q3 2006 Earnings Call," *Bloomberg Transcript,* October 26, 2006.
  - "Q4 2006 Guidance Call," *Bloomberg Transcript,* December 12, 2006.
  - "Q4 2006 Earnings Call," *Bloomberg Transcript,* January 31, 2007.
  - "Q1 2007 Earnings Call," *Bloomberg Transcript,* April 25, 2007.
  - "Q2 2007 Earnings Call," *Bloomberg Transcript,* July 26, 2007.
  - "Q3 2007 Earnings Call," *Bloomberg Transcript,* October 25, 2007.
  - "Q4 2007 Earnings Call," *Bloomberg Transcript,* January 31, 2008.
  - "FLEX – Q2 2007 Flextronics Earnings Conference Call," *Thomson StreetEvents,* October 24, 2006.
  - "FLEX – Q3 2007 Flextronics Earnings Conference Call," *Thomson StreetEvents,* January 30, 2007.

- o Celestica Press Release, "Celestica Announces Second Quarter Financial Results," July 27, 2006 (www.celestica.com/News/News.aspx?id=602).
- o Celestica Press Release , "Celestica Announces Third Quarter Financial Results," October 26, 2006 (www.celestica.com/News/News.aspx?id=606).
- o Celestica Press Release, "Celestica Appoints Craig Muhlhauser President and Chief Executive Officer," November 27, 2006 (www.celestica.com/News/News.aspx?id=610).
- o Celestica Press Release, "Celestica Updates Guidance for Fourth Quarter," December 12, 2006 (www.celestica.com/News/News.aspx?id=612).
- o Celestica Press Release , "Celestica Announces Fourth Quarter and 2006 Fiscal Year End Financial Results,", January 30, 2007 (www.celestica.com/News/News.aspx?id=614).
- o "Toronto Stks End Bearish Week With Broad Decline," *Dow Jones Newswires*, April 15, 2005, 16:20.
- o  "Celestica 2Q Rev $2.25B," *Dow Jones News Service*, July 21, 2005, 16:01.
- o "Celestica, Inc. Issues Q3 2006 Guidance," *Reuters Significant Developments,* July 27, 2006.
- o  "Celestica 2Q Rev $2.22B," *Dow Jones News Service,* July 27, 2006.
- o "RPT-UPDATE 2- Celestica See Stable Market in Third Quarter," *Reuters News,* July 27, 2006.
- o "Celestica CEO's Exit Spurs Analysts' Questions," *Reuters News*, November 28, 2006.

**Celestica Inc. Analyst Reports**

- All analyst reports obtained through Investext for the period from January 1, 2005 to February 28, 2007, including, but not limited to:
  - o "Focus On Margin Expansion While Top-Line Growth Is Modest," *CIBC World Markets*, January 27, 2005.
  - o "CLS: 1Q Preview: Enterprise & Telecom Softness Driving Seasonality, *CitiGroup*, April 17, 2005.
  - o "Q1 Results First Take," *Credit Suisse First Boston*, April 21, 2005.
  - o "That dang 'demand' thing again," *National Bank Financial*, July 21, 2005.
  - o "CLS: June Q In-Line; But Weaker Than Expected Near-Term Outlook," *Citigroup Smith Barney*, July 22, 2005.
  - o "Operating Progress, but Guidance Disappoints; Lowering Estimates," *Wells Fargo Securities, LLC*, July 22, 2005.
  - o "Weak Quarter As Anticipated; Reiterate Underperform," *Bear Stearns*, October 20, 2005.
  - o "CLS: Still on the Mend, 2S Rating and $10.00 Target Price," *Citigroup Smith Barney*, November 9, 2005.

