F7S9HENC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  RUSSELL HENNING, ET AL.,

4              Plaintiffs,

5         v.                        07 CV 0312 (GBD)

6  CELESTICA, INC., ET AL.,

7              Defendants.

8  ------------------------------x
                                 New York, N.Y.
9                                July 28, 2015
                                 10:00 a.m.
10
   Before:
11
                    HON. GEORGE B. DANIELS
12
                                          District Judge
13
                         APPEARANCES
14
   LABATON SUCHAROW LLP
15      Attorneys for Plaintiffs
   BY:  NICOLE ZEISS
16
   BLEICHMAR FONTI TOUNTAS & AULD LLP
17      Attorneys for Plaintiffs
   BY:  JOSEPH A. FONTI
18
   KAYE SCHOLER
19      Attorneys for Defendants
   BY:  PHILLIP A. GERACI
20

21

22

23

24

25

1        (In open court; case called)

2        MS. ZEISS:  Nicole Zeiss from Labaton Sucharow on

3   behalf of the class and class representatives.  Good morning,

4   your Honor.

5        MR. FONTI:  Good morning, your Honor.  Joseph Fonti

6   from Bleichmar Fonti Tountas & Auld of counsel to the class.

7        THE COURT:  Good morning.

8        MR. GERACI:  Good morning, your Honor.  Phil Geraci of

9   Kaye Scholer for the defendants.

10       THE COURT:  We're here for final approval of the

11  settlement.  Just turn to the parties and you can let me know

12  what the status is.  I received an objection from Jeff Brown.

13  I believe that's the only objection that I'm aware of that was

14  received.  Why don't you tell me what the status is at this

15  point.

16       MS. ZEISS:  Yes, your Honor.  Nicole Zeiss from

17  Labaton.

18       I can address the approval motion and Mr. Fonti will

19  be addressing the fee motion.

20       We're very pleased to be here today to present the

21  final approval of a proposed settlement of this securities

22  class action for 30 million.  The settlement represents a very

23  favorable recovery of between 11 percent and 24 percent.  It

24  has the strong support of the class representatives who

25  collectively purchased about fifteen thousand shares.  We've

1  had a very excellent reaction by the class overall.  We hired

2  one of the preeminent claims administrators in this industry to

3  disseminate notice.  They have disseminated about 65,000 copies

4  of the notice.  We received only three opt-outs, one of which

5  was valid.  All were submitted by individuals.  The valid opt

6  out request was a thousand shares.

7          We've only received the one objection by Mr. Brown,

8  who is an attorney, and also appears to be a serial objector

9  who has objected in about seven other cases.  We were able to

10  successfully subpoena -- well effect service of a subpoena for

11  records on Mr. Brown.  He has not presented any information

12  indicating that he's a class member, even though he's an

13  attorney and Garden City Group did receive his name from a

14  broker.  So we know that he does have a source for trading

15  records.  We submit that he has no standing to pursue his

16  objection.  And, in fact, in three of his other objections he

17  also did not have standing.

18          THE COURT:  Did you send notice out to him?

19          MS. ZEISS:  Yes.  He received notice.

20          THE COURT:  And on what basis did he receive notice if

21  he has no standing?

22          MS. ZEISS:  Brokers are asked to search for investors.

23  But some of their customers might have just held during the

24  class period.  They didn't necessarily purchase.  And the fact

25  that he hasn't been able to produce those records despite ample

F7S9HENC

1    opportunity and access to a broker we think indicates that he

2    likely does not have standing.

3            THE COURT:  Well, do you have any information either

4    consistent or inconsistent with that?  Obviously he's someone

5    that you sent notice to on the presumption that he had an

6    interest in this case.  So what information do you have about

7    whether or not he was, in fact, a purchaser?

8            MS. ZEISS:  We don't have trading records for class

9    members.  All we know is that his broker located his name and

10   address as somebody who may have purchased or held during the

11   class period.  But we don't have access to people's trading

12   records.

13           Celestica did not produce his name as part of their

14   transfer file.  So they don't have him as an owner of record.

15           THE COURT:  You said you sought this information from

16   him.

17           MS. ZEISS:  Yes, your Honor.  We subpoenaed the

18   information from him.  We were able to finally serve him.  And

19   he has not responded.