- o "While "Street" Indecision Lingers, we Like CLS Here!" *Halpern Capital*, December 12, 2005.
- o "Q4 Was In Line; The Q1 Guidance Was Below Estimates Due To Ramp Up Expenses," *CIBC World Markets,* January 26, 2006.
- o How much patience do you have? *National Bank Financial*. January 26, 2006.
- o "Q4 and F2005 Results," *Orion Securities, Inc,* January 27, 2006.
- o "Restructuring Snafu Trips up EPS Outlook…," *Kaufman Bros. Equity Research,* January 27, 2006.
- o "Q4 Results," *Credit Suisse*, January 27, 2006.
- o "CLS: Results Inline With RBC, But Will Temper Exuberant Expectations," *RBC Capital Markets*, April 27, 2006.
- o "Q1/06: Margin Improvement Forecast for Balance of Year," *Blackmont Capital*, April 28, 2006.
- o "Q2 Could Be Impacted By Operational Issues Due To Ramping & Transfer Programs," *CIBC World Markets,* July 24, 2006.
- o "CLS: Detecting Signs of Turn-Around, But We Still Recommend Waiting…," *RBC Capital Markets,* July 27, 2006.
- o "Upgrading to Neutral," *Credit Suisse,* July 28, 2006.
- o "Improved Performance…," *Jefferies & Company,* July 27, 2006.
- o "In-Line Q2 results, New Program Ramps Should Lead to a Strong Q3," *CIBC World Markets*, July 28, 2006.
- o "Baby Steps Forward," *National Bank,* July 28. 2006.
- o "Improving revenue exposure to emerging end markets as well as better inventory management should favor gross margin down the road." "Introducing Our FY2007 Forecast Model on Celestica; Maintaining at HOLD," *Kintisheff Research*, October 3, 2006
- o "Near-Term Outlook Improving, But Long-Term Outlook Still Unclear; Upgrading From Underperform to Peer Perform." *Bear Stearns & Co.* October 23, 2006.
- o "We Expect Positive Operating Leverage for Both Q3 and Q4," *CIBC World Markets,* October 23, 2006.
- o "This should be the Quarter of Turn," *Cowen and Company*, October 23, 2006.
- o "Celestica East vs. West Making Progress But Still Not on the Same Page; Maintain Peer Perform," *Bear Stearns & Co.,* October 26, 2006.
- o "Running With Scissors Into Q4," *CIBC World Markets,* October 27, 2006.
- o "Still Some Work Left To Do," *JP Morgan*, October 26, 2006.
- o "Q3 results," *Credit Suisse,* October 27, 2006.
- o "Q3/06 – 3.5% Margins in Sight; Reiterate Buy," *Blackmont Capital,* October 27, 2006.

- o "Out With the Old In With the New; Celestica Appoints New CEO Effective Immediately," *Bear Stearns & Co.,* November 27, 2006.
- o "CLS – Surprising Resignation from CEO, Replacement Named," *RBC Capital Markets,* November 28, 2006.
- o "CEO Steve Delaney Has Been Replaced As Margin Improvement Remains Elusive," *CIBC World Markets,* November 28, 2006.
- o "Celestica's Top Management Change Creates a New Layer of Risks and Uncertainties; Sell," *Kintisheff Research,* November 30, 2006.
- o "CLS – Lowers Q406 Guidance," *RBC Capital Markets,* December 12, 2006.
- o "CLS Lowers Its Guidance for 4Q06; Is CLS Cleaning House for the New CEO?" *Bear Stearns & Co.,* December 12, 2006.
- o "The Artic Chill Comes a Bit Early," *JP Morgan*, December 12, 2006.
- o "Reducing Estimates after Q4 Warning," *Scotia Capital*, December 13, 2006.
- o "Weaker Demand, Excess Inventory… Party Like It's 2002!" *National Bank Financial,* December 13, 2006.
- o "Another Negative Preannouncement; Moving to Neutral," *Cowen and Co.,* December 13, 2006.
- o "Celestica: Q4 In-Line, Q1 Outlook Disappointing," *Deutsche Bank*, January 31, 2007.
- o "Q4: Guidance Disaster," *Scotia Capital,* January 31, 2007.
- o "Has Celestica Bottomed Out?" *Bear Stearns,* January 31, 2007.
- o "Q4 Results," *Credit Suisse,* January 31, 2007.
- o "Q4 Results: Do You Like Black Diamond Ski Slopes?" *National Bank Financial*, February 1, 2007.
- o "Falling Back into the Red, Cutting Estimates," *Jefferies & Co.,* February 1, 2007.