20           THE COURT:  He didn't respond at all to the subpoena?

21           MS. ZEISS:  A call -- he did not provide any records.

22   A colleague called me and indicated that they did receive the

23   subpoena and that they were looking but they have not produced

24   anything.

25           THE COURT:  Have you had any further conversation or

1    correspondence with Mr. Brown?

2              MS. ZEISS:  No.  Absolutely none, Your Honor.

3              THE COURT:  All right.

4              MS. ZEISS:  I have some more information to put the

5    opt-outs in context if you would like.

6              THE COURT:  Sure.

7              MS. ZEISS:  So we received the three opt-outs.  Only

8    one is valid.  A thousand shares.  Celestica, at the end of the

9    class period, had about 200 million shares outstanding.  And

10   our expert estimated that potentially a hundred million shares

11   are damaged.  So the fact that only a thousand shares by an

12   individual opted out we think is very significant.

13             Our expert also estimated that institutional investors

14   owned about 80 percent of the damaged shares.  So the fact that

15   no institution or pension fund came forward to object or opt

16   out we also submit is significant.

17             I have some updated claim information for you.

18             THE COURT:  Sure.

19             MS. ZEISS:  So, we are very early in the process.  The

20   claims deadline is two months away.  Garden City Group's

21   experience is the vast majority of claimants file right before

22   the deadline or at the deadline.

23             They overall estimate that they may receive between

24   6500 claims and 13,000.  To date they've received 500 claims.

25   About 50 of them are from institutions.  450 are from

F7S9HENC

1    individuals.  The total shares claims so far is about a

2    million.  So we're still a ways away from our estimate of a

3    hundred million damaged share.

4            The average number of shares purchased per claim is

5    about 2,000 shares.  Our largest claim is by an institutional

6    investor and they held shares -- they purchased shares of

7    300,000 shares.  So a very significant claimant has come

8    forward, and we expect that that will increase significantly by

9    the end of the claims period.

10           THE COURT:  All right.

11           MS. ZEISS:  With respect to the substance of

12   Mr. Brown's objection.  I just want to make it clear that he

13   hasn't objected to the recovery or anything of substance with

14   respect to the settlement.  He has not objected to the plan of

15   allocation.  He has not objected to the request for expenses.

16   He has a few quibbles with some side issues with respect to the

17   settlement that I can go through.  And Mr. Fonti can address

18   any -- you know, the fee objections.  But he's cited absolutely

19   no authority for any of his points.

20           So I can walk the court through those although they

21   are all laid out in the papers.

22           THE COURT:  Why don't you just summarize it for the

23   record.

24           MS. ZEISS:  Sort of a laundry list with respect to the

25   class -- I'm sorry, the settlement.  No claims oversight.  The

F7S9HENC

1    timelines and deadlines favor defendants and class counsel.

2    There is no explanation of what any of this means.  The claims

3    process is burdensome.

4           This is exactly the claims process that is used

5    uniformly in securities class actions.  The court has

6    continuing oversight over the case and remains to have

7    jurisdiction over class counsel and the claims administrator.

8    We will come forward at the end of the claims process and file

9    a motion for approval of a distribution.  Your Honor will need

10   to approve all of the distributions before they're made.  So

11   there is significant oversight of the process.

12          He mentions something about the SIPRI entity.  At the

13   end of the claims process, after we've made multiple

14   distributions, if there is an amount that's unclaimed by class

15   members, the standard practice is to make a donation to a SIPRI

16   entity.  His objection is that the funds should be used to

17   benefit certain class members.  Well, the whole point of SIPRI

18   is that you have unclaimed money.  And it's not economically

19   feasible to distribute to class members.  But what will happen

20   here is that if we get to that point we will ask your Honor to

21   approve SIPRI recipients so the court will have oversight of

22   that.

23          And I believe that's it as to these settlement issues

24   that he raises.

25          THE COURT:  And Mr. Fonti did you want to -- I'm sorry

1    Mr. Johnson.

2              MS. ZEISS:  Mr. Fonti.

3              THE COURT:  Sorry.

4              MR. FONTI:  Mr. Fonti, yes.

5              THE COURT:  Mr. Fonti, did you want to address the

6    issue of the fees and expenses?

7              MR. FONTI:  Yes, your Honor.  Thank you very much.

8    I'll begin by saying it's, after eight years of litigation,

9    it's good to be here before the court presenting this

10   settlement and resolution; that we're extremely pleased.  As

11   Ms. Zeiss articulated, the class appears to be very content

12   with the exception of one objection.