## Academic Articles/Texts

- Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35(1), March 1980, pp. 1-12.
- Yakov Amihud, Haim Mendelson and Lasse Heje Pedersen, 2006, "Liquidity and Asset Prices," *Foundations and Trends in Finance* Vol. 1(4) pp. 269-364.
- Doron Avramov, Tarun Chorida, and Amit Goyal, "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance,* Vol. LXI, No. 5, 2006, pp. 2367-2368.

- Brad M. Barber, Paul A. Griffin and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law*, Winter 1994, 19 Iowa J. Corp. L. 285.
- William H. Beaver,  "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, (1968), pp. 67-92.
- J. C. Bedard & L. Graham, "Detection and Severity Classifications of Sarbanes-Oxley Section 404 Internal Control Deficiencies," *Accounting Review*, Vol. 86(3), (2011).
- J. C. Bedard, R. Hoitash & U. Hoitash, "Evidence from the United States on the Effect on Auditor Involvement in Assessing Internal Control Over Financial Reporting," *International Journal of Auditing*, Vol. 13 (2), 105-25 (2009).
- Chandra Shekhar Bhatnagar and Dyal Bhatnagar, "Stock Traversals and Arbitrage Possibilities: An Examination of Multiple Listings," *Journal of Business & Economic Studies,* Vol. 12, No. 2, 2006.
- John Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* Vol. 11, 1998, pp. 111-137.
- Phillip A. Braun, Daniel B. Nelson, and Alain M. Sunier, "Good News, Bad News Volatility, and Betas," *Journal of Finance* 50, 1995, p. 1597.
- William O. Brown, Jr., J. Harold Mulherin and Marc D. Weidenmier, "Competing With The New York Stock Exchange," *The Quarterly Journal of Economics,* November 2008.
- Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization.*  Fourth Edition, pp. 646 & 648.
- Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, John Wiley & Sons, Inc., 1996, pp. 9-10.
- Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.
- Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance,* Vol. 25, 1970, p. 383.
- Eugene Fama, "Efficient Capital Markets: II," *The Journal of Finance*, Vol. 46, 1991, pp. 1575-1617.
- Daniel R. Fischel, 1982, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, Vol. 38, p. 11.
- William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.
- J. S. Hammersley, L.A. Myers & C. Shakespeare, "Market Reactions to the Disclosure of Internal Control Weaknesses and to the Characteristics of those Weaknesses under Section 302 of the Sarbanes-Oxley Act of 2002," *Review of Accounting Studies*, Vol. 13(1), 141-65 (2008).
- Frederick H. deB. Harris, Thomas H. Mclnish, Gary L. Shoesmith, and Robert A. Wood, "Cointegration, Error Correction, and Price Discovery on Informationally Linked

Security Markets," *Journal Of Financial And Quantitative Analysis*, Vol. 30, No. 4, 1995.

- Shantaram Hegde, Hao Lin, CFA, and Sanjay Varshney, CFA, "Competitive Stock Markets: Evidence from Companies' Dual Listings on the NYSE and NASDAQ," *Financial Analysts Journal,* Vol. 66, No. 1, 2010.

- D. R. Hermanson & Z. Ye, "Why Do Some Accelerated Filers With SOX Section 404 Material Weaknesses Provide Early Warning Under Section 302?"*Auditing: Journal of Practice & Theory*, Vol. 28(2), 247-71 (2009).

- Roger D. Huang and Hans R. Stall, "Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE," *Journal of Financial Economics* Vol. 41, 1996, pp. 313-357.

- Michael C. Jensen, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* Vol. 6, Nos. 2/3, 1978, pp. 95-101.

- Raman Kumar, Atulya Sarin and Kuldeep Shastri, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *The Journal of Finance,* Vol. LIII, No. 2, April 1998, pp. 717-732.