13             The request has three components.  It has one for

14   reimbursement of expenses; one for reimbursement of

15   out-of-pocket costs and lost wages of the lead plaintiff, the

16   New Orleans Retirement System; and the third component is the

17   award of attorneys' fees to class counsel.

18             As to the first and second component, the

19   reimbursement of expenses.  They were completely advanced by

20   class counsel, the attorneys in this case, over an eight-year

21   history of the case.  There is no objection.

22             In our papers we presented to the court the particular

23   breakdown of those expenses.  As we indicated in the papers,

24   about 60 percent of the expenses go toward expert fees.

25             As your Honor knows, this case went up to, just weeks

1  before trial, through summary judgment, expert discovery.  It

2  was a very technical, complex case around a high tech industry

3  that Celestica was in.  And the use of experts was essential,

4  both from the proof standard as well as meeting our obligations

5  at summary judgment and certainly at trial.

6        If the court would like, I could go into more detail.

7  We believe the papers present a fair amount of information

8  around the reasonableness of those fees and expenses -- I'm

9  sorry, the expenses and without -- and they are met without

10  objection by anyone.

11        THE COURT:  Go ahead.

12        MR. FONTI:  The second component, your Honor, is the

13  reimbursement of expenses and lost wages provided for under the

14  Private Securities Reform Act, the PSLRA, for a payment of

15  roughly $3,645 to the New Orleans Retirement System which was

16  active lead plaintiff.  The court is well familiar with the

17  provision of the PSLRA that provides for the reimbursement of

18  expenses and lost wages to a lead plaintiff, statutorily

19  provided.  Your Honor has awarded in the past, the court has

20  awarded in the past such reimbursements to lead plaintiffs;

21  indeed, in Winstar awarded a reimbursement of roughly $60,000.

22  Here the amount at issue is far smaller.  It's about $3600, as

23  articulated in the papers.  This is for any out-of-pocket

24  expense, if any, and the time that the New Orleans Retirement

25  System put in to overseeing the case over the course of eight

F7S9HENC

1    years, being part of class discovery as well as being part of

2    the settlement process and the time commitment put into the

3    matter.  And that request is also met without any objection.

4         Barring any questions from the Court, I'll move on to

5    the fee which is, in fact, met with an objection.  I'll

6    articulate the grounds for the fee.

7         THE COURT:  Yes.

8         MR. FONTI:  The fee request that's made today, your

9    Honor, is for 30 percent of the common fund that will be

10   created as a result of the settlement.  This fee request is

11   consistent with what the Court has done in prior securities

12   litigations.  Not only your Honor has ruled and granted such

13   fee requests but courts within this district, within the Second

14   Circuit and nationally, have awarded fees in line with what is

15   being requested here today.

16        The fee request could be looked through and assessed

17   reasonableness through a variety of lenses.  I think most

18   important and most authoritative is that set forth by the

19   Second Circuit in the Goldberg case where the Second Circuit

20   said that a percentage fee is an appropriate award, using a

21   percentage of the common funds is an appropriate measure of

22   awarding fees.  And, in fact, the trend in this circuit and the

23   trend even nationally has been toward percentage fee awards.

24   In the Goldberg case, the court set forth a number of elements

25   to be assessed in looking at the reasonableness of the fee.

1    We've set that forth in the papers and I'll summarize for your

2    Honor and for the record what those elements are.

3         The first is the time and labor expended.  As the

4    court is fully familiar, this case began in 2007.  And over the

5    intervening years over 28,000 hours of attorney time have been

6    dedicated by class counsel and the other lawyers working in the

7    case.  That is a very significant number of hours, obviously.

8    But one fact remains, that nearly 70 percent of that effort was

9    a dedication of eight specific attorneys.  We believe that

10   reflects the efficiency, the persistence, bringing to bear the

11   institutional knowledge of the case where a small group of

12   attorneys dedicated a very substantial amount of their time and

13   resources towards the prosecution of this case over a very long

14   period of time.  If we were to tabulate what the -- essentially

15   what the bill would be for that time over the years at market

16   rates, the total value of that time is roughly $14.3 million.