- Jonathan R. Macey and Maureen O'Hara, "Regulating Exchanges And Alternative Trading Systems: A Law And Economics Perspective," *Journal of Legal Studies,* Vol. 28, 1999.

- A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature,* Vol. 35, No. 1, March 1997, pp. 13-39.

- Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Journal of Accounting Research*, Vol. 9, Empirical Research in Accounting: Selected Studies 1971 (1971), pp. 119-163.

- Vanthuan Nguyen, Bonnie F. Van Ness, and Robert A. Van Ness, "Short- and Long-Term Effects of Multimarket Trading," *The Financial Review,* Vol. 42, 2007, pp. 349-372.

- Stephen A. Ross, "Options and Efficiency," *The Quarterly Journal of Economics*, Vol. 90, February 1976, pp. 75-89.

- William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995.

- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.

- Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting." *Law and Contemporary Problems* Vol. 63, p. 108 & 117.

- T. Whitehouse, "Internal Controls Audits Continue to Shine," *Compliance Week*, Nov. 16, 2010.

**Depositions and Exhibits**

- Deposition of Robert L. Crandall, December 4, 2012, and Exhibits.
- Deposition of Donna Singh, December 18, 2012.
- Deposition of Paul Nicoletti, January 9, 2013, and Exhibits.
- Deposition of Antonio Fernandez-Stoll, January 29, 2013, and Exhibits.
- Deposition of Richard Burden, February 8, 2013, and Exhibits.
- Deposition of Frank Binder, March 13, 2013, and Exhibits.
- Deposition of Rachel Turpin, March 19, 2013, and Exhibits.
- Deposition of Gerald Schwartz, March 21, 2013, and Exhibits.
- Deposition of David Maff, March 28, 2013, and Exhibits.
- Deposition of John Boucher, April 5, 2013, and Exhibits.
- Deposition of Anthony Puppi, April 12, 2013, and Exhibits.
- Deposition of Frank Rondi, April 16, 2013.
- Deposition of Timothy J. McKeown, April 16, 2013.
- Deposition of Cisco by and through Eric Lundquist, April 17, 2013, and Exhibits.
- Deposition of Michael Homer, April 23, 2013, and Exhibits.
- Deposition of Stephen Delaney, April 30, 2013, and Exhibits.

**Discovery**

- CEL00023164
- CEL00023185
- CEL00023189
- CEL00024451
- CEL00024453
- CEL00024454
- CEL00024455
- CEL00024891
- CEL00025029
- CEL00028948
- CEL00028966
- CEL00029031
- CEL00029178
- CEL00029193
- CEL00032671
- CEL00032673
- CEL00033028

- CEL00033029
- CEL00033466
- CEL00033448
- CEL00033449
- CEL00033460
- CEL00033462
- CEL00034804
- CEL00034956
- CEL00034956
- CEL00035352
- CEL00036772
- CEL00036772
- CEL00037698
- CEL00042311
- CEL00042311B
- CEL00042313C
- CEL00046026
- CEL00046357
- CEL00053726
- CEL00054191
- CEL00054202
- CEL00057450
- CEL00059078
- CEL00062224
- CEL00063350
- CEL00071263
- CEL00071264
- CEL00098545
- CEL00099195
- CEL00102773
- CEL00102778
- CEL00109012
- CEL00118048
- CEL00118451
- CEL00118452
- CEL00118453
- CEL00118454
- CEL00118455

- CEL00118456
- CEL00118457
- CEL00118458
- CEL00118459
- CEL00118496
- CEL00121234
- CEL00132835
- CEL00188671
- CEL00199210
- CEL00199213
- CEL00203379
- CEL00207225
- CEL00218573
- CEL00219657
- CEL00283683
- CEL00283686
- CEL00287880
- CEL00288625
- CEL00324327
- CEL00330734
- CEL00375782
- CEL00396427
- CEL00396429
- CEL00415490
- CEL00416077
- CEL00417600
- CEL00421992
- CEL00422062