17        Those are very high level quantifications of the time

18   and labor expended.  But as the Court is fully familiar, this

19   is a case that began without any criminal investigations or

20   parallel government actions or parallel litigation.  This is

21   the only case in which the class will recover for the alleged

22   wrongdoings here.  Class counsel had no roadmap, had no benefit

23   of other proceedings in developing this case.  So through the

24   course of fact discovery -- through the course of the

25   investigation, the development of the allegations, as your

1    Honor knows, this was not a simple case to get past the motion

2    to dismiss.  In fact, we had to take a trip to the Second

3    Circuit on very complicated issues and the application of what

4    was then a very new Supreme Court case, the Tellabs decision,

5    and back down to your Honor for discovery, all the way through

6    summary judgment and, as I said weeks before trial, including

7    19 fact depositions, five expert depositions and a very full

8    record in a hotly contested litigation.

9         The second category of factors under Goldberg is the

10   risk of the litigation.  The settlement that I've just

11   presented bears on the risk of the litigation without having

12   the benefit of other proceedings to look at.  This was a case

13   in which liability was far from certain.  And, in fact, we

14   didn't prevail the first time on the motion to dismiss and our

15   articulation of what the case was about but developed the case

16   through discovery.  And your Honor undertook a very detailed

17   analysis of the record that had been developed by counsel here

18   at summary judgment, denying in full the multiprong attack that

19   defendants made at that juncture, moving on I believe nine or

20   so grounds for summary judgment on every element of the claim.

21        That's not to say that being able to prove our claims

22   at trial was anything but a sure thing.  It was a very highly

23   complicated case dealing with accounting issues, internal

24   controls, a complex, high-tech industry.  So the risk of

25   proving liability at trial was very significant and something

1    we took very seriously.

2          Over the course of the case we, in fact, bore

3    significant legal risks.  The Supreme Court, over those eight

4    years, assessed and took under certiorari a number of very

5    significant cases that would have very much -- could have, if

6    defendants prevailed in those cases, upended the securities law

7    regime as we knew it at the time the case was brought.  The

8    most recent decision was that in Halliburton II which was a

9    case that decided whether or not the front of the market, which

10   was a presumption, would continue forward.  Had plaintiffs in

11   that case lost, this case would have been excruciatingly

12   difficult to prove as a class and would have certainly altered

13   the economic value of it.  Those are risks that we, as

14   plaintiffs' counsel, fully took on, continuing to advance all

15   of the costs and putting our time in without certainty of

16   compensation.  We also, of course, could have resolved the case

17   at an earlier juncture in view of those risks for a far less

18   amount rather than establishing and proving the case through

19   the juncture at which it was settled.

20         The risk of loss causation and damages is a

21   substantial risk, and your Honor ruled on some of those

22   elements of loss causation at summary judgment; meaning, simply

23   that we could put on trial the expert evidence around the

24   corrective statements here, those five corrective dates, which

25   we needed to prove in whole to establish our damages theories.

And even under a best case scenario, the damages analysis

rendered damages to the class of somewhere between 125 million,

based on certain assumptions, up to about 272 million under a

best case scenario.  As we articulate in the Johnson

declaration at paragraph 108, damages very easily could have

been at trial somewhere in the neighborhood of $40 million.

And certainly defendants' estimate of damages was that there

were none, that the false statements alleged here were not

material; that they were amply forewarned; that there was no

fraudulent attempt, even to the extent there was a mistake made

it was not fraudulent in nature and that we bore the burden of

proving it.  So in view of the risk that either we would lose

on the merits and have zero damages or that our theories of

liability damages would not pan out, we bore significant risk.

As Ms. Zeiss articulated, this is a contingent case.

That is the reason for the percentage fee request.  And we, as

your Honor knows, have not been paid a penny over the eight

years of prosecuting this.

The Goldberg case also looks at the magnitude and

complexity of the case.  And I think I articulated many of the

factors it that weigh in favor of the fee with respect to

magnitude, complexity and the nature of the accounting and the

internal control issues and the technical issues of the

company.  And, again, that is -- those are issues we had to

navigate solely without the benefit of any other proceeding out

1    there.

2         The quality of representation is something that the

3    Goldberg case points to.  Your Honor is familiar with the

4    practice that we have brought to bear here and the

5    professionalism that we have attempted to prosecute this case

6    and present it to the court, and I believe it speaks for

7    itself.  But one point worth making is the persistence with

8    which we pursued this case.  Given all of the risks and points

9    of inflection over the eight years, this case could have been

10   resolved at an earlier juncture for certainly less.  But we

11   persisted through to the end.