## **Other**

- "Study and Recommendations on Section 404(b) of the Sarbanes-Oxley Act of 2002 For Issuers With Public Float Between $75 and $250 Million," *U.S. Securities and Exchange Commission*, April 2011.
- "SEC Approves New Guidance for Compliance with Section 404 of Sarbanes-Oxley," *U.S. Securities and Exchange Commission*, May 23, 2007.
- SEC Release No. 33-8810

- "Auditing Standard No. 5: An Audit of Internal Control Over Financial Peorting That Is Integrated with An Audit of Financial Statements," Public Company Accounting Oversight Board (http://pcaobus.org/standards/auditing/pages/auditing_standard_5.aspx#introduction)
- Onex holdings of CLS Common Stock was obtained from Bloomberg.
- Ratings agency coverage of Celestica was obtained from Bloomberg.
- http://www.rss-specifications.com/ .
- http://www.rss-specifications.com/what-is-rss.htm.
- http://www.nyse.com/equities/nyseequities/1166830723427.html.
- http://www.world-exchanges.org/statistics/monthly-reports
- http://www.tmx.com/en/trading/index.html
- http://www.tmx.com/en/trading/products_services/market_system.html
- http://www.tmx.com/en/trading/products_services/market_makers_list.html
- http://www.sec.gov/info/smallbus/secg/s3f3-secg.htm.

APPENDIX B
## CHAD W. COFFMAN, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:         (312) 470-6500
Mobile:        (815) 382-0092
Email:         ccoffman@globaleconomicsgroup.com


## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, San Francisco and Atlanta, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)


## EDUCATION:

**CFA**      Chartered Financial Analyst, 2003

**M.P.P.**   University of Chicago, 1997
             Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**     Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## SELECTED EXPERIENCE:

Experience in Securities and Valuation Cases:

- Expert consultant for Citigroup/Salomon Smith Barney in various matters related to Jack Grubman's analyst coverage of various companies.  This included supporting multiple experts at high-profile arbitration where plaintiffs claimed $900 million in damages.  Arbitration panel returned a verdict in favor of client (reported in Wall Street Journal).

- Expert damages consultant in dozens of 10b-5 and Section 11 securities litigation, including, but not limited to:
    - WorldCom
    - Enron
    - Tyco
    - Parmalat
    - Sears
    - Atlas Air
    - UnumProvident
    - XL Capital
    - Household Finance/HSBC
    - Dynegy
    - Anicom

- Expert consultant in multiple cases involving market timing and/or late-trading.  Developed models to estimate market timing profits.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in multiple 10(b)-5 securities cases as well as futures manipulation case.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Expert consultant to large hedge fund that owned bonds in WorldCom.  Responsible for directing analysis that led to favorable settlement of their claim in the bankruptcy.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed rebuttal expert report August 4, 2010.

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report on January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et. al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed rebuttal expert report July 8, 2010.  Deposition September 1, 2010. Filed supplemental rebuttal expert report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed rebuttal expert report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed rebuttal expert report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed rebuttal expert report September 26, 2011. Filed expert report March 16, 2012. Filed rebuttal expert report April 9, 2012. Filed rebuttal expert report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed rebuttal expert report August 2, 2012. Filed declaration re: Plan of Allocation, January 28, 2013.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed rebuttal expert report October 29, 2012. Filed declaration re: Plan of Allocation, May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court, Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed rebuttal expert report March 25, 2013. Deposition March 27, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed expert report April 1, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant for Novartis regarding various labor related issues.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.


**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)


**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Ra ilroad Construction and Land Value."  *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).


**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

    1994  Ford Fellowship Recipient for Summer Research.
    1993  Arnold Prize for Best Research Proposal.
    1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

Pro bono consulting for Cook County State's Attorney's Office.
    Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.

# Appendix C
## Exhibit 1
### CLS CS TSX Regression Model: S&P 500 and Peer Weighted Index Coefficients
### 1/27/2005 - 1/31/2007



Source: Bloomberg.