12        And the final Goldberg factor is the public policy

13   interest.  It's articulated in our papers.  The Supreme Court,

14   again, in the Halliburton II decision reemphasized the

15   importance of the securities class actions and the role of

16   private lawyers to bring such cases when government entities

17   either don't have the resources or the governmental interest in

18   pursuing them.

19        The second lens through which the court can assess the

20   case and the fee request is what is called the lodestar

21   crosscheck.  I intimated earlier that if you took the 28,130

22   hours billed in this case that would amount to $14.3 million.

23   The Second Circuit has acknowledged in the Wal-Mart case back

24   in 2005 that, in fact, a multiple of the lodestar is reasonable

25   under certain circumstances and that a multiple as high as five

1  under certain circumstances can be appropriate.

2          Here, however, we're not asking not only for a

3  multiple, we're asking for a fee that represents a discount

4  over the time expended.  We are seeking a 30 percent fee, which

5  represents only 63 percent of the value of the time we've put

6  into this case.  We think that's an appropriate fee.  It's one

7  that has been negotiated with the institutional lead plaintiffs

8  here.  That's a third lens through which the court can assess

9  the fee, that two institutional plaintiffs who are fiduciaries

10  not only to the class, as class representatives, but

11  fiduciaries to their own beneficiaries as pension systems,

12  oversaw this case, familiar with what lead counsel, class

13  counsel have done here, the effort undertaken, the risks

14  surmounted, and have authorized us to seek a 30 percent fee.

15          I think the final lens through which the court may

16  assess the fee is through what your Honor has done in other

17  cases as well as other district courts in this district, in

18  this circuit as well as nationally.  Certainly a fee of

19  30 percent is in line with what your Honor has awarded in cases

20  like Perry, and Dewey Dolan, Provo, and Winstar.  Those are

21  some recent decisions.  But Judge McMahon recently awarded such

22  a fee in the Aeropostale case, and other Second Circuit

23  district courts have awarded fees of 30 percent, in fact, in

24  settlements much larger than this one, including Merck-Medco,

25  the Amaranth case, the Priceline case.  And we've summarized

1    those cases from pages 5 through 8 of our brief, fully cites

2    those cases and articulates them.

3           So I'd like to move on, your Honor, to the objection,

4    addressing the objection.

5           THE COURT:  Yes.

6           MR. FONTI:  As Ms. Zeiss articulated, after having

7    sent out 65,000 plus notice packets, we have one objection from

8    Mr. Brown.  And Ms. Zeiss has touched on the standing and the

9    serial objector elements of the objection.  But we know your

10   Honor, at least address the objection, and rule on it today.

11   And he takes issue with the fee and so I'll address those

12   objections.

13          The objection is very similar to the one that your

14   Honor ruled on in the Sanofi litigation and, in fact, as it

15   relates to the fee, there are almost verbatim parallels.

16          He says in point three of his objection that no fees

17   should be withheld to assure oversight of the settlement.  That

18   overlaps with what Ms. Zeiss articulated that your Honor has,

19   the court has oversight of this settlement.  It is routinely

20   the case that class counsel is awarded fees and continues its

21   oversight which is not only required by the court's order but

22   is customary practice.

23          The Labaton firm, which is the court-appointed class

24   counsel, has overseen the administration of literally billions

25   of dollars in class settlements and has an ungarnished track

F7S9HENC

1    record in doing so and doing so promptly.  And your Honor

2    ultimately will have jurisdiction over the final distribution

3    of the settlement.

4           On top of that, we have not been paid at all.  And so

5    this is the appropriate juncture at which class counsel should

6    be awarded its fees and rest assured that class counsel will

7    oversee and promptly resolve the distribution process.

8           Points four and six of his objections, which also

9    touch on fees, speak to the concern that fees should not be

10   awarded because the amount to be paid to the class is

11   uncertain.  That is just simply wrong.  It seems to be a

12   vestige of what Mr. Brown may view as what we call a

13   claims-made settlement; in other words, you reach a settlement

14   with defendants, depending on the volume of claims that come

15   in, defendants will pay to the class on a claims-made basis.

16          Here, that's not the case.  We have a common fund that

17   was created.  Defendants are paying to the class $30 million.