Notes: For each trading day I constructed a regression using data from the prior 120 trading days. This rolling regression model estimates the relationship between CLS's CS returns with the returns of the S&P 500, and value-weighted peer index. For the peer index, I used the following firms identified in the CLS's 2004-2007 20-F filings: Flextronics International Ltd, Sanmina-SCI Corporation, Solectron Corporation, and Jabil Circuit. CLS's earnings dates and identified corrective disclosure dates are excluded from the regression. The corrective disclosures are: 1/27/2006, 10/27/2006, 11/28/2006, 12/12/2006, and 01/31/2007.

**Appendix C**
**Exhibit 2**
**CLS CS TSX Regression Model: Standard Deviation of The Errors**
**1/27/2005 - 1/31/2007**



Source: Bloomberg.

Notes: For each trading day I constructed a regression using data from the prior 120 trading days. This rolling regression model estimates the relationship between CLS's CS returns with the returns of the S&P 500, and value-weighted peer index. For the peer index, I used the following firms identified in the CLS's 2004-2007 20-F filings: Flextronics International Ltd, Sanmina-SCI Corporation, Solectron Corporation, and Jabil Circuit. CLS's earnings dates and identified corrective disclosure dates are excluded from the regression. The corrective disclosures are: 1/27/2006, 10/27/2006, 11/28/2006, 12/12/2006, and 01/31/2007.

# Appendix C
## Exhibit 3
## CLS CS TSX Regression Model: Abnormal Returns
## 1/27/2005 – 1/31/2007



Source: Bloomberg.

Notes: For each trading day I constructed a regression using data from the prior 120 trading days. This rolling regression model estimates the relationship between CLS's CS returns with the returns of the S&P 500, and value-weighted peer index. For the peer index, I used the following firms identified in the CLS's 2004-2007 20-F filings: Flextronics International Ltd, Sanmina-SCI Corporation, Solectron Corporation, and Jabil Circuit. CLS's earnings dates and identified corrective disclosure dates are excluded from the regression. The corrective disclosures are: 1/27/2006, 10/27/2006, 11/28/2006, 12/12/2006, and 01/31/2007. 95% confidence interval is based on Student's t-distribution.

**Appendix C**
**Exhibit 4**
**Event Study Analysis of CLS Earnings Announcements (TSX)**

| # | Date | Market Date | Event | CLS CS Price | CLS CS Return | Abnormal Return | Abnormal Dollar Change | T-Stat | Sig Level |
|---|------|-------------|-------|--------------|---------------|-----------------|------------------------|--------|-----------|
| 1 | 1/27/2005 | 1/28/2005 | Earnings Announcement | CAD 15.89 | -4.28% | -0.67% | -CAD 0.11 | -0.38 | |
| 2 | 4/21/2005 | 4/21/2005 | Earnings Announcement | CAD 14.24 | -4.11% | -6.89% | -CAD 1.02 | -3.87 | ** |
| 3 | 7/21/2005 | 7/22/2005 | Earnings Announcement | CAD 14.89 | -15.01% | -13.97% | -CAD 2.45 | -8.52 | ** |
| 4 | 10/20/2005 | 10/21/2005 | Earnings Announcement | CAD 11.25 | -8.16% | -7.06% | -CAD 0.87 | -4.71 | ** |
| 5 | 1/26/2006 | 1/27/2006 | Earnings Announcement | CAD 11.18 | -5.25% | -5.58% | -CAD 0.66 | -3.06 | ** |
| 6 | 4/27/2006 | 4/27/2006 | Earnings Announcement | CAD 13.30 | 4.31% | 3.41% | CAD 0.44 | 1.88 | |
| 7 | 7/27/2006 | 7/28/2006 | Earnings Announcement | CAD 10.83 | 21.69% | 20.83% | CAD 1.85 | 12.32 | ** |
| 8 | 10/26/2006 | 10/27/2006 | Earnings Announcement | CAD 11.41 | -13.03% | -11.78% | -CAD 1.55 | -7.28 | ** |
| 9 | 1/30/2007 | 1/31/2007 | Earnings Announcement | CAD 6.98 | -23.46% | -24.21% | -CAD 2.21 | -17.59 | ** |

\** Denotes statistical Significance at the 95% confidence level or greater.