18   The class will receive a pro rata proportion of that amount

19   minus fees and expenses.  So we know the finding first of what

20   the class will recover.  And so those particular objections are

21   without merit on the basis that we know what the class will

22   recover.

23          Point seven.  Mr. Brown says that the fee is not

24   reasonable absent documentation of the actual fee, in other

25   words, access to our billing records.  Certainly the court --

it's in the court's prerogative to access those records if it
should.  But the entire premise of the Goldberg decision is
that a percentage fee is a more appropriate, efficient way for
the court to address a fee award.  It is not in, in our view
and the view of other courts that the decide these kinds of fee
applications, in the interest of the judiciary to wade into the
records.

He also says in point nine that a fee percentage is a
disproportionate percentage.  He says that categorically.  He
does not explain the reasoning of why a 30 percent fee is
disproportionate.  He doesn't do anything to distinguish the
elements of Goldberg that we've just gone through and why, for
some reason, we have not satisfied the Goldberg standard.  He
does nothing to distinguish this case from other cases that
your Honor and other district court judges have awarded such
fees.  And he does nothing to say that the process by which
lead plaintiffs negotiated these fees somehow doesn't warrant
the award.

His final point is touched on in his sixth objection.
And he says, "Fees must be limited to the lodestar
calculation."  I think we let that one speak for itself in that
we're not seeking the lodestar in this case.  We're seeking a
discount.  We're seeking 63 percent of the lodestar.  Had we
been asking for the lodestar billed in this case, our billable
time, it would reflect a fee of 48 percent, and we're just

F7S9HENC

1    simply not asking for that.  So I think your Honor can take for

2    what it's worth in terms of what that objection states.

3          We ask respectfully that the court overrule the

4    objection on the grounds that Ms. Zeiss articulated, the

5    standing, failure to provide proof as well as the merits set

6    forth here.  We respectfully ask your Honor enter an order

7    approving the settlement and the order approving the award of

8    attorneys' expenses, lead plaintiffs' expenses, and the award

9    of attorneys' fees.

10          Thank you, your Honor.

11          THE COURT:  Tell me more specifically with regard to

12   particularly the proposed order, paragraph three of the

13   proposed order on attorneys' fees and expenses.  You discuss

14   the alternative -- well, you discuss interest applicable to

15   both the fees and to the expenses.  How do you intend to handle

16   that?  What do you anticipate those to be?

17          MR. FONTI:  The funds, after your Honor ordered

18   preliminary approval, $30 million are put into escrow.  Those

19   funds were then used to buy Treasury securities that accrue

20   interest.  The class and -- has been accruing interest since

21   that point in time.  This simply requests that to the point in

22   time when we withdraw our fees we get our percentage of

23   interest, the same as the class will get on its proceeds, and

24   that interest will continue to build until the class is

25   distributed.

F7S9HENC

1        THE COURT:  For that time period that the funds are

2    accumulating interest?

3        MR. FONTI:  Correct.

4        THE COURT:  Not from the beginning?

5        MR. FONTI:  This is not prejudgment interest.  This is

6    just the interest accumulated in the account while it was

7    sitting in the Treasury.

8        THE COURT:  My understanding of what you're proposing

9    is that either you get the specific amount plus interest that

10   is laid out in paragraph three or a flat 30 percent of the

11   total settlement fee which would cover both attorneys' fees and

12   interest.

13       MR. FONTI:  Right, your Honor.  I think this is sort

14   of belts and suspenders.  The 9 million is 30 percent.  So

15   we're asking for a fee of 30 percent or $9 million plus

16   interest and separately expenses.  I think we just worded it

17   in, as I said, a belts and suspenders kind of way, but it's the

18   same dollar amount.

19       THE COURT:  I thought 10 million was 30 percent.

20       MR. FONTI:  The settlement is 30 million and

21   30 percent of that would be nine.  Expenses would be on top of

22   that.  One million -- the 1,392,450 are out-of-pocket expenses

23   which are in addition to the fee.

24       THE COURT:  I understand.  So it's 9 million plus the

25   1.3 in expenses?

1          MR. FONTI:  Correct, your Honor.

2          THE COURT:  That's why I didn't understand the

3     parenthetical.  The parenthetical says or 30 percent of the

4     settlement fund which includes interest.