Source: Bloomberg

Notes:

1) For each trading day I constructed a regression using data from the prior 120 trading days. This rolling regression model estimates the relationship between CLS's CS returns with the returns of the S&P 500, and value-weighted peer index. For the peer index, I used the following firms identified in the CLS's 2004-2007 20-F filings: Flextronics International Ltd, Sanmina-SCI Corporation, Solectron Corporation, and Jabil Circuit. CLS's earnings dates and identified corrective disclosure dates are excluded from the regression. The corrective disclosures are: 1/27/2006, 10/27/2006, 11/28/2006, 12/12/2006, and 01/31/2007. 95% confidence interval is based on Student's t-distribution.

# Appendix C
## Exhibit 5
## Event Study Analysis of CLS Corrective Disclosures (TSX)

| # | Date | Market Date | Event | CLS CS Price | CLS CS Return | Abnormal Return | Abnormal Dollar Change | T-Stat | Sig Level |
|---|------|-------------|-------|--------------|---------------|-----------------|------------------------|--------|-----------|
| 1 | 1/26/2006 | 1/27/2006 | Corrective Disclosure | CAD 11.18 | -5.25% | -5.58% | (CAD 0.66) | -3.06 | ** |
| 2 | 10/26/2006 | 10/27/2006 | Corrective Disclosure | CAD 11.41 | -13.03% | -11.78% | (CAD 1.55) | -7.28 | ** |
| 3 | 11/27/2006 | 11/28/2006 | Corrective Disclosure | CAD 10.44 | -5.26% | -5.16% | (CAD 0.57) | -3.34 | ** |
| 4 | 12/12/2006 | 12/12/2006 | Corrective Disclosure | CAD 9.42 | -12.45% | -12.22% | (CAD 1.32) | -8.07 | ** |
| 5 | 1/30/2007 | 1/31/2007 | Corrective Disclosure | CAD 6.98 | -23.46% | -24.21% | (CAD 2.21) | -17.59 | ** |

** Denotes statistical Significance at the 95% confidence level or greater.

Source: Bloomberg

Notes:

1) For each trading day I constructed a regression using data from the prior 120 trading days. This rolling regression model estimates the relationship between CLS's CS returns with the returns of the S&P 500, and value-weighted peer index. For the peer index, I used the following firms identified in the CLS's 2004-2007 20-F filings: Flextronics International Ltd, Sanmina-SCI Corporation, Solectron Corporation, and Jabil Circuit. CLS's earnings dates and identified corrective disclosure dates are excluded from the regression. The corrective disclosures are: 1/27/2006, 10/27/2006, 11/28/2006, 12/12/2006, and 01/31/2007. 95% confidence interval is based on Student's t-distribution.



**Appendix C**
**Exhibit 6A**
**CLS CS TSX and NYSE Intraday Prices**
**1/27/2005 - 1/28/2005 (Q4 FY 2004 Earnings Announcement)**

| Model | Return | Abn. Return | T-Stat |
|-------|--------|-------------|--------|
| NYSE | -3.53% | 0.09% | 0.05 |
| TSX | -4.28% | -0.67% | -0.38 |

4:00 pm - $13.32
NYSE Close

4:00 pm - $12.85
NYSE Close

4:00 pm - CAD 16.6
TSX Close

9:30 am - NYSE: $13.00, TSX: CAD15.99
Celestica announces fourth quarter and fiscal 2004 financial results (*CNW Group, 1/27/2005, 4:01 PM*)