5          MR. FONTI:  I think, your Honor, that is surplusage

6     and I think we could -- we intended to mean the same thing, but

7     to articulate it both as a dollar amount and as a percentage.

8     If the court were to strike out the parenthetical, the effect

9     would be the same.  I see the potential for confusion.

10          THE COURT:  So 30 percent of the settlement fund plus

11     interest; not 30 percent of the settlement fund which in

12     itself --

13          MR. FONTI:  Correct.

14          THE COURT:  -- includes the interest.

15          MR. FONTI:  I think -- maybe Ms. Zeiss might have a

16     different articulation that's clearer than mine.

17          MS. ZEISS:  I will try.

18          THE COURT:  That's the way I read it.

19          MS. ZEISS:  The settlement amount -- pursuant to the

20     settlement agreement, the settlement amount is 30 million.  The

21     settlement fund is 30 million plus interest.  So it's just a

22     different way of capturing the 30 million plus interest.

23          THE COURT:  Well the 90 plus interest is more money

24     than 30 percent of the settlement fund, which includes

25     interest.

F7S9HENC

1          MS. ZEISS:  Right.  30 percent of the settlement fund,

2     there is no extra interest.  Settlement fund already includes

3     interest.  We can just strike that.

4          MR. FONTI:  It's been sitting in the bank.  So it's

5     accruing interest.  And that settlement fund is what it is

6     today.  We could strike the parenthetical.

7          THE COURT:  No.  I understand.  30 percent of the

8     settlement fund.  So you're saying 9 percent of the -- you're

9     saying 9 million is 30 percent of the amount of money that was

10     deposited into the settlement fund.

11          MS. ZEISS:  Yes.

12          THE COURT:  And then it has subsequently accrued

13     interest.

14          MR. FONTI:  Correct.

15          THE COURT:  The parenthetical is 30 percent of what's

16     in the settlement fund.

17          MS. ZEISS:  Right.

18          THE COURT:  As of the time of the paying of the fee,

19     which would be what was deposited in the settlement fund plus

20     what interest had accumulated during that period of time.

21          MS. ZEISS:  Right.

22          MR. FONTI:  Yes, your Honor.

23          THE COURT:  Okay.  That's fine.  That I understand.

24          Let me just see.

25          Mr. Geraci, did you want to add anything at this

F7S9HENC

1    point?

2              MR. GERACI:  No, your Honor.  The defendants are

3    obviously satisfied with the settlement or we wouldn't have

4    agreed to it.

5              THE COURT:  Then I've reviewed the papers and I have

6    also considered the objections.

7              I'm going to overrule the objections.  I find in

8    substance the objections are not valid objections to the nature

9    of the settlement and I can really characterize them as general

10   boilerplate objections without anything real specific with

11   regard to why this particular settlement is somehow unfair to

12   the class and the class members.  Also, it's not been

13   established that Mr. Brown is technically in a position to

14   object having not demonstrated that he is, in fact, a class

15   member.  But even if that issue is overcome, I find that his

16   objections on their substance lack merit.

17             I find that the settlement is fair and reasonable,

18   adequate for the class.

19             I find that the attorneys' fees are also reasonable in

20   this case given the factors to be considered, lodestar and the

21   other factors to be considered with regard to the nature of the

22   fees.

23             So, therefore, I'm prepared to order final approval of

24   the settlement into a final -- the proposed final order and

25   judgment.

F7S9HENC

1        I'm prepared to order approval of the plan of

2   allocation and sign the proposed order with regard to that and

3   also approve the award of attorneys' fees and expenses as

4   articulated and will sign the proposed order with regard to

5   attorneys' fees and expenses.

6        I will obviously maintain jurisdiction over this case

7   with regard to distribution and final payment in this case but

8   otherwise I will close the case in the active docket and reopen

9   it as necessary with regard to substantive filings or any

10  issues that arise with regard to distribution in this case.

11       Is there anything else that plaintiffs --

12       MS. ZEISS:  No, your Honor.

13       MR. FONTI:  No, your Honor.

14       THE COURT:  Anything else from defense?

15       MR. GERACI:  No, your Honor.  It's been a long road.

16  Eight-and-a-half years.  It's always been a pleasure appearing

17  before you and we appreciate everything the court has done for

18  us.

19       THE COURT:  Sure.  I hope to see you again sometime.

20       I will have it on the docket today.

21       (Adjourned)

22

23

24

25