4:00 pm - CAD15.89
TSX Close

— CLS NYSE Price    — CLS TSX Price

Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Appendix C**
**Exhibit 6B**
**CLS CS TSX and NYSE Intraday Prices**
**4/20/2005 - 4/18/2005 (Q1 FY 2005 Earnings Announcement)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Appendix C**
**Exhibit 6C**
**CLS CS TSX and NYSE Intraday Prices**
**7/21/2005 - 7/22/2005 (Q2 FY 2005 Earnings Announcement)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Appendix C**
**Exhibit 6D**
**CLS CS TSX and NYSE Intraday Prices**
**10/20/2005 - 10/21/2005 (Q3 FY 2005 Earnings Announcement)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Appendix C**
**Exhibit 6E**
**CLS CS TSX and NYSE Intraday Prices**
**1/26/2006 - 1/27/2006 (Q4 FY 2005 Earnings Announcement and Corrective Disclosure)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Appendix C**
**Exhibit 6F**
**CLS CS TSX and NYSE Intraday Prices**
**4/26/2006 - 4/27/2006 (Q1 FY 2006 Earnings Announcement)**



| Model | Return | Abn. Return | T-Stat |
|---|---|---|---|
| NYSE | 5.22% | 4.31% | 2.52 |
| TSX | 4.31% | 3.41% | 1.88 |

4:00 pm - CAD 12.75
**TSX Close**

9:30 am -  NYSE: $11.12, TSX: CAD12.35
Celestica announces first quarter financial results (*CNW Group, 4/27/2006, 7:01 AM*)

4:00 pm - CAD13.3
**TSX Close**

4:00 pm - $11.31
**NYSE Close**

4:00 pm - $11.9
**NYSE Close**

—— CLS NYSE Price       —— CLS TSX Price

Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.



**Appendix C**
**Exhibit 6G**
**CLS CS TSX and NYSE Intraday Prices**
**7/27/2006 - 7/28/2006 (Q2 FY 2006 Earnings Announcement)**

| Model | Return | Abn. Return | T-Stat |
|---|---|---|---|
| NYSE | 21.22% | 20.39% | 12.72 |
| TSX | 21.69% | 20.83% | 12.32 |

9:30 am - NYSE: $8.35, TSX: CAD 9.39
Celestica announces second quarter financial results (*CNW Group, 7/27/2006, 4:00 PM*)

4:00 pm - $9.54
NYSE Close

4:00 pm - CAD10.83
TSX Close

4:00 pm - $7.87
NYSE Close

4:00 pm - CAD 8.9
TSX Close

—— CLS NYSE Price    —— CLS TSX Price

Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Appendix C**
**Exhibit 6H**
**CLS CS TSX and NYSE Intraday Prices**
**10/26/2006 - 10/27/2006 (Q3 FY 2006 Earnings Announcement and Corrective Disclosure)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Appendix C**
**Exhibit 6I**
**CLS CS TSX and NYSE Intraday Prices**
**11/27/2006 - 11/28/2006 (Corrective Disclosure)**



| Model | Return | Abn. Return | T-Stat |
|-------|--------|-------------|--------|
| NYSE  | -4.4%  | -4.22%      | -2.92  |
| TSX   | -5.26% | -5.16%      | -3.34  |

4:00 pm - $9.68
NYSE Close

4:00 pm - $9.25
NYSE Close

9:30 am - NYSE: $9.61, TSX: CAD 10.84
Celestica appoints Craig Muhlhauser
President and Chief (*PR Newswire,
11/27/2006, 5:58 PM*)

4:00 pm - CAD 11.02
TSX Close

4:00 pm - CAD 10.44
TSX Close

———— CLS NYSE Price    ———— CLS TSX Price

Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Appendix C**
**Exhibit 6J**
**CLS CS TSX and NYSE Intraday Prices**
**12/11/2006 - 12/12/2006 (Corrective Disclosure)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.

**Appendix C**
**Exhibit 6K**
**CLS CS TSX and NYSE Intraday Prices**
**1/30/20067- 1/31/2007(Q4 FY 2006 Earnings Announcement and Corrective Disclosure)**



Sources: TICK data; Bloomberg.
Note: Price is calculated as the volume weighted average price for each minute of the trading day except for the closing price, which is the reported price from Bloomberg.